LAW OFFICES OF

# GERALD B. LEFCOURT, P.C.

A PROFESSIONAL CORPORATION

1776 BROADWAY, SUITE 2000

NEW YORK, N.Y. 10019

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

———

SHERYL E. REICH
reich@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

December 12, 2019

<u>VIA ECF</u>

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

*United States v. Kukushkin, et al.* 19 CR. 725 (JPO)

Dear Judge Oetken:

We are counsel to Andrey Kukushkin, a defendant in the above referenced matter.  We write on behalf of all defendants with regard to the defense's request pursuant to 18 U.S.C. § 3504, that the government be required to (a) inquire of government agencies and "affirm or deny" whether the defendants' oral or wire communications, including written communications, have been intercepted by means other than Title III or FISA warrants,[1] including by means of Executive Order 12333 ("E.O. 12333") and other surveillance; and (b) if so, to identify such evidence and delineate all fruits thereof.

## The Government's Covert Surveillance of United States Citizens

The Foreign Intelligence Surveillance Act ("FISA") was enacted in 1978.  It was the result of extensive multi-year investigations into unlawful executive branch domestic surveillance activities.  Those investigations were prompted by President Richard Nixon's use of federal resources, including law enforcement, to spy on political and activist groups. FISA was created to provide oversight, both judicial and congressional, of the government's covert

---

[1] The government has denied procuring evidence pursuant to Title III or FISA warrants.

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 2

surveillance activities within the United States related to matters of national security, and is meant to proscribe surveillance of United States persons pursuant to the Act in all but limited circumstances.

In 1981, President Ronald Reagan signed E.O. 12333.  It is the primary authority for the NSA's foreign intelligence gathering.  Addressed to "detecting and countering" "[t]hreats to the [United States] and its interests from terrorism" it authorizes intelligence agencies to create policies and procedures to accomplish E.O. 12333's goals without court involvement or oversight.  The breadth of E.O. 12333 is so far reaching that even though directed to activities outside the United States by foreign persons and governments, it permits the collection, retention, and dissemination of information concerning United States persons that is "incidentally obtained", if that information "may indicate involvement in activities that may have violated Federal, state, local, or foreign law".  E.O. 12333, Part 2, § 2.3(i).  With this broad directive, the advent of more advanced surveillance techniques, and global interconnectedness, it is not surprising that the line between domestic and foreign surveillance has blurred, and along with it the line between FISA surveillance (requiring notice and judicial process) and E.O. 12333 surveillance (which the government contends can be maintained in secrecy and insulated from judicial review).

We now know United States agencies have the ability to and under the auspices of E.O. 12333 engage in bulk surveillance programs, not subject to judicial or congressional oversight,[2] by which they (1) collect metadata and audio files of every cell phone call to, from and within certain countries;[3] (2) intercept the private data of hundreds of millions of Google and Yahoo

---

[2] Per the NSA, "FISA only regulates a subset of NSA's signals intelligence activities.  NSA conducts the vast majority of its SIGINT [signal intelligence] activities solely pursuant to the authority provided by Executive Order (EO) 12333".  NSA Legal Fact Sheet: Executive Order 12333 (June 19, 2013).

3 Amos Toh, Faiza Patel, & Elizabeth Goitein, *Overseas Surveillance in an Interconnected World,* Brennan Center, March 16, 2016, at p. 5
(www.brennancenter.org/sites/default/files/publications/Overseas_Surveillance_in_an_Interconnected_World.pdf) ("Under a program codenamed NYSTIC, the NSA fathers information about every cell phone call made to, from and within the Bahamas, Mexico, Kenya, the Phillipines, and Afghanistan... In the Bahamas and Afghanistan, the NSA ... goes further and stores for thirty days an audio recording of every cell phone call placed to, from, and within these countries using a system codenamed SOMALGET... the NSA reportedly intends to expand the program to more countries and may already have done so".); *see also* Patrick C. Toomey et al., ACLU Letter to Privacy and Civil Liberties Oversight Board, January 13, 2016, at pp. 5-7 (www.aclu.org/letter/aclu-comments-privacy-and-civil-liberties-oversight-board-its-review-executive-order-12333).

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 3

customers as it is routed to data centers outside the United States;[4] (3) conduct "backdoor searches" of Section 702 data for information about U.S. persons;[5] (4) collect personal information from email and instant messaging accounts, many belonging to Americans;[6] and (5) conduct daily sweeps of text messages around the world.[7]   And if that were not enough, law enforcement efforts to avoid disclosure of such techniques, including through a process aptly entitled "parallel construction," also are well documented.  *See* Sarah St. Vincent, *Dispatches: U.S. Surveillance Court Opinion Shows Harm to Rights*, Human Rights Watch, April 22, 2016 (detailing government "use" of data seized under § 702 FISA in the investigations of "any federal crime" but noting apparent policy of non-disclosure to criminal defendants"); *see also* B. Heath, *FBI Warned Agents Not To Share Tech Secrets With Prosecutors*, USA Today, April 20,

---

[4] Charlie Savage, *Reagan-Error Order on Surveillance Violates Rights, Says Departing Aide,* N.Y. Times, August 13, 2014 ("Large email companies like Google and Yahoo have built data centers abroad, where they store backups of their users' data.  Mr. Snowden disclosed that in 2012 the N.S.A....penetrated links connecting the companies' overseas data centers and collected 181.3 million records in 30 days".).

[5] Ronald Newman and Neema Singh Guiliani, *ACLU Letter to U.S. Senate Judiciary Committee*, November 5, 2019, (www.aclu.org/letter/aclu-statement-record-senate-judiciary-committees-reauthorizing-usa-freedom-act-2015-hearing) ("Section 702 explicitly prohibits the government from targeting U.S. persons.  The government nevertheless searches Section 702 data looking specifically for information about U.S. persons, a practice often referred to as a "backdoor search." This permits Section 702 to be exploited as a tool against Americans in foreign intelligence and domestic criminal investigations alike....While the FBI refuses to report the number of backdoor searches it performs, the Privacy and Civil Liberties Oversight Board reports that the number of these searches is 'substantial,' in part because it is 'routine practice' for the FBI to conduct a query when an agent initiates a criminal assessment or investigation related to any type of crime") citing Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Sec. 702 of the of the Foreign Intelligence Surveillance Act,* July 2 2014 (https://www.pclob.gov/library/702-Report.pdf).

[6] Barton Gellman & Ashkan Soltani, *NSA Collects Millions of Email Address Books Globally,* Washington Post, October 14, 2013 (https://www.washingtonpost.com/world/national-security/nsa-collects-millions-of-e-mail-address-books-globally/2013/10/14/8e58b5be-34f9-11e3-80c6-7e6dd8d22d8f_print.html ) ("During a single day last year, the NSA's Special Source Operations branch collected 444,743 e-mail address books from Yahoo, 105,068 from Hotmail, 82,857 from Facebook, 33,697 from Gmail and 22,881 from unspecified other providers, according to an internal NSA Powerpoint presentation. Those figures, described as a typical daily intake in the document, correspond to a rate of more than 250 million a year.... Although the collections take place overseas, two senior U.S. intelligence officials acknowledged that it sweeps in the contacts of many Americans... likely to be in the millions or tens of millions".).

[7] Amos Toh, Faiza Patel, & Elizabeth Goitein, *supra*, at p. 6, ("The NSA uses a program codenamed DISHFIRE to gather the content and metadata of hundreds of million of text messages from around the globe, and stores the information in a database that is also accessible to [British intelligence]".).

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 4

2016 ("…there's usually no need for the case agents or prosecutors to know how something was done".); Savage, *supra* at note 4 (government avoids using E.O. 12333 information as direct evidence in criminal cases "so as not to have to divulge its origins … in court…officials contend that defendants have no right to know if 12333 intercepts provided a tip from which investigators derived other evidence".); Brian Fung, *The NSA Is Giving Your Phone Records to the DEA and the DEA is Covering It Up,* Washington Post, August 5, 2013; Shiffman & Cooke, *Exclusive: U.S. Directs Agents To Cover Up Program Used To Investigate Americans*, Reuters, August 5, 2013 ("federal agents are trained to 'recreate' the investigative trail to effectively cover up where the information originated…").

