K23HPARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 Cr. 725 (JPO)

5   LEV PARNAS, IGOR FRUMAN, DAVID
    CORREIA, AND ANDREY KUKUSHKIN,
6                                          Conference
                   Defendants.
7   ------------------------------x
                                           New York, N.Y.
8                                          February 3, 2020
                                           2:10 p.m.
9

10  Before:

11                  HON. J. PAUL OETKEN,

12                                         District Judge

13                      APPEARANCES

14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    NICOLAS L. ROOS
16  REBEKAH A. DONALESKI
    DOUGLAS S. ZOLKIND
17       Assistant United States Attorneys

18  JOSEPH A. BONDY
    STEPHANIE SCHUMAN
19       Attorneys for Defendant Parnas

20  TODD BLANCHE
         Attorney for Defendant Fruman
21
    WILLIAM JOSEPH HARRINGTON
22  JEFFREY MARCUS
         Attorneys for Defendant Correia
23
    GERALD LEFCOURT
24  FAITH FRIEDMAN
         Attorneys for Defendant Fruman
25

K23HPARC

1          (Case called)

2          MR. ROOS:  Good afternoon, your Honor.  Nicolas Roos,

3   Rebekah Donaleski, and Douglas Zolkind, for the United States.

4          THE COURT:  Good afternoon.

5          MR. BONDY:  Joseph Bondy and Stephanie Schuman on

6   behalf of Mr. Parnas, who is present today.

7          THE COURT:  Good afternoon.

8          MR. BLANCHE:  Good afternoon, your Honor.  Todd

9   Blanche on behalf of Igor Fruman.  Pursuant to your Honor's

10  orders last Thursday, I discussed what we hope to accomplish

11  today, and he waives his appearance.

12          THE COURT:  Thank you.

13          MR. HARRINGTON:  Good afternoon, your Honor.  Bill

14  Harrington and Jeff Marcus for David Correia.  Mr. Correia also

15  waives his appearance today.  We've updated him on the status

16  of the case.

17          MR. LEFCOURT:  Good afternoon, your Honor.  Gerald

18  Lefcourt and Faith Friedman.  As I indicated last week,

19  Mr. Kukushkin waives his appearance.

20          THE COURT:  Good afternoon.  Thank you.

21          I scheduled this conference in December for today, and

22  I'd like to cover a few things.  First of all, the letter

23  motion filed by counsel for Mr. Kukushkin on the issue of

24  surveillance under 18 U.S.C. Section 3504, which I intend to

25  rule on today; second, the status of discovery; and third,

K23HPARC

 1    scheduling of any pretrial motions and scheduling the trial,

 2    which I'm hopeful we can get on the calendar today.  And then

 3    finally, any other issues the parties wish to address.

 4         Let me just ask, are there any other preliminary

 5    matters anyone wants to raise before I proceed to the first of

 6    those?

 7         All right.  On December 12, 2019, counsel for

 8    Mr. Kukushkin filed a letter motion on behalf of all defendants

 9    requesting that I order the government to affirm or deny

10    whether defendants' communications have been intercepted by any

11    government agencies pursuant to 18 U.S.C. Section 3504.  You

12    filed a letter citing supplemental authority on December 19,

13    the government filed its response on January 3, and

14    Mr. Kukushkin filed a reply submission on January 9.  I've

15    reviewed the parties' submissions and the relevant authorities,

16    and I'm prepared to rule.

17         Section 3504 provides that "In any trial, hearing, or

18    other proceeding in or before any court upon a claim by a party

19    aggrieved, that evidence is inadmissible because it is the

20    primary product of an unlawful act or because it was obtained

21    by the exploitation of an unlawful act, the opponent of the

22    claim shall affirm or deny the occurrence of the alleged

23    unlawful act."  The government has represented that it did not

24    obtain or use any Title III intercepts in this investigation.

25    The government also represents that it does not intend in this

K23HPARC

case to use any information obtained or derived from other

forms of surveillance, i.e., under FISA, the Foreign

Intelligence Surveillance Act, or under Executive Order 12333.

Defendants contend that despite the government's

representation, they are entitled under Section 3504 to have

the government inquire of other federal agencies and affirm or

deny whether their communications have been intercepted under

FISA or otherwise.  Defendants emphasize the issue of

widespread covert surveillance by federal agencies and

highlight the potential for abuse from such surveillance.  They

argue they are "aggrieved parties" with a claim of unlawful

surveillance under Section 3504 because such evidence -- such

surveillance, even though the government will not use it in

this case, may have been used to derive other evidence

presented to the grand jury or to be used at trial such that it

could be fruit the poisonous agree under Fourth Amendment

doctrine.

