UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

                      :

UNITED STATES OF AMERICA

                      :

        - v. -

                      :    S1 19 Cr. 725 (JPO)

LEV PARNAS, IGOR FRUMAN, and
ANDREY KUKUSHKIN,             :

             Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


# THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' PRETRIAL MOTIONS


                                    AUDREY STRAUSS
                                    Acting United States Attorney
                                    Southern District of New York

Rebekah Donaleski
Nicolas Roos
Douglas S. Zolkind
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTS ......................................................................................................................4

    A. THE STRAW DONOR SCHEME.................................................................4

    B. THE FOREIGN DONOR SCHEME..............................................................6

    C. THE FRAUD GUARANTEE SCHEME .......................................................8

ARGUMENT.............................................................................................................9

I.   THE ███████████ EMAIL IS NOT PRIVILEGED...................................9

    A.   BACKGROUND ........................................................................................9

    B.   APPLICABLE LAW .................................................................................12

    C.   THE ███████████ EMAIL IS NOT PRIVILEGED............................14

    D.   THE DEFENDANTS WAIVED ANY PRIVILEGE OVER THE ███████
       ███████ EMAIL ..................................................................................18

    E.   EVEN IF THE ███████████ EMAIL WERE PRIVILEGED, IT WOULD
       BE SUBJECT TO THE CRIME-FRAUD EXCEPTION............................22

    F.   SUPPRESSION IS NOT WARRANTED .....................................................26

    G.   DISMISSAL IS NOT AN APPROPRIATE REMEDY .................................33

II.  THE DEFENDANTS' MOTIONS FOR SEVERANCE ARE MERITLESS.......................35

    A.   APPLICABLE LAW .................................................................................36

    B.   THE GOVERNMENT HAS NO OBJECTION TO SEVERANCE OF THE
       FRAUD GUARANTEE SCHEME UNDER RULE 14(a)............................39

    C.   THE STRAW DONOR SCHEME AND FOREIGN DONOR SCHEME SHOULD
       NOT BE SEVERED ..................................................................................40

    D.   KUKUSHKIN'S REQUEST FOR A SEVERANCE ███████████████
       ███████████████████ SHOULD BE DENIED .......................55

    E.   FRUMAN'S REQUEST FOR A SEVERANCE FROM PARNAS SHOULD BE
       DENIED..................................................................................................62

III. THE GRAND JURY'S INDICTMENT WAS NOT IN VIOLATION OF THE
    CONSTITUTION AND A HEARING IS NOT REQUIRED...............................64

    A.   APPLICABLE LAW .................................................................................65

    B.   DISCUSSION.........................................................................................66

IV. KUKUSHKIN IS NOT ENTITLED TO A RULE 15 DEPOSITION..................................68

    A.   APPLICABLE LAW .................................................................................68

    B.   DISCUSSION.........................................................................................71

V.  PARNAS'S SELECTIVE PROSECUTION CLAIM IS MERITLESS.................................80

    A.  APPLICABLE LAW ................................................................................................80

    B.  DISCUSSION........................................................................................................82

VI. THE DEFENDANTS ARE NOT ENTITLED TO AN EXHIBIT OR WITNESS LIST,
    OR 3500 MATERIAL, THIS FAR IN ADVANCE OF TRIAL ...........................................87

    A.  APPLICABLE LAW ................................................................................................87

    B.  DISCUSSION........................................................................................................93

VII. THE DEFENDANTS ARE NOT ENTITLED TO AN ITEMIZATION OF
    POTENTIAL *BRADY* MATERIAL WITHIN DISCOVERY, OR TO FBI 302s OR
    OTHER "BACKUP" ........................................................................................................96

    A.  APPLICABLE LAW ................................................................................................97

    B.  DISCUSSION........................................................................................................99

CONCLUSION......................................................................................................................... 101

## PRELIMINARY STATEMENT

The defendants raise a host of arguments in their pretrial motions, but none has any merit.[1] For the reasons that follow, the defendants' motions should be denied in their entirety.

*First*, the defendants assert that an email, which was quoted in part in several search warrant applications, is protected by the attorney-client privilege.  They further argue that, as a result, not only should the returns from those search warrants be suppressed but that the Superseding Indictment should be dismissed.  As detailed herein, however, the email is not privileged: it does not request legal advice from an attorney or contain advice communicated by an attorney.  And despite the fact that it is the defendants' burden to establish the privilege, their argument is premised on nothing more than *ipse dixit* assertions, unsourced claims, and heavy reliance on the fact that an uninvolved business associate who was copied on the email happened to be a lawyer.  Moreover, even assuming the email was otherwise privileged, the privilege does not apply here for two independent reasons:  First, any privilege was waived when the email was sent to individuals uninvolved in the defendants' cannabis venture.  Second, the crime-fraud exception applies because the email furthered a criminal effort by the defendants to utilize attorneys to structure a new business to conceal the involvement of a foreign national.[2]  Because the email is not protected by the attorney-client privilege, the Government is free to use the email in its case-in-chief at trial.  However, even if the Court reaches the opposite conclusion—that the email is privileged, that the privilege was not waived, and that the crime-fraud exception does not

---

[1] The defendants' motions are cited as "Parnas Mot."; "Fruman Mot."; and "Kukushkin Mot."  The declaration of Gerald Lefcourt is cited as "Lefcourt Decl."  A redacted copy of the instant brief will be filed publicly, while an unredacted copy will be filed under seal pursuant to the Protective Order entered by this Court on November 13, 2019.

[2] The foreign national is ███████████ a Russian national, who is identified in the Superseding Indictment as "Foreign National-1."

apply—the defendants still would not be entitled to the unprecedented and extraordinary relief of suppressing any warrants or dismissing the Superseding Indictment.  Rather, the sole remedy for any infringement of the attorney-client privilege—though no infringement occurred here—would be to preclude the Government from using the privileged document at trial.

*Second*, the defendants seek severance, requesting at least five separate trials:  They all seek to sever each of the Straw Donor, Foreign Donor, and Fraud Guarantee Schemes for separate trials; Kukushkin seeks to be tried separately ███████████████████████████ ████████████████; and Fruman seeks to be severed from Parnas because Parnas's statements to the media would prejudice a jury against them.  The Government has no objection to the discretionary severance of the Fraud Guarantee Scheme, but otherwise objects to each of these requests.  The Straw Donor and Foreign Donor Schemes are properly joined under Federal Rule of Criminal Procedure 8(b)—indeed, they share multiple common participants and facts—and neither the schemes nor any defendant should be severed under Rule 14(a).  Kukushkin cannot come close to meeting the standard necessary to sever a case ███████████████████████████ █████, and the interests of efficiency, judicial economy, and avoidance of delay all weigh strongly in favor of a joint trial.  Parnas's statements to the media are mainly prejudicial only as to Parnas himself, but in any event, any potential unfair prejudice to his co-defendants can be addressed through *voir dire* and jury instructions.

*Third*, the defendants seek records relating to the composition, quorum, and presentation of evidence to the grand jury that returned the Superseding Indictment.  The defendants, however, have not advanced any particularized proof of irregularities in the grand jury process or concrete allegations of misconduct that would justify departing from the presumption of regularity and secrecy afforded to grand jury proceedings.  Accordingly, the defendants' request for information

about the grand jury proceedings should be denied.  Moreover, upon the Court's entry of a protective order, the Government will provide the defendants with responses and records relating to questions about the grand jury's composition, and therefore the defendants' motion on that ground is moot.

*Fourth*, Kukushkin demands the Court order a deposition of ███████, who is believed to be located in Russia, pursuant to Rule 15 of the Federal Rules of Criminal Procedure, yet his motion fails at each step of the analysis.  The fact that Russian law prohibits the taking of depositions for use in the United States alone is dispositive of the motion.  Kukushkin's motion fares no better on the other required elements.  Kukushkin's assertion that ███████ is unavailable is insufficient as a matter of law, and Kukushkin fails to show that ███████'s testimony is material and not cumulative of other evidence and testimony.

*Fifth*, Parnas seeks dismissal of the Superseding Indictment or discovery on his claim that he was selectively prosecuted.  His claim is utterly meritless and wholly unmoored from the facts, the law, and common sense.  Parnas fails to put forth any evidence—beyond his own grandiose claims or citations to random Twitter postings or news articles—of either a discriminatory effect or discriminatory purpose, which is fatal to his claim.

*Sixth*, the defendants seek an order requiring the Government to immediately disclose the exhibits it intends to introduce, and witness it intends to call, during the Government's case-in-chief at trial, along with all 3500 and *Giglio*/impeachment material.  The Federal Rules of Criminal Procedure do not require the identification of the documents and witnesses the Government will use in its case-in-chief, and the Government is not aware of any authority that would require the Government to produce such materials for a trial that is not currently scheduled, and is likely at least seven months away, if not more.  The well-settled practice in this District for complex, white-

collar cases is to disclose exhibits and witnesses, as well as 3500 and *Giglio* material, reasonably in advance of trial, typically on a schedule for mutual pretrial disclosures that is either agreed upon between the parties or crafted by the Court. The Government intends to follow that practice here and has already made clear to the defendants that it is amenable to discussing such a schedule for mutual pre-trial disclosures. The defendants provide no persuasive reason why such a radical departure from the norm is warranted in this case, let alone authority for the proposition that they are entitled to the sort of premature, Court-ordered schedule they seek.

And *seventh*, the defendants seek an order compelling the Government to itemize every text message, email, or other document that has been produced in discovery and that the defendants might characterize as *Brady* material. This request should be denied. The Government's obligation is to produce Rule 16 and *Brady* material, not to review, itemize and describe it for the defendants. Nor is there a basis for the defendants' claim that the Government must produce all FBI 302s and handwritten notes reflecting potentially exculpatory witness statements, rather than detailed summaries of such statements. It is well-settled that the Government satisfies its obligation by disclosing the substance of such statements, which the Government has done here. Again, 3500 and *Giglio* material will be produced in the ordinary course, reasonably in advance of trial.

## FACTS

A Superseding Indictment ("Ind.") was returned on or about September 17, 2020. As reflected therein, the Government expects to prove the following at trial, in substance and in part:

### A. THE STRAW DONOR SCHEME

In the spring of 2018, Parnas and Fruman were in the process of developing and launching a new business venture, an energy business that they called "Global Energy Producers" or "GEP." (Ind. ¶ 13). GEP had no income or assets, or even a bank account, but Parnas and Fruman devised

a scheme to promote their nascent business and make it appear that GEP was established and successful.[3] (*Id.*). They began attending political fundraisers and making substantial contributions to candidates and political action committees ("PACs"). (*Id.*). In or about May 2018, they made a $325,000 contribution to America First Action ("AFA") (referred to the in the Superseding Indictment as "Committee-1") and a $15,000 contribution to "Committee-2," falsely reporting that both contributions came from GEP. (*Id.* ¶ 14). They hoped that by claiming that these contributions came from GEP, powerful political players would believe—incorrectly—that they were the heads of a successful energy business capable of making substantial contributions, and would therefore support their business venture. (*Id.* ¶ 13).

In fact, the donations to AFA and Committee-2 did not come from GEP's funds, but rather, from Fruman, who had obtained them from a private lending transaction between Fruman and third parties. (*Id.* ¶ 15). The funds were routed through a shell company controlled by Parnas and never passed through a GEP account. (*Id.*).

In addition to these two contributions that were falsely reported to be in GEP's name, Parnas and Fruman made other contributions that were funded by Fruman and were falsely reported as being in Parnas's name. (*Id.* ¶ 16). These contributions accomplished two impermissible goals: First, they allowed Parnas and Fruman to evade federal contribution limits (by effectively allowing Fruman to provide maximum contributions twice). And second, as with the donations made in GEP's name, these contributions created the false appearance that Parnas was himself a major political donor and thereby boosted his profile in political and business circles. (*Id.*). The contributions that were falsely reported as being in Parnas's name included a maximum

---

[3] As discussed below, around the same time, Parnas and Fruman (along with Kukushkin and others) engaged in a very similar scheme with respect to another nascent business venture they were seeking to develop.

$2,700 contribution to a then-U.S. Congressman in June 2018, and an $11,000 contribution to another PAC ("Committee-3") in or about June 2018. (*Id.* ¶¶ 16-17).

In or around July 2018, the Federal Election Commission ("FEC") received a complaint regarding the $325,000 contribution to AFA, began an investigation, and requested a response from GEP. (*Id.* ¶ 18). In or about October 2018, Parnas and Fruman—as well as Correia, who was also deeply involved in GEP—submitted affidavits to the FEC. (*Id.*). These affidavits contained various materially false statements concerning the business and finances of GEP, which like the donations themselves were intended to create the false impression that GEP was a successful, operational energy business, when in fact it had no operations, no assets, and no ability to make the political donations that had been reported in its name. (*Id.*). Parnas's and Fruman's affidavits also claimed that Parnas had reimbursed Fruman for the donations made in Parnas's name, which was patently false. (*Id.* ¶ 19).

## B. THE FOREIGN DONOR SCHEME

Around the same time that Parnas, Fruman, and Correia were attempting to launch GEP, in mid-2018, they were also working on another business venture, a cannabis company. (*Id.* ¶ 21). In this venture, they had two additional partners: ███████ a Russian businessman who would be their main source of funding, and Kukushkin, who was an associate of ███████ working in the United States. (*Id.* ¶¶ 11, 12, 20). As with the GEP-related scheme described above, the defendants schemed to promote, and gain political support for, their nascent cannabis business by making political donations, while concealing the true source of those donations. (*Id.* ¶ 20.) Since ███████ was barred from contributing funds in connection with federal or state elections because he was a foreign national, the defendants instead caused the donations to be made falsely in Parnas's and Fruman's names. (*Id.* ¶ 20).

During a trip to Nevada in or about September 2018, the defendants and ████ met regarding the cannabis company and developed their plan.  (*Id.* ¶ 21.)  They agreed that ████ would provide $1 million for the enterprise, which would be spent on certain specific states, including Nevada, in order to obtain the requisite licenses to operate a cannabis business in those states.  (*Id.*).  Parnas, Fruman, and Kukushkin also attended a political fundraiser for a state candidate in Nevada ("Candidate-1") and pledged to contribute money to Candidate-1.  (*Id.*).

Following the trip to Nevada, Correia—with assistance from Parnas and Fruman—drafted a table of political donations and contributions for a "multi-state licensing strategy" (the "Political Donations Table").  (*Id.* ¶ 22.)  The Political Donations Table contemplated approximately between $1 and $2 million in contributions to federal and state candidates and PACs, and included a "funding" schedule of two $500,000 transfers by ████  (*Id.*).  Fruman sent the table to Kukushkin and ████ and Parnas, Fruman, and Correia thereafter repeatedly solicited ████ sometimes through Kukushkin, to wire the money.  (*Id.*).  They emphasized that the funds were needed for political donations, including to Candidate-1.  (*Id.*).

In or about September and October 2018, ████ wired $1 million to an account designated by Fruman.  (*Id.* ¶ 23.)  The defendants thereafter exchanged various text messages confirming that the funds were intended to be used for political donations.  (*Id.*).  For instance, Kukushkin texted Fruman, Parnas, and ████ that the "[m]oney transferred by [████ . . . was to support the very specific people and states (per [the Political Donations Table]) in order to obtain green light for licensing."  (*Id.*).  In another text message, Kukushkin said that the $1 million was intended "to cover all the contributions as planned."  (*Id.*).

Parnas and Fruman used these funds, in part, to make political donations and pay off credit card bills containing charges for political contributions they had previously made that were listed

on the Political Donations Table. (*Id.* ¶ 24). Furthermore, in early November 2018, the day after the elections—and following victories of candidates that the defendants had supported in certain states, including Florida—███████ congratulated Fruman, Parnas, and Kukushkin "on victory," and Kukushkin added his congratulations for the "victory in Florida" and inquired about the timing on licenses. (*Id.* ¶¶ 24, 25).

## C. THE FRAUD GUARANTEE SCHEME

At the same time that Parnas and Correia were engaging in the schemes discussed above, they were also perpetrating a long-running scheme to defraud investors in a company known as "Fraud Guarantee." (*Id.* ¶ 26). Parnas and Correia established Fraud Guarantee in or about late 2012. (*Id.* ¶ 27). Between 2012 and 2019, they pitched Fraud Guarantee to potential investors as a company that would provide services to protect investors from fraud, including by offering an insurance product to allow policyholders to recoup their losses in the event they lost money due to fraudulent conduct. (*Id.* ¶¶ 26, 27). To induce victims to invest in Fraud Guarantee, Parnas and Correia made multiple materially false misrepresentations. (*Id.* ¶ 26). They told certain victims that their funds, and other investors' funds, would be used solely for legitimate business expenses of Fraud Guarantee, when in fact the funds were largely withdrawn as cash, transferred to personal accounts, and used for various apparently personal expenditures. (*Id.* ¶ 26). Parnas and Correia also made materially false statements concerning how much money Parnas had contributed to the company and how much money the company had raised overall. (*Id.*). At least seven victims invested in Fraud Guarantee based on these false and misleading representations, with each victim investing hundreds of thousands of dollars, for a total of more than $2 million. (*Id.*; *see also id.* ¶¶ 28-31 (defrauding of "Victim-1," "Victim-2", and "Victim-3"); *id.* ¶¶ 32-33 (defrauding of "Victim-4"); *id.* ¶¶ 34 (defrauding of "Victim-5"); *id.* ¶¶ 35-36 (defrauding of "Victim-6"); *id.* ¶¶ 37-38 (defrauding of "Victim-7")).

## ARGUMENT

### I.     THE ███████████████ EMAIL IS NOT PRIVILEGED

The defendants move to dismiss the Superseding Indictment and suppress several search warrants based on the Government's use of a single email sent by Kukushkin to Correia about ████████████████████████████████████████████ *First*, the email is not privileged and therefore the Government is free to use the email in its case-in-chief.  In particular, the email was neither authored by nor principally addressed to an attorney, and it neither requested nor provided legal advice.  Instead, the defendants' superficial claim of privilege is premised on little more than the fact that an attorney was copied on the communication, which is itself insufficient to give rise to a valid claim of privilege.  Alternatively, even if the email were otherwise privileged, the privilege was waived when the email was sent to individuals uninvolved in the defendants' cannabis venture.  Furthermore, because the email furthered an effort by the defendants to ████████████████████████████████████████, the email would be subject to the crime-fraud exception.  *Second*, even if the Court were to determine that the email in question is privileged and not subject to waiver or the crime-fraud exception, the only remedy would be that the Government is precluded from using the email at trial.  The remedies urged by the defendants of dismissal and a *Franks* hearing are nearly unprecedented and are inappropriate based on the facts here.

### A.  BACKGROUND

On January 18, 2019, the Government obtained a search warrant for records associated with eleven email accounts, including a ██████ email account belonging to David Correia (the "Correia Email Account").  The Correia Email Account records were produced on March 4, 2019, and those records (along with records from other email accounts) were loaded to two document review platforms hosted by third party vendors ("Review Platform-1" and "Review Platform-2").

9

The search warrant returns were subsequently reviewed by a filter team,[4] who screened out communications with attorneys believed to have attorney-client relationships with the subjects of the investigation, and then the remaining materials were released to the prosecution team.

In the course of its review of email search warrant returns, the prosecution team identified an email in Review Platform-1 from the Correia Email Account, which was sent by Andrey Kukushkin to David Correa dated September 16, 2018.  The email copied ████████████, an attorney for some of Kukushkin's other businesses (who was using a personal email account), and ████████████, a partner of Kukushkin's in some of those other businesses.  The email is below:



---

[4] Pursuant to the Government's protocol, the filter team is tasked with reviewing search warrant returns to ensure that privileged documents and communications are not released to the prosecution team.  The filter team, which includes several senior members of the U.S. Attorney's Office, uses a variety of techniques to screen out potentially privileged information, including by running keyword searches, filtering out communication to or from attorneys, and/or conducting a manual review.  As noted in the defendants' motions, the use of filter teams is a widely accepted practice in this District.  None of the members of the filter team are now or have ever been members of the prosecution team.



Ex. A (⬛⬛⬛⬛⬛).  This email is described in defendants' motions as the ⬛⬛⬛⬛⬛ Email."  (Fruman Mot. 9).  Correia responded to the email from Kukushkin:

Ex. B (⬛⬛⬛⬛⬛).  The ⬛⬛⬛⬛ Email and the response from Correia were part of an email chain, the earlier parts of which included communications with attorneys at ⬛⬛⬛⬛ ⬛⬛⬛.  While the filter team has redacted the substance of the emails earlier in the chain (the "Redacted Email Chain"), the header information shows the following: ⬛⬛⬛⬛

⬛⬛⬛⬛⬛ | ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛,

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛



*See* Ex. C (Redacted Email Chain); Ex. D (header information relating to the Redacted Email Chain). It appears that the ███████████ attorneys were involved in ███████████████████ ████████████████████.

On October 9, 2019, the defendants were arrested on an Indictment charging them with, among other things, campaign finance offenses. The Indictment quoted from the last paragraph in the ██████████ Email. In search warrant applications sworn to on October 9, October 21, October 22, and November 13, 2019, the last paragraph of the ██████████ Email was quoted. (Kukushkin Mot., Ex. D). The warrant applications containing the same paragraph were also either attached as exhibits or referenced in later search warrant applications dated December 10, 2019, February 27, 2020, and March 20, 2020. (*Id.*). Pursuant to a November 13, 2019 warrant to search Kukushkin's iPhone, the Government obtained a second copy of the ██████████ Email. On May 4, 2020, the Government obtained a search warrant for an email account belonging to ███████. The last paragraph of the ██████████ Email is quoted in the affidavit in support of the warrant. Ultimately, the Government did not seize any materials from ████████████ ████. On September 17, 2020, the defendants were charged in a Superseding Indictment, which does not quote from the ██████████ Email.

