



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 11, 2021

**BY ECF**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square, New York, NY 10007

Re: *United States v. Lev Parnas and Andrey Kukushkin*, S3 19 Cr. 725 (JPO)

Dear Judge Oetken:

The Government respectfully submits this letter in response to the defendants' three recent filings. (Dkts. 233, 234, 235). For the reasons set forth below, the defendants' various requests are without merit and should be denied.

## I. The Summary Charts Provide an Efficient, Helpful, and Approved Manner to Present Evidence to the Jury.

Kukushkin, joined by Parnas, has moved to exclude Government summary charts creating a timeline of events relevant to the Government's case and probative of the charged conduct. (*See* Ex. A 1402).[1] These charts present voluminous email, text message, phone record, and other evidence in an integrated and chronological manner that the Government believes will aid juror comprehension and allow for an efficient presentation of evidence. For example, page 3 combines threads from four different WhatsApp chats and an entry from toll records on July 19, 2018 in chronological order so that jurors can readily observe the chronological relationship between this disparate evidence. There is no requirement for jurors to themselves locate these data points from the totality of the admitted evidence, pull out the relevant pieces, then line them up in chronological order so that they can understand such a sequence of events. Rather, that kind of laborious, time consuming task is exactly why Federal Rule of Evidence 1006, allowing the admission of summary charts, exists.

For this reason, the Second Circuit has "regularly affirmed" the use of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records." *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003). Most recently, the Circuit affirmed the use of timeline charts similar to those at issue here in *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020). There, as here, the defendant complained that summary charts organizing various types of evidence into timelines were "created for the purpose of generating a narrative supporting the prosecution's theory of the case." *Id.*

[1] To the extent Parnas means to imply that the disclosure of this exhibit was untimely (*see* Dkt. 234 at 1), he is wrong. The Government informed the defendants on September 3, 2021 that it would not be able to produce its timeline summary charts until after the Court ruled on motions *in limine*, because the content of the charts depended on those rulings. No defendant objected or requested earlier disclosure. On October 7, 2021, the Government disclosed a draft of these charts as 18 U.S.C. § 3500 material for the summary witness. And because the charts merely excerpt other exhibits that were disclosed four weeks before trial (and which are based on Rule 16 material disclosed long before then), no defendant can claim surprise.

at 209.  The Circuit disagreed, citing a long line of precedent holding that such charts are useful to the jury and permitted by Rule 1006.  *Id.* at 209-10.[2]  Indeed, the use of such charts is so plainly proper that that it does not always rise to the level of written briefing.  *See, e.g.*, *United States v. Skelos*, No. 15 Cr. 317, Tr. 2252-57, 2262 (S.D.N.Y. 2015) (rejecting defense argument that timeline charts were "argument presented through an FBI agent" and "in effect summation," and finding that "it is precisely the type of information that has been allowed to be used in charts").  Indeed, the charts in this case have been modeled on the same charts previously found admissible by the Circuit and other courts in this District.  *Compare* Ex. A (GX 1402) *with* Ex. B (one of two *Ho* timelines), Ex. C (*Skelos* timelines), and Ex. D (two of several summary charts admitted in *United States v. Calk*, 19 Cr. 366 (LGS), at Tr. 2-5 (S.D.N.Y. June 22, 2021)).

Kukushkin's claim that these charts improperly summarize the Government's case (Dkt. 233 at 7-8) thus reprises exactly the sort of argument courts routinely reject.  Moreover, his contention that the charts improperly "link" disparate evidence to suggest ominous connections is incorrect.  To choose Kukushkin's sole example, the first page of the charts does not imply any nefarious link between Kukushkin and Muraviev exchanging an article about legalizing marijuana in April 2018, and the other entries occurring in May 2018.  The significance of the article is simply that it shows Kukushkin and Muraviev were interested in legalized cannabis and the politics surrounding it in the period right before the charged conduct began—exactly as Kukushkin describes it.  (*See id.*).  If there are further inferences to be drawn from that fact, neither the chart nor the testifying agent will draw them.  That is a matter solely for argument, not direct or cross-examination.  Nor is there anything improper about using ellipses in the summary chart to indicate where the original exhibit has been excerpted: if the chart did not excerpt exhibits, it would not be a summary, but simply a compilation as voluminous as the exhibits it contained.

By contrast, the cases upon which Kukushkin relies concerned summary charts that were prejudicial because they contained errors or unsupported assertions.  (*See id.* at 7 (citing *United States v. Conlin*, 551 F.2d 538 (2d Cir. 1977) and *United States v. Citron*, 783 F.2d 307 (2d Cir. 1986)).  In *Citron*, a tax case, the chart displayed a calculation of a disputed figure even though its basis was not apparent from the chart, and which the court found was based on "playing with numbers and doubletalk and triple talk, which no one understands."  783 F.2d at 316.  In *Conlin*, also a tax case, the chart contained a conclusion made by the testifying agent about another sum, but the chart did not indicate it was a conclusion—instead describing the number as simply "Amount Per Evidence"—which was particularly problematic given that the conclusion differed from the figures upon which it was based.  551 F.2d at 538.  That is what is meant by saying a chart fails to "fairly represent competent evidence."  *Id.*  Because the charts in this case advance no conclusions at all, nor will such testimony be elicited from the testifying agent, and neither defendant has identified any inaccuracy in their reflection of the underlying exhibits, they are admissible.