**Procedural Background**

With this backdrop, in the days leading up to and following his arraignment, Mr. Kukushkin's counsel sought to discover whether in the course of its investigation Mr. Kukushkin's communications were intercepted or overheard by the government.  After all, among other things, the charges involved foreign nationals, foreign money, and foreign communications, and the indictment contained what the government purports are direct quotes of messages between the defendants.  The government responded by advising counsel that no Title III warrants or intercepts had been obtained as part of the investigation.  The defense specifically inquired as to whether non-Title III interceptions had been authorized or obtained, including as a result of FISA warrants, National Security Letters, or any other form of NSA or intelligence agency surveillance, which would include all Executive Order ("E.O.") 12333 surveillance. Curiously, the government's response remained that "the government did not obtain or use Title III intercepts" during its investigation.

Not satisfied with the government's oral representations, on November 26, 2019, Mr. Kukushkin submitted a written request pursuant to 18 U.S.C. §3504, that the government conduct a search of the appropriate agencies and "affirm or deny" whether Mr. Kukushkin's communications were intercepted by means other than a Title III warrant. *See* Exhibit "A".  On December 1, 2019, the government again responded that it did not obtain or use Title III intercepts during the course of this investigation. *See* Exhibit "B".  In addition, the government, without denying its existence, stated that it "does not intend to use any information that was obtained or derived from the Foreign Intelligence Surveillance Act or the other forms of surveillance identified" in Mr. Kukushkin's request. *Id.*  The government further contended that the defense had not presented a sufficient basis for its request and that the request was premature

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 5

because it applies only to "proceedings and not discovery". *Id.* The government reiterated the
same arguments when the issue was raised during the December 2, 2019 status conference.

The government has no basis to refuse the defendants' request and should be ordered to
conduct an inquiry of its agencies and "affirm or deny" whether the defendants' oral or written
communications were subject to surveillance and/or intercepted by the government by means
other than a Title III warrant, and whether any evidence the government presented to the grand
jury or which it intends to introduce at trial was obtained in this manner or otherwise derived
therefrom.

**Applicable Law**

Oral and written communications intercepted in violation of federal law and the United
States Constitution are not admissible. The prohibition applies equally with respect to evidence
sought to be admitted at trial and that sought to be admitted in any grand jury proceeding. 18
U.SC. § 2515. The fruits that flow from that evidence are similarly inadmissible. *Id.*; *Gelbard v.
United States,* 408 U.S. 41, 46 (1972); *Wong Sun v. United States,* 371 U.S. 471, 486-88 (1963)
(explaining "fruit of the poisonous tree" doctrine); *Murray v. United States,* 487 U.S. 533, 536-
37 (1988) (as to right to seek suppression of evidence "derived" from an unlawful search).

In order to vindicate and protect their rights, defendants are entitled to test – in an
adversarial proceeding – whether the government's evidence is the direct product of or derived
from illegal surveillance. *United States v. U.S. District Court,* 407 U.S. 297 (1972) (unanimously
declaring non-court ordered interceptions illegal and violative of the Fourth Amendment)
("Official surveillance, whether its purpose be criminal investigation or ongoing intelligence
gathering, risks infringement of constitutionally protected privacy of speech.
Security surveillances are especially sensitive because of the inherent vagueness of the domestic
security concept, the necessarily broad and continuing nature of intelligence gathering, and the
temptation to utilize such surveillances to oversee political dissent. We recognize, as we have
before, the constitutional basis of the President's domestic security role, but we think it must be
exercised in a manner compatible with the Fourth Amendment".); *Alderman v. United States,*
394 U.S. 165 (1969); *see also, Wong Sun v. United States,* 371 U.S. at 486-88 (1963); *Murray v.
United States,* 487 U.S. at 536-37. Of course, before one can seek to suppress illegally obtained
evidence and the fruits thereof, the existence of such evidence and the manner by which it was
obtained must be ascertained. Put another way, without notice of the evidence and discovery
with respect to the means by which it was collected, a court has no mechanism to "provide the

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 6

scrutiny which the Fourth Amendment exclusionary rule demands". *Alderman v. United States,* 394 U.S. at 184, 184-85; *see also, Berger v. New York,* 388 U.S. 41, 60 (1967).

Section 3504 was enacted to benefit and protect the rights of victims of illegal electronic surveillance. *See Hearings on S. 30 Before Subcomm. No. 5 of the House Comm. On the Judiciary,* 91st Cong., 2nd Sess. 84, 104 (1970); *see also Gelbard v. United States,* 408 U.S. at 56. The statute provides that "upon a claim" by a defendant that either direct or derivative evidence was the subject of an unlawful seizure, the government must "confirm or deny" the existence of that purported unlawful seizure:

> (a) In any trial, hearing, or other proceeding in or before any court . . . of the United States—
>
> (1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim *shall affirm or deny the occurrence of the alleged unlawful act.*

18 U.S.C. § 3504 (emphasis added). "Unlawful act" is defined as "the use of any electronic, mechanical, or other device . . . in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto". 18 U.S.C. § 3504(b).

A request pursuant to § 3504, while requiring more than "mere suspicion", need not be based on a "particularized" claim. All that is necessary is a "colorable basis" to trigger the government's obligation to inquire and respond. *See United States v. Pacella,* 622 F.2d 640, 643 (2nd Cir. 1980); *accord* CRM at 36 ("'mere assertion' ... generally been sufficient to raise a claim under 18 U.S.C. 3504 (*see In re Evans*, 452 F.2d 1239, 1247 (D.C. Cir. 1971), *cert. denied,* 408 U.S. 930)", although "there is some indication that courts are beginning to raise the threshold." *citing e.g. In re Millow,* 529 F.2d 770, 774-775 (2d Cir. 1976) (claim lacks any colorable basis; objection should be raised to the search on that ground)). Once the defendants have met the initial threshold, it is incumbent upon the government to respond.

Of course, in order to comply with its obligations under § 3504, the government must necessarily apprise itself of the facts upon which its response will be based. Accordingly, the Department of Justice has created a procedure, known as the "all agency search", conducted in

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 7

Washington, D.C. by trained researchers who search records maintained by the government for the purpose of keeping track of electronic surveillance:

> Generally, the government has an obligation pursuant to the provisions of 18 U.S.C. § 3504, to conduct a search of the appropriate agencies and to affirm or deny a claim that a defendant has been illegally overheard. This search is initiated at the request of the United States Attorney, to the Policy and Statutory Enforcement Unit of the Office of Enforcement Operations of the Criminal Division, and the results of the check are reported to that office.

Criminal Resource Manual at 36.

The government's conclusory assertions aside, the defendants undoubtedly have established a "colorable basis" sufficient to trigger the government's inquiry obligations, and the government should be ordered to undertake a comprehensive "all agency search". Indeed, if ever a case cried out for the government to conduct such a review and return its findings, this is it.

## Colorable Basis For the Request

As congress and the courts recognize, the very nature of the information sought makes it difficult to articulate with any particularity the bases for defendants' request. Defendants who are in possession of compelling "proof" that the government engaged in illegal electronic surveillance need not avail themselves of § 3504, as the acknowledgment of government wrongdoing is unnecessary to proceed with a motion to suppress. Instead, § 3504 is meant to be invoked by those defendants who, although they have a "colorable basis" for their claim, lack the proof necessary to demonstrate their communications were illegally. Such is the case here.