With respect to FISA, I conclude that the defendant's

request is actually governed by a different provision, 50

United States Code, Section 1806.  As the Court held in *United

States v. Aziz*, 228 F.Supp.3d 363, 370 (M.D.Pa. 2017):  "FISA's

particularized notice disclosure and suppression procedures

supplant the requirements of Section 3504."  This conclusion

seems correct to me, particularly in light of the fact that

FISA was enacted in 1978, eight years after the enactment of

K23HPARC

1    Section 3504.  There's no basis here to find a violation of

2    FISA's notice requirements.

3              In any event, with respect to both FISA and Executive

4    Order 12333, I conclude that the defendants have not

5    established a colorable basis for believing that they have been

6    aggrieved by any unlawful surveillance.  First, I will assume

7    that defendants' request is not untimely.  Although the case

8    law is not entirely clear on the proper timing for seeking

9    relief under Section 3504 and what "proceedings are covered by

10   the statute," I think it is plausible that the statute

11   contemplates a motion being brought in advance of trial when

12   filed by a criminal defendant.  A motion under Section 3504 is

13   closely connected to a motion to suppress, and we are

14   essentially at the point in this case where we're scheduling

15   such motions.  Moreover, if a defendant files such a motion on

16   the eve of trial, there is a risk that it would be considered

17   untimely, as in *United States v. Yanagita*, 552 F.2d 940 (2d

18   Cir. 1977).  On the merits, however, the Second Circuit has

19   made clear that an assertion of unlawful surveillance based on

20   mere speculation is insufficient to trigger the government's

21   duty to respond under Section 3504.  Rather, as the Second

22   Circuit has held, "It is now established that a claim of

23   unlawful surveillance must have at least a colorable basis

24   before the government will be obliged to respond."  United

25   States v. James, 609 F.2d 36, 51 (2d Cir. 1979).

K23HPARC

1          Here, I find that the defendants have not established

2     a colorable basis to believe that any of them have been

3     subjected to unlawful surveillance.  The defendants rely on

4     circumstantial facts of this case, including the fact that it

5     involves foreign communications, foreign nationals, and

6     political contributions.  However, I find that those facts did

7     not establish a colorable basis beyond speculation to believe

8     that the defendants were aggrieved by unlawful surveillance.

9     Those are facts that are not outside the norm in cases in this

10    district, and I find that the claim here is similar to those in

11    which courts have not found a duty to respond under

12    Section 3504, including Judge Ramos in *United States v. Gammal,*

13    No. 15 Cr. 588; Judge Engelmayer in *United States v.*

14    *Alimehmeti*, No. 16 Cr. 398; and the Second Circuit in *James*;

15    *United States v. Pacella; United States v. Dien*; and *United*

16    *States v. Aref*.  The motion is therefore denied.  However, this

17    denial is without prejudice to renewal in the event that a

18    colorable basis for relief emerges based on a further showing.

19         I'd now like to begin by asking counsel for the

20    government about discovery.  At our last conference in

21    December, you all provided the categories of discovery and

22    indicated that it was fairly voluminous, and if you could,

23    please give me an update on the status of production to the

24    defendants.

25         MR. ROOS:  Certainly, your Honor.  So discovery, to

K23HPARC

1    date the government's produced approximately 197,000 pages of

2    Bates-stamped discovery.  The number is underinclusive because

3    there are certain native files that were produced without Bates

4    stamping, and there are also documents that were obtained from

5    third parties that did their own Bates stamping, and those

6    Bates stamp numbers are not included within the government's

7    range.  I give that to your Honor largely to give you a sense

8    of the volume of the stamped discovery.

9           There's also a good volume of electronic discovery

10   that came from devices such as cell phones or other devices

11   like computers.  Those files, while they may only receive a

12   single Bates number, are highly voluminous because, for

13   instance, it could be a spreadsheet containing tens of

14   thousands of checks.

15          So that's where the government's production in terms

16   of volume stands today.  To give you a sense of what's been

17   produced and what's yet to come, I'll just run through a few

18   categories.

19          So the government has executed and produced 14 search

20   warrants over the course of the case.  There are two more that

21   are being produced to the defendants shortly.  In total, 14 of

22   16 of those search warrants relate to premises, accounts, or

23   devices that belong to the defendants, which I think is

24   relevant in terms of thinking about potential motion practice

25   in this case.  So they have almost all the applications.

K23HPARC

1   They'll have the rest of them very shortly, those ones that

2   just happened recently.

3         In terms of the materials that were seized pursuant to

4   those warrants, all the materials that were used to charge the

5   case, that came out of either email or ICloud search warrants

6   executed before the case was charged have been produced.

7   There's still sort of what I describe as dribs and drabs from

8   those accounts, whether it's attachments that are still being

9   processed and turned over or residual amount of emails that are

10  still being cut through.  But, basically, everything that was

11  used to charge the case is now in the defense's possession.

12        The government also since the last conference has

13  produced a large volume of materials that were seized that were

14  not in the government's possession prior to charging.  So, for

15  instance, all of the paper records that were seized from the

16  defendants have been produced.  There's been a partial

17  production of defendant Parnas' iPhone, the responsive -- so

18  just be clear.  I'll back up for a second.