## B. APPLICABLE LAW

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of

obtaining or providing legal advice." *United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020) (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)).  "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *Id.* (quoting *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997)).  "Such showings must be based on competent evidence, usually through affidavits, deposition testimony, or other admissible evidence." *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013) (citing *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 147 (2d Cir. 1987), and *Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 472 (S.D.N.Y. 1993)).  The "burden is not . . . discharged by mere conclusory or *ipse dixit* assertions. . . ." *von Bulow by Auersperg*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)).  "[B]ecause the attorney-client privilege 'stands in derogation of the search for truth so essential to the effective operation of any system of justice . . . [it] must be narrowly construed." *Correia*, 468 F. Supp. 3d at 621 (quoting *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000)).

"[T]he attorney-client privilege . . . may be waived, either impliedly . . . or expressly," and "[t]he burden is on the party resisting discovery to establish the facts necessary to show that the privilege . . . has not been waived." *United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 390-91 (S.D.N.Y. 2016) (citations omitted).  Moreover, the privilege is not absolute, and communications that otherwise might be privileged are not entitled to that protection if they "relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984)).  The purpose of the so-called "crime-fraud exception" is to "assure that the 'seal of secrecy' . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the

commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (internal citations omitted).

### C.  THE ██████████ EMAIL IS NOT PRIVILEGED

The ██████████ Email, which is neither from an attorney nor made for the purpose of obtaining legal advice, is not a privileged communication.  To be privileged, "[t]he purpose of the communications must be solely for the obtaining or providing of legal advice." *Shaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015).  Advice must be sought "from the lawyer." *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995) (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).  Where "'non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the 'primary' purpose of the document is to seek legal advice.'" *Medina v. Buther*, No. 15-CV-1955, 2018 WL 4383098, at *3 (S.D.N.Y. Aug. 22, 2018) (quoting *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01 Civ. 8854 (LTS), 2006 WL 1004472, at *5 (S.D.N.Y. Apr. 18, 2006)).  Additionally, "a communication directly among the clients is not privileged unless made for the purpose of communicating with a privileged person." *United States v. Krug*, 868 F.3d 82, 87 (2d Cir. 2017) (quoting *Restatement (Third) of the Law Governing Lawyers* § 76 cmt. c (2000)).

The ██████████ Email is from a non-lawyer, Kukushkin, and is addressed to another non-lawyer, Correia.  The emails sent before and after the ██████████ Email show that the email's purpose was not to seek legal advice from an attorney.  According to the header information, the ██████████ Email was a response by Kukushkin to an email that had been sent by Correia, which did not copy attorneys at ██████████.  *See* Ex. C; Ex. D.  To the extent Kukushkin sought a response to the email, it is clear that he was soliciting a response from Correia, which is how the email was also read by its recipients, because Correia responded.  There is no

suggestion in the ▮▮▮▮▮▮ Email that Kukushkin or Correia were communicating with the intent to go back to attorneys at ▮▮▮▮▮▮▮▮ with a request for legal advice.  The text of the ▮▮▮▮▮▮ Email, as well as the subsequent email from Correia, show that the emails were plainly not about seeking legal advice regarding the formation of an entity, but rather about making a business decision about how to structure the partnership in that entity.  For instance, Kukushkin wrote, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which is a business judgment, not a request for legal advice.  That is confirmed by the fact that Correia responded by saying that he, Parnas, and Fruman would ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮[5]

The defendants make two arguments in support of their claim that the ▮▮▮▮▮▮ Email is privileged.  First, they argue that because the Redacted Email Chain involved communications with ▮▮▮▮▮▮▮▮ attorneys, the subsequent ▮▮▮▮▮▮ Email is also privileged. (Fruman Mot. 9).  But there are no ▮▮▮▮▮▮▮▮ attorneys included on the ▮▮▮▮▮▮ Email, and the motion does not explain why the presence of ▮▮▮▮▮▮▮▮ attorneys earlier

---

[5] Kukushkin's only reference to an attorney in the ▮▮▮▮▮▮ Email is a single sentence about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That sentence, however, does not reveal the substance of the attorney advice—i.e., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Even if the Court were to determine that that sentence is privileged, the remedy is to redact the sentence, not suppress the entire email.  *See Attorney-Client Privilege in the U.S.* § 11:21 (2020) ("If the nonprivileged portions of a communication are distinct and severable, and their disclosure would not effectively reveal the substance of the privileged legal portions, protected portions of the communication may be excised or redacted (blocked out) prior to disclosure."); *United States v. Weisman*, No. S1 94 Cr. 760 (CSH), 1995 WL 244522, at *4 (S.D.N.Y. Apr. 26, 1995) (holding that entities in a diary relating to an investigation "must be disclosed" with the "sole redaction" of a single entry protected by the attorney-client privilege).

in the Redacted Email Chain renders the later communications privileged.  Nor do they explain why forwarding an email from an attorney would render later communication with non-attorneys privileged.  Notably, the mere fact that an earlier email may be privileged does not render a later forwarded email privileged.  *See United States v. Stewart*, 287 F. Supp. 2d 461, 464 (S.D.N.Y. 2003) (privileged email to attorney that was then forwarded to the defendant's daughter was not privileged).  Moreover, the fact—as borne out by the email headers—that Kukushkin and Correia dropped the ██████████ attorneys from the email chain cuts against the defendants' argument that they intended to continue to seek legal advice from their attorneys.

The fact that the defendants may have intended to use advice from ██████████ attorneys that was previously provided does not alter the conclusion that the ████████ Email is not privileged because "[t]he privilege does not extend to opinions and decisions made by the client based on the legal advice the client received."  *Attorney-Client Privilege in the U.S.* § 5:14 (2020); *see also Nat'l Sec. Counselors v. C.I.A.*, 960 F. Supp. 2d 101, 194 (D.D.C. 2013) ("[I]f an attorney provided legal advice about a certain matter at a given point in time, and a staff member separately communicated about that matter at a later point in time, that latter communication is not privileged simply because it is 'relate[d] to' the matter for which advice was previously given."); *United States v. Gotti*, 771 F. Supp. 535, 545 (E.D.N.Y. 1991) (rejecting the extension of the attorney-client privilege "to conversations among the defendants themselves even in the absence of any attorney during the course of those conversations").  The defendants claim that the "email communications show that defendants sought advice from attorneys on how to properly form their cannabis business" and that "attorneys were in the process of drafting entity formation documents" (Fruman Mot. 9), but it appears the defendants are referring to emails earlier in the Redacted Email

16

Chain.  No such request appears on the face of the ▮▮▮▮▮▮▮▮ Email, and the motion fails to

explain what about the ▮▮▮▮▮▮▮ Email is a request for legal advice from an attorney.

Second, the defendants also argue that because ▮▮▮▮▮▮, an attorney for some of

Kukushkin's other business ventures, was copied on the ▮▮▮▮▮▮▮▮ Email, it is privileged.

(Fruman Mot. 9).  There are several problems with this argument.  As a preliminary matter, despite

claiming that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," the motion and declaration do not cite to any

evidence to support those assertions.  (Lefcourt Decl. 2).  The defendants have not provided a

sworn declaration that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was represented by ▮▮▮▮▮▮  They have

also failed to provide any retainer agreement between ▮▮▮▮▮▮ and the entity.  It does not appear

that ▮▮▮▮▮ was copied on any of the emails exchanged with ▮▮▮▮▮▮▮▮▮▮, including but

not limited to the emails earlier in the ▮▮▮▮▮▮▮ Email chain.  *See* Ex. C (Redacted Email

Chain); Ex. D (email header information).  Nor does it appear that he ever wrote any emails in

response to the ▮▮▮▮▮▮▮▮ Email or the Redacted Email Chain.  *Id.*  Thus, while Kukushkin

may have added ▮▮▮▮▮▮ to the email chain because ▮▮▮▮▮▮ is Kukushkin's business partner

and general counsel on other ventures, there is no evidence he was an attorney for the ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ or was advising Correia, Parnas, or Fruman.

Moreover, the ▮▮▮▮▮▮▮▮ Email is not addressed to ▮▮▮▮▮▮ and there is nothing in

the text of the email suggesting it is seeking legal advice from ▮▮▮▮▮▮  *See In re Aenergy, S.A.*,

451 F. Supp. 3d 319, 324 (S.D.N.Y. 2020) (email thread not privileged when it was "plainly devoid

of any request for legal advice," "directed to a non-legal . . . employee, and in-house counsel does

not once weigh in").  Further buttressing the inference that the email was not a request to ▮▮▮▮▮▮

for legal advice, the defendants have put forth no evidence that ▮▮▮▮▮▮ ever replied to this email,

which is unsurprising, as it was not addressed to him.  The mere fact that ███████, an attorney, is copied on an email does not render it privileged.  *See In re Grand Jury Proceedings*, No. 11 Misc. 189, 2001 WL 1167497, at *24 n.41 (S.D.N.Y. Oct. 3, 2001) ("The fact that a[n] . . . attorney is copied on the document . . . does not transform the document into a confidential communication between an attorney and client."); *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 160, 163-64 (E.D.N.Y. 1994) ("the mere fact that . . . an attorney is copied on a memorandum[] does not mean that the communication is necessarily privileged").  And as discussed below, Kukushkin's addition of ███████ to the email chain had the effect of waiving any privilege that would have existed because he was not an attorney for the ████████████████ venture that was being formed by Correia and Kukushkin.[6]

## D.  THE DEFENDANTS WAIVED ANY PRIVILEGE OVER THE ████████████████ EMAIL

Even if the ████████████ Email were otherwise privileged, the privilege was waived when Kukushkin forwarded the email chain to ████████ and ████████ the principal and the general counsel of a separate business, ████████, with which Kukushkin was affiliated.  It is black-letter law that disclosure of a previously privileged communication to a third party waives privilege as to that communication.  *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (privilege "is generally waived by voluntary disclosure of the [privileged] communication to another party"); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed").  Notwithstanding the defendants' conclusory assertions in their motion papers, there is no evidence that ████████ or its agents—████████

---

[6] As noted in the defendants' motions, this venture is also referred to in emails and text messages as ████████████████████████.

and ███████—were part of the █████████████████ business or came within the confidential attorney-client relationship with ███████████████. As a result, when Kukushkin forwarded the Redacted Email Chain with █████████████ attorneys to ████████ and █████████ he waived the privilege as to those communications.

The retainer agreement between ███████████████████████ and █████████████, the incorporating documents that were prepared by the firm, and the emails with the █████████████████ are clear evidence that ███████ and ██████████ were not included in the privileged communications with counsel. For starters, the retainer agreement sent just days before the █████████ Email states that ████████████████ was retained by █████████████████████ █████████ through the "responsible parties" Kukushkin and Correia. *See* Ex. E (████████████ ██████████████████ retainer agreement, dated September 14, 2019). ███████████ and ██████████ are not named in the retainer agreement. According to email header information, █████████ and ███████ were not on any communications with █████████████████ related to the ██████████. *See* Ex. D (email header information). And the incorporating paperwork that was ultimately filed by █████████████████ on behalf of the ████████████████████— which lists Kukushkin as the president, treasurer, and director, and Correia as the secretary— similarly does not name █████████ or ███████████ *See* Ex. F (███████████████████████ articles of incorporation). The Government is also not aware of any emails sent by ██████████ or █████████ regarding the ████████████████████ or ██████████████████████. Indeed, other than the █████████████ Email, the Government did not identify a single relevant email involving ██████████ in the email accounts of Correia, Parnas, or Fruman. Thus, the self-evident conclusion from these materials is that ██████████ and █████████ were not subject to the attorney-

19

client relationship with ██████████████, and as a result, Kukushkin waived the privilege over the communications he forwarded to them.

Notwithstanding the fact that it is the defendants' burden to establish the existence of a privileged relationship and the absence of waiver, *see Mount Sinai Hosp.*, 185 F. Supp. 3d at 390-91, their motion is based on unsourced conclusions and "*ipse dixit* assertions" in the declaration of Gerald Lefcourt about how ████████ and ████████ were "essential parties in the Cannabis Venture." *Von Bulow by Auersperg*, 811 F.2d at 146.  There is no evidence cited in the motion or declaration for the claim that ████████ "has responsibility for the corporate financials" of the ███████████████, "maintained a continuous and close working relationship with the defendants," and "had been assisting in the planning" of the venture.  (Fruman Mot. 4; Lefcourt Decl. 2).  The motion and declaration do not cite to any retainer agreement, emails evidencing ██████████ purported work, or an affidavit from an individual with first-hand knowledge of the relevant events.  Moreover, the assertions are belied by, among other things, the absence of emails between ████████ and the defendants or work product prepared by ████████ for the ████████ ███████████████.  Similarly, as noted above, despite claiming that "████████████ ███████████████████████████" the motion and declaration lack any evidence to support that assertion.  (Lefcourt Decl. 2).  Rather, as explained above, it does not appear that ████████ was copied on any of the emails exchanged with ████████████ or replied to the Redacted Email Chain.  The fact that ████████ may be a general financial advisor to Kukushkin on other businesses is not a basis to conclude that he falls within the scope of any attorney-client privilege that Kukushkin holds.  *See Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 340 (E.D.N.Y. 1996) (holding that a conversation was not privileged due to the presence of a third party where there was "no evidence" that a "personal advisor" "served any function" in a meeting with attorneys).

Likewise, even if ██████ is an attorney for Kukushkin on other matters, by forwarding the purportedly confidential communications from ████████, without any indication he was providing legal advice, it broke the privilege. *See United States v. Sanmina Corp.*, 968 F.3d 1107, 1117-19 (9th Cir. 2020) (holding that the defendant waived the attorney-client privilege over memos prepared by an attorney by disclosing the memos to another law firm for "a non-legal purpose" such as conducting a market analysis for tax reasons).

Lacking evidence of ██████ or ██████ involvement in the ████████, the defendants assert that ████████—a separate business operated by Kukushkin, ██████ ██████ and others[7]—"would potentially be involved in the formation" of the ████████. (Fruman Mot. 5). But that claim is based "[u]pon information and belief," *id.*, not actual evidence, and only suggests that ████████ was considering an investment, not that it had a privileged relationship with ████████ and a common interest with Correia. Moreover, in multiple text messages over the duration of the charged conspiracy, Kukushkin repeatedly disavowed *any* involvement of ██████ in the ██████ ████████ and its related operations. *See, e.g.*, Ex. H (Oct. 29, 2018 text from Kukushkin to Fruman stating that ████████████████████ and asking ████████████); Ex H (Nov. 3, 2018 text from Kukushkin to Fruman, Parnas, and ██████ stating ████████████████ ████████████); Ex. H (Nov. 3, 2018 text from Kukushkin to Fruman, Parnas, and ██████ stating that ████████ ████████████████"). Even if

---

[7] ████████ is a cannabis business based in California. According to its capitalization table, its members include Kukushkin, ██████ ██████ ██████ and nine other members. *See* Ex. G.

Kukushkin, ██████ ████████ and ███████ are all affiliated with ████████████, that does not mean that their inclusion on an email chain about a separate business is privileged. Quite the opposite, "[a]s the cases show, *unrelated* corporations cannot claim the attorney-client privilege for communications from counsel which they have shared with each other unless they have a substantial identity of legal interest." *Music Sales Corp. v. Morris*, No. 98 Civ. 9002 (SAS) (FM), 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999) (collecting cases). ████████████████████ ████ and ██████████ do not have all of the same directors, and are not sufficiently interrelated to justify extending the privilege belonging to one business to the other.

In sum, the defendants have failed to meet their burden of establishing ██████████ and ██████████ involvement in the ██████████████████ and its communications with ██████████████. Accordingly, the forwarding of attorney emails to ████████ and ████████ waived the privilege (assuming *arguendo* it existed in the first place) over the entire chain of emails with ██████████████.

**E. EVEN IF THE ██████████████ EMAIL WERE PRIVILEGED, IT WOULD BE SUBJECT TO THE CRIME-FRAUD EXCEPTION**

As set forth above, the ██████████ Email is not a privileged communication. But even if the Court were to determine otherwise, it would still be subject to disclosure under the crime-fraud exception because it was made in furtherance of the campaign finance offenses charged in Counts Four through Six of the Superseding Indictment, and was intended to conceal the defendants' criminal activity.

For the crime-fraud exception to apply, the Government must show that there is probable cause to believe that (1) a fraud or crime has been attempted or committed, and (2) the communication was "in furtherance" of a crime or fraud, *i.e.*, it was "intended in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.

1995).  The exception applies to communications "even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose."  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).  In proving that a communication is in furtherance of a crime, "the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent."  *Id.* at 1039.  "Typically that can be shown by evidence of some activity following the improper consultation, on the part of either the client or the lawyer, to advance the intended crime or fraud."  *In re Grand Jury Investigation*, 445 F.3d 266, 279 (3d Cir. 2006) (citation omitted).  Where "the government has comfortably made a showing of probable cause" that the communications "were in furtherance of a crime or fraud," a court may order the production of documents that fall within the crime-fraud exception without *in camera* review.  *See United States v. Tucker*, 254 F. Supp. 3d 620, 625 (S.D.N.Y. 2017) (*in camera* review was unnecessary due to government's showing that entire category of attorney-client communications were in furtherance of crime); *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) (exception applicable on categorical basis to all files seized in search of attorney's office).

The Government more than amply satisfies its burden of showing that the ████████ Email was made in furtherance of a fraud or a crime and, accordingly, the crime-fraud exception applies.  By itself, the Superseding Indictment meets the requirement of showing probable cause of the commission of a campaign finance crime or fraud by Kukushkin, Fruman, Parnas, and ████████  The grand jury, in returning the Superseding Indictment, found probable cause that the defendants and ████████ were engaged in a scheme to solicit contributions and donations from a foreign national and make contributions and donations from that foreign national to federal and state political candidates.  *See Tucker*, 254 F. Supp. 3d at 624 ("[T]he fact that a grand jury issued

the Indictment . . . supports a finding of probable cause that a crime was committed."); *United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *4 (S.D.N.Y. Oct. 5, 2015) ("The Grand Jury has returned an Indictment, finding probable cause to charge the defendants with mail and wire fraud.  The Government has thus satisfied the first prong of the crime-fraud exception."); *see also Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (a grand jury's return of an indictment "conclusively determines the existence of probable cause").

The relevant allegations in the Superseding Indictment, as well as the ▮▮▮▮▮▮▮ Email, also demonstrate probable cause to believe that Kukushkin's communication in the ▮▮▮▮▮▮▮ Email was in furtherance of the campaign finance scheme alleged in the Superseding Indictment. As described in the Superseding Indictment, "[t]o conceal the source of the funds [used for political contributions] and their intended use, the transfers [from ▮▮▮▮▮▮▮ came from bank accounts in the names of foreign limited liability corporations, and were made pursuant to purported loan agreements between those entities and a business operated by Fruman and his family member." (Ind. ¶ 23).  Additionally, the Superseding Indictment alleges that "to avoid problems later," the "agreements were not signed by [▮▮▮▮▮▮▮ or any of the defendants" and "the funds were wired into Fruman's business bank account rather than a bank account for the Business Venture." (*Id.*). To further conceal the true source of the contributions, they were made in the names of Fruman and Parnas, and not ▮▮▮▮▮▮▮ (*Id.* ¶ 24).

Consistent with the allegations in the Superseding Indictment, the ▮▮▮▮▮▮▮ Email indicates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In the ▮▮▮▮▮▮ ▮▮▮ Email, Kukushkin asked Correia whether the defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ confirming that his intent was to mask the ownership of the business.  In the



next sentence of the email, he made his intent clear: he was ███████████████████

███████████████████████████████████████████████████████████

███████████████████████ In other words, Kukushkin was ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ The email response from Correia also confirms that one of the defendants'

intentions in communicating with ████████████ attorneys about incorporating the ██████

████████████ was to ████████████████████████████████████████

Such communications about setting up an entity in a way to conceal its true ownership are

communications made to facilitate and conceal the criminal scheme alleged in the indictment. *See*

*United States v. McDonald*, No. 01 Cr. 1168, 2002 WL 31956106, at *3-5 (E.D.N.Y. May 9, 2002)

(applying the crime-fraud exception to communications relating to the formation of a fraudulent

"shell entity"); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 404-08 (D. Conn. 2007) (same for

communications in furtherance of the formation and operation of a trust established to defraud

creditors); *Amusement Industry, Inc. v. Stern*, 293 F.R.D. 420, 439-40 (S.D.N.Y. 2013) (same for

communications that effectuated fraudulent financial transactions); *United States v. Schlesinger*,

No. 02 Cr. 485, 2005 WL 8158206 at *3-5 (E.D.N.Y. Apr. 8, 2005) (same); *Chord Associates LLC*

*v. Protech 2003-D, LLC*, No. 07 Civ. 51382013, WL 12366876, at *6 (E.D.N.Y. Oct. 18, 2013)

(arguing in dicta that exception applies for communications concerning instatement and conduct

of "front man" in fraudulent scheme).[8]

---

[8] In the alternative, if the Court deems it necessary to its determination of the application of the crime-fraud exception, the Court should conduct an *in camera* review of an unredacted copy of the Redacted Email Chain.  The Government need not establish probable cause to obtain such an *in camera* review; instead, the Government must show only "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491

## F.  SUPPRESSION IS NOT WARRANTED

The defendants argue that all evidence seized from the use of the ███████ Email should be suppressed pursuant to *Franks v. Delaware*, 438 U.S. 154, 156 (1978), and its progeny.[9] They are wrong for several reasons.  Even assuming *arguendo* that the ███████ email is privileged, that the privilege was not waived, and that the crime-fraud exception does not apply, the defendants are still not entitled to the drastic relief they seek.