## II.    The Defendants' Objections to the Mens Rea Evidence Are Meritless.

The Government offers the following three points in reply to the defendants' last-minute attempts to exclude evidence that they knew their conduct was illegal (Dkts 233 at 2-6, 234 at 1-3), while basing their defense on ignorance of the law:

---

[2]      In affirming the charts' admission, the Circuit noted the importance of the usual limiting instruction "that the charts themselves did not constitute independent evidence and that it was the jury's duty to first determine that they accurately reflected the evidence on which they were based."  *Ho*, 984 F.3d at 210.  The Government consents to the same instruction here.

*First*, both defendants erroneously claim that evidence directly proving one defendant's state of mind cannot be offered against the other. (Dkts. 233 at 2-3, 234 at 2-3). Neither cites a case for this proposition, perhaps because, as the Second Circuit recently affirmed, evidence of a co-conspirator's state of mind is properly admitted against his co-defendant for many reasons. *See United States v. Mostafa*, 753 F. App'x 22, 36-37 (2d Cir. 2018) (collecting cases). Obviously, evidence that one defendant exchanged an article discussing the criminal nature of straw and foreign donations does more to prove his mens rea than his co-defendant's. But it is probative against both to show, among other things, that when Parnas and Kukushkin pursued a joint course of action that resulted in secretly introducing foreign donations into U.S. elections, they did so with a shared unlawful purpose. *See id.*

*Second*, the defendants have failed to identify any cognizable source of unfair prejudice. They primarily fear that the jury might accept the Government's straightforward interpretation of the evidence—such as that exchanging media coverage discussing the illegality of certain acts alerted the defendants to illegality of such acts—rather than the defendants' exculpatory explanations. That is not grounds for exclusion. *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (argument that document did not bear on defendant's mens rea absent sufficient evidence he was aware of document went to weight, not admissibility). Where the defendants do resort to case law, the precedents only further support admission. For example, in *United States v. Royer* (cited by Kukushkin, Dkt. 233 at 5), the Circuit *affirmed* the allowance of testimony about the 9/11 attacks to rebut a defense, after carefully weighing its probative value and issuing an appropriate instruction. 549 F.3d 886, 902-03 (2d Cir. 2008). That is exactly the approach the Government urges here. (*See* Dkt. 231, at 5).[3] And to the extent the defendants fear prejudice from extraneous material, unrelated to the purpose for which these exhibits are offered, the Government has repeatedly offered to make whatever redactions are appropriate. *See generally United States v. Davis*, 624 F.3d 508, 512 (2d Cir. 2010) (use of redaction appropriate to remove risk of unfair prejudice).

*Third*, the defendants have done little to detract from the probative value of these exhibits. They cannot reasonably dispute the basic purposes for which the disputed exhibits are offered, and so instead target strawmen. For example, Kukushkin notes that the FEC Complaint Article says only that GEP "might" have served as a conduit for campaign contributions from others, and claims it does not state that such conduct "is prohibited" (Dkt. 233 at 4), whereas Parnas depicts the same article as "journalistic sensationalism" (Dkt. 234 at 2). Both defendants have thus described the same article in opposite ways, in equally misleading attempts to exclude its considerable probative force. In fact, the relevant portion of the article describes a "Federal Election Commission complaint alleging that GEP might be an illegal campaign-finance conduit created to mask the actual sources of its political contributions." (GX 30-A-1 at 3). That is hardly sensationalist, but it does plainly inform any reader that campaign-finance conduits and efforts to mask the actual sources of political contributions are "illegal." (*Id.*). The defendants thus cannot reasonably ask the Court to find that a risk of unfair prejudice from this article—or the other disputed evidence (*see* Dkt. 231 at 1-6)—"substantially outweigh[s]" its plain probative value. Fed. R. Evid. 403.

---

[3]     The other case Kukushkin cites on this issue has nothing to do with admitting evidence. (*See* Dkt. 233 at 5 (citing *United States v. Elfgeeh*, 515 F.3d 100, 130 (2d Cir. 2008)). In *Eflgeeh*, media coverage during and about the trial linked the defendant to Al-Qaeda, citing evidence that would not be admitted at trial, including a defendant's prior guilty plea. 515 F.3d at 130. The concern that a juror might have read such articles outside court in no way suggests the evidence offered in this case is improper.