This case involves foreign nationals, foreign government officials, foreign communications, foreign travel, foreign wires, and issues of national security. More specifically, the indictment and search warrant refer to the involvement of a purportedly Russian national (Foreign National-1), residing abroad, who, according to the government, has no legal status in the United States. Allegations of foreign sources of money, including from Russia and South Korea, being used for contributions to Republican linked political committees, including those connected to the President, as well as campaigns of other high-ranking politicians and political candidates, in contravention of federal election laws, also abound. And, the government contends that certain of the defendants in this case undertook efforts to "remove" the former United States

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 8

Ambassador to the Ukraine, "at least in part, at the request of one or more Ukrainian government officials" (indictment at p. 8, ¶17), and that in connection with those efforts those defendants communicated with high-ranking officials of the United States government and worked with Ukrainian government officials.

If that were not enough, many of subjects of the government's investigation, including some number of the defendants, are alleged and known by the government to have traveled overseas, including within Russia and the Ukraine, during the course of the charged criminal conduct. Indeed, the government cited the defendants' purportedly vast foreign travel and international connections, including Mr. Parnas' relationship with an indicted Ukrainian oligarch being sought by the United States for extradition from Vienna, as bases to impose onerous bail conditions and deny any modifications thereto.

In addition, from the recent congressional impeachment inquiry and subsequent congressional reports (in which Mr. Parnas is identified by name), not to mention media reports, it is clear that the allegations involve matters of national security and conduct and communications of United States and foreign political leaders. And from these same sources we know with little doubt that United States intelligence officers and agencies have and continue to be involved in the matter.

Moreover, the government's own statements demonstrate that there is a "colorable basis" to believe unauthorized surveillance occurred. In the face of repeated and direct requests as to the existence of such evidence, that is interceptions of oral and written communications by means other than Title III warrants, the government has offered not a single denial. Rather, it has engaged in obvious subterfuge, insisting repeatedly the mantra "no Title III warrants were used in this investigation". Of course, whether Title III warrants were used is not the information the defendants have sought from the government and the government's insistence on ignoring this fact is telling.

The government fairs not better with its averment that "it does not intend to use" such evidence – without acknowledging whether such evidence exists. It too simply begs the question and does not obviate the need for the requested information. The defendants are entitled to know whether the government overheard or intercepted their communication and whether other evidence, particularly evidence that was submitted to the grand jury or which the government intends to introduce at trial, was derived therefrom. *See United States v. Belfield*, 692 F.2d 141, 146 (D.C. Cir. 1982) (in FISA context "even when the Government has purported not to be

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 9

offering any evidence obtained or derive from electronic surveillance, a criminal defendant may claim that he has been the victim of an illegal surveillance and seek discovery of the logs of the overhears to ensure that no fruits thereof are being used against him").

Nor is the defendants' request premature. Without authority or further explanation, the government contends that demands under § 3504 are appropriate only to "proceedings not discovery". The government seemingly ignores that there is a proceeding – this criminal prosecution that will lead to a trial. The argument also ignores, or at least misapprehends, the government's Rule 16 discovery obligations; an issue the Department of Justice's own Office of the Inspector General has identified as concerning (*See* DOJ OIG Annex to the Report on the President's Surveillance Program, July 10, 2009, at 35 ("We found that the Department made little effort to understand and comply with its discovery obligations ... We believe that the Department should consider whether it must re-examine past cases to see whether potentially discoverable but undisclosed Rule 16 or *Brady* material was collected by the NSA...") https://oig.justice.gov/reports/2015/PSP-09-18-15-vol-III.pdf). Rule 16(a)(1)(E)(i) requires the government to produce "item[s] material to preparing the defense", we submit that this includes items material to making a suppression motion under Rule 12(b)(3)(C). *United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir. 1993) (Under Rule 16(a)(1)(c), the predecessor to Rule 16(a)(1)(E)(i), evidence "is material if it could be used to counter the government's case or to bolster a defense."). Further, even if that were not the case, Rule 16 (a)(1)(B)(i) commands the government to produce as part of discovery "any relevant written or recorded statement by the defendant...within the government's possession, custody, or control; and [that] the attorney for the government knows – or through due diligence could know - ... exists". The information requested by the defense falls squarely within each of these categories.

Moreover, notions of justice, fundamental fairness and due process command that the defendants not be required to wait until the eve of trial or worse, until trial, to vindicate their rights. The statutes do not contemplate that to be the case, nor have the courts held that to be so. Indeed, in *United States v. Ishan Sharif Khawaja* 05 CR 830 (HB), the Honorable Harold Baer ordered the government, in the context of discovery motion, to respond to a virtually identical request – even in the face of a representation from the Assistant United States Attorney assigned to handle the matter that no statements of the defendant were recorded. In that case, the only asserted grounds for the request were that the defendant and his family were of Afghani descent, the defense believed that post-9/11 the family was investigated to determine whether they had links to terrorism, and the case agent in the transshipment case was a member of the joint terrorism task force. Notably, even before the issue was addressed by the Court, consistent with

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 10

CRM 36, the government submitted a request for the information to the Department of Justice, without objection. *See* Exhibit "C".

**Conclusion**

As the Supreme Court so aptly stated in *United States v. United States District Court*, *supra*:

> ...Fourth Amendment freedoms cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch.  The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. *Katz v. United States*, at 359-360 (DOUGLAS, J., concurring). But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech.

407 U.S. at 316-17.  As government intelligence capabilities and activities expand beyond anything our founding fathers possibly could have imagined, the role of the judiciary as a check on unfettered executive power is ever more important.

In the context of this case, with these facts, and in the face of the government's responses, it is inconceivable that the government did not seek to intercept the defendants' oral and written communications by means other than Title III warrants. The defendants are entitled to know the extent of the government's non-Title III surveillance and interceptions and any evidence derived

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
December 12, 2019
Page 11

therefrom, to challenge such conduct, and vindicate their constitutional rights and privacy interests.

Respectfully submitted,

Gerald B. Lefcourt

cc:     All counsel (via ecf)

EXHIBIT A

LAW OFFICES OF

# GERALD B. LEFCOURT, P.C.

A PROFESSIONAL CORPORATION

1776 BROADWAY, SUITE 2000
NEW YORK, N.Y. 10019

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

—

SHERYL E. REICH
reich@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

## VIA EMAIL

Rebekah Donaleski, Esq.
Nicolas Roos, Esq.
Douglas Zolkin, Esq.
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

*United States v. Kukushkin, et al., Ind. No. 19 Cr. 725 (JPO)*

Dear Counsel:

We write as counsel to Andrey Kukushkin in advance of the status conference scheduled for next Monday, December 2, 2019, to inquire as to the existence of certain potential discovery.

During our discussions, the government has advised that no Title III wiretaps were utilized in the course of this investigation. Of course, Title III wiretaps are not the only form of communication intercepts. In a case such as this, involving multiple foreign nationals, foreign communications, foreign travel, and the like, one can imagine various government agencies using other devices – both with and without warrants – to intercept oral or written communications. To date, the existence of such intercepts or overhearings has neither been confirmed nor denied by the government. Accordingly, pursuant to 18 U.S.C. § 3504, we hereby make a formal request that the government conduct a search of all appropriate agencies to affirm or deny whether Mr. Kukushkin's oral and written communications have been intercepted and whether he has been overheard by the government.

In addition, we request that the government affirm or deny whether Mr. Kukushkin, his co-defendants, or any of his alleged co-conspirators, whether or not indicted, has been the subject of the following forms of surveillance:

LAW OFFICES OF

GERALD B. LEFCOURT, P.C.

Rebekah Donaleski, Esq.
Nicolas Roos, Esq.
Douglas Zolkin, Esq.
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
Page 2

- NSA wiretaps pursuant to a FISA warrant
- NSA or other intelligence warrantless wiretaps
- Warrantless interception of international communications (written or oral)
- Warrantless social media surveillance, monitoring and/or tracking
- A National Security Letter
- A geofence warrant or surveillance
- StingRay or other IMSI surveillance

We thank you for your consideration and look forward to your response.