19        We've produced everything in the extracted form to

20  each of the defendants.  Only basically the owner of the

21  account gets their full account or their full iPhone as soon as

22  it's been extracted.  So all of those extractions have been

23  produced in their entirety to the individual owner.  The

24  government now in -- what remains in discovery are the

25  materials that are being reviewed for responsiveness, and then

K23HPARC

1    that responsive set or the identified set is being produced to

2    all the defendants in discovery.  So the government's already

3    made a substantial production of the identified set, and what

4    remains in discovery and what the government anticipates doing

5    is producing what's outstanding, what's still either going

6    through a privilege review or the government's responsiveness

7    review.

8           So just to give your Honor a sense of things, we

9    submitted a letter last week that said we expect discovery, or

10   at least the vast majority of discovery, to be completed by

11   mid-March.  I think that deadline still holds.  Our filter team

12   is working through a few more devices and extractions, but they

13   have gone through the majority of them to date.  And in terms

14   of the identification responsiveness review, there's also been

15   a substantial amount of progress, and we expect by that

16   deadline we indicated in the letter that everything should be

17   done.  Of course, there's always the possibility an additional

18   subpoena return comes in or there are additional materials that

19   are being extracted off of a device, but for all intents and

20   purposes, the vast majority of discovery will be done by that

21   deadline.

22          The one other thing I want to flag just for everyone's

23   purposes is that, as we've indicated previously, there are

24   multiple electronic devices that were seized that the

25   government is still working to extract because there are --

K23HPARC

1     those passwords have not been provided for them.  And so, for

2     instance, there are eight devices belonging to defendant

3     Parnas, ten devices belonging to defendant Fruman, and two

4     devices belonging to defendant Correia, all of which have not

5     either been extracted at all or at least only have a partial

6     extraction.

7          The FBI continues to work diligently to complete or

8     successfully extract any data from those.  Obviously, the

9     government is working to, as soon as an extraction happens,

10    send it through a filter review and then on in discovery after

11    responsiveness review, but it's possible, for instance, an

12    iPhone could be cracked in June and then the government would

13    need to do additional filter and responsiveness review at that

14    time.

15         THE COURT:  Have you had further communications about

16    being provided passwords?

17         MR. ROOS:  Your Honor asked that question at the

18    December conference, and later that day or the next day, among

19    a number of queries to defense counsel, we invited them to

20    provide passwords.  But we're where we are right now in terms

21    of the -- I think it's a total of 16 devices.

22         THE COURT:  So can you give me a sense -- I know

23    you've said mid-March for, essentially, completion of

24    discovery -- of the responsive materials, what portion have you

25    been provided as opposed to still waiting on the filter team or

K23HPARC

1    whatever?

2            MR. ROOS:  So in terms of what existed prior to the

3    charging of the case, so the pre-October process, that has

4    basically all been produced.  Like I've said, there are, I

5    think, some attachments to some of the text messages that

6    include multimedia that are still being produced.  There may be

7    a small subset of the email accounts that we're still doing or

8    finalizing review, but everything that was used to charge the

9    case has been produced and identified and turned over.

10           Then there's also been some of -- a good deal of the

11   materials that have since been extracted, filter reviewed, and

12   identified, and those were also turned over in a recent

13   discovery production.  In terms of what's left, really the only

14   residual sort of remaining discovery besides a subpoena return

15   here or there is the subset of material that is still going

16   through a filter and responsiveness review.

17           If your Honor has specific questions about devices or

18   who they belong to and what they are, I'm happy to answer them.

19           THE COURT:  How many have you not been able to crack,

20   as you put it?

21           MR. ROOS:  So it's eight plus ten plus two, so 20

22   devices total across three defendants.

23           THE COURT:  That have not been accessed?

24           MR. ROOS:  Correct, have not been accessed.

25           THE COURT:  How many have?

K23HPARC

1          MR. ROOS:  Well, it's a little bit of a complex

2     question because of the way -- particularly where our Internet

3     service providers produced data.  So, for instance, if an

4     ICloud account, if a warrant is executed on a defendant's

5     ICloud account and Apple turns over the records, it may include

6     actually what's the equivalent of five devices, so if the user

7     backed up three different iPhones or an iPad.  So the

8     government is actually through, I believe, over 50 either

9     accounts or devices, not all of which have gone through filter

10    review, although they're very far along.  And the

11    responsiveness review is, I would say, generally just days

12    behind where the filter review is.

13          So we are through a large volume.  In particular, like

14    I said, I think the materials that are most relevant in terms

15    of the charges have been produced.  We tried to prioritize them

16    so all defense can see them and think about their motion

17    practice, and I'm confident that the remainder -- of course,

18    subject to a few exceptions here and there -- should be

19    processed by the deadline we previously indicated to the Court.

20          THE COURT:  OK.  Do you have any update on any

21    possibility of a superseding indictment, the likelihood of

22    that, the timing of that?