As a preliminary matter, the defendants only have standing to move to suppress materials seized from their own email accounts, iCloud accounts, or devices.  *See United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990) ("A defendant has no right to have evidence suppressed on Fourth Amendment grounds unless the breached privacy expectation was his own rather than that of a third party."); *United States v. Lewis*, No. 16 Cr. 786 (NSR), 2018 WL 6241445, at *5 (S.D.N.Y. Nov. 29, 2018) ("A person has no expectation of privacy in another person's e-mail account.").  Accordingly, of the search warrants listed on Exhibit D to the Lefcourt declaration, Fruman, Parnas, and Kukushkin lack standing to challenge the October 9, 2019, warrant executed at ███████████████████████, the October 21, 2019, warrant for a DHL package that was sent by Correia, the October 22, 2019, warrant for iCloud accounts belonging to ██████ and ████████, the February 27, 2020, warrant for an iCloud account belonging to ███████████, and a May 4, 2020, warrant for an email account belonging

---

U.S. 554, 572 (1989).  This standard is not "a stringent one."  *Id.*  The Government respectfully submits that the facts outlined herein certainly establish a good-faith belief that *in camera* review may reveal evidence that crime-fraud exception applies to the ████████ Email.

[9] The defendants have not cited any cases indicating that the *Franks* standard applies to the use of potentially privileged communications in a search warrant, and it is not apparent they are necessarily correct.  Nonetheless, as discussed below, even under the *Franks* standard urged by the defendants, suppression of any search warrant is unwarranted.

to ████████  Additionally, for the same reason, only Parnas has standing to challenge the October

21, 2019, and February 27, 2020, warrants for his cell phones and iCloud accounts.  But Parnas

waived his right to assert a privilege objection when he produced complete copies of three

cellphones, his iCloud account, and paper documents, without any redactions for attorney-client

privilege, to the United States House Permanent Select Committee on Intelligence ("HPSCI").  As

Parnas's counsel has repeatedly confirmed, the production of these materials to HPSCI effected a

broad subject matter waiver of Parnas's attorney-client privilege with respect to all attorney

communications besides communications with his defense counsel.  *See* Jan. 30, 2020 Conf. Tr.

at 22 (Mr. Bondy stated: "[W]e've waived our own privilege with respect to a lot of materials.

The singular piece of privilege we retained is the communications and the attorney work upon

evidence that was generated by either Ed McMahon and Mr. Parnas, my predecessor counsel or I,

subsequent to the date of Mr. Parnas's arrest. Everything else we've given over. We are not

asserting any kind of privilege."); *see also United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d

383, 390-91 (S.D.N.Y. 2016) (noting that a subject matter waiver may occur "by disclosing

privileged materials to a government agency or deliberately producing them to a litigation

adversary").  In sum, only Fruman and Kukushkin have standing to move to suppress search

warrants on the basis of privilege, and their standing is limited to challenging the October 9, 2019,

warrant executed at Fruman's home, the October 21, 2019, warrant executed on cellphones

belonging to Fruman, the October 21, 2019, warrant to search Fruman's iCloud account, the

October 22, 2019, warrant to search Kukushkin's email and iCloud account, the November 13,

2019, warrant executed on a cellphone belonging to Kukushkin, and a March 20, 2020, warrant

extension of the October 21, 2019, warrant on Fruman's iCloud account.

Second, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial,' not to order wholesale suppression." *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (quoting *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006)); *see also United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019) (same); *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *6 (S.D.N.Y. Aug. 8, 2017) (same).  Where, as is the case here, the attorney-client communications are not constitutionally protected, the privilege is a mere evidentiary one, and evidence derived from the privileged information need not be suppressed under the fruit-of-the-poisonous-tree doctrine.  *See United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding that "suppression of any evidence derived from the privileged conversations" was not required since "the privilege is a testimonial or evidentiary one, and not constitutionally-based"); *United States v. Warshak*, 631 F.3d 266, 294 (6th Cir. 2010) (applying *Squillacote* to the attorney-client privilege and holding that "evidence derived from a violation of the attorney-client privilege is not fruit of the poisonous tree").[10]  Thus, "no court [has] applied the fruit-of-the-poisonous-tree doctrine to derivative evidence obtained as a result of improper access to materials covered by a non-constitutional privilege," *Warshak*, 631 F.3d at 294, and unsurprisingly the defendants have not cited a single case where a court ordered blanket suppression or invalidation of subsequent search

---

[10] In dicta in *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991), the Second Circuit suggested, citing *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972), that "[t]he government must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources."  That rule, however, does not apply here where the allegedly privileged communication was neither compelled nor in violation of the defendants' constitutional rights.  As the Sixth Circuit has observed, the "*Kastigar* analysis is not triggered by the existence of evidence protected by a privilege, but instead by the government's effort to compel a witness to testify over the witness's claim of privilege."  *Warshak*, 631 F.3d at 293.

warrants following the seizure or use of privileged material.  *Cf. Patel*, 2017 WL 3394607, at *6 (noting that the parties had not "identified any instances where a court authorized blanket suppression or invalidation of a search warrant following seizure of privileged material").  Accordingly, even if the ██████████ Email were privileged, that fact would not provide a basis to suppress other evidence derived from the use of a portion of the email.

Third, notwithstanding the general rule that evidence derived from a violation of the attorney-client privilege should *not* be suppressed, the defendants argue that the Government intentionally or recklessly included privileged materials in the warrant, that those communications were necessary to establish probable cause, and that therefore suppression is required under *Franks*.  (Fruman Mot. 16).  Notably, the defendants have not cited a single case for the proposition that *Franks* even applies when the purported misstatement or omission relates to whether an email is privileged.   But assuming the doctrine is applicable, in order to successfully challenge the truthfulness of the factual statements in a supporting affidavit, the defendants must demonstrate (1) that there were intentional misstatements or omissions in the search warrant affidavit; and (2) that those misstatements or omissions were material.  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).  "The *Franks* standard is a high one," *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), and a search warrant is presumed reliable, *see United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008).  The defendants have failed to make either showing.

To find that there were intentional misstatements or omissions in the search warrant affidavit, "the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'"  *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *Awadallah*, 349 F.3d at 68).   And "[t]o prove reckless disregard for the truth, the

defendant[] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (citation and brackets omitted).  The inclusion of the final paragraph in the ▮▮▮▮▮ Email was not an intentional misstatement or omission in the search warrants.

For starters, the defendants have not offered any evidence that the Government believed the ▮▮▮▮▮ Email was privileged but then intentionally hid that fact from the Court.  Quite the opposite, the prosecution team reasonably relied on a filter team to screen out potentially privileged materials and segregate them from review, and therefore reasonably believed that the records that it used in search warrant applications—including the ▮▮▮▮▮ Email—were not privileged.  Indeed, the filter team removed communications from Review Platform-1 and Review Platform-2 sent or received by then-known attorneys or law firms.[11]  One of the law firms was ▮▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮, who was using a personal email account (▮▮▮▮▮), was not then known to the prosecution team to be an attorney.  Even though ▮▮▮▮▮▮▮▮▮▮ attorneys appeared earlier in the Redacted Email Chain, there was no reason for the prosecution

---

[11] The ▮▮▮▮▮ Email was segregated as potentially privileged in Review Platform-2 but not Review Platform-1 because of the technical way in which the search for attorneys was conducted.  While the Government has not been able to determine conclusively the reason why the ▮▮▮▮▮ Email was segregated in Review Platform-2 but not Review Platform-1, it appears it has to do with the technical mechanism by which potentially privileged emails are removed.  In Review Platform-1, potentially privileged emails are typically filtered out using sender and recipient email domains.  Because no ▮▮▮▮▮▮▮ attorneys were recipients on the ▮▮▮▮▮ Email, however, Review Platform-1 did not filter out the email even though there were ▮▮▮▮▮▮ communications lower in the email chain.  Review Platform-2 uses a different search methodology.  While perhaps under ideal circumstances the filter team would have reviewed the email, made a determination, and then released it, "the Government's review need only be reasonable, not perfect," *Lumiere*, 2016 WL 7188149, at *6 n.9, and ultimately it was the filter team's view that the ▮▮▮▮▮ Email is not privileged.  Moreover, after the Government discovered the issue with Review Platform-1, it removed the emails that had previously been loaded to the database and re-loaded an identical set of emails as had been released in Review Platform-2.

team to believe that the email was privileged.  The ████████ Email did not include, as far as the prosecution team knew, any attorneys; it appeared to be a waiver of any privileged communications lower in the chain; and there was nothing in the quoted portion of the ████ ████ Email that would suggest in any way that it is privileged.

Moreover, while the defendants' motion claims the Government was put on notice of their "objection to the government's use of the privileged emails," it was not until November 23, 2019, that Kukushkin's counsel identified ████ as an attorney, and it was not until February 28, 2020, that Kukushkin's counsel informed the prosecution team that they viewed the ████████ Email as privileged.  (Fruman Mot. 16).  The prosecution team informed defense counsel that it believed the email was not privileged (for many of the reasons set forth above) and invited defense counsel to provide information to justify the claimed privilege.  After defense counsel declined to respond, the filter team re-reviewed the Redacted Email Chain and released the ████████ Email with redactions to the emails earlier in the chain on or about April 3, 2020.

Against this backdrop, the defendants make no argument as to how or why the affiants of the search warrants executed in October and November 2019—*i.e.*, prior to the defendants identifying ████ as an attorney—intentionally or recklessly make a misstatement or omission because they reasonably believed that the materials quoted in the affidavits had been released by the filter team and were not privileged.  *See Lumiere*, 2016 WL 7188149, at *6-7 (holding that the Government acted reasonably when it "completed its review of the seized devices before being alerted to the fact that they might contain significant numbers of privileged documents" since "after-the-fact notice of potentially privileged documents did not render the Government's earlier search unreasonable").  Moreover, the warrant applications that are referenced in the defendants' motion from December 2019, February 2020, and March 2020 only incorporated the ████

████ Email by appending a prior warrant application as an exhibit. And while the application for the May 4, 2020 warrant on a non-party's email account did include the ██████ Email, that was after the filter team re-released the email and approximately two months after the Government told the defendants that they did not believe with email was privileged (with no response from the defense). In any event, as noted above, the Government did not seize any material pursuant to the May 4, 2020, warrant.

Finally, even if the inclusion of the ██████ Email in certain applications were to be deemed a misrepresentation, it would not be material to the probable cause analysis. It is settled that "[e]very statement in a warrant affidavit does not have to be true," and "the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *United States v. Trzaska*, 111 F.3d 1019, 1026-27 (2d Cir. 1997) (citations omitted). To determine if a misrepresentation or omission is material, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.* (internal quotation marks and citation omitted). For each of the warrant applications identified in the defendants' motions, there was probable cause without the ██████ Email. For instance, the October 22, 2019, application to search, among other things, Kukushkin's email and iCloud account included 16 pages of detailed facts establishing probable cause to believe that the defendants conspired to violate the prohibition on foreign nationals making contributions and donations. (Kukushkin Mot., Ex. E at 27-43.) The ██████ Email was just one of over forty emails and text messages quoted in that application, and there are multiple other communications, including a WhatsApp conversation between Fruman, Parnas, Kukushkin, and ██████ that alone establishes the existence of a conspiracy to commit the offenses specified in the warrant. *Id.* Half-heartedly, the

32

defendants argue that the inclusion of the  Email was "necessary to the finding of probable cause" in order to "link ███████ to the Cannabis Venture." (Fruman Mot. 18). Not true. The October 22, 2019 search warrant application, for instance, described an email in August 2018 in which

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████. (Kukushkin Mot., Ex. E at 27-43).

Accordingly, the defendants have also failed to establish the materiality prong of the *Franks* standard as they have not demonstrated that the probable cause finding would have been any different without the ███████ Email. To merit a hearing, the defendants must establish both components—intent and materiality. Here, the defendants have made no showing, let alone the necessary "substantial preliminary showing" to overcome the presumption of a search warrants validity, and his request for a hearing should be denied. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).[12]

### G. DISMISSAL IS NOT AN APPROPRIATE REMEDY

There is no basis to dismiss the Superseding Indictment, and the defendants have not cited a single case in support of such a drastic outcome. Indeed, "even in cases of intentional intrusion [of the attorney-client privilege], the Second Circuit never has gone so far as to adopt a per se rule requiring the dismissal of an indictment," and the "extraordinary remedy [should be] reserved only

---

[12] The defendants have also not made any argument as to why the other aspects of the search warrants at issue relating to the scheme alleged in Counts One through Three of the Superseding Indictment should be suppressed. The ███████ Email is entirely irrelevant to the probable cause analysis for those parts of the search warrants. Similarly, the defendants have not advanced any argument as to why Counts One through Three or Count Seven would be warranted.

for extremely limited circumstances implicating fundamental rights." *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *3-5 (S.D.N.Y. Aug. 13, 2019) (internal quotations and citations omitted).  This case does not involve such circumstances.  As described above, the prosecution team reasonably relied on the fact that the filter team screened search warrant returns pursuant to a protocol that identified attorneys known to the Government.  After the defendants alerted the Government to the fact that the ██████████ Email was in their view privileged many months later and after charging, the prosecution team conferred with the filter team, asked the filter team to re-review the email, and communicated the Government's position to the defendants.  The defendants, who bear the burden of establishing the application of the attorney-client privilege, were then silent on this issue until after the Superseding Indictment was returned and, as detailed above, have to date failed to come close to meeting their burden to establish the ███████████ Email is, in fact, privileged.  Thus it cannot be said that the Government intentionally intruded on the attorney-client privilege.  *See id.* (denying motion to dismiss the indictment where the defendants "have not shown that the Government intentionally intruded on the attorney-client privilege"); *United States v. Weissman*, No. 94 Cr. 760, 1996 WL 751386, at *13 (S.D.N.Y. Dec. 26, 1996) (denying motion to dismiss the indictment because the Government's intrusion into the attorney-client privilege could not be characterized as intentional).

Moreover, the defendants cannot establish that the prosecution team's review of allegedly privileged material implicated their fundamental rights.  There is no suggestion in the defendants' motion that their constitutional rights have been abridged by the Government's use of the ███████ ███ Email because the email chain relates to communications with attorneys that occurred pre-indictment and do not concern the defense of the instance case.  Additionally, contrary to the defendants' suggestion, the use of the ██████████ Email did not lead to the Superseding

Indictment. (Fruman Mot. 14). The ████████ Email and/or testimony about it was not presented to the grand jury that returned the Superseding Indictment. There can, therefore, be no suggestion that the Superseding Indictment is tied to the use of the email, making dismissal of the indictment particularly inappropriate.[13]

In sum, because the ████████ Email is not privileged—and because even if it were otherwise privileged, the privilege was waived and is subject to the crime-fraud exception—the Government is free to use it in its case-in-chief at trial. But even if the Court determines that the ████████ Email is privileged, the sole remedy is to bar the Government from using the email at trial. The defendants have not come close to establishing that the drastic and unprecedented remedies of suppression or dismissal are warranted.

## II.    THE DEFENDANTS' MOTIONS FOR SEVERANCE ARE MERITLESS

The defendants seek to sever the case into three separate trials, one for the Fraud Guarantee Scheme, one for the Straw Donor Scheme, and one for the Foreign Donor Scheme. Kukushkin also seeks to be tried separately from his co-defendants for the Foreign Donor Scheme (in what would be a fourth trial) ████████████████████. And finally, Fruman seeks to be tried separately from Parnas on the Straw Donor and Foreign Donor Schemes (in what would be a fifth trial) mainly because of Parnas's pretrial statements to the media. All of these requests should be denied, with one exception: Given certain factual and evidentiary differences discussed further herein—and the fact that Correia has now pled guilty—the Government has no objection to a

---

[13] For the same reasons, disqualification of the prosecution team is not required. *See United States v. Walker*, 243 F. App'x 621, 624 (2d Cir. 2007) (summary order) (denying disqualification where, despite the use of a filter team, four privileged documents inadvertently reached the trial team); *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (noting that disqualification is "reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior," and finding that inadvertent review of privileged document was not a basis for disqualification).

discretionary severance of the Fraud Guarantee Scheme (Count Seven) pursuant to Rule 14(a). The Straw Donor and Foreign Donor Schemes are properly joined under Rule 8(b) and should not be severed under Rule 14(a). Kukushkin's motion for severance should be denied because, among other things, he cannot demonstrate that ████████████████████████████████ ████████████████████████████████████████ Fruman's request for severance from Parnas should be denied because Parnas's pretrial statements to the media have not prejudiced Fruman and, in any event, any potential unfair prejudice is far outweighed by the interests of efficiency, judicial economy, and avoidance of delay that would be achieved through a joint trial.

## A. APPLICABLE LAW

Rule 8 of the Federal Rules of Criminal Procedure provides that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has held that this allows joinder of offenses and defendants where two or more persons' "criminal acts are 'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).

Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The Supreme Court has made plain, however, that there is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also Feyrer*, 333 F.3d at 114 (citing "economy, convenience, and avoidance of delay" as some of the reasons underlying

the strong preference for joint trials); *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002);

*United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997). This strong preference reflects a settled

precept in criminal law: "Joint trials 'play a vital role in the criminal justice system.' They

promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of

inconsistent verdicts.'" *Zafiro*, 506 U.S. at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-

10 (1987)).

Therefore, any analysis of prejudice under a Rule 14 motion must be viewed through the

lens of the strong presumption in favor of joint trials. As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again,
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand. Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit. Even apart from these
> tactical considerations, joint trials generally serve the interests of
> justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson*, 481 U.S. at 210; *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991)

(Posner, J.) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs

associated with depriving the jury of making its determinations based on "the full picture"), *aff'd*,

506 U.S. 534 (1993). Thus, even where a joint trial may cause some prejudice to a defendant,

"[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation

of time, money, and scarce judicial resources that a joint trial permits." *United States v. Jimenez*,

824 F. Supp. 351, 366 (S.D.N.Y. 1993).

The presumption in favor of joint trials "is particularly strong where, as here, the

defendants are alleged to have participated in a common plan or scheme." *United States v.*

*Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988). "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States v. Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999); *see also United States v. Bin Laden*, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)).

The issue under Rule 14 is accordingly not whether a defendant would prefer to be tried alone, or might suffer some prejudice from being tried with his co-defendant, but whether any prejudice to him from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted). A discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

In sum, a defendant seeking severance has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989). Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

## B. THE GOVERNMENT HAS NO OBJECTION TO SEVERANCE OF THE FRAUD GUARANTEE SCHEME UNDER RULE 14(a)

Each of the defendants seeks to sever the Fraud Guarantee Scheme charged in Count Seven. (*See* Kukushkin Mot. 11-13; Fruman Mot. 27-29; Parnas Mot. 42). Although the Government submits that joinder of this count is proper under Rule 8(b), the Government has no objection to severance of this count pursuant to Rule 14(a). In particular, the Government recognizes that since Correia has now pled guilty, Parnas is the only defendant who remains charged in Count Seven. Accordingly, the relative efficiency of trying Count Seven at the same time as the other counts is diminished, especially since most—though not all—of the evidence relevant to Count Seven is not relevant as to other counts. For instance, the Government expects that the substantial bulk of its evidence as to Count Seven will come from Fraud Guarantee-related emails and documents, financial records and analysis, and the testimony of Fraud Guarantee victims and associates, virtually none of which evidence would also be expected to be offered at a trial focused solely on the Straw Donor and Foreign Donor Schemes.

That said, the Government does anticipate at least a certain degree of overlap between the evidence at a Fraud Guarantee Scheme trial and the evidence at a Straw Donor and Foreign Donor Schemes trial. For instance, at both trials, the Government would expect to offer certain evidence regarding Parnas's and Correia's backgrounds and relationship; and at both trials, the Government would expect to offer certain evidence regarding Parnas's and Correia's involvement in political fundraising, and would potentially call as a witness one of the Fraud Guarantee victims who also played a role in that fundraising activity. (Indeed, Parnas and Correia used this victim's investment in Fraud Guarantee to fund political contributions. (*See* Ind. ¶ 36)). However, the Government expects that this overlapping evidence would be a relatively small portion of each trial.

In sum, the Government believes that severing Count Seven for a separate trial will not significantly undermine the interests in efficiency, judicial economy, and avoidance of delay, and that severance will help to ensure that Fruman and Kukushkin are not prejudiced by the admission of evidence as to a fraud scheme with which they had no criminal involvement.  Accordingly, the Government has no objection to the discretionary severance of Count Seven.

## C.  THE STRAW DONOR SCHEME AND FOREIGN DONOR SCHEME SHOULD NOT BE SEVERED

Kukushkin and Parnas move to sever the Straw Donor Scheme—Counts One, Two, and Three—from the Foreign Donor Scheme—Counts Four, Five, and Six.  (*See* Kukushkin Mot. 8-11, Parnas Mot. 42).[14]  This motion should be denied because the two schemes are properly joined under Federal Rule of Criminal Procedure 8(b), and because the relevant considerations all weigh against the Court exercising its discretion to sever the schemes pursuant to Rule 14(a).

Count One charges Parnas and Fruman with conspiring to make straw donations from in or about March to November 2018, and Counts Two and Three charge them with making false statements in connection with one of those straw donations in or about October 2018.  Counts Four through Six likewise charge Parnas and Fruman—along with Kukushkin—with campaign finance violations, specifically, conspiring to make straw donations and to violate the ban on foreign donors from in or about June 2018 to April 2019 (Count Four, all defendants); soliciting a contribution by a foreign national (Count Five, Parnas and Fruman only); and aiding and abetting the making of a contribution by a foreign national (Count Six, all defendants).  Because all of these charges arise from a common scheme, specifically, a scheme to advance various domestic business

---

[14] It appears that Fruman also moves for severance on this basis insofar as he "joins in the motions filed by all defendants in this case, to the extent not adverse to [his] own."  (Fruman Mot. 29).

interests through political donations and contributions made in violation of the ban on straw donations; because there is a significant overlap in the facts and participants as to both schemes; because Parnas and Fruman would suffer no prejudice and Kukushkin would suffer, at most, minimal prejudice from a joint trial (prejudice which could be easily addressed through an appropriate limiting instruction); and because a joint trial would serve the interests of efficiency, judicial economy, and avoidance of delay, the defendants' motions for severance should be denied.