### III.   Kukushkin's Jury Selection Requests Should Be Denied.

Kukushkin asks the Court to defer the exercise of for cause and peremptory challenges until the second day of trial so that defense counsel, presumably with the assistance of the several jury consultants he has retained,[4] can conduct background research on the jurors. (Dkt. 235 at 1-2).  Although it is permissible for parties to conduct research into potential jurors, there is no legal or constitutional requirement that parties be given an extra day to do so.  "[T]he purpose of the *voir dire* is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case."  *United States v. Barnes*, 604 F.2d 121, 138 (2d Cir. 1979) (citations omitted).  "[S]o long as the court conducts a careful *voir dire* designed to uncover any bias as to the issues or the defendants," the defendants' rights are not infringed.  *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995); *see also United States v. Vario*, 943 F.2d 236, 241-42 (2d Cir. 1991) ("the district court conducted a searching *voir dire* which sufficiently enabled [the defendant] to exercise his challenges meaningfully and to obtain a fair and impartial jury").  Indeed, it is not unusual for courts to empanel anonymous juries, which deprive the parties of identity information that could be used to do research, and still conduct a fair jury selection process.  *See, e.g.*, *United States v. Prado*, No. 10 Cr. 74 (JFB), 2011 WL 3472509, at *10 (E.D.N.Y. Aug. 5, 2011) (Bianco, J.) (collecting cases and rejecting the objection that an anonymous jury would prevent the defendant from "meaningfully exercising his peremptory challenges" because he would not be able to use "the internet and its many tools of investigation and research").  And notably absent from defense counsel's letter is any authority requiring that a defendant be given an opportunity to research potential jurors.

The Court has already indicated at the final pretrial conference that it would ensure a fair jury is selected, with input from the parties on the questions asked of prospective jurors.  The defendants and their counsel will have the opportunity to consider prospective jurors' responses, suggest additional questions to the Court, and conduct research up to the point at which they must exercise their challenges.  But to delay the completion of jury selection to Wednesday so that defense counsel and their hired consultants may research the jurors would significantly inconvenience many jurors who would need to report to court for a second day, only to be struck.  It would also unnecessarily delay the trial, extend the length of jury service, potentially force out-of-state witnesses to change travel plans, and unnecessarily occupy a courtroom for an additional period of time.  For all of these reasons, Kukushkin's request should be denied.

Kukushkin also now objects to the parties simultaneously exercising peremptory challenges, even though the Court announced the plan almost a week ago without objection from the defendants.  The Court has "broad discretion to determine the way preemptory challenges will be exercised."  *United States v. Thompson*, 76 F.3d 443, 451 (2d Cir. 1996) (internal quotation marks and citation omitted).  The "blind strike" or "simultaneous" method of exercising peremptory challenges is constitutional and consistent with Rule 24(b), and therefore it is within the Court's discretion to use that method.  *See United States v. Bermudez*, 529 F.3d 158, 164-65 (2d Cir. 2008) (citing *Pointer v. United States*, 151 U.S. 396 (1894)).

The Court should also deny Kukushkin's request for additional jury strikes.  Although courts have discretion to grant such requests, they are regularly denied.  *See, e.g.*, *United States v. Blaszczak*, 2018 WL 1787617, *1 (S.D.N.Y. Mar. 19, 2018) (denying request for one additional strike per defendant in three defendant case).  Here, Kukushkin has identified no reason that he requires additional strikes: his defense may be "not necessarily aligned" with Parnas's (Dkt. 235 at 3), but he has identified no set

---

[4]      Kukushkin's list of people and entities discloses the names of three jury consultants and a jury consulting firm.

of potential jurors who would be more inclined to favor one defendant over the other.  *See Blaszczak*, 2018 WL 1787617, at *1 (describing claimed need for additional strikes in light of defendants' different roles in offense as "rather speculative").  And that multiple defense lawyers may not agree on how to exercise their peremptory challenges does not mandate an additional challenge for each defendant.  *See United States v. Magana*, 118 F.3d 1173, 1206 (7th Cir. 1997); *United States v. McClendon*, 782 F.2d 785, 788 (9th Cir. 1986).  Providing the defense with additional challenges is unnecessary, provides a significant advantage to the defense in formulating the jury, and will needlessly prolong the jury selection process.[5]

> Respectfully submitted,
>
> DAMIAN WILLIAMS
> United States Attorney
> Southern District of New York
>
> By: /s_____
> Aline Flodr / Nicolas Roos / Hagan Scotten
> Assistant United States Attorneys
> (212) 637-2418/2423/2410

Cc:    Defense counsel (by ECF)

---

[5]     Should the Court grant the defendant's request for additional strikes, the Government respectfully requests that the Court condition such a ruling on the defendants' consent to a proportional number of additional Government strikes.  *See United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989); 2 Fed. Prac. & Proc. Crim. § 386 (4th ed.) ("[I]t is not uncommon for the court to condition the grant of a defendant's request for additional challenges on defendant's consent to a proportionate increase being accorded to the government").  Although the Government believes an impartial jury can be empaneled with the usual number of strikes, to the extent the defendants have genuine concerns about impartiality— rather than a desire for strategic advantage—such consent should be readily given.