Very truly yours,

Gerald B. Lefcourt

cc:  All Defense Counsel (via email)

EXHIBIT B

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 1, 2019

**BY EMAIL**

Gerald B. Lefcourt, Esq.
Faith Friedman, Esq.
1841 Broadway Suite 910
New York, NY 10023
Email: lefcourt@lefcourtlaw.com
Email: ffriedman@lefcourtlaw.com

      **Re:**     *United States v. Andrey Kukushkin*, No. 19 Cr. 725 (JPO)

Dear Counsel:

     The Government writes in response to your letter dated November 26, 2019, requesting, pursuant to 18 U.S.C. § 3504, that the Government affirm or deny whether the defendants or their alleged co-conspirators have been the subject of certain forms of surveillance.

     As we have previously told you, the Government did not obtain or use Title III intercepts in the course of this investigation. Additionally, the Government does not intend to use any information that was obtained or derived from the Foreign Intelligence Surveillance Act or the other forms of surveillance identified in your letter. To the extent your letter is intended as a request for discoverable materials under Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Government has already begun producing Rule 16 discovery and will continue to do so on a rolling basis. As noted in our letter dated November 18, 2019, the Government recognizes its obligations under *Brady* and its progeny, and to the extent such material exists, will provide timely disclosure as such material comes to light. Similarly, also as noted in our November 18, 2019 letter, the Government will provide *Giglio* material in a timely manner prior to trial.

     With respect to your request under 18 U.S.C. § 3504 that the Government indicate whether the defendants and their alleged co-conspirators have been the subjects of certain forms of surveillance, that request is solely based on conjecture. Mere suspicions and conjecture do not trigger the Government's duty to respond under Section 3504. *See, e.g.*, *United States v. Dien*, 598 F.2d 743, 746 (2d Cir. 1979) (deeming "frivolous" a request for information under § 3504 when the request lacked "any substantial support for the claim of illegality," and holding that such request "triggered no obligation" for the government to respond); *United States v. Yanagita*, 552 F.2d 940, 943 (2d Cir. 1977) (a request "may not be based upon mere suspicion but must at least appear to have a 'colorable' basis before it may function to trigger the government's obligation to respond under § 3504" (internal citation omitted)). The "imagine[d]" use of surveillance

techniques described in your letter, based solely on the fact that the case involves "foreign nationals, foreign communications, foreign travel, and the like," is not a basis for requiring a response under Section 3504. (Nov. 26, 2019 Ltr. at 1). Moreover, your request under Section 3504 is also premature, because Section 3504 applies by its terms only to proceedings and not to discovery. *See* § 3504(a)(1) ("In any *trial, hearing, or other proceeding in or before any court,* grand jury, department, officer agency, regulatory body, or other authority of the United States . . . upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act . . . the opponent of that claim shall affirm or deny the occurrence of the alleged unlawful act." (emphasis added)). Finally, your request fails to identify any unlawful act or specific evidence derived as a result of any unlawful act. Accordingly, because your request is premature, insufficient, and based only on conjecture, it does not provide a basis for a response under Section 3504.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:    _____/s/_____
       Rebekah Donaleski
       Nicolas Roos
       Douglas Zolkind
       Assistant United States Attorneys
       (212) 637-2423/2421/2418

Cc: All Defense Counsel (by email)

EXHIBIT C

# SERCARZ & RIOPELLE, LLP

CARNEGIE HALL TOWER
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

———

JULIA L. GATTO
*ADMITTED IN NY & NJ

December 23, 2005

**_VIA FAX AND ECF_**

The Honorable Harold Baer
United States District Court
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:** **_United States v. Ishan Sharif Khwaja, 05 Cr. 830 (HB)_**

Dear Judge Baer:

In light of the statements recently made by our President, I would respectfully ask that the Court permit me to make one additional discovery application on behalf of my client, which was not included in the motions filed on December 16. The application is this: that the Court direct the Department of Justice to ascertain from all relevant agencies of the Executive Branch of our government whether any communication (whether oral or email) of my client, or any of the companies with which he was affiliated (i.e. National Electronics, Inc., Taban Company, Inc., Krona Trading, Inc. or Mailtronics, Inc.), was covertly intercepted and/or recorded as part of our national effort to combat terrorism. In connection with this application, I request that the Court also direct the Department of Justice to obtain an affidavit from each such government agency, averring that a search of the agency's records has been done, and that no such communications were intercepted and/or recorded (if that is the case). Of course, if any such communications were intercepted and/or recorded, I ask that they be produced to Mr. Khwaja promptly, and that the Court order such production.

In connection with this application I note that this case was investigated by the Joint Terrorism Taskforce, which I believe did surveillance on the business premises of National Electronics for a period of more than a year before the indictment in this case was returned. I also note that early on in this case AUSA Leung represented to me that no statements of my

The Honorable Harold Baer
December 23, 2005
Page 2

client were recorded, and I have no reason to doubt Mr. Leung's <u>bona fides</u> in making that representation.  However, I note that there have been instances where the fact of surreptitious interception and/or recording of statements has been withheld from the United States Attorney's Office, <u>see</u> <u>United States v. Huss</u>, 482 F.2d 38 (2d Cir. 1973) and, therefore, I believe this application is appropriate, given what seems to have been an ongoing campaign of interception and recording of statements by the Executive Branch of government outside the direct supervision of the Department of Justice.

Respectfully submitted,

S/

Roland G. Riopelle

Cc:     AUSA Wilson Leung, Esq.
        AUSA Lisa Korologos, Esq.

61K8KHWA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              05 Cr. 830 (HB)

5   ISHAN SHARIF KHWAJA,

6              Defendant.

7   ------------------------------x

8                                             January 20, 2006
                                              10:15 a.m.
9
    Before:
10
                        HON. HAROLD BAER, JR.
11
                                              District Judge
12
                              APPEARANCES
13
    MICHAEL J. GARCIA
14       United States Attorney for the
         Southern District of New York
15  WILSON LEUNG
         Assistant United States Attorney
16
    ROLAND RIOPELLE
17       Attorney for Defendant

18

19

20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the government please

3    state your name for the record.

4          MR. LEUNG:  Wilson Leung for the government.

5          Good morning, your Honor.

6          THE DEPUTY CLERK:  Counsel for the defendant.

7          MR. RIOPELLE:  Roland Riopelle for the defendant.

8          Good morning, your Honor.

9          THE COURT:  Good morning.

10         This is Mr. Riopelle's motion so why don't you begin

11   and maybe we will interrupt you occasionally.

12         MR. RIOPELLE:  Judge, if you don't care where I begin,

13   I prefer to begin with the privilege issue.

14         THE COURT:  That's fine.

15         MR. RIOPELLE:  That is the thorniest and perhaps the

16   most interesting from a legal perspective.

17         We have moved, as your Honor knows, to begin by having

18   a hearing as to the manner and degree in which certain

19   privileged documents or the attorney-client privilege was

20   invaded and to determine what sort of prejudice derived from

21   that invasion, which we strongly suspect occurred.

22         I think, your Honor, the record is pretty clear at

23   this point that at least some privileged documents, and

24   specifically those documents prepared by Ms. Rana Rahimi, which

25   your Honor has previously ruled were privileged, were in fact

1    examined by Agent McWilliams, and I say that because the

2    government has now had two bites at the apple to deny that that

3    examination occurred.  First, in their response to our motion,

4    they submitted a declaration from Agent McWilliams, and that

5    declaration nowhere states that he did not examine those

6    documents, and second, the government submitted a surreply a

7    day or two ago, after in our reply we pointed out this

8    deficiency, and that surreply contains no denial of the fact

9    that Agent McWilliams did examine these documents which were

10   privileged not only, we would contend, as to National

11   Electronics but also for this individual client.

12              I know there is a standing issue that the government

13   has raised, but at least with respect to those documents, I

14   don't believe there can be any real standing.

15              THE COURT:  You're talking about you can't believe

16   there can be any problem with your position vis-a-vis National

17   Electronics, and we are not going to talk about the individual

18   for the moment?  It's a question.

19              MR. RIOPELLE:  Right.  I was making the point, or

20   trying to make the point, with respect to these documents, the

21   ones prepared by Ms. Rahimi, they were prepared in her capacity

22   as a sort of Kovel-type accountant working for me.