23          MR. ROOS:  I think the government's position, as we

24    indicated in our prior conference on a superseder has changed.

25    In terms of decision on that, we're still evaluating it.  We've

K23HPARC

1  had some discussions with defense counsel about what their

2  preference would be for a motion schedule and a trial date, and

3  the government's aware of the general practice of when it's

4  appropriate to bring a superseder relevant to those dates and

5  will keep all that in mind when making its decision.

6          THE COURT:  Thank you.

7          I guess next I'd like to hear from defendants about

8  your progress in reviewing discovery and whether you know at

9  this point whether you anticipate filing any pretrial motions

10  and what you have in mind in terms of schedule for pretrial

11  motions.  If anyone wants to tell me where you are on

12  discussing a trial date as well, you're welcome to do that,

13  whoever wants to start.

14          MR. LEFCOURT:  Your Honor, just to back up a speck, so

15  20, 25 years ago, pre-digital world, we would have this

16  discovery conference at some point with the Court, and the

17  government would tell us they know their *Brady* obligations and

18  that they would provide us probably with some fat files a month

19  before the trial date and whatever recordings, and that's it.

20  Things have remained the same from the government's point of

21  view.  They're going to turn over everything, they're not going

22  to identify what the relevance is of any particular piece, and

23  we're left in the dark.

24          As I indicated at the last conference in December,

25  there's a new discovery rule, 16.1.  It was passed and debated

K23HPARC

1   for years and became law in December.  It wants to go into the

2   digital world.  It seems to us, and we've all discussed this,

3   that without a draft exhibit list, a preliminary exhibit list,

4   we are just in a fog.  Where do you go?  What is it that is

5   really relevant to this case?  On the other hand, if we have an

6   exhibit list and we know they're offering these checks or these

7   emails, or what have you, we would at least be focused on what

8   we have to look for and look into.

9         This situation is really -- there's no question here.

10  A terabyte, I googled this morning, and in layman's terms, a

11  terabyte is 200,000 five-minute songs or 500 hours' worth of

12  movies.  That's the kind of volume of one terabyte.  We have

13  supplied the government with three terabyte drives, one of

14  which they gave us back just now before the Court proceeded.

15  In order to have any rational way to look at this stuff, we

16  need a way to do that, and one step is a draft exhibit list

17  that they're not bound by, that they could amend, that they

18  could add or subtract, but really, there's just no way for us

19  to go.

20        In terms of a motion and trial schedule, we discussed

21  it amongst ourselves.  If we're really going to be finished

22  with discovery, then we ought to talk mid-March if that's real,

23  because things keep dripping in.  Maybe a May 1 motion schedule

24  and a trial date in October.  That's what the defense had

25  proposed to the government.  I think that the government said

K23HPARC

1    August.  So that's what we would suggest, your Honor.

2              THE COURT:  OK.  Before I turn it back to the

3    government, if any other defense counsel wants to clarify their

4    own position on that or agree with Mr. Lefcourt or add anything

5    else, then I'll have the government respond.

6              MR. BONDY:  Your Honor, we agree with Mr. Lefcourt.  I

7    would note for the Court that many of the files that we're

8    receiving are exceptionally large.  I have one file that's 171

9    gigabytes, and I've bought several new computers with

10   additional RAM and had to run the most recent, biggest RAM

11   under an air conditioner to keep my processor from overheating

12   simply so I can try to open some of the midsize files.

13             THE COURT:  These are files of extractions of your

14   client's --

15             MR. BONDY:  Yes.

16             THE COURT:  -- own devices?

17             MR. BONDY:  Exactly.

18             THE COURT:  They should be things with which he's

19   familiar.

20             MR. BONDY:  Well, yes, but it's 171 gigabytes just for

21   me to be able to open it and confirm that indeed these are the

22   things he's familiar with, and that's just one example.  I

23   don't know.  I had asked the government if they could provide

24   us with PDFs of these extractions, because on a Cellebrite

25   extraction program, you click the button, and you can generate

K23HPARC

the PDF report, which is not as interactive but a lot easier to work with.  They declined to do so.

         To the extent the government can make all of our lives easier by trying to give us these extractions in a simpler format to work with, I would ask that they do so.

         THE COURT:  Anyone else?

         MR. BLANCHE:  I don't have anything to add, your Honor.

         MR. HARRINGTON:  We concur with the proposed schedule.

         THE COURT:  Mr. Roos, did you want to respond to a couple of things:  One, the suggestion that you, I guess, under Rule 16.1 do something additional to help them focus on the relevant crucial documents, including possibly some sort of initial draft exhibit list; and then, second, Mr. Bondy's suggestion about the format of production; and then, third, I guess the idea of a May 1 motion schedule and October trial date?

         MR. ROOS:  Certainly, your Honor.  So I believe your Honor took somewhat extensive argument on this question about the proposed draft exhibit list and the new Rule 16 at the last conference, and I'm happy to revisit those arguments to whatever degree your Honor wants.