### 1. The Straw Donor Scheme and Foreign Donor Scheme Are Properly Joined Under Rule 8

As set forth above, the Second Circuit has held that under Rule 8(b), joinder of offenses and defendants is permitted where two or more persons' "criminal acts are [1] unified by some substantial identity of facts or participants or [2] arise out of a common plan or scheme." *Feyrer*, 333 F.3d at 114 (internal quotation marks omitted); *see also United States v. Pena*, 932 F. Supp. 2d 464, 466 (S.D.N.Y. 2013) (noting that in this Circuit, "when a defendant in a multi-defendant action challenges joinder, whether of offenses or defendants, the motion is construed as arising under Rule 8(b)" rather than Rule 8(a)). Here, joinder is proper under both of these prongs.

The Straw Donor and Foreign Donor Schemes arose from a "common plan or scheme." *Feyrer*, 333 F.3d at 114. As set forth in the Superseding Indictment—and as the Government expects to prove at trial—in or about early-to-mid 2018, Parnas and Fruman began attending political fundraising events and making substantial contributions to candidates and political fundraising committees, with the goal of enhancing their influence in political circles and gaining access to politicians. (*See* Ind. ¶ 13). Their objective in getting involved in political fundraising was to propel certain nascent business ventures that they were in the process of developing. Specifically, as relevant to the Straw Donor Scheme, Parnas, Fruman, and Correia were seeking to promote an energy company, GEP, which they were in the process of launching (*see* Ind. ¶ 13);

41

and as relevant to the Foreign Donor Scheme, they, along with Kukushkin and ████ were seeking to advance the interests of a cannabis business that they were in the early stages of forming (*see id.* ¶¶ 21-22).  The Second Circuit has advised courts to "apply[] a commonsense rule," evaluating whether "a reasonable person would easily recognize the common factual elements" between two schemes. *Turoff*, 853 F.2d at 1044.  Here, although GEP and the cannabis company were different businesses, as any "reasonable person would easily recognize," *id.*, the defendants engaged in a common scheme as to both: seeking to advance the interests of the businesses through political donations, without accurately disclosing the true source of the funds, in violation of the ban on straw donations.  This striking commonality at the heart of both the Straw Donor and Foreign Donor Schemes is sufficient reason, on its own, to find joinder proper under Rule 8(b).

Joinder under Rule 8(b) is also proper because the Straw Donor and Foreign Donor Schemes are "unified by some substantial identity of facts or participants." *Feyrer*, 333 F.3d at 114.  This is an independent and sufficient basis to uphold joinder. *Id.*

*First*, three of the four defendants charged in the Superseding Indictment were deeply involved in both schemes: Parnas, Fruman, and Correia.  (*See* Ind. ¶¶ 13-19 (Straw Donor Scheme); *id.* ¶¶ 20-25 (Foreign Donor Scheme)).  Although Kukushkin was involved only in the Foreign Donor Scheme, the fact that his three co-defendants were involved in both schemes is an important factor indicating a "substantial identity of . . . participants" in both schemes. *Feyrer*, 333 F.3d at 114.[15]

---

[15] Although Correia has now pled guilty, "the propriety of joinder turns on what is alleged in the indictment," *United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016) (citing *Rittweger*, 524 F.3d at 178 & n.3), and accordingly the fact that Correia will not be proceeding to trial is relevant, if at all, only to the question of discretionary severance under Rule 14, not joinder under Rule 8.

*Second*, as reflected in the Superseding Indictment, certain of the political donations that Parnas, Fruman, and Correia made in connection with the Straw Donor Scheme were paid for with a credit card that Parnas and Fruman subsequently paid off using funds obtained from Kukushkin and ▇▇▇▇▇▇ in connection with the Foreign Donor Scheme.  (*See* Ind. ¶ 24).  Thus, in order to prove how at least some of the funds obtained from Kukushkin and ▇▇▇▇▇▇ were used, the Government will necessarily need to put on evidence as to certain political contributions that were made in connection with the Straw Donor Scheme.  This is precisely the sort of factual overlap that makes joinder proper under Rule 8(b).  *See, e.g.*, *Turoff*, 853 F.2d at 1044 (Joinder under Rule 8(b) is appropriate where "the proof of one scheme is indispensable for a full understanding of the other.").

*Third*, the Government would offer evidence of the FEC investigation into GEP, Parnas, and Fruman—which will be a critical part of a Straw Donor Scheme trial, especially as to the false statements charged in Counts Two and Three—at a Foreign Donor Scheme trial pursuant to Federal Rule of Evidence 404(b).  Specifically, the fact that, prior to making the political donations charged in the Foreign Donor Scheme, the FEC had investigated Parnas and Fruman for violating the ban on straw donations is highly relevant to their knowledge of applicable campaign finance laws and their intent to commit the charged crimes.[16]  Conceivably, the defendants would also

---

[16] *See United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue"); *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989) (defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded those elements of the offenses charged); *see also, e.g.*, *United States v. Dubogryzov*, No. 3:06 Cr. 233 (ANH), 2007 WL 2746752, at *1 (D. Conn. Sept. 18, 2007) (admitting evidence of police investigation of defendant pursuant to Rule 404(b) "for the proper purpose of proving the defendant's knowledge and intent").

Here, there is no question that the conduct for which the FEC investigated Parnas and Fruman in mid-to-late 2018 (*i.e.*, violating the ban on straw donations) is sufficiently similar to the conduct that Parnas and Fruman are charged with engaging in, during approximately the same time

43

seek to introduce such evidence on the theory that, having recently been investigated by the FEC, they were especially unlikely to commit a willful violation of the campaign finance laws.  In either case, a significant component of the proof at a Foreign Donor Scheme trial will be the fact of, and basis for, the FEC investigation concerning a donation which is, itself, a centerpiece of the Straw Donor Scheme.  *See Attanasio*, 870 F.2d at 815 (upholding joinder of two conspiracies because, among other things, even if they had been tried separately, the evidence of the other conspiracy would have been admitted pursuant to Rule 404(b) to prove intent and motive).

The defendants' arguments in opposition to joinder under Rule 8(b) are meritless. Kukushkin argues that "other than some defendants being charged in both, there exists only one common thread between the Foreign Donor Scheme and the Straw Donor Scheme, namely vague similarities in the nature of the offenses, which alone is not a proper basis for joinder."  (Kukushkin Mot. 8).  This is incorrect for multiple reasons.  First, there is not a "vague similarit[y] in the nature of the offenses," but rather a striking commonality in that both schemes were carried out for a common purpose (advancing various nascent domestic businesses), and using common means (making political donations while hiding the true source of the funds).  Second, the fundamental similarity between the two schemes is not the "one common thread" between the two schemes.

---

period, in connection with the Foreign Donor Scheme (*i.e.*, violating the ban on straw donations and donations by foreign nationals), to be permissibly offered pursuant to Rule 404(b).  *See United States v. Brand*, 467 F.3d 179, 197(2d Cir. 2006) ("The government is required to establish only a similarity or some connection to establish that a prior act is relevant to one of the elements (in this case, intent) of the crime charged." (internal quotations omitted)).

Indeed, prior-acts evidence is particularly salient where the defendants argue—as the Government expects they will here—that they believed they were acting in "good faith" in engaging in the charged course of conduct.  *See Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."); *see also United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (same).

Rather, as discussed above, the participants and facts applicable to both schemes overlap in multiple significant ways.

Kukushkin also argues that "distinct conspiracies" cannot be joined under Rule 8(b) unless "knowledge of an overall common plan [is] shared by **all participants**." (Kukushkin Mot. 9 (emphasis in original)). That claim is wrong as a matter of law. In fact, "members of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy," "[p]rovided that the defendants are 'alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.'" *Rittweger*, 524 F.3d at 178 (quoting Fed. R. Crim. P. 8(b)); *see Attanasio*, 870 F.2d at 815 (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts"). Kukushkin relies solely on *United States v. Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990) (*see* Kukushkin Mot. 9), but that case is easily distinguishable. There, of three charged defendants, two were not charged in—and had no involvement in—one of the counts. *Menashe*, 741 F. Supp. at 1138. The court noted that in order for a plan to be "common," it must be "shared by two or more individuals or by all members of a group," and therefore severed the count because the "plan [of the defendant charged in that count] cannot be called 'common', since he is the only one alleged to be aware of it." *Id.* (quoting Webster's Ninth New Collegiate Dictionary 265 (1985)). Here, by contrast, as described above, three of the four charged defendants were deeply involved in both the Straw Donor and Foreign Donor Schemes, and moreover, both schemes shared a common purpose and an overlap of various significant facts. Kukushkin cannot establish that the two schemes are improperly joined merely by pointing to the fact that he is not charged in one of them. *See, e.g.*, *United States v. Cervone*, 907 F.2d 332, 340-41 (2d Cir. 1990) (defendant

who was named in only one count of a 102–count indictment against eighteen defendants was properly joined under Rule 8(b)).

In sum, joinder of the Straw Donor and Foreign Donor Schemes is proper under Rule 8(b) for two independent reasons: (i) because both schemes arose from a common plan or scheme, namely, a plan to advance various nascent domestic business ventures through political donations, while hiding the true source of the donations, in violation of the ban on straw donations, and (ii) because both schemes are unified by a substantial identity of participants, namely, Parnas, Fruman, and Correia, and facts, including the use of funds obtained through one scheme to make certain of the contributions at the heart of the other.  Additionally, a significant portion of the evidence applicable to the Straw Donor Scheme—the FEC investigation—should also be admitted in a Foreign Donor Scheme trial pursuant to Rule 404(b).

### 2.  The Straw Donor Scheme and Foreign Donor Scheme Should Not Be Severed Under Rule 14

Kukushkin argues that even if the Straw Donor and Foreign Donor Schemes are properly joined under Rule 8(b), the Court should exercise its discretion to sever them pursuant to Rule 14(a).  (*See* Kukushkin Mot. 27-38).  This request should be denied because Kukushkin faces little discernable prejudice from the joinder of these schemes—prejudice which, in any event, can be adequately addressed through an appropriate limiting instruction—and because the interests of efficiency, judicial economy, and avoidance of delay all weigh strongly against severance.

"[A] defendant moving for severance under Rule 14 must prove 'facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial.'" *United States v. Forde*, 699 F. Supp. 2d 637, 641 (S.D.N.Y. 2010) (quoting *United States v. An–Lo*, 851 F.2d 547, 556 (2d Cir. 1988)).  To prevail, the movant must show "not simply some prejudice but *substantial* prejudice."  *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004)

(internal quotation marks and citation omitted; emphasis in original); *see also United States v. Werner*, 620 F.2d 922, 928-29 (2d Cir. 1980) (noting that "substantial prejudice" must be shown under Rule 14 because a "lesser showing would undermine the policies behind Rule 8 and essentially read that rule from the books"). The Second Circuit has noted that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *Rosa*, 11 F.3d at 341. Even if the defendant were to establish a serious risk of prejudice, "less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citation omitted).

Kukushkin points to a number of factors that purportedly "demonstrate[] that [his] right to a fair trial would be unduly prejudiced if severance were not granted." (Kukushkin Mot. 29). First, Kukushkin argues that because he is charged only with the Foreign Donor Scheme, at a joint trial he would "be 'swamped by this mass of irrelevant evidence' offered against the defendants in the Straw Donor and Fraud Guarantee Schemes," and "[p]ermitting the jury to hear such evidence while Mr. Kukushkin sits in court would prejudice him" by placing him "at risk of 'spillover' because the jurors may not be able to prevent themselves from attributing the evidence" to him. (*Id.* 30 (citations omitted)). As an initial matter, as noted above, the Government does not object to severance of the Fraud Guarantee Scheme, which would eliminate a substantial bulk of the potential for prejudice that Kukushkin identifies. Furthermore, while at a trial of the Straw Donor and Foreign Donor Schemes trial there would undoubtedly be some evidence introduced only against Parnas and/or Fruman in connection with the Straw Donor Scheme, the potential prejudice to Kukushkin from such evidence is, at most, minimal, and falls far short of the sort of prejudice necessary to obtain severance. "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role." *United States v.*

*Ferrarini*, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) (citing *Cardascia*, 951 F.2d at 483); *Casamento*, 887 F.2d at 1153. A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *Cardascia*, 951 F.2d at 483.

The Court will of course instruct the jury that Kukushkin is not charged in connection with Counts One, Two, or Three, and when evidence as to the Straw Donor Scheme is being offered, the Government would have no objection to a similar limiting instruction that the jury should evaluate such evidence only as to Parnas and Fruman. *See United States v. Ramos*, 346 F.Supp.2d 567, 575 (S.D.N.Y. 2004) ("Such 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial.'") (quoting *United States v. Santiago*, 174 F. Supp. 2d 16, 23 (S.D.N.Y. 2001)); *Ezeobi*, 2011 WL 3625662, at *2 ("The Court may presume that the jury is capable of understanding and following limiting instructions provided during the course of and at the conclusion of the trial with regard to the manner in which it may use evidence."). Kukushkin claims that limiting instructions, though sufficient to cure any potential prejudice in most cases, would be ineffective here. (Kukushkin Mot. 37-38). His argument boils down to a mere assertion that "it will be extremely difficult, if not impossible, for jurors to segregate evidence in their minds . . . admissible only to prove the Straw Donor Scheme." (*Id.* 37). But "[the defendant's] conclusory statements regarding prejudice do not meet Rule 14(a)'s 'extremely difficult burden.'" *Pena*, 932 F. Supp. 2d at 466 (quoting *United States v. Johnson*, No. S2 10 Cr. 431 (CM), 2013 WL 150104, at *2 (S.D.N.Y. Jan. 10, 2013)).

Moreover, the Straw Donor Scheme evidence is not inflammatory or shocking in nature, such that one might worry about jurors drawing unfair inferences about Kukushkin based on his

mere affiliation with Parnas and Fruman.[17]  Nor is the evidence as to the Straw Donor Scheme or

Foreign Donor Scheme particularly complex.  This is not a case, for example, with numerous

defendants who are charged with a variety of crimes, with different defendants charged in each

count, where the jury would need to carefully keep track of which defendants are alleged to have

engaged in each criminal act and with which co-conspirators.  *See Zafiro*, 506 U.S. at 539 (noting

that the risk of prejudice from a joint trial may be heightened where "many defendants are tried

together in a complex case and they have markedly different degrees of culpability").  Rather, the

charges are entirely straightforward: the Straw Donor Scheme alleges that Fruman made four

political contributions that were illegal because they were paid for by him but reported in the names

of Parnas or GEP; and the Foreign Donor Scheme alleges that ███████ who is not a U.S. citizen,

illegally made and conspired to make contributions and donations with the aid of Kukushkin,

Parnas, Fruman, and Correia.  The two schemes (and the corresponding charges), while related as

detailed extensively above, are nonetheless distinct in a manner that will be easily understood by

jurors.

    As the Second Circuit has explained in rejecting the same argument:  "First, 'the fact that

evidence may be admissible against one defendant but not another does not necessarily require a

severance.'  Second, the evidence with respect to each of the defendants was sufficiently

straightforward that the jury could consider it without any significant spillover effect."  *Rittweger*,

---

[17]  Kukushkin points to "Parnas' and Fruman's connections to the highly inflammatory
allegations involving Ukraine and the President" (Kukushkin Mot. 33-34), but no such allegations
are included in the Superseding Indictment and the Government does not expect any such evidence
to be offered at a Straw Donor/Foreign Donor Schemes trial.  Kukushkin also points to the fact
that Parnas has "repeatedly g[iven] statements to the press . . . and even sat for hours of interviews"
(*id.* 34), but the majority of Parnas's public statements have not related to the Straw Donor or
Foreign Donor Schemes, and in any event, to the extent the Government seeks to offer such
statements at trial, they would be offered solely against Parnas, which would be abundantly clear
from the context, and which the Court can confirm through a limiting instruction.

524 F.3d at 179 (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)) (citations omitted).  Thus, Kukushkin cannot meet the "extremely heavy burden," *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (internal quotation marks and citation omitted), of establishing that the risk of prejudicial spillover is "so great as to deprive him of his right to a fair trial."  *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (citing *Casamento*, 887 F.2d at 1149).

Second, Kukushkin argues that because Parnas waived the attorney-client privilege with respect to materials that he provided to Congress, "the government may be in a position to introduce various attorney-client privileged documents and information as evidence against Mr. Parnas, [but] it has no right to use that evidence against Mr. Kukushkin."  (Kukushkin Mot. 32-33).  This argument fails because it is simply not correct that the Government is "in a position to introduce various attorney-client privileged documents and information as evidence" against Parnas or anyone else.  Materials obtained by the Government from Parnas have been subject to the filter review process just like materials obtained from other sources.  The Government has diligently avoided exposing the prosecution team to any potentially privileged material, and certainly does not intend to offer any privileged material at trial.

Third, Kukushkin argues that severance should be granted because he and his co-defendants have mutually antagonistic defenses.  (Kukushkin Mot. 34-37).  Kukushkin notes that he "expects to argue at trial that he and ███████ were victims of Messrs. Parnas and Fruman," not their co-conspirators, and that "Mr. Kukushkin's counsel will become a second prosecution team in the courtroom attacking Messrs. Parnas and Fruman and equating their conduct" to fraud.  (*Id.* 35-36).

A defense is mutually antagonistic "or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant."  *United States v. Cardascia*,

951 F.2d 474, 484 (2d Cir. 1991); *United States v. Serpoosh*, 919 F.2d 835, 837-838 (2d Cir. 1990) (citations omitted); *United States v. Volpe*, 42 F. Supp. 2d 204, 210 (E.D.N.Y. 1999) (defenses are mutually antagonistic when they create "a conflict so irreconcilable that acceptance of one defendant's defense will lead the jury to convict the other").  "It is not the mere existence of antagonistic defenses that prompts a required severance.  Instead, the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before [the court] will find such prejudice as denies defendants a fair trial." *Cardascia*, 951 F.2d at 484 (citing *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990); *United States v. Carpenter*, 689 F.2d 21, 28 (2d Cir. 1982)).  *See also United States v. Scott*, 637 Fed. App'x. 10, 13 (2d Cir. 2015) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice" and that denial of the motion to sever amounted to a "denial of a constitutionally fair trial" (citations omitted)).

Kukushkin has not identified any mutually antagonistic defenses between himself and his co-defendants sufficient to warrant severance.  To begin with, the "defense" articulated by Kukushkin is not, in fact, a defense to the charged conduct.  He contends, in essence, that Parnas, Fruman, and Correia defrauded him and ███████ by claiming that the funds provided by ███████ for the cannabis venture would be used for political donations, when in fact they were largely spent on personal expenses.  Even assuming *arguendo* that Kukushkin successfully proves this theory at trial, it would not negate any of the elements of the offenses with which he is charged. Kukushkin is charged in Count Four with conspiring to violate the ban on straw donations and the ban on foreign donors, and in Count Six with aiding and abetting the making of donations by a foreign national.  Even if Parnas, Fruman, and Correia were trying to mislead Kukushkin and

█████ it would remain the case that Kukushkin and █████ agreed *with each other* to engage in the charged conduct (thus violating Count Four[18]) and that Kukushkin aided and abetted █████ in sending funds to the United States to make the specified political donations (thus violating Count Six).  Kukushkin is guilty of these offenses regardless of whether he was also being misled by Parnas, Fruman, and Correia.  Thus, while the Government does not dispute that Kukushkin is free to advance this theory at trial, it is important to note that it is by no means a defense to either of the charges against him.

In any event, Kukushkin's "defense" is not the sort of antagonistic defense that warrants severance.  To satisfy his burden, Kukushkin must establish that "'the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.'"  *United States v. Potamitis*, 739 F.2d at 790 (quoting *United States v. Carpentier*, 689 F.2d 21, 27-28 (2d Cir. 1982), *cert. denied*, 459 U.S. 1108 (1983)).  "The mere fact that co-defendants seek to place the blame on each other is not the sort of antagonism that requires a severance."  *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) (citing *Casamento*, 887 F.2d at 1154 ("fingerpointing" not sufficient)).  Here, Kukushkin's "defense" is not mutually antagonistic as to his co-defendants because the jury would not be required to find his co-defendants guilty if the jury accepted his defense, and nor would the jury need to find Kukushkin guilty if it accepted his co-defendants' defense.  *See United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) ("Defenses are mutually antagonistic when accepting one defense requires that the jury must of necessity convict a second defendant." (internal quotation marks omitted)).  If the jury were to believe Kukushkin and conclude that Parnas, Fruman, and

---

[18] At most, if Kukushkin proves that Parnas, Fruman, and Correia were defrauding him, it might allow the jury to infer that Kukushkin was not in a conspiracy with them.  But as noted above, it would remain true that Kukushkin was in a conspiracy with █████ which is sufficient to establish his guilt on Count Four.

Correia were defrauding him, that would not mean that the jury must convict Parnas and Fruman—on the contrary, it would indicate, if anything, that Parnas and Fruman did not intend to make the contributions with which they are charged.  Similarly, there is no reason to believe that if the jury is persuaded by whatever arguments Parnas and Fruman may choose to advance, the jury will therefore need to convict Kukushkin.  If anything, the contrary is again more likely to be true: if the jury decides to acquit Parnas and Fruman, it is most likely that the jury would reach the same conclusion as to Kukushkin.  Simply put, it is not uncommon for certain defendants in a multi-defendant case to point their fingers at each other.  Kukushkin has not come close to identifying the sort of "irreconcilable" "conflict" that will cause "such prejudice as denies [him] a fair trial." *Cardascia*, 951 F.2d at 484.