23              THE COURT:  We went through this before.  Let's not do

24   it two or three times if we can help it.  Considering my

25   decision on the privilege issue, I know who she is.

61K8KHWA

1       MR. RIOPELLE:  Those documents, I think there is some

2  strong evidence to suggest, were used by the government in

3  connection with this --

4       THE COURT:  National Electronics documents, it's their

5  privilege that you're talking to me about this morning?

6       MR. RIOPELLE:  No.  With respect to these particular

7  documents, I am talking about my own client's individual work

8  product privilege.

9       THE COURT:  Can we go back to the National Electronics

10  privilege?

11       MR. RIOPELLE:  Sure.  There were a number of documents

12  seized by the government in the search warrant of National

13  Electronics that were privileged documents.  As the record

14  reflects, some of those documents were culled out by Agent

15  McWilliams as he examined all of the documents seized at

16  National Electronics and were delivered --

17       THE COURT:  This was at the time of the search?

18       MR. RIOPELLE:  Following the search, Agent McWilliams

19  examined the documents, despite apparently a directive from the

20  government not to do so.  There appears to have been a

21  misunderstanding, is the best gloss that can be put on it, as

22  to what happened.

23       THE COURT:  OK.  So with respect to those privileged,

24  for the sake of argument, documents, in addition, there were

25  documents belonging to your client individually, is that what

61K8KHWA

1    we are talking about?

2              MR. RIOPELLE:   That would be one way to put it, your

3    Honor.   There were documents prepared by an accountant working

4    for me on his behalf.

5              THE COURT:   OK.

6              MR. RIOPELLE:   That second category of documents, I

7    think there is strong evidence to suggest in the record at this

8    point that second category of documents was employed by the

9    government in connection with the preparation of the civil

10   forfeiture complaint that is a companion to this case, because

11   many of the transactions described in that complaint are the

12   very transactions described in Ms. Rahimi's work papers.

13             THE COURT:   How do we come to the conclusion, other

14   than the two documents I ruled, that these documents, either

15   for National Electronics or for your individual client, were in

16   fact privileged?

17             MR. RIOPELLE:   With respect to the documents that Ms.

18   Rahimi prepared, there was a Kovel agreement that was produced

19   to the Court and the Court made a ruling that those are in fact

20   privileged.

21             With respect to the other documents, roughly, a box

22   full, a detailed privilege log was produced to the government

23   and ultimately the government conceded that the documents were

24   in fact privileged.

25             THE COURT:   Those were about 100 documents?   There are

61K8KHWA

1   too many boxes for me.

2                MR. RIOPELLE:   100-odd documents, maybe 120.

3                THE COURT:   I think we are referring to the same box.

4                MR. RIOPELLE:   Then there were some documents where

5   privilege was initially asserted, and as we got more familiar

6   with the facts, we withdrew our privilege claim.

7                THE COURT:   OK.   Let's move along.

8                McWilliams, the special agent, went out there with a

9   search warrant, which in the first instance you believed was

10  too broad.   Why don't we talk a little bit about that part of

11  your motion and then move right into what it was that makes you

12  clear, other than what you have told me, that in fact they were

13  relied upon in connection with the government's investigation?

14               MR. RIOPELLE:   Well, the search warrant motion is

15  pretty straightforward, Judge.   We believe that the search

16  warrant was vague and way too broad, overly broad, improperly

17  so.

18               THE COURT:   Essentially it asks for the kinds of books

19  and records that at least in the old days, and I see no change

20  in the law, I would use regularly without a problem in terms of

21  anything but perhaps the length of time.   That's not an area

22  that the search warrant covered.   But in this instance, or

23  similarly a subpoena, you don't have that problem in this

24  instance.   So I am not clear what problems you have, except you

25  think they are too broad and I don't.   So I think you lose on

61K8KHWA

1   that aspect.  I think I have ruled that way once before so I
2   don't think it comes as a big surprise.

3          So let's move along to the evidentiary hearing
4   concerns because, as you suggest, that's a little more
5   exciting.

6          MR. RIOPELLE:  I agree.  On that one, the government's
7   rejoinder to our motion has been Mr. Khwaja doesn't specify the
8   prejudice done to him and doesn't sufficiently specify the
9   manner in which the privilege was invaded, to which our
10  response is, well, we can't do that.  That's what a hearing is
11  for.  I don't know as I stand here exactly what use was made of
12  these privileged documents.  I need to cross-examine the agent
13  about that.  I don't know if the forfeiture complaint in this
14  case or the indictment in this case derived in part from those
15  privileged documents.  The agent, and we will obviously ask the
16  Court to make a Rule 6 order that permits the agent to talk
17  about what was presented to the grand jury, the agent can tell
18  us if these documents were marked as grand jury exhibits and
19  the like.

20         THE COURT:  I gather in part of your papers you say
21  you know that they were seized and looked at by virtue of some
22  Post-its and handwriting.  Tell me a little bit more about
23  that.

24         MR. RIOPELLE:  That's right.  When we went to examine
25  the documents at the agent's offices, numerous documents and

61K8KHWA

1   numerous business records which are not privileged, but all

2   kinds of documents had clearly been examined by the agent

3   despite Mr. Leung's directive not to examine anything until the

4   privilege issue was resolved.  The clear evidence of that was a

5   series of Post-its which were put on all kinds of documents

6   indicating a review.  The typical Post-it would say something

7   like the numbers here have been tied out to the bank account

8   records of May 5 or something like that, and the Post-its

9   contained dates, all of which were after the date of the

10  execution of the search warrant.

11          Now, as I stand here today, Judge, without the

12  specific privileged documents at issue in hand, I can't tell

13  you how many Post-its were attached to which privileged

14  documents, but I can tell you that the Post-its indicated

15  clearly a review of the business records of the company and at

16  least some of the privileged materials, and, indeed, Agent

17  McWilliams acknowledges at least looking at documents, and with

18  respect to those he clearly recognized as privileged,

19  segregating them and delivering them to us in a manila envelope

20  when we arrived on the first day to review the documents.

21          So that's what the Post-its are about.  I do think

22  they would be relevant depending on which documents they are

23  attached to.  We would like to see those.  I think they do

24  appear to be in more than one handwriting.  There may be more

25  than one agent who looked at these documents.

1        THE COURT:   What makes you clear that these are agents

2   rather than your client and his employees?  Is there no

3   contention by the government to the contrary on that score?   We

4   don't need to talk about it if everybody agrees.

5        MR. RIOPELLE:   The Post-its are dated after the date

6   of the search warrant.

7        THE COURT:   So that means the government had the

8   records in their possession?

9        MR. RIOPELLE:   That's correct.

10        THE COURT:   What you're saying is we don't know what

11   they used these for.

12        What is the date of the indictment?

13        MR. RIOPELLE:   August 5.   The search warrant was in

14   May.

15        THE COURT:   We know that in fact the search warrant

16   was executed in the documents available, whatever that means,

17   prior to the indictment.

18        MR. RIOPELLE:   What really raises my suspicion level,

19   Judge, is the forfeiture complaint, which was filed at the same

20   time as the indictment in August, contains detailed

21   descriptions of the very transactions that were recorded by Ms.

22   Rahimi on those Kovel-type schedules, and that makes me

23   believe, or I think it gives me a fair argument, that there

24   clearly was an examination and perhaps use of these very

25   privileged documents.

1    I just offer that as some circumstantial evidence in

2    favor of the need for a hearing.

3    THE COURT:  OK.  Now, there are a couple of other

4    concerns that you have it seems to me.  First, let's run

5    through the more typical ones just so we can seesaw back and

6    forth amongst the goodies.

7    Let's go to the bill of particulars for a moment.

8    MR. RIOPELLE:  Your Honor, this is a very interesting

9    case and I think an appropriate one for the provision of the

10   very modest type of particulars that the defendant has

11   requested here.  The reason I say that is this.  There is going

12   to be a real battle at trial, I believe, as to whether there

13   was, for at least a very long period and indeed for all of the

14   relationship between my client and the two sellers of goods

15   here, whether there was really any real proscription against

16   the resale of the goods he bought back into the United States.