         But to just summarize a few of the most salient points, I think there's a speaking indictment that outlines the charges and gives more than ample notice to each of the

K23HPARC

1    defendants of what exactly they're charged with.  There are, as

2    I said, 14 search warrants that are quite lengthy in terms of

3    their affidavits, sometimes close to 100 pages that quote

4    verbatim the emails and text messages that form the basis for,

5    first, the probable cause in the search warrants and for some

6    of the later search warrants, in fact note the defendant's

7    already been indicted and then describe the factual bases for

8    the defendant's charge.  So as we said at the last conference,

9    that should be the guide.

10           The defendants also have all of the responsive

11   materials that were cited in those search warrants before the

12   case was charged.  So, literally, they take the search

13   warrants, that's the guide; read the relevant text messages,

14   which should be some of the most salient evidence against their

15   clients; they could also then find those text messages and

16   emails in the responsive materials that have been produced.

17   So --

18           THE COURT:  Let me just interrupt you there.  Is it

19   simple enough -- I agree with you that the indictment is

20   relatively detailed, and I think the search warrant and

21   affidavit information is also pretty detailed.  Is it easy

22   enough when they're given a terabyte of data to find a

23   particular email from the responsive materials the government

24   has produced?

25           MR. ROOS:  Well, on that question, your Honor, so with

K23HPARC

1    every discovery production we provide an index that indicates

2    where the materials are.  There are Bates ranges.  For the

3    responsive materials that, for instance, text messages, there's

4    all sorts of identifying information you could control-F some

5    of the words in the text message.  You could sort the data by

6    date or by recipients and find all those chats, and so --

7              THE COURT:  So it is sortable by date?

8              MR. ROOS:  It's sortable by date, yes.

9              THE COURT:   The way it's produced?

10             MR. ROOS:  The way it's produced.

11             THE COURT:  OK.

12             MR. ROOS:  So I think that's the answer.  I don't

13   think the rule contemplates providing early exhibit lists, and

14   frankly, not only would that be, I think, an unprecedented and

15   not legally supported request, but also I don't think it would

16   do a lot of good at this stage when we are months away from at

17   least the trial date that's proposed by defense counsel.  What

18   they need to be thinking about in terms of motions and

19   preparing for a potential trial is in the discovery generally

20   but also specifically in the indictment and the search warrant.

21             Now, I think Mr. Bondy has a very different type of

22   question which relates to the full extractions that we're

23   giving to each of the defendants individually of their own

24   devices.  So this is not material that has been deemed the

25   discovery that will be used by the government in its case.

K23HPARC

1   It's just the mirror copy we're providing to each of the

2   defendants individually.  And so in terms of review, I think

3   your Honor's absolutely right that the defendants should know

4   what's on their own devices, and it really sounds like it's a

5   technical issue for Mr. Bondy, whether it's the strength of his

6   computer or the air conditioner that goes with it.

7         In terms of what the government's doing, once we've

8   produced the copy or the image to the defense counsel, we are

9   then doing our filter and our responsiveness review, and they

10  will get, ultimately, the responsive materials.  And because

11  that's a smaller subset, the file sizes are also considerably

12  smaller.  So I think that's more of a technical issue.  The

13  PDFs to get to the specifics, I don't think are really a

14  workable solution, and in any event, I think the government's

15  fully complied with its discovery obligations, particularly

16  what's really a courtesy to just produce these full images

17  before we've even gone through them.

18        As to the, I guess, third question your Honor posed,

19  motion schedule and trial date, as Mr. Lefcourt alluded to, the

20  government proposed an August date.  We think for a motion

21  schedule in May, August -- and when the case was charged,

22  August would certainly be appropriate.  The government, of

23  course, is ready to try the case whenever the Court determines

24  is appropriate.  I would note defense counsel indicated to us

25  that they don't want to do August because of the volume of

K23HPARC

1    discovery, the possibility of a superseding indictment, and

2    other scheduling conflicts, so we would just leave it to the

3    Court, then.

4              THE COURT:  OK.  But you could do October?

5              MR. ROOS:   We could do October.  August, we think, is

6    appropriate due to the schedule, but we can do whenever the

7    Court agrees is appropriate.

8              THE COURT:  Assuming I agree with them to put it in

9    October as a trial date, would May 1 be reasonable for a motion

10   schedule?

11             MR. ROOS:  That's fine.

12             THE COURT:  All right.  It sounds to me defendants

13   would prefer October to August.  Let me see if anyone disagrees

14   with that.  It looks like everyone agrees.

15             Let's start with the trial date, because I really want

16   to get that on the schedule so everyone can plan around it.  I

17   think I'll go ahead and schedule that in October.  What is the

18   government's latest prediction of the number of trial days?