Finally, the concerns raised by Kukushkin pale in comparison to the multiple factors that weigh strongly in favor of a joint Straw Donor/Foreign Donor Schemes trial.  *See Jimenez*, 824 F. Supp. at 366 (even where a joint trial may cause some prejudice to a defendant, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits"); *Panza*, 750 F.2d at 1149 (prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").  Because of the overlapping nature of the participants and facts between the two schemes, a joint trial would allow for a far more efficient use of the time and resources of the Court, the parties, and certain witnesses.  As discussed above, at both a Straw Donor Scheme trial and a Foreign Donor Scheme trial, the Government would seek to introduce (i) evidence of certain political donations that were made in connection with the Straw Donor Scheme but paid for using funds obtained through the Foreign Donor Scheme, as such evidence is intrinsic to both schemes (*see* Ind. ¶ 24; *see supra* 43-44), and (ii) evidence of the FEC investigation of GEP,

Parnas, and Fruman pursuant to Rule 404(b) as such evidence is strongly probative of Parnas's and Fruman's knowledge of applicable campaign finance laws and their intent to commit the charged crimes (*see supra* 44-45).  The Government would also anticipate certain common witnesses at both a Straw Donor Scheme trial and a Foreign Donor Scheme trial.  For example, one individual who is an important witness to both schemes is a senior official of AFA, the PAC to which Parnas and Fruman contributed $325,000 in the name of GEP.  This witness played an instrumental role in coordinating various contributions in connection with the Straw Donor Scheme, and he also played an important role in facilitating Parnas's and Fruman's attendance at certain political events in Nevada, which are a key part of the Foreign Donor Scheme.  (*See* Ind. ¶ 21).  Various background and contextual evidence regarding Parnas, Fruman, and Correia, and their relationships to each other, would also be offered at both a Straw Donor Scheme trial and a Foreign Donor Scheme trial.

In sum, a single trial of the Straw Donor and Foreign Donor Schemes would allow for a far more efficient use of the time and resources of the Court, jurors, witnesses, and the Government.  Parnas and Fruman would face no prejudice whatsoever from such a trial.  Kukushkin faces, at most, minimal prejudice that is no different than the minimal prejudice faced by most defendants who are tried at the same time as co-defendants who are more culpable and are charged in a broader range of conduct.  The Court can easily cure such potential prejudice through appropriate limiting instructions.  Kukushkin cannot come close to carrying his "extremely heavy burden" of establishing such substantial prejudice "as to deprive him of his right to a fair trial."  *Nerlinger*, 862 F.2d at 974; *Bellomo*, 954 F. Supp. at 649.

**D. KUKUSHKIN'S REQUEST FOR A SEVERANCE** ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **SHOULD BE DENIED**

Kukushkin next argues that because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the Court should (i) sever the trial of Kukushkin from any trial of ▮▮▮▮▮▮▮▮▮ (thus requiring *two* trials on the Foreign Donor Scheme alone), (ii) ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and (iii) ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Kukushkin Mot. 15-26). This request is baseless and should be rejected.

The Second Circuit has

> identified several factors for determining whether to grant severance based on a defendant's need to call a co-defendant as a witness:
>
> (1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege;
>
> (2) the degree to which the exculpatory testimony would be cumulative;
>
> (3) the counter arguments of judicial economy; and
>
> (4) the likelihood that the testimony would be subject to substantial, damaging impeachment.

*United States v. Ferguson*, 676 F.3d 260, 287 (2d Cir. 2011) (quoting *United States v. Finkelstein*, 526 F.2d 517, 523-24 (2d Cir. 1975). "While no single facet of this test is dispositive, the first [factor] is of particular importance." *United States v. Pirro*, 76 F. Supp. 2d 478, 481 (S.D.N.Y. 1999).

Kukushkin's motion fails principally based on the first *Finkelstein* factor:  He cannot

show—and has not even attempted to show— █████████████████████████████████████

████████████████████████████████████████   As another court in this Circuit has

explained in rejecting a virtually identical motion:

> [T]he Court finds that [defendant] has not shown that [co-defendant] would waive her Fifth Amendment rights and testify at a severed trial.  Given the fact that [co-defendant did not] plead[ ] guilty . . . it is unrealistic to think that [she] would be any more willing to waive [her] constitutional privilege against self-incrimination when called as a witness at a separate trial than [she] would be willing to insist upon [her] privilege as a defendant not to take the stand. . . .
>
> [Defendant] has not presented an affidavit from [co-defendant] indicating that [co-defendant] would be inclined to testify . . . . and the Court has not found any independent basis to support such a finding. . . .
>
> [Defendant's] argument that [co-defendant] will testify if she is tried first is speculative.  This argument is premised on an unfounded claim that [co-defendant] would no longer have any Fifth Amendment concerns if her trial proceeded first.  Clearly, such an argument is incorrect.  *See United States v. Triumph Capital Group, Inc.*, 260 F.Supp.2d 432, 443 (D. Conn. 2002) (noting that codefendant's Fifth Amendment concerns would continue after his trial, particularly if the co-defendant "[was] convicted in [an] earlier trial and had a motion or appeal pending that challenged his conviction and could result in a new trial.").

*United States v. Schlegel*, No. 06 Cr. 0550 (JS), 2009 WL 3837305, at *2 (E.D.N.Y. Nov. 16,

2009) (internal quotations and citations omitted); *see also United States v. Wilson*, 11 F.3d 346,

354 (2d Cir. 1993) (no abuse of discretion where district court denied severance, finding that "since

[co-defendant] had not pleaded guilty, it was unrealistic to think that [co-defendant] would be any

more willing to waive his privilege at a separate trial than at the joint trial").

Indeed, virtually the only circumstance in which courts find the first factor to be satisfied is when a co-defendant provides a sworn affidavit stating that he will waive his Fifth Amendment privilege against self-incrimination and testify at a severed trial of his co-defendant. *See, e.g.*, *United States v. Morelli*, No. S1 04 Cr. 391 (DAB), 2005 WL 743062, at *3 (S.D.N.Y. Mar. 29, 2005) (granting severance where defendants submitted a sworn affidavit from co-defendant "in which he states that he would waive his Fifth Amendment Privilege against self-incrimination and testify at the separate trial" and sets forth the specific exculpatory testimony he would offer at trial); *United States v. DePalma*, 466 F. Supp. 920, 922 (S.D.N.Y. 1979) (holding that first *Finkelstein* factor was satisfied where co-defendant submitted affidavit stating he would testify at separate trial of moving defendant and setting forth substance of his proposed testimony); *United States v. Stella*, No. 90 Cr. 95, 1990 WL 128918, at *7 (S.D.N.Y. Aug. 27, 1990) (same); *United States v. Gardell*, No. 00 Cr. 632, 2001 WL 1135948, at *9 (S.D.N.Y. Sep. 25, 2001) (noting that "[c]ourts have required a factual showing that demonstrates with a modest degree of definiteness the exculpatory nature and effect of the co-defendant's testimony") (listing cases).

Here, Kukushkin has not provided sworn affidavits █████████████████████████ ████████████████████████████████████████. Nor has he provided any other reason to believe that ██████ would agree to do so. To the contrary, Kukushkin has stated— elsewhere in his brief—that at trial "Mr. Kukushkin's counsel will become a second prosecution team in the courtroom attacking Messrs. Parnas and Fruman and equating their conduct to that alleged in thefts committed in connection with the Fraud Guarantee Scheme." (Kukushkin Mot. 36). Indeed, Kukushkin plans to prove at trial that Parnas and Fruman engaged in a scheme to defraud him and ██████████ Given this strategy, it is hard to imagine that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

Kukushkin also incorrectly contends that ████████████████████████████████

████████████████████████████████████████████. "[I]t is well established

that a waiver of the [Fifth Amendment] privilege in one proceeding does not affect the rights of a

witness or the accused in another independent proceeding." *United States v. Miranti*, 253 F.2d

135, 139 (2d Cir. 1958) (holding that witness's "disclosure of information to the FBI (here in the

nature of a confession), while admissible as evidence in a subsequent trial of the witness, if

voluntarily made, does not constitute a waiver of the witness' privilege against self-incrimination

even in response to the same questions before a grand jury").

For instance, in *United States v. Avenatti*, defendant Michael Avenatti moved to compel

the testimony of Mark Geragos, an individual who had participated in the charged conduct and

whom the Government initially described as an unindicted co-conspirator. No. S1 19 Cr. 373

(PGG), 2020 WL 418453, at *1 (S.D.N.Y. Jan. 26, 2020). Avenatti argued that Geragos had

waived his Fifth Amendment rights by proffering with the Government. *Id.* at *1, *9. The court

rejected this argument, explaining:

> While [the "innocence proffer"] agreement makes clear that
> the Government may use any of the statements Geragos
> makes during the innocence proffers against him . . . Geragos
> does not agree – in the innocence proffer agreement – to
> never assert his Fifth Amendment privilege in a subsequent
> proceeding. Accordingly, the innocence proffer agreement
> does not, standing alone, prevent Geragos from asserting his
> Fifth Amendment privilege at trial. It merely prevents him
> from objecting to the Government's introduction of his
> proffer statements against him. And, as discussed above, the
> fact that Geragos waived his Fifth Amendment privilege
> during the innocence proffers does not prevent him from
> asserting his Fifth Amendment privilege at trial.

*Id.* at \*10 (citing *Miranti*, 253 F.2d at 139) (footnote omitted); *see also United States v. James*, 609 F.2d 36, 45 (2d Cir. 1979) ("waiver of the privilege [against self-incrimination] in one proceeding does not affect a witness['s] rights in another proceeding"); *United States v. Housand*, 550 F.2d 818, 821 n.3 (2d Cir. 1977) ("His voluntary testimony in the Grand Jury, by the weight of authority, did not waive his right to claim privilege at trial[,] a separate proceeding."); *United States v. Longstreet*, 567 F.3d 911, 923 (7th Cir. 2009) (noting that the district court "considered and appropriately rejected" defendant's argument that a witness had "relinquished or waived his Fifth Amendment privilege by voluntarily making his prior proffer to the government"); *United States v. Lawrenson*, 315 F.2d 612, 613 (4th Cir. 1963) ("[Defendant's] claim that [a witness], having given a statement, has waived his fifth amendment privilege, and so should be forced to testify, is without merit.").

This case is on all fours with *Avenatti*—indeed, if anything, Kukushkin's argument is notably weaker than Avenatti's because Kukushkin is seeking to compel the testimony of ███ ███████████████ whereas Avenatti was seeking to compel the testimony of an uncharged witness. Here, as in *Avenatti*, ██████████████████████████████████ ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ "[]ever assert[ing] his Fifth Amendment privilege in a subsequent proceeding."   *Avenatti*, 2020 WL 418453, at \*10.   Rather, ████████████████████████████████████████

---

[19] Here, ████████████████████████████████████████████████ ████████████████████████.   In *Avenatti*, by contrast, Geragos had signed an "innocence proffer" agreement, which freely permitted the Government to use his statements against him.   Thus, if anything, ████████████ have a *stronger* claim than Geragos to having not waived their Fifth Amendment rights in the context of a future trial.



In a last-ditch effort to escape ███████████████████████████

███ Kukushkin argues that the Court can simply forbid the Government from "us[ing] ███

████████████████████████████████████████████████████████████████

under the authority of *Simmons v. United States*, 390 U.S. 377, 394 (1968)."  (Kukushkin Mot.

25).  *Simmons* provides no such authority.  Rather, *Simmons* stands for the proposition that when

a defendant makes "a showing of substantial tension between [the] defendant's desire to testify in

a hearing that adjudicates a claim of constitutional right in a criminal case and the right of that

defendant not to give testimony that is incriminating as to the charge in question," the court should

provide "use immunity" for the defendant's testimony in the hearing.  *United States v. Bryser*, 95

F.3d 182, 186 (2d Cir. 1996) (citing *Simmons*, 390 U.S. at 394).  Thus, for example, pursuant to

*Simmons*, if a defendant provides testimony in support of a motion for the assignment of counsel,

such testimony should not be used by the Government in its direct case against the defendant.  *Id.*

Kukushkin cites no case in which a court has relied on *Simmons* to prohibit the Government from

using a witness's trial testimony against such witness, and the Government is not aware of any.

Nor would such an extension of *Simmons* make any sense, since that case was focused on

safeguarding a defendant's *own* Fifth Amendment rights, not on protecting witnesses who

voluntarily waive their Fifth Amendment rights and testify at trial.[20]

---

[20] Kukushkin also contends that the Court can immunize ██████████████, or order the
Government to do so.  (Kukushkin Mot. 25-26).  *First*, "[n]o court has authority to immunize a
witness.  That responsibility . . . is peculiarly an executive one, and only the Attorney General or
a designated officer of the Department of Justice has authority to grant use immunity."  *Pillsbury*

Because Kukushkin cannot meet the first *Finkelstein* factor—establishing that █████████ █████████████████████████████████—the Court need not consider the remaining factors. *See Pirro*, 76 F. Supp. 2d at 481 ("the first [factor] is of particular importance"). In any event, the third and fourth factors also weigh against severance.[21] With respect to the third factor—judicial economy—severing Kukushkin would require two separate Foreign Donor Scheme trials. Thus, the same witnesses, the same documents, and the same arguments would be presented twice before two different juries. This would be massively inefficient. Finally, with respect to the fourth factor—the likelihood that ████████████████████ would be subject to substantial, damaging impeachment—the Government expects that ████ self-serving, false exculpatory statements would be easily impeached. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

*Co. v. Conboy*, 459 U.S. 248, 261 (1983) (citing 18 U.S.C. §§ 6002, 6003). "The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006).

*Second*, although "under 'extraordinary circumstances,' due process may require that the government confer use immunity on a witness for the defendant," *United States v. Stewart*, 907 F.3d 677, 685 (2d Cir. 2018) (citation omitted), in order to obtain such relief, a defendant must establish, among other things, that "the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation." *Id.* (quoting *Ebbers*, 458 F.3d at 119). Here, of course, ████████████████████ Thus, the Government has good reason not to immunize ████████ Kukushkin has not attempted to articulate how he meets the requisite standard, and plainly, he cannot.

[21] As to the second factor—the degree to which the allegedly exculpatory testimony would be cumulative—the Government concedes that it would not be cumulative. The Government is not aware of other evidence that corroborates the self-serving false exculpatory statements ████ ████████████████████—which is a key reason the Government does not credit the statements.

████████████████████████████████████  *See Schlegel*, 2009 WL 3837305,

at *3 ("[A]s to the fourth factor, the Court finds that there is a likelihood that [co-defendant's]

testimony would be subject to impeachment given the fact that the Government seeks to prove that

[co-defendant] and [defendant] jointly participated in the alleged conspiracies for which they are

charged.").

### E. FRUMAN'S REQUEST FOR A SEVERANCE FROM PARNAS SHOULD BE DENIED

Fruman argues that he and Parnas should be severed—not just as to Count Seven (the Fraud

Guarantee Scheme, for which the Government does not object to severance) but for *all* counts,

notwithstanding that Parnas and Fruman are charged with committing the same crimes together

while they were business partners.  (Fruman Mot. 24-27).  The Court should decline to exercise its

discretion under Rule 14(a) to grant such a severance as it is unnecessary to prevent unfair

prejudice to Fruman and because it would severely undermine the strong interests in efficiency,

judicial economy, and avoidance of delay.  *See Feyrer*, 333 F.3d at 114.

As discussed above, there is a "preference in the federal system for joint trials of defendants

who are indicted together."  *Zafiro*, 506 U.S. at 537 (1993).  "It would impair both the efficiency

and the fairness of the criminal justice system to require . . . that prosecutors bring separate

proceedings, presenting the same evidence again and again, requiring victims and witnesses to

repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-

tried defendants who have the advantage of knowing the prosecution's case beforehand."

*Richardson*, 481 U.S. at 210.  "[J]oint trials [also] generally serve the interests of justice by

avoiding the scandal and inequity of inconsistent verdicts."  *Id.*  Thus, even where a joint trial may

cause some prejudice to a defendant, "[t]he risks of prejudice attendant in a joint trial are

presumptively outweighed by the conservation of time, money, and scarce judicial resources that

a joint trial permits." *Jimenez*, 824 F. Supp. at 366 (S.D.N.Y. 1993).  Furthermore, the presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme."  *Salameh*, 152 F.3d at 115.  Accordingly, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.

Fruman argues, first, that even if the trial of the Fraud Guarantee Scheme is severed, evidence of that scheme may be offered in a Straw Donor/Foreign Donor Schemes trial pursuant to Rule 404(b), which would prejudice Fruman.  (Fruman Mot. 25).  As an initial matter, the Government does not currently plan to offer evidence of the Fraud Guarantee Scheme at a Straw Donor/Foreign Donor Schemes trial pursuant to Rule 404(b) or otherwise.  But even were the Government to do so, there is no reason to believe that Fruman would be prejudiced by such evidence.  On the contrary, Fruman would likely use such evidence to distinguish himself from Parnas by noting that Parnas, unlike Fruman, perpetrated a wide-ranging years-long multimillion-dollar fraud scheme.  The Court could also provide an appropriate limiting instructions to the jury explaining the purpose of such Rule 404(b) evidence and making clear that they should consider it, if at all, only as to Parnas.  *See Ramos*, 346 F. Supp. 2d at 575 ("Such limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial." (internal quotation marks omitted)).

Second, Fruman argues that Parnas "has already begun trying this case in the court of public opinion and has gained a great deal of attention in the media through his efforts," leading to various inaccurate and prejudicial news reports concerning Fruman.  (Fruman Mot. 26).  However, even assuming Fruman's characterizations to be accurate, the Court can and will nonetheless cure any

potential prejudice through a careful *voir dire* process aimed at selecting only jurors who have no preconceived views about the case, the parties, or the evidence. The Court presumably will also instruct jurors not to read any press concerning the case and not to research the case or run searches about it on the internet. Jurors are presumed, of course, to follow such instructions, and in any event, the risk of the instructions being disregarded is the same whether Parnas and Fruman are tried together or separately.[22]

In sum, the Government does not object to severance of the Fraud Guarantee Scheme, but objects to (i) the defendants' motion to sever the Straw Donor and Foreign Donor Schemes, (ii) Kukushkin's motion to sever his trial from his co-defendants, and (iii) Fruman's motion to sever his trial from Parnas. For the reasons set forth above, the Court should find that the Straw Donor and Foreign Donor Schemes are properly joined under Rule 8(b), and should decline to exercise its discretion under Rule 14(a) to order any severance of counts or defendants as to those schemes.

## III.   THE GRAND JURY'S INDICTMENT WAS NOT IN VIOLATION OF THE CONSTITUTION AND A HEARING IS NOT REQUIRED

Parnas moves, in a motion joined by the other defendants, for discovery and an evidentiary hearing relating to the Government's presentation to the grand jury, and for dismissal of the Superseding Indictment because it was purportedly obtained in violation of the Fifth and Sixth Amendments. Despite this broad request, the motion does not provide any reason why the Superseding Indictment should be dismissed. Instead, Parnas's "motion" is little more than a

---

[22] Fruman also alludes to "antagonistic . . . defenses" between Parnas and himself. (Fruman Mot. 26). He does not elaborate on what their defenses are or why they are supposedly antagonistic. In any event, as discussed above (*see supra* 51-52), in order to be so antagonistic as to warrant severance, defenses must be "irreconcilable" such that "in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Cardascia*, 951 F.2d at 484. Fruman has made no such showing here.

laundry list of questions that Parnas has about the grand jury proceedings, substantially all of which are protected by a presumption of grand jury secrecy, and the defendants have not provided any legitimate basis to depart from that presumption. To the extent the Government can provide the information relating to those request without running afoul of grand jury secrecy, the Government will do so shortly upon the Court's entry of a protective order, including by providing information from the Jury Administrator relating to the composition of the grand jury. Therefore, the defendants' motion and requests for additional information should be denied.

## A. APPLICABLE LAW

"There is a tradition in the United States, a tradition that is 'older than our Nation itself,' that proceedings before a grand jury shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)). The bar for obtaining disclosure of grand minutes is exceedingly high, and such relief is never granted absent extraordinary circumstances. That is because grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991). A review of grand jury minutes "should not be permitted without concrete allegations of Government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994). "Mere speculation" about the proceeding before the grand jury "falls far short of the showing to overcome the presumption of secrecy." *United States v. Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).

While minutes of grand jury proceedings are afforded a presumption of regularity and secrecy, under the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1867, a defendant may move to dismiss the indictment "on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." 28 U.S.C. § 1867(a). In preparation for such a

motion, a defendant is entitled to inspect the "content of records or papers used by the jury commission or clerk in connection with the jury selection process." 28 U.S.C. § 1867(a), (f). Thus, a defendant is generally entitled to some records relating to the how the grand jury was drawn, summoned, or selected in preparing a challenge to the composition of the grand jury.

### B. DISCUSSION

First, the defendants make several requests for information relating to whether there was a quorum of grand jurors that returned the Superseding Indictment and what evidence was presented to them. (Parnas Mot. 36-37). The answers to several of those questions are straightforward and have already been provided by the Government or are otherwise publicly available. The original Indictment was returned by a special grand jury sitting in Manhattan on October 9, 2019, and the Superseding Indictment was returned by a different special grand jury sitting in Manhattan on September 18, 2020. There were twenty grand jurors present when the Superseding Indictment was returned, seven of whom participated using video teleconferencing from a location in the White Plains courthouse. The defendants ask several additional questions about whether the second grand jury was presented with "all testimony and evidence upon which the previous indictment was based." But that information is protected by grand jury secrecy and the defendants have failed to make any concrete allegations of Government misconduct that would overcome the presumption of secrecy. *See United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017) (rejecting the defendant's request for grand jury materials because she "merely speculates that the Government may not have presented to the second grand jury evidence regarding her conduct"); *United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 3577903, at *10 (S.D.N.Y. July 1, 2020) ("Defendant's speculation regarding what evidence the Government may or may not have

presented to the grand jury is insufficient to meet his burden to overcome the presumption of regularity.").[23]

Second, the defendants seek information about the removal of certain allegations from the "speaking" portion of the Superseding Indictment and raise six questions about whether information about Ukraine was presented to the grand jury.  Much like their first request, the defendants have failed to advance anything more than "mere speculation" about what occurred before the grand jury, and have not made the concrete showing required to gain access to the requested materials.  Indeed, the defendants have not even attempted to link the newspaper stories cited in their motion about information coming from Ukraine with the Superseding Indictment. (Parnas Mot. 38).  And more generally, in a superseding indictment, the Government and the grand jury are free to refine the theory of a case, add or drop charges, or alter "speaking allegations." The fact that there were changes from the original Indictment to the Superseding Indictment— including adding counts, adding an existing defendant to a count, and revising the "speaking allegations"—is neither unordinary nor a basis to invade grand jury secrecy.