17   Among the particulars we have sought are, Where is it

18   that it is said either in writing or orally that you can't

19   resell in the United States?  We know from the complaint that

20   there came a point where there was a conversation allegedly

21   between my client and a very senior executive at Panasonic on

22   this issue, but for years prior to that my client was,

23   according to the allegations, reselling into the United States

24   without complaint by anyone, and indeed, after examining 30

25   boxes, as near as I can tell, there was never any writing

1    addressed to him by Panasonic or Fuji saying you can't resell

2    in the United States.

3         I think, in fact, what was going on here, to lay all

4    the cards on the table, was there were distributors of

5    Panasonic goods working for Panasonic or for Fuji who had a

6    certain territory that their goods were supposed to be resold

7    in, but who were on commission and couldn't care less where the

8    goods went once the goods went out their door, and indeed knew

9    darn well, given the nature of the goods sold and for a host of

10   other factors, that these goods would be resold in the U.S.,

11   and the guy selling the goods purportedly in Puerto Rico

12   couldn't care less where they went once they went out his front

13   door and he earned that commission.

14        Now, I believe his knowledge, which I think we will be

15   able to prove at trial if we get there, that he knew these

16   particular goods were going back to the United States, I think

17   that's going to be amply demonstrated by the proof at trial,

18   and that knowledge then, I believe, will be attributable to

19   Panasonic, and if that's so, there can be no fraud.  That will

20   be the defense.

21        THE COURT:  In other words, the distributor knew that

22   your client was doing what he is accused of doing illegally?

23        MR. RIOPELLE:  That's correct.

24        THE COURT:  If you know all that, not that I think

25   you're entitled to it anyway, but why would you need it?

1     MR. RIOPELLE:  I want to know if there was, prior to

2  this conversation very late in the relationship, if there was

3  at any time in the years before any written or oral

4  proscription known to the government to my client, and these

5  are not described in the indictment so I don't know if there

6  was or there wasn't.  I suspect there was not.

7     I have looked at 30 boxes of documents.  I don't see

8  any written one, but I want to know did Panasonic ever say to

9  my client in 2001, near the beginning of their relationship,

10  did Panasonic say explicitly you may not resell these goods in

11  the United States?  Is there some written or oral command that

12  I will be hit with at trial on that?  I don't think there is,

13  but I want to confirm that.

14     That's an example of the type of particular I am

15  looking for.  Indeed, I am signaling what the defense really is

16  here.  I don't think there was that kind of command, and if

17  there was not, that's something I intend to try to make hay of.

18     THE COURT:  Anything else you want in your bill?

19     MR. RIOPELLE:  I confess, Judge, that my memory is not

20  perfect.  I don't recall exactly what else we asked for.

21     THE COURT:  You must have a copy of your papers.

22     MR. RIOPELLE:  I have it right here.  We asked for the

23  precise nature of the misrepresentations the government alleges

24  by Mr. Khwaja, to whom the misrepresentation was made, when and

25  in what format, and essentially the same type of information

61K8KHWA

1   with respect to any proscription on his resale of the goods in

2   the United States.

3           THE COURT:  You understand that the law is relatively

4   clear here that as long as the indictment apprises you, as I

5   recall it again from long ago, of the charges so that you could

6   prepare a defense, which you have now actually recited to me,

7   you don't have an entitlement to a bill of particulars.

8           MR. RIOPELLE:  I know that the law is very bad for me

9   on the point of the bill of particulars, and I know the

10  strategic risk in actually coming to court prepared on this

11  issue and knowing something about your case.  Perhaps I would

12  have done better to show up and just play dumb, your Honor, but

13  I have too much ego for that.

14          There are cases like *Bortnovsky* and *Nachamie* and

15  *Davidoff*, which say in these enormous document cases where

16  there are thousands of documents and boxes of records and all

17  of that, to enable the defendant to adequately prepare his

18  case, some modest particulars are appropriate, and those are

19  the cases on which we rely, and I do think it is good law.  I

20  think it is frankly good practice.  I have to say, having been

21  a U.S. attorney, I cited the same strings of cases that

22  Mr. Leung cites today with exactly the same types of arguments.

23          THE COURT:  And usually how did you come out?

24          MR. RIOPELLE:  I won a hell of a lot more than I lost,

25  again, to be painfully honest, but the truth is cases like

61K8KHWA

1   this, where there is really no allegation of violence or

2   anything like that, the greater factual openness there is on

3   both sides, I think the greater the chances for a resolution

4   that's appropriate.

5           THE COURT:  I don't want to interfere with you and Mr.

6   Leung working out some kind of resolution, but I am not clear

7   that my role as lawgiver gives me any more leeway because of

8   your good intentions.

9           In any event, I will listen to Mr. Leung.  Maybe he is

10  willing to provide you with some of this information.

11          Let's go back to the more romantic aspect.

12          MR. RIOPELLE:  There is one last issue.

13          THE COURT:  On the bill of particulars?

14          MR. RIOPELLE:  No, one last issue in our motions.

15          THE COURT:  I have another issue on your motion.

16          You play it the way you want to play it.  I won't

17  forget.

18          MR. RIOPELLE:  I am sure you won't.

19          The last motion we have was sort of sprung from the

20  recent statements from our executive branch about wiretapping

21  without judicial authority, and we believe, based on the way

22  the investigation proceeded in this case, and the fact that the

23  investigation was conducted apparently by the Joint Terrorism

24  Task Force, although this case --

25          THE COURT:  The investigation that resulted in this

61K8KHWA

1    indictment?

2            MR. RIOPELLE:  Yes, sir.

3            THE COURT:  I thought they were there for a while and

4    then they left.

5            You tell the story.  I hope you understand your case

6    better than I do.

7            MR. RIOPELLE:  My client is an Afghani American

8    citizen, and he has a large family which is, as near as I can

9    tell, sort of the equivalent of an Irish clan.  They all are in

10   this business of electronics distribution together and the

11   entire family after 9/11 was pretty intensively investigated,

12   and Agent McWilliams is a member of the Joint Terrorism Task

13   Force, as I understand it, and I am confident that they were

14   looking to see if there was some evidence of some involvement

15   in terrorism, and I am equally confident that they found none

16   of that.

17           But given that fact and the kind of, I won't call it

18   statements, I would call it rhetoric that has come out of the

19   executive branch, I have to say I must believe that my client's

20   telephone calls have probably been tapped during the last few

21   years, and indeed, based on my conversations with my client, I

22   think that if they were intercepted, there would be what

23   amounts to Brady material on there because I think that many of

24   those phone calls would demonstrate or tend to demonstrate that

25   the people he dealt with at Fuji and Panasonic were in fact

61K8KHWA

1  well aware of the fact that he was transshipping the goods back

2  into the United States despite obtaining them on the Caribbean

3  price list.

4        THE COURT:  You want to know if in fact he was under

5  this umbrella of surveillance that nobody knew about?

6        MR. RIOPELLE:  That's exactly correct.  Again, I make

7  absolutely no criticism of Mr. Leung with respect to this.  He

8  has handled himself completely professionally at all points,

9  but I must say it seems to me entirely possible that the

10  executive branch has been photographing my client regularly on

11  surveillance, unknown to Mr. Leung, tapping his phone unknown

12  to Mr. Leung.  Indeed, I am informed by my client that he met

13  with representatives of Panasonic on United States soil to

14  discuss his business on at least one occasion and possibly

15  more.  If there are photographs out there of my client meeting

16  with the people who claim they had no idea he was doing

17  business in the United States, if they are sitting around a bar

18  talking in a Marriott somewhere in Montana or something, well,

19  gosh, I would like to get those photographs and argue that I

20  can put them into the jury and say, Look, they are meeting to

21  talk about business on American soil.  Where did they think he

22  was doing business, ladies and gentlemen?