19             MR. ROOS:  Certainly a lot of variables that could go

20   into that.  I guess I would say two weeks, although with four

21   defendants, as your Honor knows, jury selection takes longer,

22   there are multiple openings, there are -- could be up to four

23   crosses of every witness.  There, of course, remains the

24   possibility of a superseding indictment.  So I think, while the

25   current estimate might be two weeks, it probably makes sense to

K23HPARC

1    at least block off on the Court's calendar additional time in

2    case things change.  It certainly could be shorter also.  It

3    could be a one-defendant case with a narrow set of issues.

4    Sorry I can't be more helpful in terms of timing.  Given we're

5    talking about October and we're here in the beginning of

6    February, there are a number of factors that go either way in

7    terms of how the case comes down.

8            THE COURT:  Fair enough.  I think we should definitely

9    put two weeks.  I think we should probably put three weeks on

10   the calendar just to be safe.

11           Does anybody think that's not enough?  I don't see any

12   objections.  So looking at October, I just want to make sure

13   that we avoid any holidays.  We could do October 5.  I know the

14   holiday of Sukkoth is the weekend before, begins Friday, the

15   2nd.  I'm not sure if October 5 is a workday or not.  We could

16   either do October 5 or October 13, which is the day after

17   Columbus Day the following week.  We could start either of

18   those, I believe.

19           MR. LEFCOURT:  Either is fine with us, your Honor.

20           MR. BLANCHE:  Either's fine.

21           MR. BONDY:   Either's fine, your Honor.

22           THE COURT:  So October 5 looks OK.

23           MR. BLANCHE:  Yes.

24           THE COURT:  Let's go ahead and put it down for

25   October 5.  Jury selection beginning October 5 at 9:30 a.m.  On

K23HPARC

1    motions, I think May 1 sounds fine.  Actually, May 1 is a --

2    oh, yes, that's a Friday.  We can do May 1.

3             How long would the government like to respond?

4             MR. ROOS:  Three weeks.

5             THE COURT:  All right.  Responses will be due May 22.

6    And I don't know if you wanted to do reply briefs.

7             MR. BONDY:  Yes, your Honor, please.

8             THE COURT:  How long would you like for that?

9             MR. BONDY:  Two weeks.

10            THE COURT:  All right.  That would be June 5.  May 1

11   for motions, May 22 for responses, and May -- June 5 for any

12   reply briefs.

13            Then I am persuaded by the government that I don't

14   think there's any basis to require an expedited set of exhibits

15   or anything like that.  I do think the parties should confer.

16   I think Rule 16.1 does contemplate conferences to address the

17   complexities of discovery.  So I want you to confer, and if

18   there are problems, I'm open to trying to knock some heads.

19            MR. LEFCOURT:  Your Honor, can I take just one more

20   chance?

21            THE COURT:  Sure, sure.

22            MR. LEFCOURT:  The government says the indictment is

23   clear as to what the charges are and it's a speaking indictment

24   and there are search warrant affidavits from which we can

25   understand what the case is, but there are three terabytes of

K23HPARC

1    information.  Are they saying we shouldn't look at that other

2    material, or how long that would take us to look at that

3    material?  I didn't hear any statement of prejudice, that they

4    would in any way by prejudiced by a preliminary exhibit list so

5    that we could be focused, because it is impossible to review

6    three terabytes of information.  So you have to be focused.

7    They want to focus us with what's in the indictment or what's

8    in the search warrant.  I think all of us would be more

9    comfortable in understanding what kind of exhibits we were --

10   and this is not unusual.  Judge Kaplan has given 3500 material

11   in the KPMG case eight months before trial; other judges have

12   done other things.  We're dealing with a lot of material.  It

13   just is unreasonable.

14       THE COURT:  But this is an indictment where the

15   evidence is essentially laid out in the indictment and in the

16   search warrants and the affidavits.  It says email on this date

17   from so-and-so to so-and-so, and you can search for it in the

18   documents produced.  The terabytes are a lot of stuff just

19   extracted from your client's phone, and as to that, there's no

20   reason to think it's necessarily going to be used.  It's mostly

21   irrelevant information.

22       MR. LEFCOURT:  That's the whole point.  Is it going to

23   be used?  Is it relevant to anything?  Should we look at it?

24   How would you make that determination, your Honor, with all due

25   respect?  You have three terabytes of information.  You know

K23HPARC

1     what's emailed -- emails are in a search warrant affidavit.

2     You might know what the indictment says.  Now you have all this

3     other material.  Don't look at it?  Focus on what?  It's really

4     untenable and it's inappropriate and there's no prejudice.

5            THE COURT:  OK.  Mr. Roos, why shouldn't you provide

6     some sort of preliminary exhibit list that you're not

7     necessarily bound to?

8            MR. ROOS:  Well, first of all, your Honor, my

9     colleague, Mr. Zolkind at the last conference back in December

10    offered, on this exact issue, if there are questions or ways we

11    can help defense counsel navigate the discovery, we're

12    certainly open to and will engage in that type of conference

13    that's not contemplated by the rule.  I don't believe that

14    Mr. Kukushkin's counsel's taken us up on that.  We're surely

15    willing to have that type of dialogue if we can help focus them

16    on particular discovery.