Finally, the defendants request information about the composition of the grand jury so that they may assess whether the grand jury was drawn in compliance with the JSSA.  The Government has answered the first three questions posed by the defendants, and will provide records from the Jury Administrator pursuant to the JSSA upon the Court's entry of a protective order.  (Parnas Mot. 40-41).  Pursuant to the Court's suggestion at the last conference, these records are substantially similar to those that have been produced by the Government in other recent cases.

---

[23] The single case cited by the defendants in support of their request on this point, *United States v. Reyes*, 921 F. Supp. 189 (S.D.N.Y. 1996), both predates and is inconsistent with the Circuit's later ruling in *Schlegel*.  And in any event, the court in *Reyes* did not order the Government to produce grand jury material, it merely ordered *in camera* review.  If the Court here believes it is necessary, the Government is prepared to make an *ex parte* submission on this issue.

*See, e.g.*, *United States v. Balde*, No. 20 Cr. 281 (KPF); *United States v. Rodriguez*, No. 20 Cr. 301 (PKC). To the extent the defendants seek leave to file a supplemental motion based on this information, the Government opposes the request as untimely, but asks that it be permitted to file a separate opposition if leave is granted.[24]

## IV.    <u>KUKUSHKIN IS NOT ENTITLED TO A RULE 15 DEPOSITION</u>

Kukushkin moves for a Rule 15 deposition of ███████ but his motion fails to meet every aspect of the standard and falls far short of demonstrating that "exceptional circumstances" exist to grant such a deposition.[25] The Court should dispose of the motion because the relief Kukushkin seeks is impossible: Russian law prohibits taking testimony in Russia for use in the United States. In addition, even if it were possible to depose ██████ in Russia, the lack of an effective oath or any possibility of extradition would render ██████'s already suspect testimony wholly unreliable. Kukushkin's allegations are also insufficient to establish ██████'s unavailability, and that ██████'s testimony is material and not cumulative of other evidence and testimony available to him. Kukushkin's motion should be denied.

### A.  APPLICABLE LAW

Rule 15 permits a court to grant a party's motion for a pretrial deposition in a criminal case only "because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). The Rule requires that such a "deposition must be taken and filed in the same manner as

---

[24] The Superseding Indictment was returned on September 18, 2020, and these questions about the grand jury's composition would have been known to the defendants at that time. It was not until November 27, 2020—the day after Thanksgiving and the Friday before the defendants' motions were due—that Parnas first made a request for these materials. The defendants' delay in making such a request is no excuse for extending the motion deadline.

[25] Although Parnas and Fruman generally join in their co-defendants' motion to the extent not adverse to their own (Fruman Mot. 29; Parnas Mot. 49), neither specifically joins Kukushkin's motion with respect to the Rule 15 deposition of ██████ Nonetheless, the Government construes Parnas and Fruman as joining in this motion.

a deposition in a civil action" and that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial." *Id.* 15(e). As a result, "more than one court has observed that 'foreign depositions are suspect and, consequently, not favored.'" *United States v. Oudovenko*, No. 00 Cr. 1014 (JG), 2001 WL 253027, at *3 (E.D.N.Y. Mar. 7, 2001) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993)). "This is due, in part, to the use of different procedures related to, *inter alia*, the oath, the translation process, and the opportunity for cross-examination." *Id.*; *see also United States v. Salim*, 855 F.2d 944, 950 (2d Cir. 1988) (expressing "considerable concern about the possible abuses of foreign methods of examining witnesses").

The party seeking a Rule 15 deposition bears the burden of demonstrating that "exceptional circumstances" exist. *United States v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008). Specifically, the movant "'must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice.'" *Id.* (quoting *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)).

With respect to witness availability, the movant must establish that he made a "good-faith effort to produce the person to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984). "[S]pecific reasons" must be provided to establish unavailability; "'[c]onclusory statements of unavailability . . . are insufficient." *United States v. Pham*, No. 12 Cr. 423 (AJN), 2015 WL 7871348, at *1 (S.D.N.Y. Dec. 4, 2014) (quoting *United States v. Chusid*, No. 00 Cr. 263 (LAK), 2000 WL 1449873, at *1 (S.D.N.Y. Sept. 27, 2000)).

Evidence is "material" for purposes of Rule 15 "if it is 'highly relevant to a central issue in the case . . . .'" *United States v. Grossman*, No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005) (quoting *Drogoul*, 1 F.3d at 1556); *see also United States v. Abu Ghayth*,

No. 98 Cr. 1023 (LAK), 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014) (reasoning that proposed Rule 15 testimony "should be more than merely relevant"). This requires "some showing, beyond unsubstantiated speculation, that the evidence exculpates the defendant." *United States v. Kelley*, 36 F.3d 1118, 1125 (2d Cir. 1994) (internal quotation marks omitted); *see also United States v. Merritt*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *5 (S.D.N.Y. May 7, 1991) (denying Rule 15 deposition request where "the defendants have made no showing that the deponents' testimony would be exculpatory"). And even if the sought-after evidence is material, "a court may properly deny the motion if the proposed testimony would be cumulative or consists of hearsay." *Id.* (citing *United States v. Dunseath*, No. 98 Cr. 493 (JGK), 1999 WL 165703, at *1 (S.D.N.Y. Mar. 25, 1999) and *United States v. Campbell*, No. 91 Cr. 1219 (RJD), 1998 WL 564376, at *1 (E.D.N.Y. June 30, 1998)); *see also Abu Ghayth*, 2014 WL 144653, at *2 ("[T]he proposed testimony must be admissible and non-cumulative of other evidence.").

Finally, "[t]he 'failure of justice' element is met if the other two elements are met and there are no other countervailing factors." *United States v. Epskamp*, No. 12 Cr. 120 (RJS), 2013 WL 12175097, at *2 (S.D.N.Y. Oct. 3, 2013); *accord Vilar*, 568 F. Supp. 2d at 442 (reasoning that courts must also consider "'substantial countervailing factors militating against the taking of the deposition'" (internal citation omitted). "Such countervailing factors would include," among other things, (i) "undue expense to the non-moving party and significant delays in trying the matter," *United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2008 WL 4735269, at *2 (S.D.N.Y. Oct. 27, 2008); (ii) "whether the safety of United States officials would be compromised by going to the foreign location," *United States v. Olafson*, 213 F.3d 435, 442 (9th Cir. 2000); and (iii) "the likelihood that the procured testimony will be admissible at trial," *United States v. Jefferson*, 594 F. Supp. 2d 655, 655 (E.D. Va. 2009).

## B. DISCUSSION

Kukushkin cannot demonstrate that "exceptional circumstances" exist to warrant the exceptional relief he seeks: a deposition of a Russian citizen—a co-conspirator who is directly implicated in the Foreign Donor Scheme—in Russia.  Such a deposition is prohibited by Russian law and is thus an impossibility.  Furthermore, Kukushkin has failed to meet his burden of demonstrating ███████'s unavailability, or the materiality of his testimony.

### 1. Countervailing Considerations Weigh Against Granting a Rule 15 Deposition

While Kukushkin's motion is silent as to where ███████ is currently located, ███████ is a Russian national (Ind. ¶ 12) whom the Government believes to currently be located in Russia.[26] Kukushkin seeks to depose ███████ in Russia, or by videoconference from Russia.  (Kukushkin Br. 39).  However, what Kukushkin proposes is impossible:  Russian law prohibits taking any testimony under oath in Russia for use in the United States.  The impossibility of taking ███████'s testimony in Russia—coupled with the lack of an effective oath, the possibility of extradition, or any indicia of reliability for that testimony—constitute countervailing considerations that compel denial of his motion.[27]

---

[26] On December 10, 2020, and December 23, 2020, the Government contacted ███████'s counsel and asked (i) whether ███████ was located in Russia; (ii) whether ███████ would travel to the United States to testify; and (iii) whether Foreign National-1 would participate in a deposition, or assert his Fifth Amendment rights.  ███████'s counsel declined to answer the Government's inquiries.

[27] Kukushkin asks to depose ███████ in Russia or another "mutually agreeable foreign jurisdiction," but Kukushkin does not specify which "foreign jurisdiction" that might be. (Kukushkin Mot. 39).  The countervailing considerations prong requires a country-specific analysis focused on, among other things, the particular country's extradition treaty with the United States, the feasibility of conducting a deposition in that country, and whether that country permits testimony under oath.  Kukushkin's lack of specificity with respect to the proposed location of the deposition does not allow the Government or the Court to engage in the sort of analysis required by Rule 15.  Moreover, Kukushkin is also silent as to whether ███████ will leave Russia to travel to another foreign jurisdiction.  To the extent Kukushkin proffers new facts regarding the proposed

Simply put, Russian law prohibits foreigners from taking depositions in Russia.  As set forth in the accompanying declaration of William P. Fritzlen, an attorney advisor in the Office of the Assistant Legal Advisor for Consular Affairs at the United States Department of State, Russian authorities "do <u>not</u> recognize the authority or ability of foreign persons, such as American attorneys, to take voluntary depositions of willing witnesses, even before a U.S. consular officer."[28]  Ex. I (Fritzlen Decl. ¶ 6 (emphasis in original)).  Indeed, Russia has advised that "it would deem taking depositions in Russia before a U.S. consular officer as a violation of Russia's judicial sovereignty," which could result in the "arrest, detention, expulsion, or deportation of the American attorney."  (*Id.* ¶ 7).  Moreover, the process by which defense attorneys may seek evidence from foreign countries, the letters rogatory request process, is not feasible here.  Although Russia has "insisted on the exclusive use of letters rogatory, this vehicle has proven in practice to be unreliable," and the State Department is not aware of any "request for testimony pursuant to letters rogatory on behalf of the defense in a criminal or civil case, has been successfully executed in Russia in recent years."  (*Id.* ¶ 8).  In the State Department's experience, "all such" letters rogatory requests sent to Russia are "returned unexecuted."  (*Id.* ¶ 11).

Even if Russian law did permit ███████'s deposition, because Russia does not deport its citizens to the United States, ███████'s testimony would "essentially be free of any penalty of perjury, calling into doubt the reliability of any of the potential testimony."  *United States v. Buck*,

---

location of the deposition or ███████'s willingness to travel in his reply brief, the Government respectfully requests that the Court disregard any newly-raised arguments or facts, or allow the Government an opportunity to respond in a sur-reply.

[28] Other Courts have recognized the impossibility of conducting depositions either in person or by videoconference within Russia. *See Interlabservice, OOO v. Illumina, Inc.*, 2017 WL 4217133, at *9 (S.D. Cal. Sept. 20, 2017) (accepting defendant's assertion that "Russian law prohibits the taking of depositions in Russia for American lawsuits — even if the depositions are taken by videoconference") (citation omitted); *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, No. 19 Civ. 4355 (LGS), 2020 WL 4034733, at *3-4 (S.D.N.Y. July 17, 2020) (same).

271 F. Supp. 3d 619, 624 (S.D.N.Y. 2017).  The Government has conferred with the Office of International Affairs at the Department of Justice, and they have advised that Russia does not extradite Russian citizens to the United States on any charges, because Russia and the United States do not have a bilateral extradition treaty.  Accordingly, ██████ would in effect be unconstrained by any oath or obligation tell the truth because he would be "entirely beyond the reach of the United States government[,]" as [he is a Russian] citizen[] not subject to United States extradition or, as a result, perjury charges."  *United States v. Banki*, No. 10 Cr. 08, 2010 WL 1063453, at *2 (S.D.N.Y. Mar. 23, 2010) (denying motion for CCTV testimony for Iranian witnesses in Iran).  "Without the teeth of the penalty of perjury, the oath becomes nothing more than an empty recital.  Thus, the strongest indicator of the reliability of a witness' testimony—the oath—is effectively absent here."  *Id.*  The absence of a viable perjury sanction for ██████'s testimony provides yet another reason for denying Kukushkin's motion.

The lack of an effective oath—when coupled with the lack of opportunity for in-person cross examination and observation by the jury—is particularly concerning here given that ██████'s potential testimony (as previewed in the attorney proffer provided to the Government and produced to the defendants) lacks indicia of reliability and is in significant part *contradicted* by the contemporaneous evidence.  As relevant to Kukushkin's motion, ██████ would purportedly testify that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ (Kukushkin Mot. 42).  Yet text messages exchanged at the time tell the opposite story.  As but a few examples: following meetings between ██████ and the defendants in Las Vegas, Nevada in September 2018, Correia drafted the Political Donations Table, which

anticipated contributions being made to politicians in Nevada, California, New York, and New Jersey and contemplated a "funding" schedule of two $500,000 transfers from ███████ (Ind. ¶ 22).  Fruman sent the Political Donations Table to Kukushkin and ███████ and thereafter, ███████ wired $1 million in two, $500,000 installments.  (*Id.* ¶ 22).  Text messages from both Kukushkin and ███████ at the time make plain the purpose of those funds:  Kukushkin wrote ███████ Parnas, and Fruman that the "[m]oney transferred by [███████ . . . was to support the very specific people and states (per [the Political Donations Table]) in order to obtain green light for licensing.  (*Id.* ¶ 23).  Similarly, ███████ described the terms of the agreement in a subsequent text messages as him "provid[ing] $1 million for our future enterprise" to be spent in Nevada, California, New York, and New Jersey (*i.e.*, the states listed in the Political Donation Table) in order to "obtain[] licenses [in] th[o]se states."  (*Id.* ¶ 22).  Given that ███████'s testimony is, at minimum, contradicted by the contemporaneous evidence, the lack of an effective oath and absence of in-person cross-examination or observation for the jury, would render that testimony utterly unreliable.  *See Oudovenko*, 2001 WL 253027, at *3 (finding that a deposition in Russia would be particularly "suspect" because "the government would not have a full opportunity to cross-examine the witnesses" and "there is no realistic perjury sanction"); *Jefferson*, 594 F. Supp. 2d at 655 (countervailing considerations include "the likelihood that the procured testimony will be admissible at trial").

Finally, Kukushkin's motion provides no basis to believe—even if Russia did permit foreign depositions—that ███████ would voluntarily appear and not invoke his Fifth Amendment rights.[29]  ███████ is a co-conspirator and the Government intends to argue as much at trial.

---

[29] The Second Circuit has previously held that the proponent of Rule 15 testimony bore the burden of demonstrating that the deponent would willingly appear.  *See, e.g.*, *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962) ("the moving party has the burden of demonstrating the availability of the proposed witnesses and their willingness to appear"); *see also United States v.*

Indeed, it is for this reason that the Government inquired of ████'s counsel as to whether ████ would invoke his Fifth Amendment rights if called to testify, *see supra*, n.26, but his counsel declined to answer.  If ████ does, in fact, intend to invoke his Fifth Amendment rights, then any effort by Kukushkin to secure that testimony through Rule 15 depositions, even outside of Russia, would be entirely futile.  *See, e.g.*, *United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004) ("circumstances indicating that a potential witness will refuse to testify may support a decision not to compel disclosures sought by the defense").  However, Kukushkin's failure to put forth competent evidence on this point does not permit the Court or the Government to ascertain whether a Rule 15 deposition is even possible.[30]  For instance, even though

---

*Bronston*, 321 F. Supp. 1269, 1272 (S.D.N.Y. 1971) ("In addition, the defendant must show that it is practicable to obtain the testimony and that the proposed witness is, although unavailable for trial, willing to testify by deposition."); *United States v. Birrell*, 276 F. Supp. 798, 823 (S.D.N.Y. Nov. 15, 1967) ("[N]o showing has been made that the witness has consented or will consent to be deposed, as required by Rule 15(a). . . . In fact, it would appear that [the witness] has refused to cooperate with defendant."); *United States v. Figueroa*, 298 F. Supp. 1215, 1216 (S.D.N.Y. 1969) (denying Rule 15 deposition of a fugitive co-conspirator where, *inter alia*, there was "not showing that he is willing to testify.").  However, these cases predate the 1974 amendment to the language of Rule 15, and it is unclear whether they remain good law.  In any event, at least one court within this District has considered it as a factor, *see United States v. Jailall*, No. 00 Cr 069 (RWS), 2000 WL 1368055, at *4 (S.D.N.Y. Sept. 20, 2000) ("As no evidence has been presented as to whether these witnesses are willing to appear on Jailall's behalf, why they might be prevented from appearing, or even whether Jailall has made any efforts to contact them, the motion is denied."); while another has held that it was not a factor the Court must consider, *see United States v. Vilar*, No. 05 Cr. 621 (RJS), 2008 WL 3895563, at *1 (S.D.N.Y. Aug. 22, 2008) ("Neither the text of Rule 15 nor binding case law concerning the Rule provide any basis to conclude that, in resolving a Rule 15 motion, courts must consider the witness's willingness to voluntarily appear at a deposition in a foreign country.).  The Government respectfully submits that ████'s availability is a countervailing consideration that the Court may consider, but Kukushkin's failure to introduce evidence relevant to this key fact shows that he has not met his burden in demonstrating that the Rule 15 elements are met.

[30] The Court should deny Kukushkin's Rule 15 deposition motion for the reasons stated throughout.  However, to the extent the Court denies this motion without prejudice and Kukushkin seeks to renew the motion with respect to a country other than Russia, he should be required to submit an affidavit consistent with the law in the Circuit, which would, at minimum, speak to the reasons for ████'s unavailability, Kukushkin's efforts to secure that testimony, and whether ████ would invoke his Fifth Amendment rights.  Needless to say, it would be an enormous

Kukushkin's counsel and the Government believe that ██████ has a basis to invoke his Fifth Amendment rights, he or his counsel may have a different view.  Similarly, if ██████ refuses to come to the United States, but does not intend to invoke his Fifth Amendment rights, the Court should, as discussed *infra* look skeptically on what would be effort to have it both ways by ██████ testifying in a deposition knowing that there would be no repercussions if he testified falsely since the Government could not extradite him from Russia.  *United States v. Alvarez*, 837 F.2d 1024, 1029 (11th Cir. 1988) ("Foreign deposition testimony, because of the absence of a sanction for perjury, is suspect."); *Banki*, 2010 WL 1063453, at *2-3 (denying defense motion for live video testimony with a witness in a foreign country, explaining that the "ineffective oath, coupled with the lack of opportunity for in-person cross-examination and observation, makes it extremely difficult to assess the reliability of the proposed witnesses' testimony.").

In short, significant countervailing factors—including the impossibility of deposing ██████ in Russia, the lack of an effective oath or any perjury sanctions, and Kukushkin's failure to show that ██████ would even be willing to be deposed—weigh strongly against granting the Rule 15 deposition.

## 2.  Kukushkin Has Not Established That ██████ is Unavailable

Kukushkin bears the burden of providing "specific reasons" for ██████'s unavailability that are not "conclusory."  *Buck*, 271 F. Supp. 3d at 623 (internal citation omitted).  In addition, Kukushkin must establish that he undertook a "good faith effort to produce the person to testify at trial."  *United States v. Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007).

---

waste of time and effort and cause potentially significant delays in this case (thereby impacting his co-defendants) if Kukushkin were permitted to proceed forward with the letters rogatory request process (which can take years, even when countries are willing to participate in the process) only to find out at the eleventh hour that ██████ would invoke his Fifth Amendment rights.

Kukushkin circularly argues that "were [Foreign National-1] willing to voluntarily appear at a trial in the United States, this motion would be unnecessary." (Kukushkin Mot. 41).  In support of that assertion, Kukushkin cites to conversations with ███████'s lawyer, who advised Kukushkin's counsel that ████████ would not travel to the United States for any reason, including to testify.  (Lefcourt Decl. ¶ 32).[31]  That is not enough.  Kukushkin has failed to put forth any evidence or explanation from ██████ or his counsel about why ██████ will not travel to the United States, or the good-faith efforts that Kukushkin has undertaken to secure his testimony.  "[A] defendant's mere allegation that there is reason to believe that a foreign witness would not attend trial in the United States is an insufficient basis upon which to require the taking of the witness' deposition."  *United States v. Merrit*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *4 (S.D.N.Y. May 7, 1991); *see also United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962) (affirming denial of Rule 15 motion where, *inter alia*, defense filings contained only conclusory allegations regarding witness availability); *United States v. Figueroa*, No. 95 Cr. 823 (EHN), 1996 WL 68529, *1 (E.D.N.Y. Feb. 11, 1996) (denying motion pursuant to Rule 15 where, *inter alia*, defense failed to submit an "affidavit from the witness in question" regarding "the reasons for his alleged unavailability to appear here").

Kukushkin argues that "depositions have been permitted essentially whenever counsel makes a good faith assertion that the witness will not appear," but he misstates the relevant law, which is set forth above, and the two cases he cites in support of that proposition are easily

---

[31] ██████ appears to be able to travel to the United States and has in the past. ████ has business interests in the United States, and ████████████████████ According to U.S. Customs and Border Patrol records. ████████████████████████████████████ ████████████████████████████████.  Indeed, United States border crossing records reflect that between ██████████ █ ████████ traveled to the United States ████████████ ████████████████████████████████

distinguishable.  (Kukushkin Mot. 40 n.11).   In *Dunseath*, 1999 WL 165703, at *1-2, the Government submitted a sworn affidavit asserting that a witness based in Missouri, who was 86 years old and was the primary caretaker for a spouse with advanced Alzheimer's disease, was unable to leave his home because of his wife's need for constant care.  The Government also detailed its efforts to secure the witness's testimony, including by having him bring his wife to New York or supply an alternate caregiver for his wife.  Similarly, in *Johnpoll*, 739 F.2d at 709-710, the Government went to extensive lengths to secure the witnesses' appearance where they were based in Switzerland and refused to accept service of United States process by either statute or treaty, including asking witnesses to travel voluntarily to the United States with certain payment for travel expenses; and seeking authority from the Attorney General to pay the witnesses' funds in excess of the standard travel allowance.  Here, Kukushkin's showing falls far short of even the cases he cites in his favor.  Kukushkin has simply stated that ███████'s counsel advised Kukushkin's counsel that ████████ would not testify.  He does not explain why, detail the lengths Kukushkin has gone to in order to secure that testimony, or even submit an affidavit from ████████ or his counsel.