23        These are the types of things that I think may well

24  have gone on unbeknownst to Mr. Leung and the United States

25  Attorney's Office and anybody else, except maybe the NSA and

1    the CIA and whatever other acronym does that kind of thing, but
2    we want access to it.

3            THE COURT:  There has to be some relationship, it
4    seems to me -- I guess you're trying to give it to me --
5    between this particular lawsuit and the kinds of surveillance
6    that you're postulating.

7            MR. RIOPELLE:  I would think that -- and again, I sort
8    of will beam myself back to my days as a law enforcement
9    officer -- I would think that if they were concerned that my
10   client was somehow selling electronics to the wrong people or
11   dealing with bad people, they would want to know what
12   electronics he was ordering, what his relationship with his
13   suppliers were and what might be going out the door to
14   terrorists, and it wouldn't surprise me at all if they were
15   listening to his conversations with Panasonic and Fuji.  And if
16   he talks to a distributor from Panasonic who says, I will sell
17   you 300 video cameras that cost $3,000 each, which, by the way,
18   is the type of business my client was doing, and these were
19   sold on the Caribbean price list, I don't mean to belittle the
20   folks in the Caribbean, but there are just not that many people
21   who can afford that kind of fancy equipment down there, and it
22   would be our argument to the jury that, look, when this person
23   from Panasonic was selling $3,000 worth of video cameras to my
24   client, they had to understand, because they understand the
25   business, that this was going to go to a market where it might

61K8KHWA

| | |
|---|---|
| 1 | be afforded, namely, the United States.  That's where people |
| 2 | can afford to spend that money. |
| 3 | THE COURT:  Are you saying McWilliams was a member of |
| 4 | this joint terrorist task force? |
| 5 | MR. RIOPELLE:  Yes.  Indeed, I think it may be right |
| 6 | in the criminal complaint, Judge, which is attached to our |
| 7 | papers. |
| 8 | THE COURT:  I will take your word for it.  The concern |
| 9 | that I have is why can't this information be elicited by you |
| 10 | from the people at Panasonic that your client tells you he |
| 11 | negotiated with? |
| 12 | MR. RIOPELLE:  That's a very good question, but I |
| 13 | think as a practical matter what will happen, I think that the |
| 14 | distributors from Panasonic, who the home office at Panasonic |
| 15 | would be furious to find were selling goods knowing they would |
| 16 | be transshipped to the United States, are likely to take the |
| 17 | witness stand and sound a little bit like the French inspector |
| 18 | in the old movie Casablanca and say that they were shocked to |
| 19 | find that goods were transshipped into the United States. |
| 20 | That's the testimony we are going to hear, I think, on direct |
| 21 | examination, as their winnings were handed to them each month |
| 22 | in the form of a commission. |
| 23 | What I want, if I could get it, are the |
| 24 | contemporaneous recordings that would show quite the opposite. |
| 25 | THE COURT:  If there are any. |

61K8KHWA

1          MR. RIOPELLE:  And I want those photographs if they

2    are out there.

3          THE COURT:  In color if they are there.

4          MR. RIOPELLE:  If they are.

5          THE COURT:  Is that the totality of your motions so we

6    can get some pearls from the government?

7          MR. RIOPELLE:  I believe those are the highlights,

8    Judge, and if you have further questions after you hear from

9    Mr. Leung, let me know.

10         THE COURT:  Very well.

11         All right.  Mr. Leung, let's not tax you with respect

12   to the bill because I really don't think it's appropriate.  But

13   all the other motions seem to have a little more meat on the

14   bones so take them in whatever order you choose.

15         MR. LEUNG:  It seems like the major bone of contention

16   here is the privilege issue and the issue concerning whether a

17   hearing would be appropriate.

18         The government has stated to the Court in its

19   submissions it believes that a hearing would not be appropriate

20   and here is why.

21         There are three categories of documents, your Honor,

22   that are putatively privileged.  The first and the largest

23   volume is a box of documents which the government did not

24   concede was privileged but did not really care about, so

25   therefore we returned to Mr. Riopelle.  The second category

1   consists of the few documents that were submitted to your Honor

2   for in-camera review about which there was dispute.  And the

3   third category were documents that belonged to National

4   Electronics, etc.

5           We submit that the National Electronics documents are

6   not in issue because these are documents that are protected by

7   a corporate privilege and it's not available to Mr. Khwaja as

8   an individual defendant to assert the privilege over those

9   documents.

10          In addition, your Honor, the several documents that

11  were in dispute that were submitted to you for in-camera

12  review, there is some dispute as to whether those documents

13  were reviewed.  Mr. Riopelle indicated that his belief that

14  privileged documents were reviewed is based on the fact that

15  there were Post-it notes on several of the documents that he

16  identified as privileged.  However, I am not aware of whether

17  the documents in dispute that were submitted to your Honor had

18  those Post-it notes.  I haven't seen them.  We turned them over

19  to you when you ordered an in-camera review.

20          THE COURT:  For the sake of argument, let's assume

21  that they indicated that the bureau had looked at them.

22          MR. LEUNG:  Even if we assume that the attorney-client

23  privilege was violated in this case, it seems clear that there

24  are two remedies.  One, either dismissal of the indictment,

25  which is a drastic remedy that's disfavored, or two,

61K8KHWA

1   suppression of the evidence.  We turned over all putatively

2   putatively privileged documents back to Mr. Riopelle.  Your

3   Honor has possession of the few remaining items.  We have no

4   intention of using any of these putatively privileged documents

5   at all.

6          THE COURT:  The problem is whether they were used to

7   help make the case.

8          MR. LEUNG:  That issue can be easily resolved, your

9   Honor, because we had a complaint that was filed prior to the

10  execution of the search warrants.

11         THE COURT:  When?

12         MR. LEUNG:  Dated May 9, 2005.  That was the day

13  before the execution of the search warrants and its allegations

14  are substantially identical to the allegations in the

15  indictment.

16         Mr. Riopelle alludes to a forfeiture case.  However,

17  that case is not before this Court.  That case is before Judge

18  Stein.  If there are issues concerning privilege arising from

19  the forfeiture allegation, that should be addressed before

20  Judge Stein by the appropriate parties.  I believe it's the

21  corporate entities who are the parties in that civil matter.

22         Right now, for purposes of this criminal case, the

23  remedies are dismissal of the indictment or suppression of the

24  evidence.  Suppression would be the favored remedy.  However,

25  that's somewhat moot because, as I noted earlier, we already

1    turned over the documents and we don't intend to use them.

2              THE COURT:  Isn't the concept whether they in some

3    fashion tweaked your head so as to really be utilized, if not

4    specifically, in the lawsuit if they were privileged?

5              MR. LEUNG:  The charge is solidified on May 9, 2005.

6    The charges have not changed since then.  Between the complaint

7    and the indictment the charges remain the same, the allegations

8    remain the same.

9              The issue then becomes what evidence becomes available

10   to the government to prove its case?  We submit, your Honor,

11   that suppression would be the appropriate remedy in this case

12   if there had been a violation of the attorney-client privilege.

13   Suppression, however, is moot because we don't intend to use

14   this stuff, and we turned the stuff back over to Mr. Riopelle.

15             The other issue, your Honor, is we believe that there

16   is absolutely no reason to have a hearing concerning this

17   issue.  It would be a waste of the Court's time.  Mr. Riopelle

18   indicated that he wanted a hearing to determine whether the

19   privilege was violated and to determine what prejudice

20   resulted.  That is somewhat speculative because the only

21   documents at issue were, of course, the Rana Rahimi documents

22   that were presented to you.  Since your Honor has ruled they

23   are privileged, we don't intend to use them.  So Mr. Riopelle

24   gets the appropriate remedy that we feel he is entitled to

25   under the circumstances.

61K8KHWA

1       THE COURT:  I gather you're saying that even if they

2    were utilized, they were too little and too late to affect your

3    charge because that charge had already been formulated.