17           I would say in this case, particularly as to this

18    defendant, you have charged a conspiracy to have a foreign

19    national make an unlawful or set of unlawful political

20    contributions.  Really, it's about a conspiracy, so

21    communications between individuals and the flow of money.  So I

22    think there's actually a simplicity to it and it should be

23    easy, particularly with the indexes and all the warrants,

24    including warrants for devices and accounts belonging to that

25    particular defendant.  So it's really a roadmap to work through

K23HPARC

1    those issues.

2          Now, what's the prejudice potentially to the

3    government?  Solely premature, it's not contemplated by any

4    rule, things may change and develop, and gives an insight and,

5    frankly, may skew things in a direction that don't ultimately

6    manifest later on in October.  So I think there's a reason why

7    this is not contemplated in the rules, why it's not a practice

8    that's done in other cases.

9          I think the best approach here would be for defense

10   counsel to review the indictment and the warrant applications;

11   engage with us if they have specific questions.  We will always

12   be happy to point them to the Bates ranges.  If they're saying,

13   where are the chats that are referenced in this particular

14   warrant?  We're more than happy to identify the Bates range.

15   The same goes for financial documents.

16          THE COURT:  I think they want more than that.  They

17   want to know, of three terabytes, what am I supposed to focus

18   on?

19          MR. ROOS:  I think your Honor is correct in terms of a

20   large volume of that -- by the way, because it's a terabyte

21   hard drive doesn't mean we filled it.  We just ask for that

22   amount because we may fill above what is 24, 64 gigabytes.

23          In terms of what is the largest uses of volume on

24   those drives, it is the mirror image of electronic devices.

25   They certainly have the right and the reason why we've provided

K23HPARC

1    those mirror images when they do is that way they can work with

2    their client's materials, but if they choose, they can just

3    wait for the government to produce what we've identified as the

4    responsive set, which is certainly going to be considerably

5    smaller.  They either have it already or they're going to get

6    it in the next month.  And that could be a way in which, in

7    trying to navigate those electronic documents, they can work

8    through them.

9         So I just don't see this argument that it's -- I think

10   it's so voluminous is really a red herring designed to try to

11   get an order that really is not contemplated by the rule.  It's

12   very different from early 3500 material, especially where we

13   have a case that's estimated for two to three weeks that's set

14   for October.

15        THE COURT:  What do you mean when you say the

16   responsive material?  Are you providing that in a different way

17   under an identification as responsive?

18        MR. ROOS:  Exactly, your Honor.  So, basically, to use

19   an analogy, when FBI agents go into a premises, a home, with a

20   warrant to look for evidence of specified campaign finance

21   violations, because that's what it says, they seize items that

22   are specified in the warrant, evidence of financial movements

23   from a foreign country relating to a political expense or

24   evidence of communications between coconspirators.  When an

25   electronic service provider produces records, they're producing

K23HPARC

1    for a temporal period the entirety of the records for a

2    particular account.  The government's warrant calls for the

3    seizure of only those materials that are responsive to the

4    warrant.

5         So what the government does, after a filter review has

6    happened, is we review the electronic materials and only seize

7    those materials that are responsive, meaning they match up on

8    one of the categories of the warrant.  So, conceivably, there

9    could be an email account that is a terabyte full of data for

10   Mr. Kukushkin, but the chats between him and Parnas, Fruman,

11   and Correia are only a single megabyte.  That could be the

12   volume ultimately seized from the account and produced as

13   discovery and used at the trial.  When you use those big

14   numbers of, oh, the account is a terabyte or the device is a

15   terabyte, it doesn't really reflect what's at issue.  We're

16   just giving them a copy of what their phone looks like because

17   we're not giving the phone back.

18        THE COURT:  But then are you giving them a separate

19   category and saying this is responsive to this?

20        MR. ROOS:  So what does that look like?

21        THE COURT:  Yes.  How are you providing that?

22        MR. ROOS:  For instance, for emails, they're produced

23   with an electronic load.  So it's basically the images or the

24   PDFs of the emails with a Bates stamp on them, and they have an

25   electronic load file that goes into them.  You can load them

K23HPARC

1    into Relativity or Concordance.  For text messages, we have

2    been producing them in Excel spreadsheets, only those that have

3    been seized or identified responsive with an accompanying

4    folder that contains the attachments in their native form so

5    you can read the chats on the spreadsheet and then say, Oh, I'm

6    interested in that attachment, and look at the folder.

7           THE COURT:  So some of that's been produced.  You're

8    still producing some of the attachments and other information?

9           MR. ROOS:  Right.  So, for instance, if someone were

10   to image my phone and pull off all of the textual material, you

11   would probably get three spreadsheets: My chats, my SMS, and my

12   text messages.  The government then produces just those subsets

13   that are responsive to the warrant or seized, and so the

14   defendants will get for each phone likely something like three

15   spreadsheets which will have each of those types of textual

16   material.