Kukushkin's failure to provide the reasons for ████████'s refusal to appear or detail any efforts on Kukushkin's part to secure that testify does not permit the Court to "determine whether [Kukushkin] has made the requisite good-faith effort to produce the person to testify at trial'" and as such he has not established ████████'s unavailability.  *Stein*, 482 F. Supp. 2d at 365 (quoting *Johnpoll*, 739 F.2d at 709)).

### 3.  Kukushkin Has Not Established that the Testimony is Material

Kukushkin has similarly failed to carry his burden in showing that ████████'s testimony is not cumulative of other evidence and testimony, and thus not material.  As set forth above,

testimony is material if it exculpates the defendant and would not be "cumulative or consist[] of hearsay." *Kelley*, 36 F.3d at 1125.

Kukushkin argues that ▮▮▮▮▮'s testimony is material because it would "challenge central aspects of the government's allegations" in three principal ways, each of which are cumulative of other evidence or testimony that is available to Kukushkin.  (Kukushkin Br. 42). First, ▮▮▮▮ would testify that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*).  Setting aside the fact that a loan to an import and export business is different from an equity investment in a cannabis business, ▮▮▮▮'s transfers to ▮▮▮▮▮▮▮▮▮ were memorialized in written agreements after the funds were sent, which Kukushkin could introduce at trial because at least one of those agreements was sent to Kukushkin.  Second, ▮▮▮▮ would testify, in essence, that there was ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*).  But Kukushkin is free to testify to each of these points himself:  Kukushkin participated in the same alleged conspiracy as ▮▮▮▮ and can testify to his understanding of each of the above points.  As such, ▮▮▮▮▮'s testimony is cumulative of Kukushkin's own and thus not material.  *See, e.g.*, *United States v. Buck*, 271 F. Supp. 3d 619, 623 (S.D.N.Y. 2017) (denying motion for Rule 15 deposition because, *inter alia*, "as [the defendant] could provide this same evidence, any testimony about what advice [the defendant] was given by other witnesses may be cumulative.").[32]

---

[32] Without any substantive analysis on this point or citations to any cases, a different court in this Circuit reached the opposite conclusion.  *See United States v. Mohamed*, No. 18 Cr. 603 (ARR), 2020 WL 1545522 (E.D.N.Y. Apr. 1, 2020) (holding that even if Rule 15 deposition testimony is cumulative of the defendant's, the defendant has the right not to testify and to present

Finally, because Kukushkin has failed to demonstrate that ███████ is unavailable; that his testimony is material; or that there are no countervailing considerations, Kukushkin has also failed to demonstrate that the failure of justice element has been met. *Epskamp*, 2013 WL 12175097, at *2. In sum, Kukushkin has failed to carry his burden in demonstrating that a Rule 15 deposition of ████████ is necessary or even possible, and his motion should accordingly be denied.

## V.  **PARNAS'S SELECTIVE PROSECUTION CLAIM IS MERITLESS**

Parnas argues that the charges in the Superseding Indictment are not based on the substantial evidence of his guilt of multiple federal crimes committed over a seven-year period, or the Government's multi-year investigation, but are instead the product of a selective prosecution brought as a result of his national origin, his political affiliation, and a Government-wide conspiracy to prevent him from exercising his Constitutional rights. Parnas's motion is not based on actual evidence—as it must be—but instead on his own allegations, speculation from various television personalities and Twitter users, and wholly irrelevant news articles that have no bearing on the instant case. His claims do not withstand scrutiny and are utterly without merit.

### A. APPLICABLE LAW

A defendant challenging the Government's decision to prosecute him bears a heavy burden. *United States v. Armstrong*, 517 U.S. 456, 463-64 (1996). Federal prosecutors retain "broad discretion to enforce the Nation's criminal laws." *Id.* at 464 (internal quotation marks omitted). "As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the

---

his defense through witness testimony). Indeed, in different contexts, the Second Circuit has held differently and in line with the reasoning of *Buck*, 271 F. Supp. 3d at 623, cited above. *See, e.g.*, *United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) (in the context of a motion for severance to call a co-defendant to testify, affirming denial of motion where witness testimony "would be cumulative, given that [the defendant] could have called any number of witnesses, including himself," to provide the same testimony).

absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)).  To establish a claim of selective prosecution, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but was also (2) "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

With respect to the first of the two required prongs (discriminatory effect), a defendant must establish that "'others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant'" and that the defendant has been "'singled out.'" *Fares*, 978 F.2d at 59 (quoting *Moon*, 718 F.2d at 1229) (alteration incorporated); *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same).

With respect to the second of the two required prongs (discriminatory purpose), a defendant must establish that the Government's "selection of the defendant for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59 (internal quotation marks omitted; alteration incorporated).  This means more than that the Government acted with an "awareness of consequences." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (internal quotation marks omitted).  Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* (internal quotation marks omitted).  Where a defendant "has not shown that the Government prosecuted him *because of*" his protected status or conduct, his claim fails. *Id.* (emphasis in original).

Consistent with the presumption of regularity, the Supreme Court has explained that "the showing necessary to obtain discovery" in support of a selective prosecution claim "should itself be a significant barrier." *Armstrong*, 517 U.S. at 464. A defendant must meet a "rigorous standard for discovery in aid of such a claim," *id.* at 468, because the "decision to prosecute is particularly ill-suited to judicial review," and "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy," *Wayte*, 470 U.S. at 607. To obtain discovery, a defendant accordingly first "must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see also Fares*, 978 F.2d at 59 (same). "Mere assertions and generalized proffers on information and belief are insufficient" to meet this burden. *Id.*

**B. DISCUSSION**

Parnas does not come close to establishing that he is entitled to discovery in support of his claims, much less dismissal.[33] Parnas fails to meet either prong of the requisite standard with respect to his claim of alleged selective prosecution, and his motion for discovery or dismissal should be denied.

---

[33] Because Parnas's claim is meritless, the Court need not consider the contours of his discovery request (Parnas Mot. 32-33), but multiple of his requests seek materials that, if they exist, appear to be attorney work product, covered by the deliberative process privilege, and/or are outside of the scope of what would be reasonably necessary to try to advance his asserted claims rather than to gain a strategic advantage at trial.

### 1. Parnas Fails to Show that Similarly Situated Individuals Were Not Prosecuted

With respect to the first required prong, Parnas must show evidence that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [him]." *Fares*, 978 F.2d at 59 (internal quotation marks omitted). "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.").

Parnas points to the fact that the recipients of his straw donations were not charged as proof that he was impermissibly singled out. (Parnas Mot. 32).[34] But the Superseding Indictment and Parnas's motion do not contain any evidence that any of the recipients of the contributions by Fruman, Parnas, and GEP were aware that the contributions had illegally been made in the name

---

[34] In Parnas's discovery demands, Parnas asks the Court to order discovery as to why other individuals were not charged. (Parnas Mot. 32). Those individuals and entities are the recipients of political contributions ███████████████████████ and third parties that Parnas or Fruman did business with (███████████████████████████████████████████████). It is unclear whether these individuals are those as to whom, for the purposes of this motion and satisfying his burden with respect to the first prong, Parnas alleges are similarly situated to him. Despite the fact that many of these individuals and entities have already produced records in response to subpoenas—which were then produced in discovery—Parnas has not identified a basis for concluding these individuals and entities were similarly situated, or why he should be entitled to additional discovery without meeting that burden.

of another person.[35]  Without evidence that the recipients of the contributions knew or consciously avoided learning the fact that they were illegal straw donations, the recipients cannot be deemed similarly situated because they would not be guilty of a crime.  *See United States v. Smith*, 231 F.3d 800, 811 (11th Cir. 2000) (defendant "must establish that the government could prove beyond a reasonable doubt that someone else had engaged in the same type of conduct, committing the same crime in that or substantially the same manner").

Notably, Parnas alleges—without a scintilla of evidence—that because not every participant in the events leading to his criminal charges was indicted, the Government's charges against him must have been based on his national origin, his political beliefs, and his (as-yet-unformed at the time of his arrest) interest in exercising his constitutional rights to comply with a Congressional demand.  (Parnas Mot. 32).  The arguments are as legally meritless as they are factually baseless.  To the contrary, the Government began investigating Parnas more than a year prior to his arrest,[36] and indicted Parnas because he committed numerous crimes—indeed, Parnas now stands charged with seven separate felony offenses.  Further fatal to Parnas's argument is the fact that individuals similarly situated to him *were* prosecuted along with Parnas.  Parnas stands charged alongside some defendants who share his national origin (Fruman and Kukushkin) and at least one, Correia, who does not.  Similarly, Fruman was also subject to a Congressional demand at the time of his arrest, and while Parnas eventually complied with the demand several months

---

[35] In so noting, the Government does not intend to comment on its deliberative process or the exercise of its prosecutorial discretion.  It notes these facts simply in response to Parnas's baseless assertion that the lack of a charge against the recipients of his straw donations, who were in many respects victims of his criminal conduct, is in and of itself sufficient to meet the *defendant's burden* of establishing "clear evidence" of a similarly situated defendant who was not charged.

[36] Parnas makes various unsourced factual allegations about when and why the Government's investigation began and purportedly ended (it has not, *see* Dkt. 119) that are false. (*See, e.g.*, Parnas Mot. 3-5).

later, Fruman did not.  In short, Parnas has failed to discharge his burden in showing discriminatory effect, and he is not entitled to discovery, much less dismissal of the indictment, based on selective prosecution.

## 2.  Parnas Fails to Show Discriminatory Purpose

Since Parnas has failed to make an evidentiary showing in support of the first required prong, his motion for dismissal or discovery must be denied.  *See, e.g.*, *Bass*, 536 U.S. at 863.  But even if the Court were to assume *arguendo* that Parnas had made such a showing, his motion still fails, because Parnas also fails to meet the second required prong.

Citing to Twitter posts and an article summarizing "speculation" from a television host, Parnas claims that "Millions of Americans" believe "Mr. Parnas's longstanding assertion that Attorney General Barr ordered the timing of his indictment and arrest as a means to protect the President and thwart his potential testimony in the impeachment inquiry."  (Parnas Mot. 29). Parnas's claim of discriminatory purpose is nothing more than his own speculation, amplified by the equally baseless speculation of Twitter users and internet commentators with no first-hand knowledge of any relevant fact.  Needless to say, a handful of Twitter pages, unsourced references to what "Millions of Americans" purportedly believe, and Parnas's own "longstanding assertion" do not constitute actual "evidence," *Bass*, 536 U.S. at 863.  Instead, these "mere assertions," *Fares*, 978 F.2d at 59, that Parnas was prosecuted "*because of*" of such activity are insufficient as a matter of law.  *Wayte*, 470 U.S. at 610 (emphasis in original); *Fares*, 978 F.2d at 59 ("Mere assertions and generalized proffers on information and belief are insufficient" to meet this burden). Moreover, Parnas's claims do not withstand even the gentlest of scrutiny.  Parnas was, by his own admission, not cooperating with the Congressional demand as of the day of his indictment.  (Parnas Mot. 12).  Accordingly, to believe Parnas's "longstanding assertion," requires the Government to have known on October 9, 2019—even when Parnas himself did not, and had only recently

publicly stated the opposite—that one day, several weeks in the future, Parnas would change his mind and decide to cooperate with the Congressional demand.  His allegation is absurd.

Moreover, the suggestion that the Government acted for the purpose of preventing Parnas from exercising his Constitutional rights or to "thwart his potential testimony in the impeachment inquiry" is utterly belied by the facts.  (Parnas Mot. 28).  Leaving aside the fact that the instant case and Parnas's arrest appear to have been significant motivating factors in Parnas's very decision to cooperate with the impeachment inquiry, the Government consented to two modifications of the Protective Order in order to allow Parnas to produce materials he obtained in discovery to HPSCI.  (Dkt. 58, 68).  Moreover, when, despite Parnas's repeated and high-profile public entreaties to do so, neither the House nor the Senate called him as a witness at the impeachment proceedings, the Government consented to Parnas's request to modify the home detention ordered by the Court so that Parnas could travel to Washington, D.C. during the proceedings, where despite being denied entry to the proceedings themselves, Parnas held several impromptu press conferences.[37]  (Dkt. 87).  The Government also never objected to Parnas's dozens of media interviews and television appearances, which continue to this day, and appear aimed at, among other things, swaying public opinion in his favor with respect to his criminal case.  (Dkt. 71).

Parnas has not shown, and cannot show, that the Government prosecuted him "'*because of*' his protected status." *Wayte*, 470 U.S. at 610.  Parnas's failure to satisfy either required element

---

[37]  "Lev Parnas, barred from impeachment trial, makes himself its star anyway," *Washington Post*, Jan. 29, 2020 ("So, if [Parnas] couldn't say it in front of the Senate, he could say it here, in front of the Union Station Laduree macaron shop.") (https://www.washingtonpost.com/lifestyle/style/lev-parnas-barred-from-impeachment-trial-makes-himself-its-star-anyway/2020/01/29/2cb47062-42d2-11ea-aa6a-083d01b3ed18_story.html) (last visited December 17, 2020).

of his selective prosecution claim is fatal to his motion.  He is entitled to neither discovery nor dismissal of the indictment on this basis. [38]

## VI.   THE DEFENDANTS ARE NOT ENTITLED TO AN EXHIBIT OR WITNESS LIST, OR 3500 MATERIAL, THIS FAR IN ADVANCE OF TRIAL

In a letter motion dated November 27, 2020 ("Def. Ltr.") (Dkt. 147), the defendants seek "an order requiring the government to produce an exhibit and witness list, as well as marked exhibits and 3500 material well in advance of trial." (Def. Ltr. 1).  "[W]ith respect to the exhibit list and marked exhibits," the defendants seek to have the Government "identify those materials produced to the defense upon which it intends to rely."  (*Id.* 2).  There is no authority for such relief in the Federal Rules of Criminal Procedure, and this request conflicts with the established practice in this District and is neither warranted nor practical.  The Court previously denied this request, and should do so again.

### A.  APPLICABLE LAW

#### 1.  Exhibit Lists

The Federal Rules of Criminal Procedure neither require the Government to identify the documents it intends to use in its case-in-chief, nor do they bestow authority on courts to order such identification.  *See, e.g.*, *United States v. Nachamie*, 91 F. Supp. 2d 565, 569-70 (S.D.N.Y. 2000) ("[A] court has no license to rewrite the Federal Rules of Criminal Procedure. . . .  In the

---

[38] Fruman generally joins in his co-defendants' motions (Fruman Mot. 29) and Kukushkin specifically joins in Parnas's selective prosecution claim (Kukushkin Mot. 48). Neither defendant proffers any basis for their selective prosecution claim, and nor does Parnas's motion proffer any reason to believe that Fruman or Kukushkin were selectively prosecuted.  To the extent their motions can be construed as joining in Parnas's with respect to alleged selective prosecution on the basis of their shared national origin, none of the three defendants put forth *any* evidence that they were impermissibly singled out as a result.  Instead, they were prosecuted alongside a co-defendant, Correia, with a different national origin.  Accordingly, this motion it is similarly meritless as to Fruman and Kukushkin.

absence of any controlling authority interpreting the Rule as requiring this action, I cannot direct the Government, at this time, to identify the documents it intends to offer in its case-in-chief."); *United States v. Prince*, 618 F.3d 551, 562 (6th Cir. 2010) ("Rule 16 does not entitle a defendant to pretrial disclosure of the government's exhibit list."). Nonetheless, several courts have imposed such a requirement—or, more commonly, a schedule for pretrial exhibit list disclosure—based on their inherent authority to "facilitat[e] an orderly trial." *United States v. Russo*, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007).

When courts in this circuit exercise their inherent authority to order the early disclosure of exhibits to facilitate an orderly trial, the overwhelming practice has been to do so several days or, at most, several weeks in advance of trial. *See United States v. Ferguson*, 478 F. Supp. 2d 220, 243-44 (D. Conn. 2007) (even for cases that order pretrial disclosure of documents Government intends to rely on, "a majority of those courts only ordered the government to disclose its case in chief documents a given period of time before trial" (collecting cases)). This practice holds in complex and document-intensive cases.[39] *See, e.g.*, *United States v. Freeman*, No. 18 Cr. 217 (KMW), 2019 WL 2590747, at *4 (S.D.N.Y. June 25, 2019) (in four-defendant case where "complex nature" and "large volume of documents produced by the government" justified early exhibit lists, ordering preliminary exhibit lists 30 days before trial, and rejecting defense request for 90-day disclosure as "unwarranted"); *United States v. Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440, at *1 (S.D.N.Y. Jan. 7, 2014) (noting ordering of exhibit lists approximately 6 weeks before

---

[39] Other courts, as well, have rejected claims that the volume of discovery entitles a defendant to the identification of documents to be used at trial well in advance of the trial date. *See, e.g.*, *United States v. Richards*, 659 F.3d 527, 545 (6th Cir. 2011) (affirming denial of identification of the documents to be relied on in case in chief); *United States v. Perraud*, No. 09 Cr. 60129, 2010 WL 228013, at *1, *9, *12 (S.D. Fl. Jan. 14, 2010) (ordering production of exhibit list 10 days before the start of trial where defense complained the Government had produced "over 3 million mostly irrelevant and immaterial documents").

trial, over defense request for longer period, in case involving an estimated 1 million pages of documents); *United States v. Mandell*, No. 09 Cr. 662 (PAC), 2011 WL 924891, at *7 (S.D.N.Y. Mar. 16, 2011) (exhibit list 3 weeks before trial in prosecution of 8-year-long international securities fraud scheme with "substantial" volume of discovery). Indeed, an approximately 60-day time period for an exhibit list was employed in a prosecution that involved a "massive" discovery production that was "one of the largest productions in any prosecution in this district." *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2016 WL 386133, at *12 (S.D.N.Y. Jan. 28, 2016); *see also id.* at *6, *14 (denying defense request for adjournment of trial); *see also, e.g.*, *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2014 WL 1800409, at *13 (E.D.N.Y. May 6, 2014) (denying request for exhibit and witness lists as premature since no trial date set).[40]

Notably, in the five-month trial of five defendants for participating in the decades-long Bernard Madoff fraud scheme—arguably the most extensive criminal scheme prosecuted in this District—the district court ordered production of exhibit lists 60 days before trial. *United States v. Bonventre* ("*Bonventre I*"), No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013) (ordering exhibit lists 60 days before trial in light of "the fact that the charges in the Indictment span decades, the sheer volume of documents at issue in th[e] case, the number of Defendants allegedly involved and the difficulty for the Defendants in determining which Defendants is alleged to have produced, or been involved in producing, each document"); *see also United States v. Bonventre* ("*Bonventre II*"), 646 F. App'x 73, 79 (2d Cir. 2016) (summary order)

---

[40] This practice has also been employed when the productions involve large volumes of paper documents. *See, e.g.*, *United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (exhibit lists ordered 30 days before trial, despite defense request for longer period, where discovery consisted of over 1 million pages of documents in "450 boxes").

(60-day disclosure period "adequately addressed" concerns about the "volume of discovery," rendering the provision of a bill of particulars unnecessary).[41]

Consistent with these opinions, providing an exhibit list several weeks before trial is a standard practice in complex and high-profile white-collar cases in this District. *See, e.g.*, *United States v. Gatto*, 17 Cr. 686 (LAK) (four-week, three-defendant honest services fraud trial; exhibit and witness lists approximately 30 days before trial); *United States v. Blaszczak*, 17 Cr. 357 (LAK) (five-week, four-defendant insider trading trial; exhibit and witness lists approximately 30 days before trial); *United States v. Ng,* 15 Cr. 706 (VSB) (five-week bribery trial; exhibit list on rolling basis beginning four weeks before trial and completed two weeks before trial; witness list two weeks before trial); *United States v. Skelos*, 15 Cr. 317 (KMW) (two-defendant, month-long bribery trial; exhibit list approximately four weeks before trial); *United States v. Levin*, 15 Cr. 101 (KBF) (two-defendant, three-plus week fraud trial; exhibit list six weeks before trial; witness list three and a half weeks before trial); *United States v. Silver*, 15 Cr. 93 (VEC) (month-long bribery trial; exhibit and witness lists approximately three weeks before trial); *United States* v. *Ulbricht*, 14 Cr. 68 (KBF) (three-week cybercrime and narcotics trial; exhibit and witness lists approximately one month before trial).

## 2. Witness Lists

Federal Rule of Criminal Procedure 16 "does not require the Government to furnish the names and addresses of its witnesses." *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). Thus, "'[i]n the absence of a specific showing that disclosure [of a witness list] [is] both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the]

---

[41] On appeal, the defendants complained that the discovery involved "millions of documents," Bonventre Br. at 104, *United States v. Bonventre*, No. 14-4714, 2015 WL 4503258 (2d Cir. filed Jul. 21, 2015), and the *exhibits themselves* totaled "millions of pages," *id.* at 110.

case,' the request for a witness list should be denied." *Russo*, 483 F. Supp. 2d at 309 (quoting *Bejasa*, 904 F.2d at 139-40).

"Courts in the Second Circuit typically deny motions for the early disclosure of witness lists where, as here, Defendants have not made a specific showing of need." *United States v. Rivera*, No. 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017). The claim that "given the complexity of the case, disclosure of the government's witness list will level the playing field" amounts to an "abstract statement of need" that does not justify provision of a witness list. *Russo*, 483 F. Supp. 2d at 309.

Much as with exhibit lists, it is common practice in high-profile and complex cases in this District to provide witness lists several weeks before trial. *Cf. United States v. Mohamed*, 148 F. Supp. 3d 232, 247 (E.D.N.Y. 2015) ("It is unclear to the Court why the Defendant requires immediate disclosure when no trial date has been set."); *Ashburn*, 2014 WL 1800409, at *13 (denying request for exhibit and witness lists as premature since no trial date set).