4       MR. LEUNG:  That charge had already been formulated on

5    May 9th of 2005, your Honor.  The issue is whether then the

6    government should be denied its use as evidence, and of course

7    we don't contest that.  We don't intend to use it.  I will

8    state now that we don't intend to use any privileged documents.

9       We would also note that a case that Mr. Riopelle cites

10   in his brief on page 11, *U.S. v. Aulicino*, 44 F.3d 1102, which

11   is a Second Circuit case, addresses this issue in passing.  It

12   noted that the defense attorney's, quote, statement that he had

13   no way of knowing the extent of any prejudice defendants might

14   have suffered, supported only by speculation that they may well

15   have been severely privileged, was insufficient to require a

16   hearing.  That's exactly what Mr. Riopelle has presented to

17   your Honor.  He has acknowledged that he doesn't know what

18   prejudice resulted, even assuming there was a violation of the

19   attorney-client privilege.

20      Under these circumstances and given the fact that he

21   has already got what remedy would be appropriate, even if he

22   prevailed on the violation claim, would obviate the need for a

23   hearing.  To have a hearing, your Honor, would simply be a

24   waste of time under these circumstances.

25      THE COURT:  What about -- you're welcome to finish.

1             MR. LEUNG:  That's it.

2             THE COURT:  Tell me about his other concern about this

3     great big brother in the sky concept.

4             MR. LEUNG:  Your Honor, we have complied with our

5     Brady obligations, to the extent that we have the evidence that

6     we have available, and we produced them to Mr. Riopelle.  We

7     have made inquiries concerning Mr. Riopelle's latest requests

8     for executive branch intercepts that were made without

9     warrants, and we will take appropriate action after being

10    advised by Washington.

11            THE COURT:  You have to go a little slower for me, Mr.

12    Leung.  What exactly have you done and what exactly do you

13    think limits your obligation to do more?

14            MR. LEUNG:  We have made inquiries with the Department

15    of Justice in Washington, D.C. who is handling all such

16    requests.

17            THE COURT:  All these requests, like it's a big flood

18    of interest in this kind of surveillance?  Have they designated

19    a special place in the DOJ for these inquiries so that we know

20    they actually have an idea of what they are doing when they get

21    your request?

22            That may be unfair.  I don't mean to say this in the

23    pejorative, but I am not quite clear.  Mr. Riopelle said,

24    Listen, we don't know what is happening with this possible

25    unconstitutional search up there in the sky.  And you say, OK,

61K8KHWA

1   there is a special office at DOJ where these inquiries are

2   sent, and I am going to send one on your behalf.  Is that

3   right?

4          MR. LEUNG:  Your Honor, we have contacted the

5   Department of Justice in Washington, D.C. with Mr. Riopelle's

6   inquiry and that's all that I am authorized to report, your

7   Honor.

8          THE COURT:  We have a trial date here come April, on

9   the 3rd as I recall.  The only thing that interested me about

10  it is if it was this national terrorism task force and

11  Mr. McWilliams was a part of that, and if whatever is happening

12  in this, we will make it quasi legal search is going to have

13  some exculpatory material, the fact that you're telling me how

14  it is you did all you can do and you say all you can say really

15  doesn't advance my role at all.  You have to do better or

16  somebody has to do better in order for me to be sure that the

17  defendant's rights are protected.  If you don't have any idea,

18  I will be glad to work something out on my own.

19         MR. LEUNG:  I understand your Honor's concerns, and I

20  am addressing it through the procedures we have been instructed

21  to follow.

22         THE COURT:  Maybe we can put it this way, Mr. Leung.

23  Are there other cases in this office where that concern has

24  been raised and those concerns have been forwarded to this post

25  office box?

61K8KHWA

1      MR. LEUNG:  I am not sure if there are other cases in

2  this office in which the same issues have been addressed.  I

3  read in the papers that defense attorneys have been making such

4  requests, generally speaking.

5      THE COURT:  What are you suggesting we do?  You don't

6  think you have an obligation to ferret out what may or may not

7  exist and what may, if they exist, be or not be exculpatory?

8      MR. LEUNG:  Your Honor, we certainly have Brady

9  obligations and we take our Brady obligations seriously.  We

10  are operating under established instructions to determine how

11  to comply with these Brady obligations.

12      THE COURT:  I think we ought to give you another few

13  weeks to make that determination, but come the 9th of February,

14  which gives you three weeks, you have to help me.  Because I

15  can't really try a case where in fact there may be Brady

16  material out there that we have actually pinpointed, and we

17  can't find it, understand it, touch it, feel it, smell it or

18  anything like that.

19      MR. LEUNG:  I understand, your Honor.

20      THE COURT:  How about 10:00?  If that's convenient for

21  both of you, let's come together at 10 to hear a current status

22  report on what it is that can be furnished in the way of an

23  understanding or information about whether there was some kind

24  of surveillance of the defendant or the kinds of negotiations

25  or conversations which Mr. Riopelle thinks are vital.  I am not

1    clear they are vital, I am not clear he can't get them another

2    way, but I think, as you suggest, Mr. Leung, the Brady

3    obligation is yours, not his.

4          As far as the balance of these concerns, I have denied

5    once the allegations about the breadth of the search warrant,

6    and I will deny them again.  With respect to the bill of

7    particulars, I am also denying that.

8          With respect to this privilege problem that Mr. Leung

9    has been able to address, I will give that some more thought,

10   and with respect to the information about which we have just

11   been speaking, I will wait until the 9th, but come the 9th, or

12   prior thereto, keep in mind, Mr. Riopelle, that I have no

13   problem, if you convince me that indeed this is information

14   you're entitled to and you can't get it through this procedure,

15   there are other remedies.  Since the remedies are helpful to

16   you, my hope is that come the 9th you will tell me what they

17   are and why they are appropriate.  If you don't understand

18   that, I will be glad to spell it out.

19          MR. RIOPELLE:  I am not sure I do.

20          THE COURT:  What I think Mr. Leung is saying is that

21   there really are only two sanctions, if that's the proper word.

22   One is suppression and the other is dismissal.  I don't have

23   any problem on either score, or, in the alternative, in order

24   to be sure that defendant gets whatever he deserves, you ought

25   to make sure I understand exactly what you believe is

61K8KHWA

1     appropriate.

2              MR. RIOPELLE:  I understand that, your Honor.  If I

3     could just say one other thing.

4              THE COURT:  You have got to speak up.

5              MR. RIOPELLE:  Long ago I was a Wilson Leung on the

6     front line handling cases, and it seems to me what is happening

7     here is the executive branch is just refusing to cooperate with

8     the judicial process, and I hope there is some way we can

9     encourage it to do so.  I think Mr. Leung has been entirely

10    professional and fair and he is getting orders as to how to

11    handle these things, and, frankly, it's a little disturbing to

12    me, and it's no criticism of Mr. Leung at all, but I think I am

13    confronted with a situation where there may well be proof of my

14    client's innocence out there in the hands of the executive

15    branch, and we will all be told it doesn't exist and my client

16    will have to find out about it some day in the future

17    potentially sitting in a jail cell having been wrongly

18    convicted, and that I find deeply disturbing.  There is nothing

19    Mr. Leung can do about it other than make the inquiries he has

20    made, and I thank him for that, but it is deeply troubling to

21    me what I see in the press and the way in which this issue is

22    being handled.

23             I don't have anything else to say.  I just needed to

24    get that off my chest.

25             THE COURT:  I think we are both concerned.  What

61K8KHWA

1   happens as a consequence of that concern can only happen if you

2   tell me more about it, both of you, and we have a road map that

3   we can follow.  I think my position has now been spread on the

4   record clearly, and we will see you again at 10:00 on February

5   9th for a status report, hopefully backed up by additional

6   inquiries and perhaps even additional directions that the

7   government can take to try and clarify this problem, and I

8   presume, by the same token, Mr. Riopelle, you will tell me what

9   and why I should do something if we are able to go any further.

10          All right?

11          MR. RIOPELLE:  Thank you, Judge.

12          MR. LEUNG:  Thank you, your Honor.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25