17          THE COURT:  If that's what it is, I don't see why the

18   fact that there's three terabytes of mostly extractions from

19   your own devices, why that should be used as a reason to make

20   them do more than what the law requires, which is to provide

21   responsive documents under Rule 16.

22          MR. LEFCOURT:  I'm not sure the law doesn't require

23   it.  Rule 16.1 is a plan.  That contemplates a plan so that the

24   defendants will be given the proper discovery in a timely way

25   and usable way.  I don't think that it's not contemplated.  It

K23HPARC

1   is contemplated.  What's the prejudice?  They just don't want

2   to do it.  Why?  I mean, the fact that they don't want to do it

3   is -- what are they thinking?  That we're going to learn

4   something more about the case that will help us get prepared?

5   Oh, how terrible.

6         THE COURT:  Well, I don't see why you're not getting

7   plenty of information by getting the responsive documents and

8   the detailed information in the warrants and affidavits and the

9   indictment.  I think it's adequate.

10         So do we need to have a conference at some point

11   between now and -- either between now and May or between now

12   and, obviously, some point in summer or fall before the trial

13   date?  What do you all think?

14         MR. BONDY:  I think we do.  I think we should have a

15   conference after the discovery that is anticipated being closed

16   in March has been produced.

17         THE COURT:  So maybe April?

18         MR. BONDY:  Yes.

19         MR. ROOS:  On that, your Honor, I mean, we're always

20   happy to come see you.  We're right next door.  I think we

21   certainly could show up for a conference.  If it's just a

22   question of has discovery been, for all intents and purposes,

23   completed, that's something we could also just put forth in a

24   letter.  I think it certainly makes sense to have a conference

25   at some point likely after the motions are filed to set a

K23HPARC

1     pretrial schedule, like motions in limine, voir dire, requests

2     to charge, a final conference date.  We'd defer to you if you

3     think it makes sense to have another check-in in a month or

4     two.

5             THE COURT:  I'm open to having something in April.

6     I'm also open to having something in, say, July where we would

7     set pretrial dates.  What do you all think?

8             MR. BONDY:  Could we set both?  If we don't need an

9     April conference, we can let the Court know we don't need a

10    conference.

11            THE COURT:  What do you all think?

12            MR. BLANCHE:  That's fine, your Honor.  Seems like

13    July is more appropriate after motions are filed, but if we

14    need one in April, fine.

15            THE COURT:  OK.

16            MR. HARRINGTON:  I agree, Judge, unless something

17    comes up, we probably won't need an April conference date, but

18    if something should could come up, there's obviously a lot of

19    moving pieces here.  So I'd put it down or just have us request

20    it if we feel we need it.  End up at the same place.

21            MR. LEFCOURT:  Whatever, your Honor.

22            THE COURT:  I'll set it down for July, and then if

23    there's any need to come in in April, just send me a letter in

24    advance, and I'll bring you in.

25            How is July 17, Friday, July 17?

K23HPARC

1          MR. LEFCOURT:  Could we make it that Thursday instead?

2          THE COURT:  Sure.

3          MR. HARRINGTON:  That's great, your Honor.

4          THE COURT:  July 16, 2:30 p.m.

5          MR. LEFCOURT:  Good.

6          THE COURT:  All right.  Next conference will be

7     July 16, 2020, at 2:30 p.m.  We'll let you know if it's going

8     to be in this courtroom or a different courtroom.

9          Let me ask if there's anything else anybody wanted to

10    address at this point?

11         MR. ROOS:  If there's nothing else from defense

12    counsel, the government would move to exclude time between now

13    and the trial date which is scheduled for October 5, 2020, so

14    that the defendants have ample time to review discovery and

15    make any pretrial motions, the government can oppose those

16    motions, and the parties can discuss a disposition, if

17    necessary, and prepare for trial.

18         THE COURT:  Any objection, Mr. Bondy?

19         MR. BONDY:  No, your Honor.

20         THE COURT:  Mr. Blanche?

21         MR. BLANCHE:  No, your Honor.

22         THE COURT:  Mr. Harrington?

23         MR. HARRINGTON:  No, Judge.

24         THE COURT:  Mr. Lefcourt?

25         MR. LEFCOURT:  No, your Honor.

K23HPARC

| | |
|---|---|
| 1 | THE COURT:  All right.  I grant the application, and I |
| 2 | exclude time under the Speedy Trial Act from today's date |
| 3 | through October 5, 2020.  I find the ends of justice outweigh |
| 4 | the interests of the public and each of the defendants in a |
| 5 | speedy trial for the reasons stated by counsel for the |
| 6 | government. |
| 7 | Anything else for today? |
| 8 | MR. BONDY:  No, your Honor. |
| 9 | THE COURT:  Thanks, everybody.  We're adjourned. |
| 10 | (Adjourned) |