### 3. 3500 Material

The Jencks Act, 18 U.S.C. § 3500, covers disclosure of statements or reports made by Government witnesses, and the rule mandates that such materials not be the subject of discovery or inspection "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). A district court does not have the authority to order disclosure inconsistent with the Act. *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001) (the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements").

With respect to impeachment or so-called *Giglio* material, courts are clear that such impeachment material need not be produced earlier than other Jencks Act material. *See, e.g., United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Canter*,

338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) (denying analogous motion and noting that "[i]t has been the practice of this Court and of other courts in this district to require that the Government produce these materials a few days before the start of trial"); *United States v. Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify"); *United States v. Gutierrez-Flores*, 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994) ("The defendants' request for material which would assist in impeaching confidential informants or government witnesses is premature.  The government is not required to disclose such material until the witness is called to testify.").  As one court held, "[t]here is nothing unique about impeachment information to require that it be disclosed before other 3500 material."  *United States v. Rahman*, 1994 WL 533609, at *3 (S.D.N.Y. 1994).

Typically in this District, the Government confirms that it will produce 3500 material and *Giglio* (or impeachment) material reasonably in advance of trial, and will engage in good faith discussions with the defense regarding a schedule for pretrial disclosures.  *See United States v. Sergentakis*, No. 05 Cr. 230 (JFK), 2005 WL 1994014, at *1-2 (S.D.N.Y. Aug. 17, 2005) ("18 U.S.C. § 3500(b) calls for production of Government witness statements after the witness 'has testified on direct examination.'  The Government response . . . that '[c]onsistent with the regular practice in this District, the Government intends to make Section 3500 material available to the defense at the same time as impeachment material, [and that] in order to avoid any delay in the trial, the Government will produce such material sufficiently in advance of each Government witness's testimony' . . . is more than adequate."); *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) ("[T]he Government has indicated that it is aware

of its obligations under *Giglio* . . . and the Jencks Act and that it will provide the required information to the defendants in accordance with its responsibilities under *Giglio* and the Jencks Act sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination.  These representations are sufficient.").

## B. DISCUSSION

At the last conference, the Court adjourned the trial *sine die*, and it appears that trial is at least seven months away.[42]  The defendants do not cite a single case, from any court, anywhere in the country, in which the Government has been ordered to disclose its exhibits, witnesses, or 3500 material so far in advance of trial.  Nor is the Government aware of any such example—certainly not in this District.  In any event, the degree of complexity to this case, and the volume of discovery, is on par with other recent white-collar trials in this District, and as set forth above, in those cases exhibits and witnesses have typically been disclosed approximately three to four weeks before trial.  *See, e.g.*, *Gatto*, 17 Cr. 686 (LAK); *Blaszczak*, 17 Cr. 357 (LAK); *Ng*, 15 Cr. 706 (VSB); *Skelos*, 15 Cr. 317 (KMW); *Levin*, 15 Cr. 101 (KBF); *Silver*, 15 Cr. 93 (VEC); *Ulbricht*, 14 Cr. 68 (KBF).  The Government intends to follow the same practice in this case.[43]

The defendants complain that the Government has "made eight productions . . . of terabytes of information, including images of multiple phones and the contents of cloud storage and email accounts, other electronic data, recordings, and more than 424,000 bates numbered items of

---

[42] The defendants have requested a trial in October 2021—approximately ten months from now.

[43] The defendants accuse the Government of seeking to "game the system" by declining to create and disclose an exhibit list more than seven months before trial. (Def. Ltr. 2). The opposite is true.  At this stage of a criminal case, the Government's obligation is to produce discovery (and of course disclose *Brady* material), not to undertake the work of deciding which documents and other materials to introduce as exhibits in its case-in-chief at trial.  The defense should be undertaking an independent review of the discovery, not demanding that the Government create and then provide a roadmap of its expected evidence at trial.

discovery including numerous search warrants and returns, tens of thousands of emails, chats, and text messages, many of which are in Russian and other languages." (Def. Ltr. 2-3 (footnotes omitted)). But they have also had over a year to review that material and have many months left to continue that review, a review they clearly have undertaken and intend to continue to undertake. Indeed, it is striking that in the same breath that the defendants accuse the Government of providing "a massive 'document dump,'" they also assert that "the government should not be deciding what is relevant to Messrs. Parnas, Fruman, and Kukushkin's defense." (Def. Ltr. 3 n.4).

Furthermore, the volume is driven at least in part by the fact that the defendants have explicitly requested materials that—in the Government's view—go far beyond the purview of this case. For instance, Kukushkin has requested (indeed, insisted that the Government's *Brady* obligations require it to produce) "all evidence . . . of all past (and present) financial frauds perpetrated and/or engaged in by Messrs. Parnas, Fruman and/or Correia, whether charged or uncharged, related or unrelated to the indictment, no matter the victim or premise of the fraud or misrepresentations." (Kukushkin letter dated July 24, 2020). Likewise, Parnas has requested (again, actually demanded pursuant to *Brady*) evidence "related to the decisions not to prosecute other individuals or entities with the Federal Election Act violations charged in the indictment, including but not limited to America First Action, and others." (Parnas Mot. 48). In light of these demands and many others like them, the Government has, since the outset of this case, diligently worked to make substantial additional productions that go well beyond its Rule 16 obligations.

The defendants contend that the volume of discovery and the disruptions caused by the COVID-19 pandemic make it "impossible to review, analyze, discuss, and utilize discovery as we normally would." (Def. Ltr. 3). However, the defendants identify nothing that makes them or this case different than the many other complex, white-collar cases that are continuing to proceed

apace, and defense counsel should not be allowed to use the pandemic as an excuse to avoid one of their core obligations. The defendants have had no shortage of time to review this material and, with no firm trial date set, many additional months to continue that review. Furthermore, the Government makes all discovery available in database format, meaning that it can be easily imported into a database review platform, and "OCR'd," meaning that it is text-searchable. Once imported into a review platform, the defendants can search the discovery using a variety of targeted means—such as searching by keyword, or by sender(s) or recipient(s), or by date, or by account, or some combination of these (and other) mechanisms. Electronic review platforms also enable counsel and their clients to access the discovery remotely from anywhere in the world.

Finally, as the Government has repeatedly confirmed, the Government is available and more than willing to assist the defense in locating materials within the discovery. As the Government has repeatedly noted, the best "exhibit list" that exists at this point is the set of documents referenced in the Superseding Indictment and in the various search warrant applications that have been produced in discovery. Those documents provide extensive insight into the materials the Government regards as most significant to its case. The defendants should have no difficulty identifying these materials within the discovery, and the Government has repeatedly offered its assistance in this regard.

A year ago—at the December 2, 2019 conference—the defendants made this same request. *See* Dec. 2, 2019 Conf. Tr. at 22 at 15-16 (requesting "to have the government provide a draft exhibit list so we can look at the exhibits that they intend to introduce" and "3500 material on a[n] early basis"). The Court denied the request, stating that it was "not going to require some unusual kind of early disclosure of exhibits or witness statements that are really not even I think within my power to order disclosed." (*Id.* 24-25). Nothing has changed, and that ruling remains correct.

Indeed, if anything, the pandemic has meant that the defendants will now have the benefit of many additional months to review the discovery.  The Government intends to follow the typical practice in this District and will disclose its exhibits, witnesses, and 3500 and *Giglio*/impeachment material reasonably in advance of trial.  The Government also hopes to engage in discussions with the defense to mutually agree on a schedule for reciprocal pretrial disclosures.[44]

## VII. THE DEFENDANTS ARE NOT ENTITLED TO AN ITEMIZATION OF POTENTIAL *BRADY* MATERIAL WITHIN DISCOVERY, OR TO FBI 302s OR OTHER "BACKUP"

As the defendants note, the Government has, to date, sent three letters to the defendants, disclosing potential *Brady* material.  (Def. Ltr. 3).  The defendants complain that "the information provided took the form of summaries of witness statements prepared by the government and did not include any backup.  Not a single 302, note, chat, text exchange, or email which formed the basis for these summaries, or which memorialized, discussed, or referenced these statements was produced."  (*Id.*).  The defendants request the immediate production of "all exculpatory and impeachment evidence, of which the government is currently aware and in **all formats** in which it exists, including the identities of the witnesses who allegedly provided the information."  (*Id.* 4 (emphasis in original)).  Parnas reiterates these requests, and makes certain specific requests, in a separate pretrial motion.  (*See* Parnas Mot. 43-49).

The defendants' requests should be denied.  To the extent they seek to have the Government identify and itemize every "chat, text change, or email" (Def. Ltr. 3) which has been produced in discovery and which might be viewed as *Brady* material, they have no right to such an order.  Nor are they entitled to "backup" like FBI 302s or notes of witness statements at this stage of a case,

---

[44] The Government has requested reciprocal discovery from the defendants and, to date, they have produced nothing.

more than seven months before trial.  Rather, the Government has discharged its *Brady* obligation by providing the detailed summaries set forth in its letters.  (*See* Def. Ltr. (attachments)).

### A.  APPLICABLE LAW

Courts in this District recognize that "[i]n the *Brady* context, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous . . . ."  *United States v. Healey*, 860 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (internal quotations marks and citation omitted); *see also, e.g.*, *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 457 (S.D.N.Y. 2011) ("The Government is under no general obligation to identify or sort *Brady* material within even an extremely voluminous disclosure[.]"); *United States v. Ohle* ("*Ohle I*"), No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) (While "'the Government may not properly conceal exculpatory evidence from a defendant, [the rule] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case.'" (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990))); *United States v. Calk*, 19 Cr. 366 (LGS) (Transcript of conference dated July 2, 2020, at 34 ("I'm going to rule and deny the [defendant's] motion to compel further identification of *Brady* materials from this most recent batch of . . . documents . . . . The practice in this district is not to compel the government to do that, and the government seems to have been acting in good faith in trying to be helpful with regards to *Brady* material, and I don't think there's any reason to deviate from the usual practice in this circuit.")).

For example, in *United States v. Ohle*, the Second Circuit rejected the arguments that the defendants press here.  *See United States v. Ohle* ("*Ohle II*"), 441 F. App'x 798, 804 (2d Cir. 2011) (summary order).  In that case, the district court considered at length a defense argument that

materials presented to the defense in discovery (in connection with the related *Daugerdas* case) had not been adequately disclosed under *Brady* because they were not identified within the Government's voluminous productions. *See Ohle I*, 2011 WL 651849, at *3. The district court squarely rejected this argument, holding that "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," *id.* at *4, and that although "the Government may not properly conceal exculpatory evidence from a defendant, [*Brady*] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case." *Id.* (internal quotation marks omitted). On appeal, the Second Circuit rejected the same arguments, citing the district court's "thoughtful and meticulous opinion." *Ohle II*, 441 F. App'x at 804.

Consistent with *Ohle II*, courts in this District recognize that "prosecutors may satisfy their *Brady* obligations through . . . disclosures of exculpatory or impeachment materials within large productions of documents or files." *Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 455. Absent "prosecutorial misconduct—bad faith or deliberate efforts to knowingly hide *Brady* material," even "voluminous" disclosures will be held to satisfy *Brady*. *Id.*; *see also Ohle I*, 2011 WL 651849, at *4 (noting possibility of *Brady* violation if Government "deliberately hid" documents or "purposefully confounded" defendant). Courts have thus rejected demands for *Brady* identification where the Government takes steps to facilitate defense review of the Government's productions, such as providing searchable electronic productions, indices, and metadata. *See Rubin/Chambers, Dunhill*, 825 F. Supp. 2d at 457; *Ohle I*, 2011 WL 651849, at *4.

Furthermore, to discharge its *Brady* obligation with respect to witness statements, the Government need only disclose "the essential facts which would enable [the defendant] to call the witness[es] and thus take advantage of any exculpatory testimony that [they] might furnish."

*United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975); *see also United States v. Collins*, 409 F. Supp. 3d 228, 244–45 (S.D.N.Y. 2019), *appeal withdrawn*, No. 19-3051, 2019 WL 7169099 (2d Cir. Oct. 22, 2019) (denying *Brady* request for agent notes and 302s in light of the summaries provided by the Government).

## B.  DISCUSSION

As discussed above, the Government has erred on the side of disclosure in providing broad discovery to the defendants.  Insofar as potential *Brady* material may exist within the discovery materials, the Government has discharged its obligation by producing such material to the defense. To the extent the defendants are seeking to have the Government comb through the discovery and compile a list of every "chat, text exchange, or email" (Def. Ltr. 3) that the defendants might view as *Brady* material, such request should be rejected.  As the cases set forth above demonstrate, "the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."  *Ohle I*, 2011 WL 651849, at *4; *see also Ohle II*, 441 F. App'x at 804; *Healey*, 860 F. Supp. 2d at 269; *Rubin/Chambers, Dunhill*, 825 F. Supp. at 457 ("The Government is under no general obligation to identify or sort *Brady* material within even an extremely voluminous disclosure[.]"); *Calk*, 19 Cr. 366 (LGS) (same).[45]

---

[45] Furthermore, the defendants' request, in addition to being contrary to well-settled law, is also completely unworkable.  As noted above, the defendants have characterized as *Brady* material various categories of documents that are not remotely exculpatory as to the charges in this case.  *See, e.g.*, *supra* 95 (Kukushkin claiming that "all evidence . . . of all past (and present) financial frauds perpetrated and/or engaged in by Messrs. Parnas, Fruman and/or Correia, whether charged or uncharged, related or unrelated to the indictment, no matter the victim or premise of the fraud or misrepresentations" constitutes *Brady* material).  While the Government has generally committed to producing such materials to the extent that they are within the Government's possession, it would be another matter entirely—and enormously burdensome, not to mention unwarranted—for the Government to undertake the effort of identifying and itemizing such materials for the defense.

Nor are the defendants entitled to the so-called "backup" for the witness statements that the Government has summarized in multiple disclosure letters. (*See* Def. Ltr. 4 (seeking "the notes and 302s from which [the Government's summaries] are derived or which memorialize those [witness] statements"). The defendants do not cite a single case in support of their request. The law is clear that the Government is under no obligation to produce—especially at this stage, more than seven months before trial—the FBI 302s and handwritten notes that reflect statements made by witnesses in the course of the Government's investigation. At this juncture, the Government has discharged its *Brady* obligation by disclosing "the essential facts which would enable [the defendants] to call the witness[es] and thus take advantage of any exculpatory testimony that [they] might furnish." *Stewart*, 513 F.2d at 960; *Collins*, 409 F. Supp. 3d at 244–45 (denying *Brady* request for agent notes and 302s in light of the summaries provided by the Government). As discussed above, the Government will produce 3500 material and *Giglio*/impeachment material reasonably in advance of trial, consistent with the typical practice in this District.

Finally, the defendants complain that the Government anonymized the identities of certain witnesses in its disclosure letters. (Def. Ltr. 4). The Government submits that this claim is not ripe for adjudication because the defendants declined to raise it first with the Government. Had they done so, the parties may have reached an agreement whereby the witness identities (or at least some of them, or their counsel's names) could be disclosed. The Government is committed to working with the defendants to ensure that the Government's disclosure letters are useful in enabling the defendants to adequately prepare their defense. Accordingly, the Government proposes that the parties meet and confer to see if a workable solution can be reached before submitting this issue to be resolved by the Court.

\* \* \*

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court

should deny the defendants' pretrial motions in their entirety.

Dated: New York, New York
       December 23, 2020

                                        Respectfully Submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney for the
                                        Southern District of New York


                              By:    _____/s/_____
                                        Rebekah Donaleski
                                        Nicolas Roos
                                        Douglas Zolkind
                                        Assistant United States Attorneys


Cc:    Defense Counsel
       (Via ECF)

101

# **<u>Exhibit A</u>**

Email, dated

# **<u>Exhibit B</u>**

Reply to ██████████████ Email, dated ████████████
████████████████████████████

# Exhibit C
Redacted Email Chain

# **Exhibit D**
Email Header Information

# Exhibit E

# Exhibit F

# **Exhibit G**

████████ Capitalization Table

# **<u>Exhibit H</u>**

Text Messages
Excerpted from █████████

**Text Message from** █████████████

| Date/Time | From | To | Text | Draft Translation |
|-----------|------|----|----|-------------------|
| ████ | ███████████ | | ████████████ | ████████████ |

**Text Messages from** ███████████

| Date/Time | From | To | Text |
|---|---|---|---|
| ██████ | ██████ | ██████ | ████████████████████████ |
| ██████ | ████████ | ██████ | ████████████████████████ |
| ██████ | ████████ | ██████ | ██████████████████████ |
| ██████ | ██████ | ██████ | ████████████████████████ |
| ██████ | ██████ | ██████ | ██████████ |
| ██████ | ██████ | ██████ | ████████████ |
| ██████ | ████████ | ██████ | ██████████████████ |
| ██████ | ██████ | ██████ | ████████ |



# **Exhibit I**
Declaration of William P. Fritzlen



**United States Department of State**

*Washington, D.C.   20520*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| LEV PARNAS, *et al.* | ) |

No.   19 Cr. 725
Judge J. Paul Oetken

DECLARATION OF WILLIAM P. FRITZLEN

I, William P. Fritzlen, hereby depose and say as follows:

1. I am an Attorney Adviser in the Office of the Assistant Legal Adviser for Consular Affairs at the United States Department of State (L/CA).  Prior to that I served as an Attorney Adviser in the Bureau of Consular Affairs, Office of Legal Affairs for Overseas Citizens Services.  I have worked on judicial assistance matters between the United States and the Russian Federation in both of these offices and have done so since March, 2004.  I make this declaration based on information available to me in my official capacity.

2. L/CA is responsible, <u>inter alia</u>, for receiving and transmitting requests for international judicial assistance under 28 USC § 1781 as well as for other legal assistance requests that foreign States may make via the diplomatic channel to

the United States, including those for which assistance may be available under 28 USC § 1782.

3.  Judicial assistance between the United States and the Russian Federation is governed by multilateral conventions to which the United States and Russia are parties – for example, the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, 20 UST 361; and the Vienna Convention on Consular Relations ("VCCR"), 21 U.S.T. 77 – as well as customary international law and applicable U.S. and Russian law and regulations.  The Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, 23 UST 2555, is not in force between the United States and the Russian Federation.  Although the Russian Federation acceded to the Hague Evidence Convention on April 30, 2001, no Russian Central Authority has been established, and accordingly, the United States has not accepted Russia's accession.

4.  Moreover, there are two bilateral agreements in force between the United States and the Russian Federation pertaining to judicial assistance.  The Treaty on Mutual Legal Assistance in Criminal Matters, with related note, signed at Moscow June 17, 1999 entered into force January 31, 2002.  The forms of assistance provided by this agreement – as well as by mutual legal assistance provisions of multilateral treaties regarding specific criminal offenses, such as the 2000 UN Convention against Transnational Organized Crime, TIAS 13127 – are available

only for government authorities in criminal cases, that is, for the prosecution. The other bilateral instrument is the Exchange of Notes Between the United States of America and the Union of Soviet Socialist Republics of November 22, 1935 on the Execution of Letters Rogatory, 49 Stat. 3840, and the supplementary letter of January 19, 1937 from the Vice Director of the Legal Division of the People's Commissariat for Foreign Affairs to the American Charge d'Affaires ad interim, 11 Bevan 1262-1267, publication 843, Executive Agreement Series No. 83.

5. Criminal defendants who wish to request judicial assistance in obtaining evidence or in effecting service of documents abroad in connection with criminal matters may make such requests pursuant to letters rogatory in accordance with Article 5(j) of the Vienna Convention on Consular Relations.

6. Russian authorities do <u>not</u> recognize the authority or ability of foreign persons, such as American attorneys, to take voluntary depositions of willing witnesses, even before a U.S. consular officer.  In bilateral meetings held in Moscow in 2003 and 2004, Russian authorities reiterated this position and confirmed that this applies to both civil matters and defense requests in criminal matters.  There have been no changes in the Russian position on this matter since 2004.

7. In view of this position, Russia has advised it would deem taking depositions in Russia before a U.S. consular officer as a violation of Russia's judicial sovereignty.  Such action could result in the arrest, detention, expulsion, or

deportation of the American attorney.  A private U.S. defense attorney in a criminal case seeking assistance from Russia, or any foreign country, customarily submits letters rogatory through the Department of State, L/CA, which then forwards the request through the diplomatic channel to the appropriate Russian authorities, 22 CFR § 92.66.  This procedure is explained in the "Preparation of Letters Rogatory" feature on the Department of State, Bureau of Consular Affairs Internet webpage.

8.  Although Russia has insisted on exclusive use of letters rogatory, this vehicle has proven in practice to be unreliable.  To the best of our knowledge, no request for testimony pursuant to letters rogatory on behalf of the defense in a criminal case, or in a civil case, has been successfully executed in Russia in recent years.

9.  In July 2003, Russia unilaterally suspended all judicial cooperation with the United States in civil and commercial matters.  Russia refuses to serve letters of request from the United States for service of process presented under the terms of the 1965 Hague Convention or to execute letters rogatory transmitted via the diplomatic channel.  Russia also declines to give consideration to U.S. requests to obtain evidence.  Russia's stated reason for the suspension relates to a fee imposed by the United States for service of documents under the Hague Service Convention.

10. The Department and the Russian Foreign Ministry have exchanged several diplomatic notes setting out our respective positions on the matter, and met twice in Moscow in 2003 and 2004 to explore ways to provide normal judicial cooperation.

11. While the Department of State is prepared to transmit letters rogatory for service or evidence to Russian authorities via the diplomatic channel, in our experience, all such requests are returned unexecuted.  Likewise requests sent directly by litigants to the Russian Central Authority under the Hague Service Convention are returned unexecuted.

12. The Department of State would be pleased to assist the U.S. District Court in any further questions the Court may have regarding judicial assistance in Russia.

I declare under penalty of perjury that the foregoing is true and correct (28 USC § 1746).

William P. Fritzlen

*Executed in Washington, D.C.*

December 18, 2020