LAECpar1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    --------------------------------x
      UNITED STATES OF AMERICA,              New York, N.Y.
 3
                   v.                        19 CR 725 (JPO)
 4
      LEV PARNAS and ANDREY KUKUSHKIN,
 5
                   Defendants.
 6    --------------------------------x
                                             October 14, 2021
 7                                           9:15 a.m.

 8
      Before:
 9
                          HON. J. PAUL OETKEN,
10
                                             U.S. District Judge
11                                              And a Jury

12                                APPEARANCES

13    DAMIAN WILLIAMS
             United States Attorney for the
14           Southern District of New York
      BY:  NICOLAS ROOS
15         ALINE FLODR
           HAGAN SCOTTEN
16         Assistant United States Attorneys

17    LAW OFFICES OF JOSEPH A. BONDY
             Attorneys for Defendant Parnas
18    BY:  JOSEPH BONDY

19    LEAF LEGAL, P.C.
             Attorneys for Defendant Parnas
20    BY:  STEPHANIE SCHUMAN

21    GERALD B. LEFCOURT, P.C.
             Attorneys for Defendant Kukushkin
22    BY:  GERALD LEFCOURT
           FAITH FRIEDMAN

23

24

25
```

LAECpar1

```
 1              (In open court, jury not present)
 2         THE COURT:  Good morning, everyone.  Any preliminary
 3    matters to address?
 4         MR. SCOTTEN:  Just one, your Honor.  It's just reading
 5    approximately 45 exhibits into the record for the summary
 6    witness as we discussed yesterday, your Honor.  If I could do
 7    that, I will.
 8              Your Honor, the government offers --
 9         THE COURT:  Do you want to wait until the jury is
10    here?
11         MR. SCOTTEN:  I was planning on doing it without the
12    jury being here so they didn't have to listen to 40 numbers,
13    but I could wait.
14         THE COURT:  I think that's fine.  It's all in a
15    stipulation?
16         MR. SCOTTEN:  They're actually from various
17    stipulations, but yes.  And then I talked to defense counsel
18    about this beforehand.
19         THE COURT:  And you're okay with that?
20         MS. FRIEDMAN:  Yes, your Honor.
21         MR. BONDY:  Yes.
22         THE COURT:  Also, before you do that, I want to
23    mention a couple things.  Just so the record is clear, the
24    actual handout that we pass out to the jurors during voir dire,
25    I'm going to mark that as Court Exhibit 1, just so the record
```

LAECpar1

1    is clear.  Then I'm marking your page of peremptory challenges

2    and defense counsels' page of peremptory challenges as Court

3    Exhibits 2 and 3.

4           One other thing I should have mentioned before

5    Mr. Stewart began testifying is I actually received a letter

6    from a lawyer at his law firm, which you all probably received

7    copies of.  It says copies, Assistant United States Attorney,

8    Ms. Flodr and Mr. Bondy, and it just says we're sensitive to

9    attorney-client privilege, and to the extent Mr. Stewart has

10   any questions about the scope of attorney-client privilege, we

11   hope you're okay with taking a break so that can he consult

12   with me by phone, which is fine.  That's all it really says.

13          Just so the record is clear, I'll just mark that as

14   Court Exhibit 4 so it's technically in the record.

15          Mr. Scotten, go ahead.

16          MR. SCOTTEN:  Thank you, your Honor.  The government

17   offers -- and this is for each the exhibit number and the

18   subexhibits.  Many of these have a 4-A2, but I'm just reading

19   the primary number.

20          4, 8, 14, 15, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34,

21   35, 38, 39, 40, 42, 43, 44, 45, 48, 50, 52, 53, 54, 58, 59, 60,

22   61, 62, 64, 66, 68, 72, 73, 74, 75, 77, 78, 79, 81, 82, 83, 84,

23   86, 89, 90, 91, 133, 135, 137, 141, 144, 146, 155, 156, 167,

24   601, 702, 1212, 1295, 1296.

25          THE COURT:  Those are all subject to stipulations?

LAECpar1

1          MR. SCOTTEN:  I believe so, your Honor.  Yes, they

2     are.  I confirmed all of them are.

3          THE COURT:  They're admitted.  Any other

4     preliminaries?

5          (Government's Exhibits 4, 8, 14, 15, 24, 25, 26, 27,

6     28, 30, 31, 32, 33, 34, 35, 38, 39, 40, 42, 43, 44, 45, 48, 50,

7     52, 53, 54, 58, 59, 60, 61, 62, 64, 66, 68, 72, 73, 74, 75, 77,

8     78, 79, 81, 82, 83, 84, 86, 89, 90, 91, 133, 135, 137, 141,

9     144, 146, 155, 156, 167, 601, 702, 1212, 1295, 1296 received in

10    evidence)

11         MR. SCOTTEN:  The one thing we could do now, your

12    Honor, might avoid a sidebar, it might not, is yesterday

13    during -- I think it was both Mr. Duncan and Mr. Hirsch's

14    testimony, there was a lot of cross examination about the

15    nuances of marijuana law.  We began objecting on relevance

16    grounds.  Mr. Bondy stated that he would tie it together.  If

17    it has been tied together, we missed it, and we were either

18    going to ask for a proffer of relevance or just sort of note at

19    some point in Mr. Stewart's cross, I expect we may again find

20    ourselves doing a lengthy expository of marijuana law, and we

21    would ask for a proffer of relevance now to avoid having to

22    figure out what the relevance is in the middle of his

23    testimony.

24         MR. BONDY:  Certainly.  I spoke with their witness,

25    Mr. Stewart, by phone.  He was kind enough to speak with me

LAECpar1

1    with his lawyer.  He confirmed that most of the cannabis

2    clients that come to him in his legal practice learn about the

3    requirements for an application are dissuaded because it's so

4    difficult.

5         Part of our argument here is that, indeed, Mr. Parnas

6    was dissuaded from working with Mr. Kukushkin because he wasn't

7    going to be the type of applicant, whether a social equity or a

8    diversity or an inclusion applicant or somebody that had the

9    financial wherewithal or the experience in cannabis or the kind

10   of structure that would be required under Nevada's licensing

11   scheme to even be validly considered as an applicant, to get a

12   high score to be somebody worth pursuing or, as Mr. Stewart

13   talked about yesterday, to be in a position to actually

14   qualify, a qualified applicant to transfer the license, and

15   that's why.

16        MR. SCOTTEN:  So I suppose if he wants to ask a few

17   questions to bring out the difficulty of applying and many

18   people are dissuaded, we have no objection.  We don't think we

19   need to delve into the nature of all these various categories

20   as was done yesterday to establish that.

21        I also have some concern -- and, really, I should let

22   Ms. Flodr handle it, but since I've got the mic, a lot of this

23   sounds like it's going to be privileged unless it's done in the

24   abstract.  It's our understanding that Mr. Parnas is not in a

25   position to waive privilege because Mr. Fruman and Mr. Correia

LAECpar1

1    would have also been part of that privilege, and to my

2    knowledge, they have not waived.  Maybe Mr. Kukushkin, too, I

3    suppose he could waive too, but the problem is the two people

4    who are not here.

5          MR. BONDY:  I'm not going to seek to adduce anything

6    privileged from the witness, your Honor.

7          MR. LEFCOURT:  I'm sorry, your Honor.  I didn't

8    understand what the prosecutor said about Mr. Kukushkin.

9          THE COURT:  Could you repeat it, please.

10         MR. SCOTTEN:  Yes.  I had said it that if it was a

11   question of what Mr. Stewart told the defendants, there would

12   be privilege issues that could not be waived by everybody at

13   the table because Mr. Fruman and Mr. Correia, I think at least

14   without arguable privilege, and what I said, for Mr. Lefcourt,

15   what I said about his client is he might or might not waive.

16   It's really the people who aren't here who are problematic.

17         THE COURT:  And then Mr. Bondy just said I'm not

18   intending to elicit any privileged communication.

19         MR. BONDY:  That's correct.  Just the fact that

20   meetings were had, of course, the existence of these meetings.

21         THE COURT:  So I guess the government acknowledges

22   that there is some relevance to the narrative that Mr. Bondy

23   just described.

24         MR. SCOTTEN:  Correct, your Honor.  We think it can be

25   brought out without educating the jury about all the nuances

LAECpar1

1    that make it difficult.  I think Mr. Stewart will agree to the

2    endpoint to not do 15 questions on diversity licensing, which

3    is an important topic in other areas, but not really applicable

4    here.

5              THE COURT:  Except to the extent it's needed to tell

6    that general narrative, which shouldn't take too long.

7              MR. SCOTTEN:  Yes.  Thank you, your Honor.

8              THE COURT:  We should go ahead and bring out

9    Mr. Stewart and then the jury.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  Good morning, members

3    of the jury.  Welcome back.  We're continuing with the direct

4    examination of Mr. Daniel Stewart who began yesterday, remains

5    under oath today.  Mr. Flodr, you may proceed.

6     DANIEL STEWART, resumed.

7    DIRECT EXAMINATION CONTINUED

8    BY MS. FLODR:

9    Q.  Good morning, Mr. Stewart.

10   A.  Good morning.  It's good to be back.

11   Q.  In the course of your work as a lawyer, did there come a

12   time when you met someone named Lev Parnas?

13   A.  Yes.

14   Q.  How did you meet Mr. Parnas?

15   A.  I had a law partner at the time named Wes Duncan who was

16   running for attorney general.  He met Mr. Parnas at a political

17   function and then introduced me to him at a lunch on October

18   22nd, 2018.

19   Q.  Without getting into any attorney-client privilege

20   communications, what was your understanding of the purpose of

21   that lunch meeting?

22   A.  Appreciate you in that.  So, just to clarify for the

23   record, even though I didn't end up representing any of the

24   individuals, the privilege in Nevada still applies to legal

25   communications, but I can speak generally.

1          They were looking to retain legal counsel for -- to

2     get involved in Nevada's legal marijuana business.

3     Q.  Who else attended the lunch meeting?

4     A.  The lunch meeting itself, to the best of my recollection,

5     was just me, Mr. Duncan, and Mr. Parnas.

6     Q.  At any point during the lunch meeting, did other people

7     join your lunch meeting?

8     A.  Yes.  I recall towards the end of the meeting a

9     Mr. Kukushkin and a Mr. Igor Fruman came by and said hello.

10    Q.  What was your understanding of who Mr. Kukushkin was?

11    A.  Again, not to get into any privileged issues, my

12    understanding is that he was one of Mr. Parnas's business

13    partners in the marijuana venture.

14    Q.  And who is Igor Fruman?

15    A.  I also understood him to be one of the business partners in

16    the marijuana venture.

17    Q.  Was this meeting before or after the dispensary license

18    application process closed in 2018?

19    A.  It was after.

20    Q.  After your lunch meeting, were you introduced to someone

21    named David Correia?

22    A.  I was via text message.  Mr. Parnas introduced me to him

23    and then Mr. Correia texted me to introduce himself to me.

24    Q.  Who was he introduced as?

25    A.  He was introduced by Mr. Parnas as his VP, and I understood

LAECpar1                          Stewart - direct

1    them to be business partners.  And VP being vice president.

2    Q.  What communications did you have with Mr. Correia after

3    being introduced?

4    A.  On October 23rd and October 24th, we exchanged some text

5    messages trying to schedule a conference call.  And then on

6    October 24th, we did have that conference call.

7    Q.  Who participated on the conference call?

8    A.  Mr. Kukushkin and Mr. Correia were on the call.  I remember

9    that.  To the best of my recollection, I don't remember anyone

10   else being on that call, but there could have been.

11   Q.  And what was the general purpose of that call?

12   A.  Not to get into privileged information, but it was the same

13   understanding, to discuss or seek legal advice with regards to

14   opening and running a legal marijuana business in the State of

15   Nevada, possibly obtaining licenses to run those businesses.

16   Q.  Were you hired to represent Mr. Parnas, Mr. Kukushkin,

17   Mr. Fruman, or Mr. Correia?

18   A.  I was not.

19   Q.  You testified earlier that the individuals who applied for

20   dispensary licenses in Nevada in 2018 were made public at some

21   point; is that correct?

22   A.  Correct.

23   Q.  Based on that publicly available information, do you know

24   whether Mr. Parnas, Mr. Kukushkin, Mr. Fruman, or Mr. Correia

25   applied for dispensary licenses in Nevada in 2018?

LAECpar1                          Stewart - cross

1    A.  To the best of my understanding, they did not.

2    Q.  After October 2018, did you have any further communications

3    with Mr. Parnas?

4    A.  Best of my recollection, I did not.

5    Q.  After October 2018, did you have any further communications

6    with Mr. Kukushkin?

7    A.  Again, to the best of my recollection, I did not.

8    Q.  And other than the communications and meetings we discussed

9    in your testimony, did you have any further dealings with

10   Mr. Parnas, Mr. Kukushkin, Mr. Fruman, or Mr. Correia?

11   A.  Again, to the best of my recollection, I did not.

12           MS. FLODR:  No further questions.

13           THE COURT:  Thank you.

14           MR. BONDY:  May I?

15           THE COURT:  Mr. Bondy.

16           MR. BONDY:  Yes.

17   CROSS-EXAMINATION

18   BY MR. BONDY:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  How are you?

22   A.  Doing okay.

23   Q.  Nice to see you today.

24   A.  It's good to be here.

25   Q.  You and I have never met in person; correct?

LAECpar1                          Stewart - cross

1   A.  Correct.

2   Q.  But we have spoken on phone?

3   A.  Correct.

4   Q.  And your lawyer responded to a letter I wrote asking to

5   talk to you and you spoke with us, yes?

6   A.  Correct.

7   Q.  Thank you very much.  I might ask you, you're a partner at

8   the law firm, yes?

9   A.  Yes.

10  Q.  Of Hutchinson & Steffen.  And you currently lead the firm's

11  election campaign and political law practice; correct?

12  A.  That's correct.

13  Q.  You're also a member of the firm's administrative law

14  practice; correct?

15  A.  Correct.

16  Q.  And it's in connection with the administrative law part of

17  the practice that you represent cannabis clients?

18  A.  Correct.

19  Q.  How many years have you represented cannabis clients in

20  Nevada, sir?

21  A.  I believe 2014 was the first time I did any work for a

22  cannabis client.  So since then, 2014 to 2021.

23  Q.  And you've maintained cannabis clients throughout that

24  whole period?

25  A.  There were two periods where I went to go work for the

LAECpar1                          Stewart - cross

1   government, so I had no clients at that time other than my

2   government clients.  But in private practice, I've generally

3   had at least one cannabis client during that time.

4   Q.  And the work in government, was that when you were working

5   as counsel to the governor?

6   A.  Correct.  In 2015, I was counsel and policy advisor to the

7   Speaker of Nevada Assembly.  And then in 2016 to 2017, I was

8   general counsel for governor Brian Sandoval.

9   Q.  Do you have any professional memberships involving

10  cannabis, are you a member of, say, the International Cannabis

11  Bar Association?

12  A.  I am not.

13  Q.  The National Legal Committee of the National Organization

14  for the Reform of Marijuana Laws, NORMAL?

15  A.  I am not.

16  Q.  Member of the National Cannabis Industry Association?

17  A.  I am not.

18  Q.  And the type of work that you do for cannabis clients is

19  generally what?

20  A.  Like I testified yesterday, it generally falls into two

21  categories.  It's either helping individuals get into the

22  business, obtain licenses or interests in licenses or it's

23  individuals that already have licenses that have regulatory

24  issues that come up with the government.

25  Q.  So when you advise clients — without talking about

LAECpar1                    Stewart - cross

1    particular clients and privilege issues — who come to you and

2    have an interest in the cannabis industry -- you've had that

3    happen, yes?

4    A.  Yes.

5    Q.  -- do you find that you speak to people and frequently

6    they're dissuaded from proceeding with an application?

7    A.  Yes.

8    Q.  Why?

9    A.  Generally, the most common thing is it costs too much

10   money.  It's too hard to get in or they can't put the

11   partnerships together or something to make it happen.

12   Q.  Let's go through those.  Too hard to get in.  Could you

13   explain to us what might make it too hard to get into the

14   marijuana industry for an applicant?

15   A.  Well, as I mentioned, in Nevada, we have a capped number of

16   licenses for both dispensaries and we currently are not

17   issuing, as far as I know, not issuing any more licenses in any

18   other -- and so, whenever there is an opening in an application

19   process, you're going to have many more applicants than there

20   are going to be licenses available, in particular with

21   dispensaries -- really, only with dispensaries.  And so, if

22   they feel like the competition is too steep, they're competing

23   against individuals that are more likely to get the license

24   than them.

25   Q.  When you say there is a cap on the licenses and the

LAECpar1                      Stewart - cross

1    competition is too steep, are there applications in Nevada

2    graded across a range of criterion?

3    A.   They are.  At least that's how the two open application

4    period processes have been done.  They've been graded and

5    scored.

6    Q.   And graded and scored, a total of 100 points, yes?

7    A.   I don't know the -- sitting here today, I don't remember

8    the actual scoring process.  I just know that you were given a

9    score and then ranked according to the score.

10   Q.   And the score and the rank, you got a certain number of

11   points per category, there were several licensing categories

12   that were reviewed; correct?

13   A.   If I understand your question category to be --

14   Q.   I'll offer an example.  The organizational structure of an

15   applicant might be given a total number of possible points on

16   an application; correct?

17   A.   Correct.

18   Q.   And that's pursuant to law in Nevada?

19   A.   Correct, pursuant to the law and the application, as they

20   devise the application itself.

21   Q.   So an applicant would have to show things like their owners

22   and officers and board members and the key personnel of the

23   marijuana establishment; correct?

24   A.   Correct.

25   Q.   Certainly the percentages of ownership for each individual;

LAECpar1                    Stewart - cross

1  right?

2  A.  Correct.

3  Q.  And a description of the organizational structure, yes?

4  A.  Yes.

5  Q.  Have you advised cannabis clients about the merits of

6  pursuing an S corp versus, say, an LLC corporation?

7  A.  With respect to cannabis only?

8  Q.  Yes.

9  A.  I do not believe so.

10  Q.  There are other criterion on the application in addition to

11  the organizational structure, yes?

12  A.  Yes.

13  Q.  One of them is showing your financial ability to conduct

14  the proposed project, yes?

15  A.  Correct.

16  Q.  And that's graded based upon the amount of money an

17  applicant can show they have; correct?

18  A.  I believe that is correct, yes.

19  Q.  If you recall, was there a minimal amount of money an

20  applicant had to show at the cusp of $250,000, was that the

21  minimum?

22  A.  As I sit here today, I do not remember any specific

23  minimum.

24  Q.  And again, finances would be one of the criterion graded on

25  the application, organizational structure would be another,

LAECpar1                          Stewart - cross

1   yes?

2   A.  Correct.

3   Q.  And then there would be things like the adequacy for the

4   structure of conducting the business; right?

5   A.  Correct.

6   Q.  Or the adequacy, I suppose, of the fields and the

7   irrigation and everything associated with it if it was a

8   cultivation license, yes?

9   A.  Yes, adequacy in all its forms, yes.

10  Q.  And adequacy in all its forms might include where a

11  building is zoned; correct?

12  A.  There is actually some dispute on that with respect to the

13  state and the local governments.  The state, you do have to

14  show that -- you do have to show that, where you intend to

15  operate.  You can get a local zoning and business license, as

16  well.

17  Q.  And there is also a requirement, there is a community

18  impact statement that has to be prepared; am I right?

19  A.  Yes.

20  Q.  And there is also a concern about whether the applicant has

21  a plan in place to ensure social equity and diversity and

22  inclusion; am I right?

23  A.  Correct.  Although, that was part of some subsequent

24  litigation, but that was on the application.

25  Q.  And by that, we mean a board or directors or officers that

LAECpar1                    Stewart - cross

1   come from different backgrounds; right?

2   A.  Correct.

3   Q.  Women, yes?

4   A.  Correct.

5   Q.  People of color, yes?

6   A.  Correct.

7   Q.  Combat disabled veterans, yes?

8   A.  Correct.

9   Q.  Distressed farmers?

10  A.  I don't know that that was what they were specifically

11  looking for, but diversity in all its forms would be

12  encouraged.

13  Q.  And Mr. Kukushkin, to your knowledge, was not in any of

14  those categories in terms of diversity, was he?

15  A.  The ones you specifically mentioned, I -- well -- no.

16  Q.  Were any others that you know about that you could tell us

17  about?

18  A.  No.  Well, all I know, I guess, is that he's a white male.

19  Q.  Mr. Parnas?

20  A.  Same thing, a white male.

21  Q.  Mr. Fruman?

22  A.  A white male.

23  Q.  You don't know who Mr. Muraviev is?

24  A.  I do not know who that is.

25  Q.  And that would be something that would be graded on an

1    application, as well, right, diversity?

2    A.  Yes.  Again, that was subject to some litigation, but the

3    reviewers did look at diversity.

4    Q.  In a very competitive licensing process, an applicant's

5    inability to meet the top of a particular category could be

6    fatal to them getting a license, yes?

7    A.  Yes.

8    Q.  You said that these -- I'm sorry?

9    A.  I was just wondering, I want to clarify something.  Is that

10   possible?

11             THE COURT:  Yes.

12   A.  The last gentleman you named with the M, I've since become

13   familiar with his name as part of this litigation, but I don't

14   know who that is.

15   Q.  And you became familiar with his name how, sir?

16   A.  I've been asked whether I knew him in discussions.

17   Q.  By the government?

18   A.  Yes.  I don't recall if you asked me either.

19   Q.  Are you a member of Governor Sisolak's marijuana -- what is

20   it called, the marijuana control board?

21   A.  For a short period of time.  So I don't want to get --

22   don't want to bore anybody with details, but in 2019, the

23   regulatory process in Nevada was moved from the Department of

24   Taxation to a newly created board called a Cannabis Compliance

25   Board or CCB.  I just know it's the CCB.  As part of the

LAECpar1                        Stewart – cross

1  creation of that -- I'm not a member of that board.  That is

2  the regulatory board.  As part of that, they were given

3  authorization to create certain subcommittees on various

4  issues.  For a short time, I served on the cannabis advisory

5  commission and then chaired the subcommittee on market

6  stabilization.  I'm no longer on that.

7  Q.  Did you represent any of the applicants in the 2018 retail

8  store application period?

9  A.  Yes, I represented one client.

10  Q.  How did they do?

11  A.  They did not get a license.

12  Q.  You said that it costs a lot of money for an applicant to

13  prepare a competitive application?

14  A.  Correct.

15  Q.  Do you have an idea of how much money it might cost to

16  prepare that application?

17  A.  Hundreds of thousands -- well, I know that individuals paid

18  hundreds of thousands of dollars.  I don't know what the

19  smallest amounts would be.

20  Q.  Now, when you met with — without talking about anything

21  privileged — Mr. Kukushkin, you think Mr. Correia by telephone,

22  you had a phone call about cannabis licensing, yes?

23  A.  Correct.

24  Q.  Nothing out of the ordinary in that phone call?

25  A.  I did not -- no.

LAECpar1                    Stewart - cross

1  Q.  And when you met with Mr. Parnas and with Wes Duncan,

2  again, same thing, discussion about cannabis licensing?

3  A.  Correct.

4  Q.  Nothing out of the ordinary?

5  A.  No.

6  Q.  Have you spoken to Mr. Duncan in the past 24 hours?

7  A.  Yes.

8  Q.  And did he explain to you the scope of his testimony?

9  A.  No.

10 Q.  But you and he know each other for many years, you've

11 worked together and he is a fine lawyer, yes?

12 A.  Correct.  Yes.

13          To clarify, I just texted Mr. Duncan.  I didn't speak

14 to him in person or on the phone.

15 Q.  After you and I spoke, you spoke to the government?

16 A.  Yes.

17 Q.  And you told them some of the things I was asking you?

18 A.  Yes.

19 Q.  Did they ask you to tell them what you and I had spoken

20 about?

21 A.  I don't -- I don't recall that it was in those specific

22 terms.  I think it naturally came up as part of the

23 conversation.

24 Q.  So, in 2018, you needed to have a license already before

25 you could actually apply and obtain this retail store license;

LAECpar1                         Stewart - cross

1    right?

2    A.  Correct.

3    Q.  To your knowledge, did Mr. Kukushkin or Mr. Parnas or

4    Mr. Correia or Mr. Fruman have that license?

5    A.  No.

6    Q.  And so, for them, if you did want to pursue getting a

7    license, you would have had to wait for an applicant to receive

8    a license then so that you could try to purchase a portion of

9    it; right?

10   A.  Yes, although they didn't necessarily have to wait.  They

11   could purchase an interest in a current applicant and hope they

12   got awarded a license.

13   Q.  To your knowledge, did anyone from Mr. Kukushkin and

14   Mr. Parnas's camp try to do that?

15   A.  I have no knowledge of it.

16   Q.  Now, the legislature in Nevada only needs 120 days a year

17   every other year?

18   A.  Correct.

19   Q.  That must create an enormous urgency for the legislators to

20   get certain pieces of law accomplished, yes?

21   A.  Correct.

22   Q.  Across not just the cannabis industry, but a whole variety

23   of questions in Nevada; right?

24   A.  Correct.  Sometimes there will be special sessions of the

25   legislature called, but they're very rare.  They have to do

LAECpar1                    Stewart - cross

1    everything in that 120 days from criminal law, to water law, to

2    budgets.

3    Q.   Are there lobbyists in Nevada?

4    A.   Yes.

5    Q.   What's a lobbyist?

6    A.   Well, the technical -- there is different technical

7    definitions, but I think the general understanding is anyone

8    who's paid or unpaid, if they work for nonprofits or so forth,

9    to advocate on behalf of themselves or a client before

10   lawmakers, local and state.

11   Q.   And so, in Nevada, you know that there are lobbyists that

12   lobby on behalf of farmers about, say, water rights, yes?

13   A.   Yes.

14   Q.   Hoteliers about casinos, yes?

15   A.   Very much so, yes.

16   Q.   And there is a marijuana lobbyist, as well, yes?

17   A.   Yes.

18   Q.   On both sides, there are lobbyists that want to limit the

19   entrance of other applicants into the market; right?

20   A.   On both sides?

21   Q.   Meaning the applicants trying to get a license and then the

22   preexisting license holders who may want to limit some aspect

23   of new licenses coming on the market; right?

24   A.   I know at least in the 2021 session, yes, there was

25   lobbyists on both sides of that question.

LAECpar1                         Stewart - cross

1    Q.  And have you ever been a lobbyist?

2    A.  Yes.

3    Q.  Lobbyists charge money?

4    A.  Yes, usually.

5    Q.  Do they charge by the hour, by the month, both?

6    A.  Both.

7    Q.  Is cannabis lobbying an important aspect in Nevada of an

8    application process?

9    A.  What do you mean by important?  I want to make sure I

10   understand the question.

11          MR. BONDY:  I'll withdraw that and clarify.

12   Q.  It's important for an applicant to hire a lobbyist?

13   A.  Yes.  In particular, with local government, like if you're

14   dealing with trying to get something zoned or you're trying to

15   get a business license before the city council or county

16   commissions.

17   Q.  So you have a financial component, you have to show you

18   have some money as an applicant, yes?

19   A.  Yes.

20   Q.  And you may have to pay hundreds of thousands of dollars in

21   fees to get the application; right?

22   A.  Could be that much, yes.

23   Q.  You could end up engaging a lobbyist if you're particularly

24   at the local level concerned about something like zoning;

25   right?

LAECpar1                    Stewart - cross

1    A.  Correct.

2    Q.  And there is a social equity component that an applicant is

3    gauged upon, yes?

4    A.  Correct.

5    Q.  Now, in terms of the legislature.  First off, Nevada was

6    progressive in a sense, they were the third state in the

7    country to legalize medical cannabis; right?

8    A.  I don't remember that offhand.

9    Q.  Do you remember the year?

10   A.  My understanding is that they legalized medical cannabis

11   maybe in the year '99 or 2000, and the legislature sat on it

12   for 13 or 14 years before they did anything about it.

13   Q.  But it's interesting, medical marijuana was for sale in

14   Nevada maybe just a year or two before there was a ballot

15   referendum legalizing adult use marijuana; right?

16   A.  Correct.  Yes.

17   Q.  With that ballot referendum came the green rush into

18   Nevada, yes?

19              MS. FLODR:  Objection, your Honor.

20              THE COURT:  Sustained.

21   Q.  So, the only way to change the cannabis legislation would

22   be through some kind of vote of your legislators every other

23   year during that 120-day period; correct?

24   A.  That's the surest way.  There is currently some dispute

25   about whether or not local governments and regulatory agencies

LAECpar1                          Stewart – cross

1    can perhaps do some things on their own, but the surest way and

2    the way people have focused on have been through that lawmaking

3    process, yes.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAETPAR2                          Stewart - cross

 1   BY MR. BONDY:

 2   Q.   And neither the governor nor the attorney general have any

 3   role whatsoever in the licensing, is that right?

 4   A.   Well, I need to --

 5   Q.   Let me say they don't have any role in the licensing regime

 6   in terms of who gets the license, right?

 7   A.   They did not review any applications.

 8   Q.   The governor could sign a bill, right, to increase the

 9   number of licenses and informally influence the legislature,

10   correct?

11   A.   Correct.

12   Q.   But the attorney general doesn't have any law-making role,

13   does he?

14   A.   Short of introducing some of their own bills or advising on

15   regulations, no.

16   Q.   They could provide advice, right?

17   A.   Right.

18   Q.   And advise on a proposed law, correct?

19   A.   Correct.

20   Q.   You've been deposed like five or six times, yes?

21   A.   Yes.

22   Q.   Always in cannabis cases?

23   A.   All but one.

24   Q.   Would you say that it's fair to say that in the State of

25   Nevada the cannabis field is particularly litigious?

LAETPAR2                        Stewart - cross

1    A.  I think that's fair to say.

2    Q.  Why?

3    A.  Well, the easiest answer to that is applicants were moving

4    forward at the same pace as the law, and sometimes not knowing

5    whether they were going to get applications or licenses in,

6    most of the litigation resulted in either partnerships fighting

7    or between people that got licenses and people that didn't get

8    licenses.

9    Q.  And you've been sucked into these litigations?

10   A.  I have, yes.

11   Q.  During the course of your meeting with Mr. Parnas, the

12   follow-up phone call with Mr. Correia and Mr. Kukushkin, there

13   was never anything about those communications that caused you

14   alarm, was there?

15   A.  No.

16   Q.  Never anything about those communications that caused you

17   in your own mind to think you needed to report something as

18   illegal, was there?

19   A.  No.

20          MR. BONDY:  Thank you very much, sir.

21          THE COURT:  Thank you, Mr. Bondy.

22          MR. LEFCOURT:  Nothing, your Honor.

23          THE COURT:  All right.  Any redirect, Ms. Flodr?

24          MS. FLODR:  Sorry, your Honor, I apologize, is

25   Mr. Lefcourt not crossing?

LAETPAR2                          Stewart - recross

1                THE COURT:  No, he said he had no questions.

2     REDIRECT EXAMINATION

3     BY MS. FLODR:

4     Q.  Mr. Stewart, do you recall being asked if you were also a

5     campaign finance lawyer?

6     A.  Yes.

7     Q.  Did Mr. Parnas, Mr. Kukushkin, Mr. Fruman or Mr. Correia --

8                MR. BONDY:  Your Honor, I really can't understand

9     Ms. Flodr.

10               THE COURT:  You want to --

11               MS. FLODR:  Sure.

12               THE COURT:  Do you want to go to the box and take your

13    mask off?  It might be easier.

14               MR. BONDY:  Thank you.

15    BY MS. FLODR:

16    Q.  Mr. Stewart, did Mr. Parnas, Mr. Kukushkin, Mr. Fruman or

17    Mr. Correia seek advice on how to lawfully contribute to

18    campaigns?

19    A.  To the best of my knowledge, no.

20               MR. BONDY:  I have one.

21               THE COURT:  All right.

22    RECROSS EXAMINATION

23    BY MR. BONDY:

24    Q.  Did the government ever seek to have you present testimony

25    about election law or anything pertaining to your field?

LAETPAR2                        Casola – direct

1          MS. FLODR:  Objection, your Honor.

2          THE COURT:  Sustained.

3          MR. BONDY:  Thank you.

4          THE COURT:  Thank you, sir, you may step down.

5          Government, you may call your next witness.

6          MR. SCOTTEN:  The government calls Anthony Casola.

7    ANTHONY CASOLA,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. SCOTTEN:

12   Q.  Mr. Casola, do you work?

13   A.  I do.

14   Q.  Where do you work?

15   A.  Federal Bureau of Investigation.

16   Q.  What is your title there?

17   A.  Special agent.

18   Q.  Special Agent Casola, how long have you been with the FBI?

19   A.  A little over four years.

20   Q.  Are you assigned any particular unit in the FBI?

21   A.  Yes.

22   Q.  Which one?

23   A.  Public corruption.

24   Q.  Have you ever heard the names Lev Parnas or Andrey

25   Kukushkin?

1    A.  I have.

2    Q.  And in what context have you heard them?

3    A.  In connection with this investigation.

4    Q.  What was your primary role in this case?

5    A.  Reviewing the summary charts.

6    Q.  When you say reviewing the summary charts, what are you

7    referring to?

8    A.  There's an exhibit where we looked at -- I looked at

9    various government exhibits that had been entered into evidence

10   and then to ensure that the information contained therein was

11   accurately reflected in the summary charts.

12   Q.  And who created the charts you're referring to?

13   A.  The United States Attorney's Office.

14   Q.  What was your role then if the United States Attorney's

15   Office created the charts?

16   A.  In checking the charts to make sure that they accurately

17   reflected the underlying evidence that was referenced in the

18   chart.

19   Q.  And did you verify that all the information in the summary

20   charts was drawn from exhibits in this case?

21   A.  I did.

22   Q.  What types of exhibits did you review?

23   A.  Phone records, WhatsApp messages, iMessages, emails, screen

24   shots.

25   Q.  About how many pages in total made up these exhibits?

LAETPAR2                          Casola - direct

1    A.  The underlying exhibits were tens of thousands of pages.

2    Q.  Is every document that the FBI gathered during its

3    investigation in these charts?

4    A.  No.

5    Q.  Who made the decision what exhibits would be used to make

6    the charts?

7    A.  The United States Attorney's Office.

8    Q.  Agent Casola, do you have a copy of what is marked as

9    Government Exhibit 1402 there?

10   A.  I do.

11   Q.  Do you recognize it?

12   A.  I do.

13   Q.  What is it?

14   A.  The summary chart.

15   Q.  And is it the summary chart we have just been discussing?

16   A.  It is.

17           MR. SCOTTEN:  Your Honor, the government offers 1402.

18           And the defense, I think, is preserving an earlier

19   objection.

20           THE COURT:  Okay.

21           MR. LEFCOURT:  That's correct, your Honor.

22           MR. SCOTTEN:  Both defendants.

23           THE COURT:  Objection is noted by defendants.  1402 is

24   received as a summary chart.

25           (Government's Exhibit 1402 received in evidence)

LAETPAR2                          Casola - direct

Q.   Agent Casola, generally what are we looking at here?

A.   This is the front page of the summary chart which provides

information that I was just discussing.

Q.   And what is the title here?

A.   April and May of 2018.

          MR. SCOTTEN:  If I could check -- can everyone hear

Agent Casola okay, especially in the back of the courtroom?

Q.   Can you explain the top row?

          What is the information in that top row beginning with

date?

A.   Yes, this is the information that will tell you what is in

the chart.  So on the left is the date of the communication

itself, the from column is who sent the particular

communication, the to column would be the recipient of the

communication, and the detail is a brief synopsis of what is

contained in the underlying government exhibit.  The specific

government exhibit that that information is taken from is

listed at the end of each of the synopses in the detail section

as a GX number.

Q.   Could you please walk us through the first row, as example,

beginning 4/21?

A.   Sure.  On 4/21 Andrey Kukushkin sent a message -- excuse

me, a link to Andrey Muraviev, Alex Mikhalev, and Sergei

Hrapunov.  And the detail in particular is a link to a

Washington Post article that is entitled:  Schumer introduces

LAETPAR2                    Casola - direct

1     measure to decriminalize marijuana.

2             And the link that was sent is actually contained in

3     Government Exhibit 4.

4             MR. SCOTTEN:  So for a second here, Ms. Drescher,

5     could we please publish stipulation S14, which is already in

6     evidence.

7             If we could go to page 4, which states that government

8     exhibits listed below are true and correct copies of

9     communications, documents, images, linked websites and

10    recordings lawfully obtained from an iPhone belong to Andrey

11    Kukushkin.

12    Q.  Agent Casola, do you see Government Exhibit 4 there?

13    A.  I do.

14    Q.  Are the other exhibits which you're about to testify

15    subject to the same stipulation?

16    A.  They are.

17            MR. SCOTTEN:  If we could take that down and go back

18    to the summary charts.

19    Q.  Here, what is it the government exhibit, you said it was 4?

20    A.  Yes.

21            MR. SCOTTEN:  Let's look at the exhibit itself,

22    please, if we could please publish Government Exhibit 4.

23    Q.  And if we could start by at the top, again, just in general

24    terms, Agent Casola, what are we looking at?

25    A.  This is a record of WhatsApp communications.

LAETPAR2                          Casola - direct

1  Q.  And who are the participants?

2  A.  Alex Mikhalev, Andrey Kukushkin, Andrey Muraviev and Sergei

3  Hrapunov.

4  Q.  I suspect many people know this, but in case, what is

5  WhatsApp?

6  A.  WhatsApp is an encrypted messaging system that is run

7  through an app that is on your phone and on the person that

8  you're messaging with would also have it.  It does not go over

9  a cellphone network, it actually goes from your phone to the

10 other person's phone through the WhatsApp system.  The contents

11 of it are stored on your phone unless you delete it or your

12 iCloud unless you don't back it up.

13 Q.  And the first entry beginning with that black row, what is

14 that?

15 A.  This is the message that is actually referenced in the

16 first row of the summary chart.

17 Q.  And now looking at row 2 on Government Exhibit 4, can you

18 summarize what we see there?

19 A.  Yes, what we see there is 4/21 at 7:15 a.m. from Andrey

20 Muraviev, but there was some every day, and you see the message

21 in the body is in Russian, and I am reading from the

22 translation which is on the right.

23 Q.  And I believe the stipulation about translations was read

24 before you took the stand.

25             Are the exhibits from what you're reading subject to

LAETPAR2                          Casola - direct

1    that stipulation?

2    A.   Yes.

3    Q.   Is this row in the summary charts?

4    A.   No.

5    Q.   And is every row in every exhibit in the summary charts?

6    A.   No.

7    Q.   How long would the charts be if you included every row of

8    every exhibit?

9    A.   Tens of thousands of pages.

10   Q.   Who made the decision which portions of which exhibit to

11   put in the summary chart?

12   A.   The United States Attorney's office.

13            MR. SCOTTEN:   Ms. Drescher, if we could please go back

14   to the summary chart.

15   Q.   I'm going to ask up about the next two lines and my first

16   question is:  Do you know why they're blue?

17   A.   I do.

18   Q.   Can you explain?

19   A.   For ease of reading of the chart.  So if there's a date

20   change in the chart it would be reflected in the color.  So the

21   first line occurred on 4/21, which is in white, the next two

22   lines the messages occurred on 5/11, so they're in blue, and

23   the last line is 5/27, so it's in white again.

24            MR. LEFCOURT:   Excuse me, could he be talking into the

25   mic better?

LAETPAR2                        Casola - direct

1          THE COURT:  Could you get a little closer to the mic,

2     please?

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  And could you repeat again?  I didn't

5     catch it, the difference between the blue and the non-blue.

6          THE WITNESS:  Sure.  The white color would be for one

7     date.  If there is blue, that means there's a date change

8     within the particular page you're looking at.  Then if it goes

9     back to white, it's another date change.  For example, here on

10    4/21 you will see the message in white, the next two messages

11    that were on 5/11 are in blue, and the next date change is

12    5/27, so they're in white again.  So just for ease of looking

13    at the chart.

14         THE COURT:  And to be clear, 5/11 means May 11.

15         THE WITNESS:  Yes, your Honor.

16    BY MR. SCOTTEN:

17    Q.  Could you I ask you to read the from, to and detail from

18    the two May 11 lines.

19    A.  From Joseph Ahearn to Lev Parnas, and it's a link to an ABC

20    News article, special counsel probing donations with foreign

21    connection to Trump inauguration, and Marijuana Moment article,

22    details on bipartisan marijuana bill to be filed soon.

23         And a message from Parnas to Ahearn:  Interesting.

24    Q.  And then if you could read the from, to and detail for the

25    May 27 line, please.

LAETPAR2                     Casola - direct

1              MR. LEFCOURT:  Excuse me, your Honor, I object on

2     behalf of Mr. Kukushkin.  He's not a participant in this

3     conversation and has no knowledge.

4              MR. SCOTTEN:  I think this conversation he actually is

5     a participant in the one I'm about to ask about.

6              MR. BONDY:  I believe Mr. Lefcourt is talking about

7     the one before that, weeks before that, Mr. Parnas and

8     Mr. Ahearn, that's not the one that Mr. Kukushkin is a part of.

9              THE COURT:  Right, it still comes in for the trial, it

10    can -- just to clarify to the jury, to the extent there's a

11    conversation between Mr. Parnas and Mr. Ahearn, obviously you

12    can't assume that Mr. Kukushkin was part of that conversation

13    insofar as it might show his state of mind or anything like

14    that.

15             But these are coming in not for a limited purpose,

16    these are coming in as non-hearsay or as an exception to

17    hearsay, is that right?

18             MR. SCOTTEN:  I think, your Honor, defense counsel

19    might have requested, and was discussed previously, is with

20    respect to the May 11 entry, which is a news -- concerns a news

21    article that is being offered for its effect on the listener,

22    it might be an appropriate time to give that instruction if

23    your Honor wanted to.

24             THE COURT:  Right.  With respect to the May 11

25    article, and I assume you're going to be showing the article.

LAETPAR2                         Casola - direct

1            MR. SCOTTEN:  In this case, I'm not going to show the

2     article, your Honor, but it's the title that's probative.  We

3     will be showing other articles down the road.

4            THE COURT:  I want to explain briefly there are

5     certain things that come in and you may consider them, as the

6     jury, for the truth of the matters that are asserted, and

7     that's basically what can be used by you, but there are certain

8     things that are hearsay and come in for the limited purpose to

9     show their effect on the listener and you may not consider them

10    for the truth of what is asserted.

11           It's kind of a subtle distinction, but the example is

12    when Ahearn and sends a message to Mr. Parnas on May 11, it

13    says links to a particular article, that is coming in as

14    evidence in this case solely for the effect on the state of

15    mind of Mr. Parnas who received the article and not for the

16    truth of the matters asserted in the article.  That is, you're

17    not to assume that what is in the article is actually true,

18    it's solely to go to the state of mind, intent and knowledge of

19    Mr. Parnas insofar as you determine he may have seen the

20    article.

21           MR. LEFCOURT:  Your Honor, may we also have a limiting

22    instruction with respect to Mr. Kukushkin, who didn't even know

23    Mr. Parnas on May 11 --

24           MR. SCOTTEN:  Your Honor --

25           MR. LEFCOURT:  -- not part of a conversation --

LAETPAR2                          Casola - direct

 1            MR. SCOTTEN:  -- I think a sidebar -- to argue before

 2    the jury to request a limiting instructions.

 3            THE COURT:  The limiting instruction is clear, that

 4    you may consider it solely for the state of mind of Mr. Parnas.

 5    Mr. Kukushkin is not stated as having received this article, so

 6    it doesn't go to his state of mind.

 7            MR. BONDY:  Might I ask the same instruction to the

 8    jury for the conversation 4/21 from Mr. Kukushkin to

 9    Mr. Muraviev, Mr. Mikhalev and Mr. Hrapunov, and also the

10    May 27 conversation between Mr. Kukushkin and Mr. Fruman,

11    Mr. Parnas was not a participant to those.

12            THE COURT:  I will make two points:  First, with

13    respect to the 4/21 -- that is April 21 -- message, which is

14    from Mr. Kukushkin to three other people, and it links to a

15    Washington Post article, I want to make that same distinction

16    to you you're not to assume that what is stated in the

17    Washington Post article is true, it's coming in solely to show

18    the state of mind of Mr. Kukushkin, what he knew at the time

19    insofar as that may be relevant, what he knew, intended,

20    believed, what's in his mind.

21            In other words, what's actually in the article might

22    be wrong, doesn't matter, you're not considering it for the

23    truth.  And it's only for Mr. Kukushkin.  Mr. Bondy correctly

24    notes that Mr. Parnas isn't the one who forwarded or received

25    the article, so you're not to assume there's any affect on his

1    state of mind with respect to that.

2             Now the second point is on May 27, there's a message

3    from Mr. Kukushkin to Mr. Fruman, and it's just a statement.

4    That's not limited to the state of mind, that's just a

5    statement that you may consider insofar as it's relevant.

6    However, again, it is a communication that does not go to

7    Parnas.  So just as a general common sense matter, you're not

8    to assume that Parnas was part of that conversation unless you

9    find somehow that it's content becomes relevant because it was

10   somehow relevant in another way or was imparted to him in some

11   way.

12            MR. SCOTTEN:  To be clear, we're not offering 5/27 for

13   the effect on the listener, but rather to show the meeting

14   occurred.

15            THE COURT:  Fair enough.

16   BY MR. SCOTTEN:

17   Q.  If you could read the May 27 line now.

18   A.  From Kukushkin to Igor Fruman:  Igor, we're flying out in a

19   couple of hours.  Thank you for your courtesy and I hope we

20   will meet soon.  With a hand waving emoji.

21            MR. SCOTTEN:  Could we have the next page.

22   Q.  Agent, could I ask you to read the from, to and detail of

23   the first two lines on this page.

24   A.  The first one is from Kukushkin to Fruman:  We will resolve

25   it with you and Andrey will support, with dollar sign and

LAETPAR2                        Casola - direct

1    smiling emoji.

2              And from Fruman to Kukushkin:  Great.

3    Q.  And what is the third line here?

4    A.  A record of a phone call.

5    Q.  And can you explain it?

6    A.  Yes, it's a call from Kukushkin to Muraviev and it lasted

7    37 seconds.

8    Q.  What exhibit is it taken from?

9    A.  Government Exhibit 601.

10             MR. SCOTTEN:  Ms. Drescher, please display

11   Exhibit 601.

12   Q.  And Agent Casola, what are we looking at here?

13   A.  These are phone billing records.

14   Q.  And from what company?

15   A.  From AT&T.

16   Q.  Just to be clear, do those tell you what was said during

17   the phone call?

18   A.  They do not.

19   Q.  What kind of records are they?  Why does the company keep

20   them?

21   A.  So they could bill their customers.

22             MR. SCOTTEN:  Ms. Drescher, could we please go to page

23   12,858 of these billing records.

24   Q.  And Agent Casola, what are we looking at in the rows

25   Ms. Drescher highlighted?

LAETPAR2                        Casola - direct

A.   These are the rows from the specific government exhibit
that's listed in the summary chart, and this details the
information that is contained there.

          MR. SCOTTEN:  At this time, your Honor, the government
offers Stipulation S7.

          THE COURT:  Yes.

          MR. SCOTTEN:  And could we please publish S7 to the
jury?

          THE COURT:  Is it already in?

          MR. SCOTTEN:  I don't think the stipulation is in,
your Honor.

          THE COURT:  But you may.

          MR. SCOTTEN:  Thank you, your Honor.  I thought I was
offering it.  I didn't wait for the court to agree.

          THE COURT:  That's fine, S7 is received.

          (Government's Exhibit S7 received in evidence)

          THE COURT:  And again, ladies and gentlemen, this is a
stipulation.  That means it's something that the parties all
agree on and you're to accept it as true.

          MR. SCOTTEN:  I will specifically read No. 2.  The
following telephone numbers and WhatsApp account numbers were
used by the following individuals in 2018 and 2019.

Q.   And Agent Casola, did you rely on this stipulation in
determining what those phone numbers we saw in the phone
records, who used them?

LAETPAR2                          Casola - direct

1    A.   Yes.

2    Q.   So if we could take that down and go back to the summary

3    charts, I did want to ask you, the AT&T records that we were

4    looking at, do they necessarily contain every phone call made

5    by Kukushkin, Muraviev, Parnas or Fruman?

6    A.   No.

7    Q.   Why not?

8    A.   There's other ways to make phone calls.  That's only

9    information for that particular phone number.  There could be a

10   WhatsApp call, there could be another encrypted app call, they

11   could be on another phone, they could be in another country.

12   So there are other ways for phone calls to be made.

13   Q.   Do the summary charts contain every phone call that the

14   AT&T records do list?

15   A.   No.

16   Q.   Who made the decision which calls to put in the summary

17   charts?

18   A.   United States Attorney's Office.

19   Q.   Turning back to the summary chart, how many different

20   exhibits are the remaining lines here from?

21   A.   One.

22   Q.   Which exhibit is that?

23   A.   Government Exhibit 14.

24        MR. SCOTTEN:  So Ms. Drescher, could we please publish

25   Government Exhibit 14.

LAETPAR2                    Casola – direct

1   Q.  And started at the top, what are we looking at here?

2   A.  A record of WhatsApp communications between Fruman and

3   Kukushkin.

4   Q.  And if we could please now zoom in on the text chats, Agent

5   Casola, have we already seen some of these chats in the summary

6   chart?

7   A.  Yes.

8   Q.  Can you point out a couple?

9   A.  Row 1 and row 4.

10          MR. SCOTTEN:  Ms. Drescher, could we please now turn

11  to page 2, and if we could zoom in on the bottom half of the

12  page starting with row 20.

13  Q.  Agent Casola, do you see these entries that have a bunch of

14  letters and numbers followed by dot JPG?

15  A.  I do.

16  Q.  Do you know what those are?

17  A.  Attachment of an image file.

18          MR. SCOTTEN:  Please publish the first attached image

19  file from row 20.

20  Q.  Agent Casola, do you recognize any of the people depicted

21  in this picture?

22  A.  Yes.

23  Q.  Who do you recognize?

24  A.  Donald Trump basically in the middle of the photo and the

25  one to the right is Igor Fruman with his arm extended.

1          MR. SCOTTEN:  Ms. Drescher, could we publish the next

2   few rows and pause again when we get to A23.

3   Q.  Agent Casola, do you recognize anyone in this picture?

4   A.  Yes.

5   Q.  Who do you recognize?

6   A.  The gentleman on the right with the blue tie is Lev Parnas.

7          MR. SCOTTEN:  And could we please, Ms. Drescher, now

8   publish the rest of the pictures Fruman sent Kukushkin here in

9   Government Exhibit 14.  I think that will take us to row 39.

10          Please go back to the chat, Government Exhibit 14.

11   Zoom in on the final four rows where we have text.

12   Q.  For each of these, Agent Casola, could I ask you to read

13   who sent it and the English translation.

14   A.  From Kukushkin:  Aside from you, Lev and Donald, I do not

15   know anyone.

16          Fruman responds:  In general, we do not need anyone

17   else anymore.

18          Kukushkin sends a message:  In general, we need Andrey

19   because your guys are raking it in just for an appointment.

20          Fruman sends a message:  This is not even open to

21   discussion.

22          MR. SCOTTEN:  We could please now go back to the

23   summary chart.

24   Q.  Agent Casola, are there any lines on this page that we

25   didn't just cover in that exhibit?

LAETPAR2                          Casola - direct

1    A.  No.

2    Q.  So let's go to the next page, please.

3              And if I could ask you to read the to, from and detail

4    for the first two lines in blue dated July 9.

5    A.  From Kukushkin to Parnas:  David's phone number, please.

6              And then Parnas sends Kukushkin the email address and

7    phone number for Dave Correia.

8    Q.  And if you could now read the first three white lines which

9    are all dated July 19.

10   A.  From Parnas to Kukushkin:  Call me, important.

11             And then Kukushkin called Parnas, and that call lasted

12   one minute and six seconds.

13             Kukushkin then sends Fruman a message:  An

14   understanding of the joint activities has been reached.  I

15   discussed it with Andrey, but we need to show at least one

16   completed action, financial resource, Andryukha.

17   Q.  Do you see in that line the three dots with spaces in

18   between sometimes called an ellipsis?

19   A.  I do.

20   Q.  What does that mean?

21   A.  That means there's more text in the supporting government

22   exhibit than is listed here on this summary chart.

23             MR. SCOTTEN:  So could we please see the exhibit then,

24   Government Exhibit 25.

25   Q.  And so before we zoom in, what is this exhibit we're

LAETPAR2                    Casola – direct

1    looking at?

2    A.  Record of WhatsApp communication between Fruman and

3    Kukushkin.

4              MR. SCOTTEN:  And Ms. Drescher, please blow up the

5    full message.

6    Q.  And I'm going to ask you if you could read it down to where

7    it says PS?

8    A.  Igor, an understanding of the joint activities has been

9    reached.  I discussed it with Andrey, but we need to show at

10   least one completed action.  Photos won't do.  Smiling emoji.

11   We'll create a managing LLC company 50/50.  Financial resource,

12   Andryukha.  Lawyers/lobbyists, Leva and you.  We need the best

13   ones and for reasonable money.  We only pay for results.

14   Administrative, me.  Goals, to quickly take control of the

15   network of licenses for stores in California with real estate

16   to buy or lease long term.  To consulate assets for our

17   financial instruct structure go into the public market.

18   Conditions, Andryuka's money will be paid back first according

19   to the approved plan and budget.

20   Q.  And could we now go back to the summary charts still on

21   page 3.

22             What is the next line, Agent Casola?

23   A.  Message from Kukushkin to Muraviev with a picture of

24   Fruman, Donald Trump, Jr. and the Florida governor candidate

25   Ronald DeSantis, with a message saying an understanding of the

LAETPAR2                        Casola - direct

1    joint texts has been reached, which is a copy of what I just

2    read.

3    Q.  Kukushkin sent the same message to Muraviev that he just

4    sent to Fruman?

5    A.  Correct.

6            MR. SCOTTEN:  Could we see 26A1.

7    Q.  Who do you recognize in this picture?

8    A.  Ron DeSantis on the left, Igor Fruman in the middle and

9    Donald, Jr. on the right.

10   Q.  And to your knowledge, what political office, if any, was

11   DeSantis seeking at that time?

12   A.  To be governor of Florida.

13           MR. SCOTTEN:  If we could now go back to the summary

14   chart, please.

15   Q.  What are the next two lines, I think it's 6:59 and 7:59,

16   still on July 19.

17   A.  So the message that I read in full, an understanding of the

18   joint texts has been reached, was forwarded or sent from Fruman

19   to Parnas, and then Kukushkin sent that message to Parnas as

20   well.

21   Q.  For the bottom two lines, who sent them and who received?

22   A.  Kukushkin sent both messages, one was sent to Fruman and

23   one was sent to the Parnas.

24   Q.  And can you just compare the content of the two messages?

25   A.  The content is the same in the two messages.

LAETPAR2                          Casola - direct

1    Q.  Is there any difference?

2    A.  Who it's addressed to.  He addressed it to the person he

3    was sending it to.

4    Q.  Could I ask you to read the bottom one from Kukushkin to

5    Parnas.

6    A.  Leva, we are going in circles, yet I clearly laid

7    everything out.  We do not pay for anyone's political ambitions

8    or lobbyists at all.  We get a license, they get a bonus.  All

9    the money invested in the process should first be repaid to

10   Andryuka.

11           MR. SCOTTEN:  Could we please go to the next page.

12   Q.  Agent Casola, could I ask you to read the to, from and

13   detail in the first line.

14   A.  From Parnas to Correia, sends a Federal Election Commission

15   complaint alleging Parnas, Fruman and Global Energy Producers

16   violated the Federal Election Campaign Act by making campaign

17   contributions in the name of another person.

18   Q.  And in this particular chat, did Parnas send anything to

19   Correia other than that complaint?

20   A.  No.

21   Q.  Let's go straight to the complaint, which I believe is

22   Government Exhibit 90A1.

23           So before we zoom in on anything, generally what is

24   this we're looking at, Agent Casola?

25   A.  This is a complaint that was before the Federal Election

LAETPAR2                    Casola - direct

1   Commission.

2          MR. SCOTTEN:  Ms. Drescher, could we blow up the boxes

3   on the left.

4   Q.  Can I ask you to read who this was addressed to?  You can

5   skip the addresses, just the parties it was addressed to?

6   A.  Global Energy Producers, LLC, Igor Fruman, Lev Parnas.

7          MR. SCOTTEN:  And Ms. Drescher, if we could go to page

8   2 and zoom in on paragraph 2.

9   Q.  Can I ask you to read the second paragraph here of the

10  complaint against Parnas and others.

11  A.  Specifically, based on published reports, complainants have

12  reason to believe that Fruman, Parnas and any other person or

13  persons who created, operated and/or contributed to GEP may

14  have violated 52, United States Code, Section 30122 by making

15  contributions to America First Action, Inc. in the name of

16  another person, namely GED, and that GEP violated 52, United

17  States Code, Section 30122 by knowingly permitting its name to

18  be used for the making of such contribution.

19         MR. SCOTTEN:  Ms. Drescher, could we please go to page

20  7 of the complaint and zoom in on paragraph 18.

21  Q.  Can I ask you to read this paragraph, Agent Casola.

22  A.  FECA provides that no person shall make a contribution in

23  the name of another person or knowingly permit his name to be

24  used to effect such a contribution.  And no person shall

25  knowingly accept a contribution made by one person in the name

LAETPAR2                          Casola - direct

1    of another person.  And that is citing 52, United States Code,

2    Section 30122.

3              MR. SCOTTEN:  Ms. Drescher, could we please go to page

4    13 and zoom in on the very bottom.

5    Q.  What is the date of this complaint against Parnas and

6    others?

7    A.  July 25, 2018.

8    Q.  How does that compare on the date to which Parnas forwarded

9    to Correia?

10   A.  It's the same date.

11   Q.  If we could please now go back to the summary chart still

12   on page 4.

13             Agent Casola, what is the next line?

14   A.  Kukushkin sends a link with a news articles to Muraviev,

15   and the article describes Parnas and Fruman as two of GEP's

16   executives and describes the FEC complaint, alleging that GEP

17   might be an illegal campaign finance conduit.

18             MR. SCOTTEN:  And here, could we please go to that

19   linked article, 30A1.  Go to page 2, please.

20   Q.  Does the article mention any GEP executives?

21   A.  Yes.

22   Q.  Who?

23   A.  Igor Fruman and Lev Parnas.

24   Q.  If we could go down to the paragraph on the bottom, page 3

25   and the top of page 4.

1          Here, could I ask you to read this portion of the

2     article that Kukushkin sent to Muraviev.

3     A.   Last week's pay dirt covered the Federal Election

4     Commission complaint alleging that GEP might be an illegal

5     campaign finance conduit created to mask the actual source of

6     its political contributions.  The lack of public information

7     about the company, the complaint suggested, indicated that it

8     wasn't doing much in the way of actual business, and instead,

9     that it may have been set up for the sole purpose of making

10    political contributions.

11         MR. SCOTTEN:  Then could we please zoom out and just

12    capture the whole of page 4 so the jury can read it if they

13    want.

14         MR. LEFCOURT:  How could they read that?  Your Honor,

15    that's absolutely too small.

16         THE COURT:  Is that better?

17         MR. LEFCOURT:  Yes.

18         MR. SCOTTEN:  Your Honor, if we could request the

19    instruction that this is being offered not for its truth but

20    only on the effect of the state of mind of listener.

21         THE COURT:  Yes.  To clarify for the jury, this

22    article is an example of what I referred to to making that

23    distinction between something coming in as evidence for you to

24    consider not for the truth of the statements in the article but

25    solely because it was an article that was sent to Mr. Parnas.

LAETPAR2                        Casola - direct

1              Is that right?

2              MR. SCOTTEN:  This was sent from Mr. Kukushkin to

3     Mr. Muraviev.

4              THE COURT:  Yes, sorry.  So this is an article, the

5     link to which was sent from Mr. Kukushkin to others, and

6     therefore, it's coming in not for the truth of the statements,

7     you're not to assume anything that's in there is true, but

8     solely for the effect -- to the extent you find that it goes to

9     the effect on the state of mind of Mr. Kukushkin, that is, the

10    knowledge, intent, state of mind of Mr. Kukushkin insofar as

11    you find it probative for those purposes, but not for the truth

12    of the statements in the article.

13             MR. SCOTTEN:  If we could please go back to page 4 of

14    the summary chart.

15    BY MR. SCOTTEN:

16    Q.  What is the next entry after that article we just looked

17    at?

18    A.  A telephone call from Fruman to Muraviev that lasted ten

19    minutes and 30 seconds.

20    Q.  And then could I please ask you to read the from, to and

21    detail in the next line.

22    A.  From Fruman to Parnas, and it's a link to an article

23    describing guilty plea for causing foreign money to be paid to

24    presidential inaugural committee using a straw buyer of

25    inaugural tickets to avoid inauguration committee's refusal to

LAETPAR2                      Casola - direct

 1    accept money from foreign nationals because of Federal Election
 2    Commission rules.
 3            MR. SCOTTEN:  I don't know if your Honor could just
 4    say the same instruction applies.  I think this is the last one
 5    of these for a little while.
 6            MR. LEFCOURT:  Your Honor, Mr. Kukushkin is not on
 7    that.
 8            THE COURT:  That's right, this is once again talking
 9    about the 7/25?
10            MR. SCOTTEN:  We're now on the August 31, which is
11    offered against all defendants as proof of existence of the
12    conspiracy, but we agree Mr. Kukushkin is not on this
13    particular article.
14            THE COURT:  So this an article, a link to an article
15    that is sent from Mr. Fruman to Mr. Parnas.  So it's offered
16    not for the truth of anything in the article itself, but simply
17    to show the probative value of on the state of mind of
18    Mr. Parnas who received that link.  But it's up to you to
19    decide what effect to give it on that state of mind issue.
20            MR. SCOTTEN:  If we could please go to the article,
21    Ms. Drescher, and scroll down until we get to the text.
22    BY MR. SCOTTEN:
23    Q.  Here, I'm just going to ask you to read the second
24    paragraph.
25    A.  In a plea agreement made public Friday, prosecutors

LAETPAR2                         Casola - direct

1    outlined other crimes that the lobbyist, Sam Patten, admitted

2    to but wouldn't be charged with.  None them was causing foreign

3    money to we paid to the Trump inaugural committee.  Patten

4    signed off on the allegation.

5              MR. SCOTTEN:  Scroll down past the redaction to the

6    next paragraph.

7    Q.  And again, if you could read this portion of the article

8    that Fruman sent Parnas.

9    A.  According to a court filing, Patten's Ukrainian client

10   wanted to attend the Trump inauguration in January 2017 but the

11   inauguration committee couldn't accept money from foreign

12   nationals because of Federal Election Commission rules.

13   Q.  If we could go down to page 3, here, I think you could read

14   all of the text that is not blacked out.

15   A.  To get around that restriction, Patten enlisted a United

16   States citizen to serve as a straw buyer, according to the

17   filing.  That individual, who wasn't named, bought four tickets

18   for $50,000, after receiving a check for $50,000 from the

19   consulting firm.  That firm, in turn, was reimbursed by a

20   $50,000 wire from the Cyprio bank account, the filing says.

21   It's unclear whether anyone on the inaugural committee was

22   aware that the money in came from a Ukrainian.

23             MR. SCOTTEN:  Ms. Drescher, please go back to the

24   summary charts, page 4.

25   Q.  Have we covered everything on this page?

LAETPAR2                          Casola - direct

1    A.  Yes.

2              MR. SCOTTEN:  Ms. Drescher, the next page, please.

3    Q.  Agent Casola, I will try to pick up the pace a bit.  Could

4    I ask you to read the from, to and detail in the next five

5    lines.

6    A.  From Muraviev to Kukushkin:  Bro, would you fly back with

7    me on the 10th?

8              From Kukushkin to Muraviev:  Sure.  Smiling emoji.

9    Where are we flying to?

10             Muraviev response to Kukushkin:  To Ibiza for two days

11   then Moscow.

12             David Correia then sends a message to Parnas:  Okay,

13   here's the deal on Vegas, Igor spoke with Andrey earlier and

14   told him that we were definitely coming there.  I just spoke

15   with Andrey.  He is expecting the same.  We will coordinate

16   with Roy today on the attorney general meeting.

17             Ahearn then sends a message to Parnas and Correia with

18   an invitation to a 9/7 fund raiser in Las Vegas for Adam Laxalt

19   with special guest Mike Pence.

20             MR. LEFCOURT:  Excuse me, your Honor, can the Court

21   explain to the jury that these are messages in different

22   exhibits and they're not all one and it's very confusing?

23             THE COURT:  Yes, I will do that, that's a fair point.

24   When I said this is a summary chart, I want to explain to the

25   jury this is a chart that was not a preexisting document that

LAETPAR2                      Casola - direct

1    existed at the time of these events but is something that the

2    prosecution team, as explained by Agent Casola, put together

3    taking parts of different exhibits to create essentially a

4    timeline bringing them together.  Rather than having to go

5    through 10,000 things, I permitted them to have a chart that,

6    where there is quotes, it's actually quoting from an exhibit,

7    from, say, a WhatsApp message, but where there's a summary,

8    like the one he just read, an invitation to 9/7 fund raiser,

9    that's a summary of the government exhibit noted there, 35.

10        So where there's not quotes -- correct me if I'm

11   wrong, but when there are not quotes, it's a summary of the

12   exhibits.  That's what a summary chart is, to allow a party to

13   put things together in a chart to make things clear sort of in

14   one place but they're not the actual exhibits, they refer to

15   the exhibits.

16        MR. LEFCOURT:  Your Honor, there are like four

17   different conversations that may or may not have to do with who

18   is one them.  It could be various people that is presented in a

19   way as it looks like one conversation.

20        THE COURT:  Well, it's a fair point.  You can make the

21   point that there are other conversations going on at different

22   times, this is just one place where certain conversations want

23   to be highlighted by a party which I allowed to them to do in a

24   summary chart.

25        MR. LEFCOURT:  And specifically this is like four

LAETPAR2                          Casola - direct

1     different or five different conversations that are represented

2     by these lines in different exhibits.

3                THE COURT:  Yeah, you can raise that in cross if you

4     would like.

5                MR. LEFCOURT:  I think that should be explained to the

6     jury so they don't get the misimpression this is a continual

7     conversation when it's many different conversations on

8     different dates and different times between different people.

9                THE COURT:  Okay, well, I think --

10               MR. SCOTTEN:  I can ask a couple of questions on that

11    if that that's unclear to anyone.

12               THE COURT:  You may.

13    BY MR. SCOTTEN:

14    Q.  Here, for example, the first three lines, what exhibit are

15    they taken from?

16    A.  Government Exhibit 34.

17    Q.  And do you remember what type of exhibit that is?

18    A.  I believe that's a record of a WhatsApp communication.

19    Q.  So those are all from the same chat?

20    A.  Yes.

21    Q.  About how far apart are they in time?

22    A.  Collectively about 30 minutes.

23    Q.  And then --

24               MR. LEFCOURT:  I couldn't hear that.

25               THE WITNESS:  Collectively about 30 minutes.

LAETPAR2                          Casola - direct

```
 1              THE COURT:  Collectively about 30 minutes.
 2    Q.   Then going to the next chat, how far apart is it in time?
 3    A.   About an hour.
 4    Q.   And is that from a different chat or the same chat?
 5    A.   Different.
 6    Q.   And how can you tell just looking at the chart?
 7    A.   Two ways --
 8              MR. BONDY:  Your Honor, it's 13 hours, not one hour.
 9              MR. SCOTTEN:  If the witness makes a mistake, that's
10    not grounds to for counsel to argue.  I believe the witness
11    should be able to testify.
12              THE COURT:  Fair enough.
13    A.   I apologize, the third message in the row was from
14    2:23 a.m.  The next message that's listed on 9/5 was at
15    3:32 p.m., not a.m.  That is my mistake, about 13 hours.
16              There's two ways to tell where they're coming from,
17    the best way is the government exhibit that's listed at the end
18    of the summary, so GX34 and GX53.  The other way to tell is in
19    the from and to, you can tell when the parties change.
20    Q.   And then in this, the fifth of the exhibits we just tried
21    to read through quickly, is that from yet another exhibit?
22    A.   Yes.
23    Q.   And you heard the judge pointing out that here there are no
24    quotation marks?
25    A.   Yes, I heard his Honor.
```

1   Q.   To assuage any curiosity, let's look at the exhibit,

2   Government Exhibit 35.

3          And so what type of message is this?

4   A.   This is a record of WhatsApp -- iMessage chat.

5   Q.   And who is it between?

6   A.   Between Parnas, Correia and Ahearn.

7   Q.   And what's the very first row?

8   A.   The attachment of a PDF that says Pence September

9   invitation.

10  Q.   And could we please go to that exhibit, which is 35A1, I

11  think.

12         And so just looking at this generally -- do you have

13  your chart in front of you?

14  A.   I do.

15  Q.   How does the summary chart describe this?

16  A.   The summary chart says this is an invitation to 9/7

17  fundraiser in Las Vegas for Adam Laxalt with special guest Mike

18  Pence.

19         MR. SCOTTEN:   At the very bottom, Ms. Drescher, could

20  we blow up where it says:   Checks are payable to.

21  Q.   So who are the checks for this 9/7 event with Laxalt and

22  Pence payable to?

23  A.   Checks are made payable to Laxalt for Nevada.

24  Q.   And did you perform a sort of similar review of the other

25  exhibits that are summarized in the summary chart?

LAETPAR2                          Casola - direct

1    A.  Yes.

2    Q.  So if we go back to the summary chart, what is the next

3    entry?  So now we're at September 5, 4:11, after that

4    invitation.

5    A.  A FaceTime call from Kukushkin to Parnas that lasted two

6    minutes and 41 seconds.

7    Q.  If you could read the to, from and detail of the last two

8    lines, please.

9    A.  From Ahearn to Parnas and Correia:  Let me know if you guys

10   want to go.  I can make sure Laxalt speaks highly.

11          Parnas sends a message to Ahearn and Correia:  Yes,

12   for sure, with a thumbs up emoji.  I'll have Dave call you with

13   info.

14   Q.  Please go to the next page.  What is the from, to and

15   detail of that first line.

16   A.  A message from Kukushkin to Maisie Rodolico, Parnas,

17   Fruman, Correia and Deanna Van Rensburg which confirms

18   attendance at Friday's Laxalt for Nevada event with Vice

19   President Pence.

20   Q.  Who is confirming that attendance in the event?

21   A.  Kukushkin.

22   Q.  What is the next entry?

23   A.  That is the date the fundraiser actually took place.

24   Q.  And the line after it?

25   A.  Record of a phone call from Muraviev to Kukushkin that

LAETPAR2                              Casola - direct

1    lasted three minutes and ten seconds.

2    Q.   Now for the next two lines, what exhibit do they come from?

3    A.   Government Exhibit 38.

4              MR. SCOTTEN:   And for this one, Ms. Drescher, please

5    publish the exhibit.

6    Q.   And again starting at the top, generally speaking, what is

7    this exhibit?

8    A.   Record of WhatsApp communications.

9    Q.   Between who?

10   A.   Muraviev, Parnas, Fruman, Kukushkin and Felix Vulis.

11   Q.   Do you see the parenthesis next to to Parnas' name?

12   A.   Yes.

13   Q.   Do you know what that means?

14   A.   Yes, owner is the person whose phone or iCloud this

15   particular chat was on, and admin means they have the

16   administrative ability to add people to the chat.

17   Q.   So Parnas could add people to this chat?

18   A.   Yes.

19   Q.   If we could please scroll down now to the first couple of

20   lines.   And the first message in this group after it's created,

21   who is it from?

22   A.   From Parnas.

23   Q.   And what is the original language that Lev Parnas chose to

24   write that message in?

25   A.   Russian.

1   Q.  If we could now scroll down to the bottom of the page, and

2   I want to capture that row that is sort of at the page break.

3          Agent Casola, could you please read the first three

4   lines of what Fruman sent the group.

5   A.  FD Import & Export Corp., U.S.A., 520 White Plains Road,

6   Suite 500, Tarrytown, New York, 10591.

7   Q.  And if I could -- actually one question quickly, what

8   county is Tarrytown in?

9   A.  Westchester.

10          MR. SCOTTEN:  And if I could now offer and read

11   stipulation S1, your Honor.

12          THE COURT:  Yes.

13          MR. SCOTTEN:  Put it up for the jury.

14          THE COURT:  S1 is received, to be clear.

15          MR. SCOTTEN:  With the Court's permission, I will be

16   reading the bold operative parts of these.

17          THE COURT:  Yes.

18          MR. SCOTTEN:  It is stipulated that FD Import & Export

19   is a domestic business corporation organized under the laws of

20   the State of New York.

21          Go back to the chat, Exhibit 38, same part.

22   Q.  Do you recognize the general type of information we're

23   looking at beneath that address?

24   A.  I do.

25   Q.  What is it?

LAETPAR2                        Casola - direct

1   A.  Wire transfer details.

2   Q.  What are wire transfer details?

3   A.  A way to send money from one bank account to another bank

4   account.

5   Q.  If we could please go back to page 6 of the summary chart.

6           What are the from, to and detail of the last two

7   lines?

8   A.  From Fruman to Kukushkin:  Let's do what is really

9   important, 500 to that bank information tomorrow.  We are

10  opening a company within a week and another 500 for Nevada.

11  Every invested dollar yields 100,000.  And then the same

12  address and bank account information and routing number for FD

13  Import & Export Corp that I just read.

14          Then Fruman sends a message to Parnas:  I sent this

15  letter to Kunya, then copied the detailed the message that I

16  just read.

17  Q.  And just to be clear, is the message there the same one

18  sent twice?  Is what is in the chart the full message or just

19  parts?

20  A.  Just parts.

21          MR. SCOTTEN:  Let's take a quick look at Government

22  Exhibit 39.  And if you could blow up that whole -- just the

23  English so the jury can read the full message if they want to.

24          I don't want to speak directly to the jury, but I will

25  look at them to see when they look up to see if they have had

LAETPAR2                    Casola - direct

1    enough time.

2              THE COURT:  Let me say to the jury, I don't think I

3    explained this, when the jury goes to the jury room to

4    deliberate after all the evidence is in, you will have all the

5    exhibits.  All the exhibits that I admitted into evidence you

6    will have.  So as you're making notes, don't feel like you have

7    to write down every word.  You can write down what you want,

8    you can write down exhibit numbers, but you will be able to

9    look at all the exhibits that are admitted in the jury room.

10             MR. SCOTTEN:  Thank you for that, your Honor.

11             With the Court's permission, for some of these I will

12   draw the jury's attention to a certain part and assume they

13   could read it later then.

14             THE COURT:  Sure.

15   BY MR. SCOTTEN:

16   Q.  So if we could go back to the chart, have we covered

17   everything on this page?

18   A.  We have.

19   Q.  Could we please go to the next page.

20             Agent Casola, what is the to, from and detail of the

21   first line?

22   A.  From Kukushkin to Slava Krasov:  I had a good meeting with

23   the attorney general of Nevada and he is willing to help in

24   Vegas.  No assurances, just donations.  Then sends a picture of

25   Kukushkin and Adam Laxalt.

LAETPAR2                         Casola - direct

1          MR. SCOTTEN:  And if we could please just blow up --
2     or sorry, publish the picture, which I believe is GX 40A4.
3     Q.  Agent Casola, do you recognize anyone in this picture?
4     A.  Yes.
5     Q.  Who do you recognize?
6     A.  Kukushkin on the left and Laxalt on the right.
7     Q.  And are you aware of the senior-most position Adam Laxalt
8     held at that time?
9     A.  Attorney general.
10    Q.  Of what state?
11    A.  Nevada.
12         THE COURT:  We'll go probably another -- are you guys
13    okay?  We're going to take a bathroom break usually between
14    11:15 and 11:30.  We'll look for a natural break around 11:15.
15         MR. SCOTTEN:  There are not good natural points, but
16    any time that the Court thinks is fine.
17         THE COURT:  We'll take a break around 11:15.
18         MR. SCOTTEN:  Okay.
19    Q.  If we could go back to the chart, page 7, what are to, from
20    and detail?
21    A.  From Correia to Parnas:  Please see draft, which is
22    contained in the email.  In that email there's an attachment
23    that is cannabis schedule and budget, which includes campaign
24    contributions and funding schedule.
25         And then Correia sends a text message or WhatsApp

LAETPAR2                        Casola – direct

1    message to Parnas attaching the cannabis schedule and budget,

2    and then the message under it that says:  Emailed to you also,

3    please read and call me.

4    Q.  And that document, cannabis schedule and budget, is that

5    the same in both?

6    A.  It is.

7    Q.  So let's just look at the first one then.

8           MR. SCOTTEN:  Ms. Drescher, can we please publish

9    Government Exhibit 135.

10   Q.  And what are we looking at in the first page?

11   A.  It's an email.

12   Q.  From who and to who?

13   A.  It is from David Correia and it is to Lev Parnas.

14   Q.  What does it attach?

15   A.  It attaches a cannabis schedule and budget document.

16   Q.  Could we please go to the second page.

17          Could I ask you to read the title?

18   A.  Schedule and contribution budget cannabis multistate

19   license strategy.

20   Q.  And can I ask you to read the bold black underlining for

21   each of the three paragraphs.

22   A.  California, Nevada, Florida.

23   Q.  And also I'm asking for the bold black underlining sort of

24   at the bottom of each paragraph.

25   A.  Campaign contributions under California is listed as

LAETPAR2                     Casola - direct

```
 1   250,000 to 350,000, the campaign contributions under Nevada are
 2   listed at 250,000, and the campaign contributions under Florida
 3   are listed at 250,000 to 500,000.
 4   Q.  And I just want to ask you about a couple of names there.
 5   Could I ask you to read the first name under Nevada.
 6   A.  Adam Laxalt.
 7   Q.  What's in the parenthesis?
 8   A.  AG/next governor.
 9   Q.  In the context of the state government, are you familiar
10   with the abbreviation AG?
11   A.  I am.
12   Q.  What does it stand for?
13   A.  Attorney general.
14   Q.  And then if you could also read the first name under
15   Florida?
16   A.  Ron DeSantis.
17   Q.  And the parenthesis?
18   A.  Next gov.
19           MR. SCOTTEN:  If we could now go back to the summary
20   chart, still page 7.
21   Q.  I'm going to ask you to please read the to, from and detail
22   of the next five lines.
23   A.  From Parnas to Correia:  Perfect.  Send it to Igor.
24           Correia then sends a message to Parnas and Fruman
25   which attaches the cannabis schedule and budget.
```

1          Parnas then sends a message to Fruman and Correia:

2     This is good, send it to Igor, with a thumbs up emoji.

3          Fruman sends a message to Parnas and Correia:

4     Perfect, I'm going to send them right now.

5          Fruman then sends a message to Kukushkin that attaches

6     the cannabis schedule and budget.

7     Q.  And that cannabis schedule and budget that Fruman sends to

8     Kukushkin, how does that compare to the earlier draft that we

9     looked at that Parnas forwarded?

10    A.  It's the draft that we looked at.

11    Q.  If we could please go to the next page.

12         Can I ask you to please read the from, to and detail

13    of first line.

14    A.  From Kukushkin to Muraviev and Mikhalev and attaches the

15    cannabis schedule and budget, and it has the message:  Tomorrow

16    it's necessary to set the priorities and to confirm the

17    transfer to the guys.  Do you already know from where can

18    500,000 be given to them, Sasha?

19    Q.  Again, that cannabis schedule and budget that Fruman sent

20    to Muraviev, how did that compare to the document that we

21    looked at?

22    A.  It's the same.

23    Q.  Can I ask you to read the second line.

24    A.  From Fruman to Kukushkin:  It's important to transfer 500.

25    The man whom you met with us in Nevada called, said that he was

LAETPAR2                          Casola - direct

1   personally waiting for us with his deputy, who would take over

2   for him when he becomes governor to discuss our issue.  One

3   can't say there is no money, the transfer must be done tomorrow

4   morning.

5   Q.  And who is the next line to and from?

6   A.  It's from Fruman to Parnas.

7   Q.  And what does Fruman send to Parnas?

8   A.  A copy of the message from above, and then underneath he

9   said:  Wrote this text to Kunya.

10  Q.  Have you reviewed a stipulation specifying who the email

11  address akunya@yahoo.com is used by?

12  A.  I have.

13  Q.  Who is that?

14  A.  Kukushkin.

15  Q.  Can we please see the full message in Government

16  Exhibit 44.  I believe it's the big one.

17          And could I ask you to read the full message.

18  A.  Andrey, it's important to transfer 500 on Friday morning.

19  We said that we have money and have huge problems explaining

20  why we are not transferring.  The man whom you met with in

21  Nevada called, said that he was personally waiting for us with

22  his deputy, who would take over for him when he becomes

23  governor, to discuss our issue.  I don't know what these few

24  days will do for you and it is not clear why you are dragging

25  it out.  I can't even explain to Lev that Sasha left and he did

1  not reach his destination and he should consult with someone.

2  We are partners in the big game and we are in bed already.

3  Where this was announced, one can't say there is no money or

4  the money did not come or the money will come soon or tomorrow

5  there will be a meeting about the money.

6          MR. SCOTTEN:  And could we please now go back to to

7  the summary chart, page 8.

8  Q.  Agent Casola, how does Parnas respond to that message from

9  Fruman?

10  A.  Parnas sends a message to Fruman with three thumbs up

11  emojis and then:  Super.

12  Q.  And what are the from, to and detail of the last two lines?

13  A.  From Fruman to Parnas:  I'll send the second Andrey a copy.

14          And from Parnas to Fruman:  Yes.

15  Q.  And do you see where Fruman tells Parnas about a second

16  Andrey?

17  A.  Yes.

18  Q.  How many individuals have we seen so far today who use the

19  first name Andrey?

20  A.  Two.

21  Q.  And who are they?

22  A.  Kukushkin and Muraviev.

23  Q.  And who had Fruman already sent this message to?

24  A.  He had already sent it to Kukushkin.

25  Q.  How does Parnas respond to that at the very end?

LAETPAR2                         Casola - direct

1    A.  Parnas sends Fruman a message and says:  Yes.

2              MR. SCOTTEN:  We could stop.

3              THE COURT:  The clock says 10:15, which of course is

4    11:15 because it's one hour off.  I will give you a ten-minute

5    break, by which I mean 15 minutes, but we'll shoot for ten

6    minutes and we'll resume promptly between 11:25 and 11:30.

7              Folks, please leave your pads on the chairs and go

8    back to the jury room and we'll see you in 10, 15 minutes.

9              (Recess taken)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAECpar3                     Casola - direct

```
 1                (Jury not present)

 2                THE COURT:  We'll bring in the jury.

 3                MR. SCOTTEN:  If I can make a quick request, your

 4    Honor.

 5                THE COURT:  Yes.

 6                MR. SCOTTEN:  I understand that it sometimes takes a

 7    few words to explain your objection, and I'm sure I will be

 8    guilty of that myself, but if objections could not be used to

 9    argue a point to the jury, we would appreciate it.

10                THE COURT:  All right.  Please try to keep the

11    objections brief.  Thank you.

12                MR. SCOTTEN:  Thank you, Judge.

13                THE COURT:  All right.  We'll bring in the jury.

14                (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

1        (Jury present)

2            THE COURT:  Please be seated.  Good morning, ladies

3    and gentlemen.  We're continuing with the testimony.  We'll go

4    to 1 o'clock and then we'll break for lunch.

5            Mr. Scotten.

6            MR. SCOTTEN:  Thank you, your Honor.

7            And Ms. Drescher, if could you please put the summary

8    charts back up.

9    BY MR. SCOTTEN:

10   Q.  Is this the page we were looking at right before the break?

11   A.  Yes.

12   Q.  Did we cover everything on this page?

13   A.  We did.

14           MR. SCOTTEN:  If we could please go to the next page,

15   Ms. Drescher.

16   Q.  Agent Casola, what are the to, from, and detail in the

17   first two entries on September 14th?

18   A.  From Fruman to Kukushkin, what's new.  Kukushkin to Fruman,

19   we are waiting for Andrey.  I am already at the office with

20   Sasha.

21   Q.  In the third line, who is it to and from?

22   A.  From Kukushkin to Muraviev and Mikhalev and --

23   Q.  Go ahead, what is he saying?

24   A.  Address and bank account information and routing number for

25   F.D. Import & Export Corp.

LAECpar3                          Casola - direct

1   Q.  Have we seen F.D. Import & Export Corp. earlier in your

2   testimony?

3   A.  We have.

4   Q.  Can you remind us where?

5   A.  It was the wire detail information.

6   Q.  Do you remember who it was sent from or to?

7   A.  I do not recall.

8   Q.  You can just flip back in your hardcopy.  If you can just

9   flip back I think to page 6 and look at the September 9th

10  entry, I think that might remind you.

11  A.  Yes.

12  Q.  Where did we see it before in your testimony?

13  A.  Fruman sent it to Parnas, Kukushkin, Muraviev, and Vulis.

14  Q.  So in the next line, do you see where Fruman sends

15  Kukushkin contact information for Steven Fruman?

16  A.  Yes.

17  Q.  Do you know who Steven Fruman is?

18  A.  I do.

19  Q.  Who is Steven Fruman?

20  A.  Igor Fruman's brother.

21  Q.  Can I ask you to just read the from, to, and detail for the

22  next two lines after that.

23  A.  From Kukushkin to Fruman, phone number and email address

24  for Alexander Mikhalev.  And then from Igor Fruman to Steven

25  Fruman, the same phone number and email address for Alexander

LAECpar3                        Casola - direct

1    Mikhalev.

2    Q.  For line 211, what exhibit is that from?

3    A.  That is from Government Exhibit 43.

4           MR. SCOTTEN:  Ms. Drescher, could we please go to

5    Government Exhibit 43.

6    Q.  Starting at the top, who's this from in between?

7    A.  These are WhatsApp messages from Igor Fruman and Kukushkin.

8    Q.  And have we actually already looked at this series of

9    messages before?

10   A.  We have.

11   Q.  Let's go further down to where we haven't seen before to

12   row 15.  Do you recognize the type of message that Fruman is

13   sending Kukushkin here?

14   A.  Yes.

15   Q.  Can I ask, what is it?

16   A.  An audio file.

17          MR. SCOTTEN:  Ms. Drescher, could we please play that

18   audio file.

19          (Audio played)

20          Could we please go back to the chat, Government

21   Exhibit 43.

22   Q.  What is the next line after Fruman sends that voicemail?

23   A.  Fruman sends a message that says, this is a message from

24   our friend.

25   Q.  I'm going to stay on this exhibit for a minute.  Can I ask

LAECpar3                     Casola - direct

1   you to read the next two entries, leaving out the Russian.

2   A.  Yes.

3   Q.  So it's going to be 17 and 18, I think

4   A.  So 17 is a missed voice call.  And then there is a message

5   from Fruman that says, how are you, brother.

6   Q.  The reply that Kukushkin sent, what's the next day, the

7   message that Kukushkin sends, do you recognize what type of

8   file that is?

9   A.  Yes.

10  Q.  What is it?

11  A.  It's a video file.

12          MR. SCOTTEN:  Could we please play that video that

13  Kukushkin sends to Fruman.

14          (Video played)

15          Could we please go back to the chat.

16  Q.  What is the next message from Fruman after Kukushkin sends

17  him that video?

18  A.  Fruman attaches a document that is titled loan agreement,

19  9/17/2018.

20          MR. SCOTTEN:  Ms. Drescher, could we please take a

21  look at that document.  If we could zoom in on the top

22  paragraphs under loan agreement.

23  Q.  Agent Casola, what does this say about who the lender is in

24  this loan agreement?

25  A.  Intellect Capital Limited.

LAECpar3                          Casola – direct

1          MR. SCOTTEN:  Your Honor, I would like to offer a

2    Stipulation S5.

3          THE COURT:  Yes.

4          (Government's Exhibits S5 received in evidence)

5          MR. SCOTTEN:  Ms. Drescher, could we please publish

6    it.

7          The stipulation agrees that Intellect Capital Cyprus

8    Limited, and another company we'll come to later, are companies

9    owned by Andrey Muraviev.

10          If we could please now go back to the loan agreement,

11    same part.

12   Q.  Does this loan agreement identify the borrower?

13   A.  F.D. Import & Export Corp.

14   Q.  Have we seen that company before?

15   A.  Yes.

16   Q.  In what context?

17   A.  The wire transfer information.

18          MR. SCOTTEN:  Ms. Drescher, could we now zoom in on

19    the middle of the page under interpretation.

20   Q.  Looking at the smaller middle blocks in this, Agent Casola,

21    what type of information is this?

22   A.  This is also wire transfer information.

23   Q.  Is there a bank account listed for the borrower?

24   A.  Yes.

25   Q.  And how does it compare to the bank account information for

LAECpar3                    Casola – direct

```
 1   F.D. Import & Export Corp. that Fruman sent Kukushkin earlier?
 2   A.  It's the same account.
 3           MR. SCOTTEN:  If we could now zoom in on the bottom
 4   third under the subject heading, agreement.
 5   Q.  Does this specify the amount of the loan?
 6   A.  It does.
 7   Q.  What is the amount of this loan?
 8   A.  500,000 United States dollars.
 9           MR. SCOTTEN:  Ms. Drescher, if we could scroll through
10   the document until we get to the end and then zoom in on the
11   signatures.
12   Q.  Agent Casola, who signed this agreement for Intellect
13   Capital Cyprus Limited?
14   A.  Ms. Evelina Liana Badiescu, and Ms. Sophia Ioannou.
15   Q.  Have we heard those names previously today?
16   A.  No.
17   Q.  According to the stipulation, who owns Intellect Capital?
18   A.  Muraviev.
19   Q.  Have you reviewed this full document before testimony?
20   A.  I have.
21   Q.  Does Andrea Muraviev's name appear anywhere in this
22   document?
23   A.  No.
24   Q.  Who signed for F.D. Import & Export Corp.?
25   A.  Mr. Steven Fruman.
```

LAECpar3                    Casola - direct

1   Q.  Agent Casola, have we now gone past, sort of, the dates

2   that were in the last page of the summary chart?

3   A.  We have.

4           MR. SCOTTEN:  Ms. Drescher, can we go back and go

5   ahead onto the next page, page 10.

6   Q.  Have we already discussed the exhibits for those first two

7   lines?

8   A.  We have.

9   Q.  If you can just read the from, to, and detail.

10  A.  First exhibit was from Kukushkin to Fruman, and there was

11  the video that we watched of the assault on the street artist.

12  Where it says, give me back my money, you think this is a joke,

13  Fruman then sends a message to Kukushkin with the signed

14  $500,000 loan agreement that we just reviewed.

15  Q.  What are the to, from, and detail for the next two entries?

16  A.  From Fruman to Parnas and Correia with a message that

17  attaches the Chase account alert regarding an incoming wire of

18  500,000 United States dollars.  Parnas then sends a message to

19  Fruman and Correia with three okay emojis, three praying

20  emojis, see you later, going to be a great day.

21  Q.  Does that Chase wire alert list the last four digits of the

22  chase account to which the $500,000 was wired?

23  A.  Yes.

24  Q.  How do those last four digits compare to the last four

25  digits of Chase wire account listed in the loan agreement?

LAECpar3                          Casola – direct

1    A.  They're the same.

2              MR. SCOTTEN:  If we could please turn the page.

3    Q.  Agent Casola, can I please ask you to read the from, to,

4    and detail of the first two lines.

5    A.  From Kukushkin to Correia.  Spoke to Lev and H suggested

6    Diana could coordinate my tickets in Hotel Miami which would be

7    very convenient.  Correia sends a message to Parnas, spoke to

8    Andrey, he mentioned he wanted Diana to set up his travels,

9    maybe use Amex.  Then Andrey M can wire 500K.  All cool with

10   you.

11   Q.  You see in that second line how there are some sets of dots

12   that are very close together?

13   A.  I do.

14   Q.  Are those in any way different from the longer, spaced out

15   ellipses we've been seeing?

16   A.  Yes.

17   Q.  What's the difference?

18   A.  The ones that come after Amex are ones that were actually

19   included in the messages themselves that Correia wrote.

20   Q.  So this does not represent material left out of the summary

21   chart, but is something that's in the original chat?

22   A.  Correct.

23   Q.  Do you see the reference to Andrey M?

24   A.  Yes.

25   Q.  Have we discussed anyone today who uses the first name

LAECpar3                     Casola – direct

1   Andrey and has the last initial M?

2   A.   Yes.

3   Q.   Who is that?

4   A.   Muraviev.

5   Q.   What is the from, to, and detail of the next line?

6   A.   From Parnas to Correia.  Have him call Igor, don't use any

7   of our cards.

8   Q.   What exhibit are the next four lines from?

9   A.   Government Exhibit 52.

10          MR. SCOTTEN:  Ms. Drescher, could we please publish

11   that Exhibit 52, and I think here we want to start on row 10.

12   Q.   Now, Agent Casola, are the chats here shorter or longer

13   than the details in the summary chart?

14   A.   The chats within the exhibit are longer.

15   Q.   I'm just going to ask you to read some parts.  In row 12,

16   how does Kukushkin respond to Correia's message about which

17   credit card to use?

18   A.   The Global Energy which received funds for all the charity

19   and support.  I am coming for particular business reasons which

20   are associated with our actions.

21   Q.   If we can scroll down to the next row from Correia, can I

22   ask you just to read the fourth line beginning the original

23   funding.

24   A.   The original funding was for charitable/political donations

25   prior to new company being opened.

LAECpar3                           Casola - direct

1   Q.  And then in row 14 from Kukushkin, can I ask you to read
2   the last sentence beginning, considering the amount.
3   A.  Considering the amount of travel, please allocate
4   10 percent of the existing donation funds for our business
5   necessities.
6          MR. SCOTTEN:  If we could please return to the summary
7   charts on page 11.
8   Q.  Agent Casola, what is the next line in the chart that
9   doesn't come from the chat we just looked at?
10  A.  It would be on 10/1 at 9:33 a.m.
11  Q.  Can I ask you to please read the from, to, and detail?
12  A.  From Correia to Parnas and Fruman, Andrey's response to my
13  last text.  And then he includes the portion of the text I just
14  read where he asks for the 10 percent of the allocation to
15  be -- from the existing donation funds.
16  Q.  Can you read the from, to, and detail of the last line?
17  A.  From Kukushkin to Correia, if Igor can't authorize it
18  instantly, then why I have authorized the transfer of 500K and
19  all this charade.
20         MR. SCOTTEN:  Ms. Drescher, could we please have the
21  next page.
22  Q.  Agent Casola, can I ask you to read the from, to, and
23  detail for the first line.
24  A.  From Kukushkin to Fruman.  Igor, I will not be flying to
25  the event.  We will meet in Vegas.  Greeting celeb.  I have an

LAECpar3                         Casola – direct

1    emergency with my teeth.  I will definitely fly into Miami and

2    we will meet with DeSantis, but are ready after Nevada.

3    Q.  Have we discussed a person named DeSantis previously in

4    your testimony?

5    A.  Yes.

6    Q.  Can you remind me who that person was as of 2018?

7    A.  Candidate for the Governor of Florida.

8    Q.  What exhibit does the next line come from?

9    A.  Government Exhibit 58.

10          MR. SCOTTEN:  If we could please publish that exhibit,

11   which we've been going through before, now at the top of

12   page 3.

13   Q.  Agent Casola, do you see the end of the message from

14   Kukushkin about DeSantis?

15   A.  I do.

16   Q.  Can I ask you to read the from, in translation, of the

17   entry after that, row 30?

18   A.  It's a message from Fruman and it says, yes, we need to

19   open an account urgently and to deposit 500 there.  We have to

20   fork over a check for 250 to him at the event.  It would be a

21   pity if you are not there.  You should have done it, but no

22   matter, we will resolve everything.  The important thing is the

23   check and then we fly to Nevada.  We are doing it even for our

24   friend in a week to 10 days.  Additional 250 maximum and that

25   is it.  It is in the bag for us.  We managed to resolve all the

1    issues before November.

2            MR. SCOTTEN:  Could we please, Ms. Drescher, go down a

3    while.  Now I want to do rows 37 to 42.

4    Q.  I'm not going to ask you to read these lines, but Agent

5    Casola, do you see Kukushkin and Fruman referring to something

6    called DocuSign?

7    A.  I do.

8    Q.  Do you know what DocuSign is?

9    A.  I do.

10   Q.  Could you explain?

11   A.  It's a digital way to sign a document so you wouldn't have

12   to print it out, sign it with a pen, scan it back in, and then

13   send it to somebody.  They can send it to you and you can sign

14   it on an electronic device and send it back.

15   Q.  By an electronic device, do you mean a phone or a computer?

16   A.  Yes.

17           MR. SCOTTEN:  I want to back up a few days in time and

18   ask Ms. Drescher to pull up Government Exhibit 50 on page 1.

19   Q.  Starting at the top, what type of exhibit is this?

20   A.  WhatsApp communications.

21           MR. SCOTTEN:  And then blowing up the entries from 26

22   and 27 of September.

23   Q.  Just to be clear, is this before or after the stuff we were

24   just looking at in the summary chart?

25   A.  Before.

LAECpar3                          Casola - direct

1    Q.  About how long?

2    A.  About a week.

3    Q.  And who sent the first message on September 26th?

4    A.  David Correia.

5    Q.  Can I ask you to read the first sentence after the

6    number 1.

7    A.  You may have seen the email that we went with the name

8    Strategic Investment Group Inc.

9    Q.  And can I now ask you also to read numbers 2 and 3?

10   A.  2.  Amanda is going to email us a copy of the corporate

11   resolutions which we both need to sign.  Please let me know if

12   you can do that while on the road, either electronically

13   through DocuSign or similar, or you could sign and scan back a

14   copy.

15              3.  Please let me know if you already have the name of

16   the entity or entities that you and Andre M will be using for

17   your 51 percent ownership in the company.  If so, please send

18   me the name and I will have her insert those into the bylaws.

19   Q.  Skipping down to row 5, can I ask you to read the first two

20   sentences.

21   A.  David, I like the name of the company, smiling emoji.  I'll

22   reach out to Alex and Andre M for the proxy entities.

23   Q.  In your testimony today, has there been anyone with the

24   first name Andrey who used the last initial M?

25   A.  Yes, Muraviev.

LAECpar3                    Casola - direct

1   Q.  Has there been anyone named Alex?

2   A.  Yes.

3   Q.  Who?

4   A.  Mikhalev.

5        MR. SCOTTEN:  Ms. Drescher, can we please go back to

6   where we left off on page 12 of the summary chart.

7   Q.  Agent Casola, can I ask you to read the from, to, and

8   detail of the next two lines beginning with the one at

9   4:56 p.m.?

10  A.  From Kukushkin to Fruman, if he sends out the DocuSign

11  document.  Then this is one minute.  Fruman send a message to

12  Correia and Parnas, hi, don't know how to use DocuSign, please

13  call him and provide step by step.  Correia then sends a

14  message to Fruman and Parnas, he has everything.

15  Q.  And then what is the entry after that?

16  A.  A message from Correia to Fruman and Parnas.  It says, I

17  have Andrey's signed document, it should be fine to open an

18  account tomorrow.

19       MR. SCOTTEN:  If we can please now publish Government

20  Exhibit 141, which has been stipulated as a document found in

21  Kukushkin's email account.

22  Q.  Agent Casola, can I ask you to read the title of this

23  document.

24  A.  Unanimous written consent in lieu of an organizational

25  meeting by the board of directors of Strategic Investment Group

LAECpar3                    Casola – direct

1    Inc.

2    Q.  Can I ask you to read the bold titles of each section.

3    A.  Articles of incorporation, bylaws, ratification of

4    incorporator actions and acceptance of resignation, officers,

5    bank account.  And the last one, further instructions to

6    officers.

7    Q.  Is this document signed?

8    A.  It is.

9    Q.  Who signed it?

10   A.  Kukushkin and Correia.

11   Q.  Can you tell how they signed it?

12   A.  Through DocuSign.

13   Q.  Agent Casola, have you reviewed this document before your

14   testimony today?

15   A.  I have.

16   Q.  Does it mention Andrey Muraviev anywhere?

17   A.  No.

18   Q.  Agent Casola, in preparing for your testimony, have you

19   reviewed any other messages between Correia and Kukushkin about

20   structuring a company?

21   A.  Yes.

22        MR. SCOTTEN:  Ms. Drescher, could we please publish

23   Government Exhibit 137.  If we could zoom in on the bottom

24   email.

25   Q.  So first off, Agent Casola, what is the date?

LAECpar3                     Casola - direct

1    A.   September 16th, 2018.

2    Q.   And so is that before or after the emails we were just

3    looking about DocuSigning corporate documents?

4    A.   Before.

5    Q.   Can I ask you to read the last sentence Kukushkin wrote.

6    A.   I am just trying to establish core structure and how

7    transparent should Andrey be exposed for the benefits of NewCo

8    transparency.  His Russian Roots and current political paranoia

9    about it.

10             MR. LEFCOURT:  Objection, your Honor.  I think the

11   people who it's sent to should be on there.

12             THE COURT:  Could you clarify who is on the email.

13             MR. SCOTTEN:  Sure.  I think we have to scroll up to

14   see one of those things where it cuts off the CC lines.

15   Q.   These are all the persons on this email?

16             MR. LEFCOURT:  Could we have him read the names, your

17   Honor, just to be clear.

18             MR. SCOTTEN:  I think who the witness reads is

19   something I should handle on direct.

20             THE COURT:  Yes.  You can raise it on cross.

21             MR. BONDY:  Your Honor, I just ask the Court for a

22   limiting on this, Mr. Parnas is not --

23             THE COURT:  I'll point out to the jury that Parnas is

24   not on this email; correct?

25             MR. SCOTTEN:  I believe that's correct, your Honor.

LAECpar3                        Casola - direct

1           If we could put up stipulation S4.  I'm not actually

2    sure, I don't remember when the objection came.  Your Honor,

3    the government offers stipulation S4.

4           THE COURT:  S4 is received.

5           (Government's Exhibit S4 received in evidence)

6           MR. SCOTTEN:  If we can put it up.

7           MR. LEFCOURT:  Your Honor, under the doctrine of

8    completeness, I have an exhibit that I think should be put

9    before the jury at this time.  It's a response who he's

10   communicating with, David Correia, and what they're talking

11   about.

12          MR. SCOTTEN:  I'm happy to come to sidebar briefly,

13   your Honor.  I think that's the only way to look at the

14   document together.  I don't know what it is.

15          THE COURT:  Is it part of that same chain?

16          MR. LEFCOURT:  Yes.

17          THE COURT:  Why don't you take a quick look.

18          MR. SCOTTEN:  Is this a response?  Can we, just for

19   the parties and the Court, put back up 137.

20          MR. LEFCOURT:  Your Honor, for the Court, this is an

21   email that --

22          MR. SCOTTEN:  Your Honor, I'm happy to come to

23   sidebar, but I don't want to argue this.

24          THE COURT:  Is it on this page that we're looking at

25   or not?

LAECpar3                        Casola – direct

1            MR. SCOTTEN:  It is not.  I can bring it up, your

2    Honor.

3            THE COURT:  Okay.  Sidebar.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAECpar3                    Casola - direct

1              (At the sidebar)

2              THE COURT:  We're at sidebar.  We're looking at what's

3    been marked Defendants Exhibit B6.

4              MS. FRIEDMAN:  So, your Honor, the government posted

5    this email to the jury along with a response to this email.

6    This email precedes it and puts into context what the email

7    that the government posted relates to.  I could bring up the

8    government exhibit if that would be helpful, as well.

9              MR. SCOTTEN:  Two points on this, your Honor.

10             One, the reason it's not included is it can't be

11   because they -- the parties here have asserted privilege.

12   Steven is giving them legal advice on why to use a C-corp, so

13   it's privileged.  Also, assuming it was not privileged it

14   doesn't actually add any necessary context because the top

15   paragraph, discussion of C-corporation.  There is no risk of

16   the jury being confused.  It's about structuring a corporation.

17   We agree it is.  I think I framed it for the witness that way

18   so that everyone knew this was about structuring the

19   corporation.

20             MS. FRIEDMAN:  Your Honor, there is no legal advice in

21   here.  This is David Correia explaining to Mr. Kukushkin that

22   Steven made some good points.  He doesn't say what those are

23   and then they respond.  There is no legal advice in there.

24   It's just that the fact is that the lawyer gave them some legal

25   advice.

LAECpar3                      Casola – direct

1              MR. SCOTTEN:  My understanding, before it came in the

2         course, is this email was sort of heavily litigated and that

3         this should have been litigated at the time, but it wasn't.

4         But I think your Honor can resolve this, because I just don't

5         think there is anything misleading about this without it, so

6         the rule of completeness doesn't apply.  To the extent they

7         want us to just stipulate, tell the jury this is about

8         considerations of forming a corporation, again, I'm happy to do

9         that.  We're not in dispute on the underlying point.

10             THE COURT:  I think it puts it in context and I think

11        I did rule that it's not privileged among other things to the

12        extent it did not actually include the legal advice as opposed

13        to business decisions.  I think it's fine.  I think it puts the

14        overall discussion in context.  I'll allow you to put it in.

15             Do you have a Government Exhibit that includes that?

16             MR. SCOTTEN:  I don't.  We redacted it because we

17        thought it might be privileged.  We have their exhibits

18        uploaded, so we can put it in that way.

19             (Continued on next page)

20

21

22

23

24

25

LAECpar3                        Casola - direct

1              (In open court)

2              MR. SCOTTEN:  At this time, your Honor, the government

3    offers Defendants Exhibit B6.

4              MR. LEFCOURT:  We offer it.  We agree.

5              MR. SCOTTEN:  Whoever offers it, we want it up.

6              THE COURT:  Exhibit B6 is admitted.

7              (Defendant's Exhibit B6 received in evidence)

8    BY MR. SCOTTEN:

9    Q.  Looking at the top, Agent Casola, does this appear to be

10   the same email you saw before?

11   A.  Yes.

12             MR. SCOTTEN:  Can we now scroll down to the bottom

13   email.

14   Q.  Can I just ask you to read what David Correia wrote to

15   Andrey?

16   A.  Andrey, I hope all is great in Moscow.  Steven made a good

17   argument for a C-corp while in Vegas and I believe we both

18   agreed.  I will leave it to him to discuss again with us on

19   Tuesday.  Hopefully, you will be able to join for the call.

20             MR. SCOTTEN:  If we can now scroll back up.

21   Q.  Does this appear to be -- well, I don't want to ask you to

22   make an inference.  Let me ask you to read the bottom sentence

23   of Mr. Kukushkin's reply --

24             MR. LEFCOURT:  May the whole email be read, your

25   Honor, because it's in response to what was sent to him.

1          MR. SCOTTEN:  Your Honor, I am quite sure that the

2     rule of completeness applies to what you offer and what you

3     read.  I was trying to facilitate defense by reading their

4     email, but I don't want to have to read everything.

5          THE COURT:  The jury can see the entirety of the

6     email.  Look, I think from the context of the way it's

7     structured, it's pretty clear that the Kukushkin email that

8     starts, thank you, David, is responding to the thing below,

9     because it starts Moscow is beyond beautiful in September

10    whilst I am catching up with colleagues and investors.  Steven

11    did make a good argument about personal liability protection

12    under C-corp formation, which wasn't necessarily the case in

13    certain states under LLC.  I am just confirming my

14    understanding, unless I missed some other purpose for it.

15    Please advise.  I believe what's left was for Igor and Lev to

16    establish who is going to be shareholders of the new co and

17    could we all use LLCs as proxies in it.  And then it says I am

18    just trying to establish core structure and how transparent

19    should Andre be exposed for the benefits of NewCo transparency,

20    his Russian Roots, and current political paranoia about it.

21         MR. SCOTTEN:  I didn't want to ask the witness to make

22    the difference, but the government agrees it's a response.

23         THE COURT:  Okay.

24    BY MR. SCOTTEN:

25    Q.  If you could just now read that last sentence.  We can stay

LAECpar3                              Casola - direct

1  on this exhibit, it's the same in both.  Beginning I am just

2  trying?

3  A.   I'm just trying to establish --

4          MR. LEFCOURT:  Your Honor just read that.

5          MR. SCOTTEN:  I didn't realize you had gone to the

6  last sentence.

7          THE COURT:  I did.

8          MR. SCOTTEN:  I am going to connect this to two other

9  exhibits where it's relevant, so I would love to have the

10  witness read it one more time.

11          THE COURT:  That's fine.

12 A.   I'm just trying establish core structure and how

13 transparent should Andre be exposed for the benefits of NewCo

14 transparency, his Russian Roots, and current political paranoia

15 about it.

16          MR. SCOTTEN:  If we could now offer that exhibit, S4,

17 which your Honor admitted.

18          THE COURT:  S4, yes, received.

19          MR. SCOTTEN:  And I'm just going to read the operative

20 portion.

21          The investigation conducted by Special Counsel Robert

22 Mueller into Russian meddling in the 2016 election began in

23 2017 and continued through March 2019.  The investigation

24 garnered extensive media attention and at times daily

25 reporting.

LAECpar3                          Casola - direct

1            Ms. Drescher, could we please put up Government

2    Exhibit 167, another of the emails entered.

3    BY MR. SCOTTEN:

4    Q.  In general terms, what are we looking at here?

5    A.  An email.

6    Q.  What is the date of the top email?

7    A.  June 5th, 2018.

8    Q.  Who is it to and from?

9    A.  It is to Kukushkin and it is from Christine Rigby.

10            MR. SCOTTEN:  Can we zoom down to see the next entry.

11   Q.  Can I ask you to read what Kukushkin wrote to Christine

12   Rigby?

13   A.  Christine, please forward me the board presentation as

14   well.  Thanks a lot.

15            MR. SCOTTEN:  Can we please now scroll down to the

16   second page.  If we capture the top part down to board members.

17   Q.  Agent Casola, have we seen the names of any of these board

18   members during your testimony?

19   A.  Yes.

20   Q.  Who?

21   A.  Muraviev.

22   Q.  What is the date we are looking at here?

23   A.  April 11, 2018.

24            MR. SCOTTEN:  Ms. Drescher, is it possible to put up

25   the bold part of S4 while leaving up the zoomed in part and

LAECpar3                      Casola – direct

1   then also put up the dated portion of the exhibit with

2   Kukushkin referring to Russian roots.

3   Q.  Agent Casola, how do the dates of the board meeting minutes

4   and the Russian Roots email relate to the date range in

5   stipulation S4?

6   A.  They were in the date range.

7   Q.  Both of them?

8   A.  Yes.

9   Q.  Does Andrey Muraviev's name appear in the board minutes?

10  A.  For the Palliatech, yes.

11  Q.  Does Andrey Muraviev's name appear in any of the corporate

12  or loan documents exchanged with Correia that we've been

13  discussing?

14  A.  No.

15          MR. SCOTTEN:  Can we please take all that down and

16  return to page 12 of the summary charts.

17  Q.  Agent Casola, can I ask you to read the from, to, and

18  detail of the last line.

19  A.  From Parnas to Correia Fruman, finally let's get account

20  open tomorrow morning and they'll get the wire info out.

21          MR. SCOTTEN:  If we can please turn the page.

22  Q.  Agent Casola, can I ask you to just keep reading.  Let's do

23  the from, to, and detail of the first four lines.

24  A.  From Correia to Parnas and Fruman.  Gentlemen, bank account

25  is open and Vienna just sent over a bank instruction page for

| | |
|---|---|
| 1 | the wire information.  You should have in your emails and |
| 2 | WhatsApp I believe.  Fruman sends a message to Correia and |
| 3 | Parnas, I asked Andrey to send money to this account.  Correia |
| 4 | replies to Parnas and Fruman, yes, great.  And Fruman sends a |
| 5 | message to Kukushkin, sending a Strategic Investment Group Inc. |
| 6 | corporate wire instructions and says, the company is ready, the |
| 7 | account is open, waiting for 500. |
| 8 | Q.  The last line you just read, Agent Casola, what exhibit is |
| 9 | it based on? |
| 10 | A.  Government Exhibit 58. |
| 11 | MR. SCOTTEN:  Could we please return to that exhibit, |
| 12 | Ms. Drescher, and I think we're now at row 48. |
| 13 | Q.  Now, Agent Casola, what are we looking at in the part that |
| 14 | Ms. Drescher has blown up? |
| 15 | A.  The information from the government exhibit that is cited |
| 16 | on the summary chart. |
| 17 | Q.  Have we seen a reference to Strategic Investment Group |
| 18 | earlier in your testimony? |
| 19 | A.  Yes. |
| 20 | Q.  Where did we see it? |
| 21 | A.  The DocuSign document. |
| 22 | MR. SCOTTEN:  Ms. Drescher, can we please return to |
| 23 | page 13 of the summary charts. |
| 24 | Q.  Agent Casola, could you please read the remaining three |
| 25 | lines, the bottom three lines, to, from, and detail. |

1  A.  From Kukushkin to Fruman, right to the group, please.  We

2  have to show actual results for the first 500.  Fruman sends a

3  message to Kukushkin, I am reminding about our agreements,

4  $1,000 before October 1.  The results exist already in Nevada

5  and Miami, and New York we'll be shortly together with

6  documents.  Fruman then sends a message to Parnas, Kukushkin,

7  Muraviev and Vulis a picture of Fruman with candidate for

8  Florida Governor Ron DeSantis with the message, today Florida

9  became ours forever, congratulations.

10         MR. SCOTTEN:  Ms. Drescher, could we please put up

11  Government Exhibit 38, zooming in on page 2, row 13.

12  Q.  Special Agent Casola, what is the date here?

13  A.  9/15/2018.

14  Q.  So that earlier or later than what we were looking at?

15  A.  Yes.

16  Q.  Sorry.  Is it earlier or later than what we were looking

17  at?

18  A.  Earlier.

19  Q.  Who wrote it?

20  A.  Parnas.

21  Q.  Can I ask you to read what Parnas wrote?

22  A.  Guys, I have a huge announcement, October 3, we are doing a

23  private event in Florida for the next governor of Florida, Ron

24  DeSantis.  The president's attorney, Rudy Giuliani, will also

25  be there and a few surprises.  It's going to be huge.  Please

LAECpar3                    Casola – direct

1    make sure you will be here, with three okay emojis and four

2    thumbs up emojis.

3    Q.  Agent Casola, how is the date on which Parnas said he would

4    be doing a private event for governor candidate DeSantis

5    compare to the date of the last line in the summary charts

6    where Fruman says, Florida became ours forever?

7    A.  They're both October 3rd.

8            MR. SCOTTEN:  If we can go back to those summary

9    charts, page 13.  Ms. Drescher, could we please have the next

10   page.

11   Q.  Agent Casola, could you please read the from, to, and

12   detail of the first two lines.

13   A.  From Fruman to Parnas, call me, need to talk.  And then

14   from Fruman to Kukushkin, please don't forget to send 500 to

15   NewCo, what we are waiting for, it is a passive end with the

16   governor.  He is very grateful and waiting.  October 13 is an

17   event with the governor and AG Nevada.  Everything is according

18   to the program of preparation of pending up the licensing in

19   the key states.  After the 6th, nobody will need anything here.

20   Q.  I think I asked you this before, but just to be clear, are

21   you familiar with the abbreviation AG in this context?

22   A.  Yes.

23   Q.  Again, what does it stand for?

24   A.  Attorney General.

25   Q.  What is the date of this message?

LAECpar3                        Casola - direct

1    A.  October 7th of 2018.

2    Q.  So what is the next month in which the date the 6th would

3    pass?

4    A.  November.

5    Q.  And what was Election Day in 2018?

6    A.  November 6th.

7    Q.  What is the third line now, please?  So it's also 10:55 on

8    September 7th?

9    A.  Yes.  From Fruman to Parnas.  He sent the same message that

10   I just read.

11   Q.  For the first line on October 8th, what type of exhibit is

12   that?

13   A.  Email.

14   Q.  And what time is the email sent?

15   A.  8:26 p.m.

16   Q.  Who is it from and to?

17   A.  It is from Correia to Parnas and Fruman.

18   Q.  Can I ask you to just read the body?

19   A.  Attached draft, attaching C-campaign contributions tables.

20           THE COURT:  I think you said C-campaign.  It's state

21   campaign.

22           THE WITNESS:  I apologize, your Honor.

23   A.  State campaign contributions tables.

24           MR. SCOTTEN:  Can we please go to Government

25   Exhibit 144.

1   Q.  Is this the message that the chart summarizes?

2   A.  It is.

3          MR. SCOTTEN:  Can we please go to page 2.

4   Q.  Agent Casola, could you please just raid the title of this

5   page.

6   A.  State campaign contributions.

7          MR. SCOTTEN:  Could you please go to the next page,

8   and then the last page.

9          Ms. Drescher, could we now publish Government Exhibit

10  54, page 5, starting with the first row on that page.

11  Q.  Agent Casola, how does the time of this top row here

12  compare to the time of that email we were just looking at?

13  A.  It's two minutes later.

14  Q.  Can I ask you to read what Correia wrote.

15  A.  Hey, guys.  I just emailed both of you my first draft of

16  this document.  Please take a look at the few things that need

17  to be added or changed.  If you could, please discuss between

18  the two of you if necessary.  I will call Lev around 9:00 p.m.

19  to make the final changes.  Going to put my son to bed now.

20  Thanks.

21         MR. SCOTTEN:  And now, if we can zoom out, I'm not

22  going to ask you to read this page through, but if you blow it

23  up so the jury can see it as best they can.  Or maybe if it

24  works better to scroll slowly, whichever one you think,

25  Ms. Drescher.

LAECpar3                          Casola – direct

1    BY MR. SCOTTEN:

2    Q.  I am going to ask you to read the last two lines, please.

3    A.  From Correia.  Just sent final draft to you both.  And then

4    Parnas responds, excellent.

5                MR. SCOTTEN:  Can we now please publish Government

6    Exhibit 146.  If we can blow it up.

7    Q.  What are we looking at here, Agent Casola?

8    A.  An email.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAETPAR4                    Casola - direct

1    BY MR. SCOTTEN:

2    Q.  Email, sorry, I didn't hear you.

3         Can you explain what the time is in the top here?

4    A.  Yes.  That's the time that the email was sent, listed in

5    UTC.

6    Q.  What is UTC?

7    A.  Any time you get electronic communications, that's the

8    designation they will get.  So like any other time zone,

9    there's a conversion for it.

10   Q.  So you convert that to New York time, like everything else,

11   what time was this sent?

12   A.  It would be 11:31 p.m. on October 8.

13   Q.  Is that a minute before the chat?

14   A.  Yes.

15   Q.  Can we please scroll down to the next page.

16        Could I ask you to read the title.

17   A.  Strategic Investment Group, Inc. state campaign

18   contributions.

19   Q.  Have you seen the name Strategic Investment Group before in

20   your testimony?

21   A.  Yes.

22   Q.  Where?

23   A.  In a signed document.

24   Q.  Was it involved in the wire instructions?

25   A.  Yes.

1           MR. SCOTTEN:  Ms. Drescher, could I ask you to put

2      back up an earlier email, Exhibit 144, and put page 2 beside

3      this.

4      Q.  To start, Agent Casola, can you compare the titles?

5      A.  Yes, the document on the right contains Strategic

6      Investment Group, Inc. whereas the document on the left does

7      not.

8      Q.  Have you had a chance to review these two documents before

9      your testimony today?

10     A.  Yes.

11     Q.  Can you generally compare the information on the left and

12     the information on the right?

13     A.  The document on the right has some of the columns filled

14     out, such as date paid, committed and event, the other

15     information there.  Also, the amounts in the document on the

16     right are higher.  In addition, there is also some individuals

17     who are added to some of the states in the document on the

18     right.

19     Q.  For example, on this page is there a new individual on

20     document on the right?

21     A.  There is.

22     Q.  Who is that?

23     A.  Andrew Cuomo.

24     Q.  If we could please now go to the next page of both

25     documents.  And if I could again ask you to make the same

LAETPAR4                        Casola - direct

1    general comparison of the information.

2    A.   Same response here.  The document on the right contains

3    some information, the date paid, committed and event columns.

4    The amount totals are higher, and there are other individuals

5    who are added to the sheet on the right.

6    Q.   Could we now go to the last page of both.

7              How would you compare these?

8    A.   These are different.

9    Q.   Generally different?

10   A.   They're different in that Texas and America First Action

11   are not in the document on the left.  The paid contributions,

12   there's a total, the outstanding commitments do provide a

13   total, and the total campaign contributions projected is also

14   listed.

15   Q.   I want to be clear about something, Agent Casola, do you

16   have any personal knowledge whether the information in either

17   of these documents is accurate?

18   A.   No.

19   Q.   When you say you checked the summary charts for accuracy,

20   what does that mean here?

21   A.   I checked to make sure that what is listed in the summary

22   chart was accurately taken from the underlying government

23   exhibits.

24   Q.   But you don't know if these charts themselves reflect

25   facts?

1    A.  No.

2                MR. SCOTTEN:  Ms. Drescher, please go back to page 14

3    of the summary charts.

4    Q.  Agent Casola, are there any lines left on this page where

5    we haven't looked at the exhibits?

6    A.  No.

7    Q.  Please go to the next page.

8                Agent Casola, could you read the from, to and detail

9    of the first line.

10   A.  From Fruman to Kukushkin with SIG contribution list

11   attaching Strategic Investment Group, Inc. state campaign

12   contribution tables.

13   Q.  What is the first letters in Strategic Investment Group?

14   A.  S-I-G.

15   Q.  How would you pronounce that?

16   A.  SIG.

17   Q.  Could you read the to, from and detail in the next four

18   lines.

19   A.  From Fruman to Kukushkin:  We will fuck up everything

20   again.  Where is it the money Andrey?

21               Kukushkin replies to Fruman:  I think we have not

22   fucked up anything but proceeding in accordance with the plan.

23   Did you send the new input to the group?

24               Fruman then sends a message to Kukushkin, Parnas and

25   Muraviev the SIG contribution list attaching Strategic

LAETPAR4                         Casola - direct

1    Investment Group, Inc. state campaign contributions tables.

2                Then Kukushkin sends a message to Parnas, Fruman and

3    Muraviev that says:  Our contributions are kind of way too

4    much.  It would be good for us to see the results after the

5    first 500 in order to keep sowing more.  When will Nevada, New

6    York, Jersey and Florida confirm the connections with results?

7                MR. SCOTTEN:  Please pull up the government exhibits

8    cited in that lat row, number 61, and start with row 5.

9    Q.  Just to start there, how does the SIG contribution list

10   there compare to the second email we're looking at, the one

11   with the higher amounts?

12   A.  It's the same list.

13               MR. SCOTTEN:  And now if we could go up to the top of

14   this to see what this document is.

15   Q.  So what type of exhibit is this?

16   A.  WhatsApp communications.

17   Q.  And between who?

18   A.  Muraviev, Parnas, Fruman and Kukushkin.

19   Q.  Who created the chat group?

20   A.  Parnas.

21   Q.  How could you tell that?

22   A.  The designation is admin next to his name.

23               MR. SCOTTEN:  Scroll down to see the first three rows.

24   Q.  Can I ask you to read what Parnas wrote in row 3.

25   A.  Hi guys, new group, no Felix.

1  Q.  In your testimony today, have you seen any chats involving

2  Muraviev, Parnas, Fruman, Kukushkin and someone named Felix?

3  A.  Yes.

4  Q.  Who is that?

5  A.  Vulis.

6  Q.  Is he present here?

7  A.  Not in this chat.

8          MR. SCOTTEN:  Go down to row 7, please, right after

9  the sending of the list.

10 Q.  Can I ask you to read -- first, can I ask you who wrote

11 this?

12 A.  Kukushkin.

13 Q.  And can I ask you to read the third through fifth sentences

14 he wrote starting with "our contributions."

15 A.  Our contributions are kind of way too much.  It would be

16 good for us to see results after the first 500 in order to keep

17 sowing more.  When will Nevada, New York, Jersey and Florida

18 confirm the connections with results?

19         MR. SCOTTEN:  Ms. Drescher, please scroll to the next

20 page.

21         MR. LEFCOURT:  Your Honor, could we read the rest of

22 it, the doctrine of completeness?

23         THE COURT:  Sure.

24 Q.  I think Mr. Lefcourt asked you to read row 7.

25         MR. LEFCOURT:  Yes.

1          MR. SCOTTEN:  If you could blow up row 7 again.

2     Q.  And if you could read the remainder.

3     A.  We need to reserve a budget for company development to open

4     the shops and to find the real estate.  This is a very

5     expensive part and it cannot be ignored.  I suggest a

6     conference call for us to indicate the priorities.  Otherwise,

7     there will never be enough money to fulfill them.  PS, Vegas on

8     the 12th?

9     Q.  Does Mr. Kukushkin write that before or after he states

10    "our contributions are kind of way too much"?

11    A.  After.

12    Q.  And does he refer to states in there?

13    A.  Yes.

14    Q.  Those states, Nevada, New York, New Jersey and Florida,

15    were any of them listed in the same contribution list that we

16    just reviewed?

17    A.  Yes.

18         MR. SCOTTEN:  If we could now scroll down to rows 8

19    and 9.

20    Q.  Can I ask you to read what Fruman wrote?

21    A.  Andryuka, read the correspondence, bro.

22         Then we have a second message:  We have time until

23    November 6.  After that, it's over.

24         MR. SCOTTEN:  And can we please now go back to

25    Government Exhibit 58, the chat between just Fruman and

LAETPAR4                         Casola - direct

1   Kukushkin on page 7.  Can we zoom in on row 84.

2   Q.  What type of file is this?

3   A.  It's an image file.

4          MR. SCOTTEN:  And Ms. Drescher, could we please

5   publish that.

6   Q.  And just in general terms, do you recognize what we're

7   looking at here?

8   A.  Yes.

9   Q.  What is it?

10  A.  Screen shot of a conversation.

11  Q.  And when you say a screen shot, a screen shot from where?

12  A.  From WhatsApp.

13  Q.  And if we could please now go to the --

14         Actually before we do that, do you recognize what is

15  in the top left corner?

16  A.  Yes.

17  Q.  What is that?

18  A.  A contact icon.

19  Q.  What is a contact icon?

20  A.  It's an image that any time you're having a communication

21  with a particular individual, you will see that image if it's

22  assigned to them.

23  Q.  And who here are the communications with, according to this

24  exhibit?

25  A.  Muraviev.

1          MR. SCOTTEN:  Ms. Drescher, please show page -- sorry,

2    can we please now put up stipulation S13, which I believe is

3    already in evidence.  And go down to page 4.  I think I have

4    gotten the wrong stipulation.  I think we want S14.

5          Again, this is the stipulation that the government

6    exhibits listed below are true and correct copies of

7    communications, documents, images, linked websites and

8    recordings lawfully obtained from an iPhone belonging to Andrey

9    Kukushkin.

10          Please scroll down until we see 1212.

11          Ms. Drescher, please display Government Exhibit 1212.

12    Zoom in on the whole text, the whole sort of box.

13    BY MR. SCOTTEN:

14    Q.  Agent Casola, what are we looking at here?

15    A.  This is a contact card for Muraviev.

16    Q.  What is a contact card?

17    A.  It's a way in your phone you can see phone number, email

18    address, physical address for your contacts.

19    Q.  And what is the picture in the top left?

20    A.  That is the icon that I was speaking about.

21    Q.  For who?

22    A.  For Muraviev.

23    Q.  This is the contact card in Andrey Kukushkin's phone for

24    Muraviev.  When would Andrey Kukushkin see that picture?

25    A.  Anytime he had any communication with Muraviev.

1          MR. SCOTTEN:  Could we zoom in just on the picture so

2     it could be seen?

3          Please now go back to Government Exhibit 58A4, but

4     let's do the translated version now.

5     Q.  Can I please ask you to read just the last two bubbles at

6     the bottom.

7     A.  Andryuka, don't disappoint with the money, brother,

8     transfer it tomorrow.  You could do a credit agreement just

9     like the last amount in order not to torment the banks.  We

10    don't have a day's worth of time to stall anymore.

11         MR. SCOTTEN:  Please go back to the summary charts,

12    page 15.

13    Q.  And is there anything on this chart that we haven't already

14    discussed in the context of going through these exhibits?

15         Not the chart, the page, sorry.

16    A.  No.

17    Q.  Please go to the next page.

18         Agent Casola, could you read the from, to and explain

19    the detail of the first line.

20    A.  From Kukushkin to Muraviev and Mikhalev:  SIG contribution

21    list, attaching Strategic Investment Group, Inc. state campaign

22    contributions tables.  Then under the attachment of that

23    document the message reads:  We need to quickly decide what our

24    moves are going to be, friends.

25    Q.  What is the to, from and detail in the second line?

1    A.  From Kukushkin to Fruman:  I spoke with Sanya, he is

2    waiting for approval from Andrey regarding transfer.  I

3    confirmed the agreements and explained the situation once more.

4    How is Washington?

5    Q.  How much later is the next entry?

6    A.  One minute.

7    Q.  And who writes it and what does he say?

8    A.  Fruman sends a message to Kukushkin:  Everything is great.

9    We are taking over the country.

10   Q.  Would you please read the to, from and detail the next

11   line?

12   A.  From Parnas for Muraviev, Kukushkin, Fruman and Vulis

13   attaching a picture of Parnas with Jared Kushner and Ivanka

14   Trump.

15          MR. SCOTTEN:  Please publish that image.

16          Now go back to page 16 of the summary chart.

17   Q.  Agent Casola, what is the to, from and detail in the next

18   line?

19   A.  It's from Kukushkin to Fruman:  I'm waiting for

20   confirmation from Andrey/Sasha.

21   Q.  In your testimony today, Agent Casola, have you reviewed

22   any WhatsApp chats involving Kukushkin and two people using the

23   names Andrey and Sasha?

24   A.  Yes.

25   Q.  Who were they?

LAETPAR4                        Casola - direct

1    A.   Muraviev and Mikhalev.

2    Q.   For the next two lines, 2:03 and 2:07, is there any

3    difference in the detail?

4    A.   No.

5    Q.   So who sends them and to who?

6    A.   Kukushkin sends the message to both Fruman and Parnas

7    separately.

8    Q.   Could I ask you to read the message he sent to both of

9    them.

10   A.   The money from Sasha will be sent tomorrow.  It's probably

11   correct that it goes straight to our new company.

12   Q.   And what is the from, to and detail of the next line?

13   A.   Fruman sends a message to Kukushkin:  I spoke with Andrey,

14   it is better to use the old scheme to avoid problems later.

15   Q.   And what government exhibit is that in?

16   A.   Government Exhibit 58.

17            MR. SCOTTEN:  Ms. Drescher, please go back to that

18   exhibit again, now on the last page, last two rows.

19   Q.   Agent Casola, do you see Fruman's message about using the

20   old scheme here?

21   A.   Yes.

22   Q.   Is there any reply from Kukushkin?

23   A.   He said okay.

24            MR. SCOTTEN:  And if we could, please, now go back to

25   page 16 of the summary chart.

LAETPAR4                           Casola - direct

1   Q.   What are the to, from and details of the last line?

2   A.   It's from Mikhalev to Steven Fruman:  Hi Steven, I need to

3   send you the second tranche.  Should I use the same company as

4   a borrower?

5   Q.   Have we discussed Steven Fruman before today?

6   A.   Yes.

7   Q.   Can you remind the jury who he is?

8   A.   He is the brother of Igor Fruman.

9   Q.   And what is the exhibit referenced for that last row there?

10  A.   Government Exhibit 48.

11          MR. SCOTTEN:  Could we please go to that exhibit,

12  Ms. Drescher.

13  Q.   Before we zoom in, I want to ask you:  In what context did

14  we discuss Steven Fruman before?

15  A.   He signed the loan document from before.

16  Q.   The September loan document?

17  A.   Yes.

18  Q.   Then if we zoom in on this and I could ask you what type of

19  exhibit we're looking at.

20  A.   This is a WhatsApp communication between Mikhalev and

21  Steven Fruman.

22  Q.   What is the date range?

23  A.   September 9 -- excuse me, September 17, 2018 to October 17,

24  2018.

25  Q.   And looking at the first eleven rows, what month are they

LAETPAR4                          Casola - direct

1   from?

2   A.   September.

3   Q.   And looking at row 8, is there a date?

4   A.   September 17, 2018.

5   Q.   And is there a dollar amount in that message?

6   A.   Yes.

7   Q.   And earlier in your testimony, have we seen any references

8   to $500,000?

9   A.   Yes.

10  Q.   Where?

11  A.   In the same that we just discussed.

12  Q.   Now looking at rows 12 through 14, what is the date in

13  those rows?

14  A.   October 11.

15  Q.   And are those the same October 11 messages we were just

16  looking at in the summary chart?

17  A.   Yes.

18  Q.   Can I ask you to read the sender and message for the next

19  two rows.

20  A.   From Fruman, Steve Fruman:  Hi, yes.

21       Mikhalev says:  Okay, I will send you a contract

22  during today.

23       Then Steve Fruman responds:  Hi.  Did you send it?

24  Q.   Now scrolling down until we get to rows 24 to 26, Agent

25  Casola, could I ask you to read the sender and message for

LAETPAR4                         Casola - direct

1    those three?

2    A.   From Mikhalev:  Could you please sign this contract and

3    send scanned copy back?  Mikhalev then says:  NIL loan AGR,

4    which is a PDF document, and Steve Fruman attaches document

5    October 15, 2018, 10/32, which is a PDF.

6              MR. SCOTTEN:  And Ms. Drescher, please pull up the

7    document in the last row, Government Exhibit 48A26, and blow up

8    the first third.

9    Q.   Agent Casola, does this loan agreement name the lender?

10   A.   Nilder Investments Limited.

11             MR. SCOTTEN:  Please display stipulation S5, which is

12   already in evidence.

13             I will read the operative portion again:  Intellect

14   Capital Cyprus Limited and Nilder Investments Limited are

15   companies owned by Andrey Muraviev.

16             Go back to the loan agreement, please.

17   Q.   Does this loan agreement name the borrower?

18   A.   Yes.

19   Q.   What is the borrower?

20   A.   FD Import & Export Corp.

21   Q.   In the middle section here, do you see bank account

22   information for the borrower?

23   A.   Yes.

24   Q.   How does it compare to the borrower's bank account in the

25   first loan agreement that we saw?

1    A.  It's the same.

2              MR. SCOTTEN:  Ms. Drescher, could we put up that first

3    agreement, which I think is 48A5, side by side with the one

4    we're looking at now.

5    Q.  Agent Casola, before your testimony today, did you compare

6    these two agreements?

7    A.  I did.

8    Q.  And what difference, if any, did you note?

9    A.  The dates of the agreement at the top are different.  The

10   borrower is -- excuse me, the lender is different in both of

11   the agreements.  Therefore, the lender's bank account is also

12   different in the agreements.  And the signatories contain one

13   distinguishing signer.

14   Q.  According to the stipulation we were just looking at, who

15   owned both lenders?

16   A.  Muraviev.

17   Q.  Does Andrey Muraviev's name appear in either document?

18   A.  No.

19   Q.  Please go back to Government Exhibit 48, the chat between

20   Mikhalev and Fruman, and if I could ask you to -- Agent Casola,

21   if you could read the last two rows, 30 and 31.

22             Not the last two rows, I misled the witness, rows 30

23   and 31.

24   A.  Mikhalev:  Hi, Steven, did you get the money?

25             Steven Fruman responds:  Hi, sorry I didn't respond

1  yesterday.  Yes, received yesterday.

2  Q.  What is the date there?

3  A.  October 17, 2018.

4  Q.  So at this point, have we actually gone past the dates in

5  the last page of the summary chart we were looking at?

6  A.  We have.

7  Q.  Let's go back to that page, that's page 16, and if we could

8  now please turn the page.

9        Agent Casola, for the first line, how many exhibits is

10  it based on?

11  A.  Two.

12  Q.  So can you explain which content comes from which exhibit?

13  A.  The link to the Fox Business story is contained in both

14  exhibits, and when you see the first set parenthesis, that

15  comes from Government Exhibit 61 and -- excuse me, quotations,

16  and the second set of quotations comes from Government

17  Exhibit 64.

18  Q.  And who is the author of both similar chats?

19  A.  Parnas.

20  Q.  Now for the next two lines between Mikhalev and Steven

21  Fruman, did we just discuss those?

22  A.  Yes.

23  Q.  In that case, I'm going to ask you to read the to, from and

24  detail for the next three lines after that.

25  A.  From Kukushkin to Fruman:  And what do we have in Vegas?

1          Fruman responds to Kukushkin:  Meeting with the

2     governor and prosecutor.  We're now trying to coordinate for

3     Saturday.  The press will be in Elko.

4          Parnas then sends a message to Deanna Van Rensburg:

5     Please find out from Kukushkin if he received an email

6     confirming his VIP entrance to the event tomorrow.

7     Q.  For the last two lines, what exhibit do they come from?

8     A.  Government Exhibit 73.

9          MR. SCOTTEN:  Ms. Drescher, please go to Government

10    Exhibit 73.

11    Q.  Starting at the top, what type of exhibit are we looking

12    at.

13    A.  Record of iMessages between Kukushkin and Deanna

14    Van Rensburg.

15    Q.  What are iMessages?

16    A.  Just messages -- if both users have an iPhone, that's how

17    the message would be sent.

18    Q.  It would be a text if you didn't have the same phone?

19    A.  Yes.

20    Q.  And what is the from and message in the first line?

21    A.  It is from Van Rensburg and it says:  Hi, did you receive

22    an email confirming your VIP entrance to the event tomorrow?

23    Q.  Is there a response from Kukushkin?

24    A.  Yes.

25    Q.  What does he send?

1    A.  He attaches a file.

2              MR. SCOTTEN:  Ms. Drescher, please publish that image,

3    73A2.

4    Q.  And Agent Casola, could I ask you to read the first line.

5    A.  Dear Andrey, congratulations.  You are registered as a VIP

6    to attend President Trump rally in Elko, Nevada.

7    Q.  And if we could now return to the summary charts.  And the

8    same question I ask:  Have we covered everything on this page?

9    A.  Yes.

10   Q.  Please go to page 18.

11             Agent Casola, what is the first entry here?

12   A.  Record of a phone call from Parnas to Kukushkin that lasted

13   for 43 seconds.

14   Q.  And for the next three lines, what exhibit are they from?

15   A.  Government Exhibit 74.

16   Q.  Can we please go to Exhibit 74.

17             Let's look at the top of the page.  What type of

18   exhibit is it?

19   A.  WhatsApp communications.

20   Q.  Between who?

21   A.  Muraviev, Parnas, Fruman and Kukushkin.

22   Q.  And scroll down.

23             Who sent the first chat in this exhibit?

24   A.  Parnas.

25   Q.  What type of chat is it?

1    A.  It's an image file.

2           MR. SCOTTEN:  Can we please publish what Parnas sent

3    GX74A1.

4    Q.  Agent Casola, do you recognize any of the individuals in

5    this picture?

6    A.  I do.

7    Q.  Who are they?

8    A.  In the middle is Wes Duncan and on the right is Kukushkin.

9    Q.  If we could go back to the chat, please.

10          Agent Casola, who sent the next two lines?

11   A.  Kukushkin.

12   Q.  And what type are they?

13   A.  Both image files.

14          MR. SCOTTEN:  Ms. Drescher, could we put them up

15   together, 74A2 and A3.

16   Q.  Agent Casola, do you recognize anyone in these pictures?

17   A.  I do.

18   Q.  Who do you recognize?

19   A.  Starting on the left, Igor Fruman, Kukushkin, and then

20   again Kukushkin and Parnas.

21   Q.  And can you read the sticker on Kukushkin's jacket?

22   A.  Laxalt, vote governor, protect Nevada.

23          MR. SCOTTEN:  Ms. Drescher, can we go back to the chat

24   again.

25   Q.  Is there a reply after Kukushkin sends these two messages?

LAETPAR4                    Casola – direct

1   A.  Yes.

2   Q.  What is it?

3   A.  Muraviev sends a strong emoji.

4   Q.  Now for the rows 5 to 11, what type of files are we looking

5   at?

6   A.  Those are all image files.

7   Q.  And who sends them?

8   A.  Fruman sends 5 to 9 and Kukushkin sends 10 and 11.

9           MR. SCOTTEN:  Ms. Drescher, please publish those one

10  at a time.  Pause for a second on each and then please stop at

11  A10.

12  Q.  Agent Casola, do you recognize the men in this picture?

13  A.  Yes.

14  Q.  Who are they?

15  A.  On the left is Parnas and on the right is Fruman.

16  Q.  Can you read their sign?

17  A.  Get out and vote.

18          MR. SCOTTEN:  Your Honor, the government offers

19  stipulation S15.

20          THE COURT:  Received.

21          (Government's Exhibit S15 received in evidence)

22          MR. SCOTTEN:  If we could please publish that.

23  Q.  Agent Casola, I ask you to read the single bold line.

24  A.  There is no record of Lev Parnas voting in the 2018

25  election or any prior election.

LAETPAR4                        Casola - direct

1      MR. SCOTTEN:  If we could please turn to page 18 of

2   the summary chart.

3   Q.  What is the from, to and detail -- sorry, from, to, detail

4   and exhibit for the line at the time 1:55 p.m.?

5   A.  From Parnas to Kukushkin with a picture of Parnas and

6   Kukushkin together at an outdoor event.  And that is from

7   Government Exhibit 66.

8      MR. SCOTTEN:  Please show that picture quickly.  I

9   think it's Government Exhibit 66A2, Ms. Drescher.

10      We can go back to the summary chart, still on page 18.

11   Q.  What is the from, to and detail for the next line?

12   A.  From Kukushkin to Muraviev and Mikhalev and there are

13   pictures of Kukushkin, Parnas and Fruman at outdoor event.

14      Picture of Kukushkin, Wes Duncan and police chief at

15   an outdoor event with the message the new attorney general is

16   in the middle, and there's a video of Donald Trump speaking at

17   an outdoor event.

18      MR. SCOTTEN:  Please publish the pictures 75A1 through

19   4 and stop when we get to 4.

20   Q.  Who is, in fact, in the middle in this picture?

21   A.  Wes Duncan.

22      MR. SCOTTEN:  Could we please go back to page 18 of

23   the summary chart.

24   Q.  What is the last entry here on this chart?

25   A.  It's a message from Fruman to Parnas, Kukushkin and

LAETPAR4                            Casola - direct

1   Muraviev with a picture of Parnas, Kukushkin and Fruman

2   together indoors.

3   Q.  What is the time difference between this entry and the one

4   above it?

5   A.  Five hours.

6           MR. SCOTTEN:  Please display that picture, I think

7   it's 61A18.

8           I think we can return to the summary charts and go to

9   the next page.

10  Q.  Agent Casola, what is the to, from and detail of the first

11  three lines?

12  A.  From Duncan to Parnas, confirmation of the scheduled

13  meeting with Wes Duncan and Duncan's law partner.

14          And message from Kukushkin to Parnas:  I am coming to

15  you in 15 minutes.

16          Then Kukushkin sends a message to Muraviev and

17  Mikhalev:  I have met with an attorney referred by the attorney

18  general.  Currently Las Vegas does not accept any more

19  applications.  With the help of our new friends, we should get

20  a guaranteed response before mid-December.

21  Q.  And the quotations there around "new friends," is that from

22  the chart or is that in the original text by Kukushkin?

23  A.  That's in the original text.

24  Q.  For the next four entries all dated October 23, what

25  exhibit are they from?

LAETPAR4                          Casola - direct

1  A.  Government Exhibit 78.

2            MR. SCOTTEN:  Ms. Drescher, please pull that exhibit

3  up.

4  Q.  And Agent Casola, generally, what is this exhibit?

5  A.  WhatsApp communications.

6  Q.  Between who?

7  A.  Muraviev and Kukushkin.

8            MR. SCOTTEN:  And can we please scroll down to see the

9  first chat.

10  Q.  Can I ask you to read the from and the translation.

11  A.  Muraviev says:  Send a picture here.

12  Q.  Is there a response from Kukushkin?

13  A.  Yes, he attaches an image file.

14            MR. SCOTTEN:  Could we please pull that up.  It's

15  78A2, Ms. Drescher.

16            If we could please go back to the chat.  And I'm going

17  to ask -- we're going to go down a bit.

18  Q.  I ask Agent Casola to read line 7 to 10.

19  A.  Muraviev asks:  Who is in the uniform?

20            Kukushkin responds:  His local cop.

21            Muraviev asks:  And with the attorney himself?

22            Kukushkin responds:  They control the whole state

23  police, just in case.  Smile emoji.

24            MR. SCOTTEN:  If you could scroll down enough to

25  capture 11 through 14, that would be great.

1   Q.  What is the next entry, row 11?

2   A.  Kukushkin attaching an image file.

3           MR. SCOTTEN:  Can we put that image file up next to

4   this so we could see both the chat and image file.

5   Q.  Can I ask you to please read those final messages.

6   A.  Kukushkin asks:  Have you seen my hat?  Smiling emoji.

7           Muraviev responds:  What's on it?

8           And Kukushkin says:  Make Our Farmers Great Again.

9           MR. SCOTTEN:  Your Honor, I would like to now offer

10  stipulation S3.

11          THE COURT:  Received.

12          (Government's Exhibit S3 received in evidence)

13          MR. SCOTTEN:  Please publish it.

14  Q.  Agent Casola, please read the bold text.

15  A.  Andrey Kukushkin is not registered to vote and there is no

16  record of him having ever voted.

17          MR. SCOTTEN:  Return to the summary charts, page 19.

18  Q.  Agent Casola, have we covered everything on this page?

19  A.  Yes.

20          MR. SCOTTEN:  Could we please go to page 20.

21  Q.  Agent Casola, what is the to, from and detail on the first

22  entry on this page?

23  A.  From Kukushkin to Correia:  I am on line.  Daniel Stewart

24  is waiting for us to conference.

25  Q.  What is the time difference before the next entry?

1    A.   Approximately an hour.

2    Q.   And what is the to, from and detail for that entry?

3    A.   It's from Kukushkin and to Parnas:  It doesn't look good

4    from what I hear and Daniel's comments.  If we don't get prime

5    locations within two to six months, we are out of the game for

6    a long time.

7    Q.   How does that compare to the message right below it?

8    A.   It's the same in substance.

9    Q.   Does the bottom one contain additional content?

10   A.   Yes.

11   Q.   What exhibit is it from?

12   A.   Government Exhibit 81.

13            MR. SCOTTEN:  Ms. Drescher, please pull up Government

14   Exhibit 81.

15   Q.   Starting at the top, who are the parties to this chat?

16   A.   Muraviev, Parnas, Fruman and Kukushkin.

17            MR. SCOTTEN:  Could you zoom in on the top of the

18   chats.

19   Q.   I'm going to ask -- let's start on row 2.

20            Agent Casola, could you please read what Kukushkin

21   wrote in row 2?

22   A.   If we don't get prime locations within two to six months,

23   we are out of the game for a long time.

24   Q.   And if we could scroll down so we could also see row 4.

25            Again, could you read what Kukushkin wrote?

1    A.  The changes must come from the state.  Otherwise, the

2    oversubscribed amount of applications are already in and only

3    80 will be given out for years to come this December.  We are

4    not included as much as we would like to be, and each county

5    has its quota fully taken.  We are two months too late to the

6    game unless we change the rules.

7    Q.  And if we now go to row 8.  I ask you to read what

8    Kukushkin wrote to Parnas, Muraviev and Fruman here.

9    A.  We need governor's approval and green light to implement

10   this with December licenses awards and to include us in per

11   plan.  Now is the time.  It's another 20 licenses reserved for

12   specific state experiment.  We should call them temporary

13   licenses which will go into full effect once the property is

14   located and proper use is established.  It's important to lock

15   those licenses now and then find prime real estate in every

16   town.  Counties can't say shit against veterans, not now, not

17   ever.

18   Q.  And do you see in the first line where it refers to the

19   governor?

20   A.  Yes.

21   Q.  In your testimony today, have we heard reference to any

22   candidate for Nevada's governorship in 2018?

23   A.  Yes.

24   Q.  Who?

25   A.  Adam Laxalt.

1          MR. SCOTTEN:  Please zoom in on row 10, which I think
2    starts at the bottom of page 2 and continues on to 3.
3          I think that will capture enough for now.
4    Q.  Could I ask you to read the first two full sentences on
5    page 3.
6    A.  There's a lot of work, but now it's -- lion emoji -- Lev's
7    turn.  This is what we want.  All the counties supporting
8    Republicans have at least to ask the governor, by the way of
9    requesting licenses quotas, and he will approve it for our
10   particular group in the frame of a program for veterans.
11   Q.  Agent Casola, can you read row 15?
12         Who wrote row 15?
13   A.  Kukushkin.
14   Q.  Read it now, please.
15   A.  Together with lawyers, we have to write something beautiful
16   and, together with the attorney general, help the current
17   governor establish, leave a legacy at the end while leaving his
18   post to his successor.  We are ready to help at the end with
19   dollar sign but we do need some specifics.
20   Q.  In your testimony today, have we seen Kukushkin referred to
21   by anyone as Nevada's future attorney general?
22   A.  Yes.
23   Q.  Who is that?
24   A.  Wes Duncan.
25   Q.  And what day are we on now?

1    A.  October 25, 2018.

2    Q.  So have the exhibits again gone past the last page of the

3    summary charts we were looking at?

4    A.  Yes.

5    Q.  If we could go back to page 20 of the summary charts where

6    we were, and if we could turn to the next page.

7            Agent Casola, have we already covered any of the

8    entries on this page?

9    A.  Yes.

10   Q.  Which one?

11           Just the first one?

12   A.  The first one.

13   Q.  Then if I could ask you to read the from, to and detail of

14   the second line.

15   A.  From Kukushkin to Correia:  They know we need to change the

16   rules from the top but only after the elections.  This is our

17   only chance.

18   Q.  And what exhibits are the next two lines from?

19   A.  Government Exhibit 82.

20           MR. SCOTTEN:  Ms. Drescher, could we please see that

21   exhibit.

22   Q.  Agent Casola, who is this chat between?

23   A.  Fruman, Igor Fruman and Kukushkin.

24   Q.  And who sends the first seven chats?

25   A.  Igor Fruman.

1    Q.  So can I just ask you to read the first seven chats?

2    A.  I spoke with Andrey, we have to resolve what we are adding

3    regarding our program.  We are flying out on Friday.  We think

4    two million.  If there is such a possibility, it would be

5    really correct and timely.  Pennsylvania, New Jersey, new

6    hemisphere, West Virginia, South Carolina, Florida, Texas,

7    Arizona, Ohio, California, Nevada, Montana.  The decision has

8    to be made today.

9    Q.  Is there a response?

10   A.  Yes.

11   Q.  And who is it from?

12   A.  Kukushkin.

13   Q.  What does he say?

14   A.  Concentrate on the states where we have already poured the

15   money and let's stick to the one million dollar budget and to

16   meet with all the key people.  I am ready to fly out when there

17   is a clear schedule of meetings and discussions.

18   Q.  If we go back to page 21 of the summary charts, please.

19           Agent Casola, could I ask you to read the from, to and

20   detail of the next two lines, 3:09 and 3:12.

21   A.  From Van Rensburg to Kukushkin:  Hey Andrey, can you tell

22   me when Adam Laxalt's team can expect the two checks totaling

23   $12,500?

24           Kukushkin responds to Van Rensburg:  Hi Deanna, the

25   money was transferred, approximately one million dollar, to Lev

LAETPAR4                         Casola – direct

1    and Igor's company a long time ago to cover all the

2    contributions as planned.

3    Q.   Then for the next three, can I ask you to just say who

4    wrote each to who and the detail?

5    A.   From Fruman to Kukushkin:  Andrey, what kind of mushroom

6    did you eat today?  What are all these discussions with our

7    secretary?

8              Kukushkin responds to Fruman:  Did you all lose your

9    minds there?  And sends a screen shot of the text that I just

10   read that he had with Van Rensburg.

11             Fruman then responds to Kukushkin:  She is my

12   secretary and travel and event coordinations manager.  Have

13   nothing to do with many situations.

14             MR. SCOTTEN:  Ms. Drescher, please go to the next

15   page.

16   Q.   Agent Casola, what exhibit are the next four lines taken

17   from?

18   A.   Government Exhibit 83.

19   Q.   Can we please go to Government Exhibit 83.

20             Starting at the top, Agent Casola, what type of

21   exhibit is it?

22   A.   WhatsApp communications.

23   Q.   Between who?

24   A.   Muraviev, Parnas, Fruman and Kukushkin.

25   Q.   Scrolling down to the first row, who is it from?

1    A.  Parnas.

2    Q.  And it's a little lengthy, but could I ask you to please

3    read it.

4    A.  Hi guys, I hope everybody is good.  I just got off the

5    phone with Igor and he's explained to me the situation.  It's

6    very disturbing after all our talks and meetings that we are

7    still nowhere in our understandings.  After spending time in

8    Las Vegas with Andreya and Igor, I realized that this is not

9    what I signed up for.  The business plan Andreya explained to

10   us.  Igor convinced me to continue because he said he spoke

11   with Andreya M. and he's on the same page.  At this time I

12   would like to stop this partnership and meet to discuss how we

13   can move forward.  This is not personal.  I like everybody very

14   much and love to hang out, but this is very serious business,

15   as I explained when we met in Vegas.  Please let me know when

16   we can schedule a meeting to discuss.  Thank you and have a

17   great day.

18            MR. SCOTTEN:  Please scroll down to row 2.

19   Q.  Who is it from?

20   A.  Muraviev.

21   Q.  Could I ask you to please read what Muraviev writes to

22   Parnas.

23   A.  Hi Lyova.  In Vegas we agreed upon the principles of our

24   cooperation and shared future as well as movement strategy.  It

25   was decided that I will provide one million dollars for our

1   future enterprises, 500 Nevada, California, and 500 New York,

2   New Jersey.  As of today, I fulfilled all my obligations

3   completely.  Then we're supposed to work on obtaining licenses

4   at these dates.  If our company is registered, then we have to

5   move to Part II, the filing of applications.  Yesterday, Igor

6   told me that two more million needed to be allocated for other

7   states.  It was not in our agreement, and if conditions change,

8   then I have no objections against the termination of our

9   partnership.  I plan to be in the United States after

10  November 15 and I am ready to meet.

11  Q.  Going down, who writes next?

12  A.  Parnas.

13  Q.  Could I ask to read his first sentence.

14  A.  Thanks for your quick response, my brother.  I don't want

15  to discuss everything over text.  When we meet in Vegas.  I

16  agree I also thought we are on the same page, and yes, you sent

17  what we discussed for Part I.  The two million that Igor spoke

18  with you was a suggestion, not a deal changer.

19  Q.  And now if we could please scroll down to row 4.

20       Who is this from?

21  A.  Kukushkin.

22  Q.  And could I ask you to read what Kukushkin wrote.

23  A.  Good day, everybody.  I believe we all have a clarity from

24  day one and a precise course of action.  We have performed

25  everything that we have agreed upon on our end.  The Nevada

1    company has been formed, the operating agreement signed, and

2    the bank account opened.  Money transferred by Andrey M. to

3    Global Energy was to support the very specific people and

4    states per Igor's table in order to obtain green light for

5    licensing.  I haven't changed any rules of our engagement and

6    was present at all our scheduled meetings with officials in

7    Nevada.  You perfectly know that the ball is in your court to

8    continue with planned licensing.  Looking forward to a

9    conference call with everybody to clear the air and coordinate

10   work accordingly.  Thanks.

11   Q.  Did you read a reference in there to Igor's table?

12   A.  Yes.

13   Q.  In your testimony this morning, have we seen any reference

14   to Igor Fruman sending a table to this group?

15   A.  Yes.

16         MR. SCOTTEN:  If we could show the witness 61A5.

17   Q.  How does this compare to the table we saw Igor Fruman send

18   this group?

19   A.  That is the table he sent.

20         MR. SCOTTEN:  Please show the jury.

21         Your Honor, I see it's a couple minutes past 1:00.

22         THE COURT:  Yes, why don't we break for lunch.  It's

23   1:01, we'll start back at 2:00.

24         Ladies and gentlemen, you're still not deliberating.

25   We have lunch for you in the jury room.  Please leave your

LAECpar5                         Casola - direct

1    notepads on the chairs, don't discuss the case, and we'll see

2    you at 2:00.

3              Have a good lunch, everybody.

4              (Jury not present)

5              THE COURT:  We'll see you all at 2:00.  Have a good

6    lunch.

7              (Luncheon recess taken)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       AFTERNOON SESSION

 2            (Jury not present)

 3            (Witness not present)

 4            THE COURT:  Good afternoon, everyone.  Sorry we're a

 5   little late, the jurors' lunch arrived a little bit late, so

 6   they should be ready now.

 7            Did you want to address anything before?

 8            MR. BONDY:  One thing.  We had neglected, I think it's

 9   important to ask for a limiting instruction on Government

10   Exhibit 90-A-1, which is the FEC complaint.  It's a complaint,

11   it's a bunch of allegations and I would ask that the jury be

12   instructed that that's what it is.

13            MR. SCOTTEN:  No objection.

14            THE COURT:  Remind me, that was --

15            MR. BONDY:  I have it as 90-A-1, the Federal Election

16   Commission complaint.  That was the document sent by Mr. Parnas

17   to Mr. Correia the day that it had been filed.

18            MR. LEFCOURT:  Your Honor, only as against Mr. Parnas.

19            MR. BONDY:  Correct.

20            THE COURT:  Thank you.  I will give that instruction.

21            MR. SCOTTEN:  Although, again, not only as against

22   Mr. Parnas, but this is all to effect on Mr. Parnas's state of

23   mind.

24            THE COURT:  I think that will be clear.

25            Anything else?
```

1          MR. SCOTTEN:  Yes.  Two quick things that I think will

2     sort of abbreviate possible objections.

3          One, I hope -- I think I've done a good job of not

4     asking Special Agent Casola to make any inferences, and I think

5     the defendants could have objected if I had.  So I don't think

6     the cross examination should ask Agent Casola to draw any

7     inferences either.  It's by definition not what a summary

8     witnesses is allowed to do.  I don't want them doing, oh, you

9     can or cannot infer this from these two pieces of evidence.  So

10    if that comes up, I would just say it calls for an inference.

11    I would hope it would be sustained, but at least the Court will

12    know what I'm talking about.

13          THE COURT:  Yes.

14          MR. SCOTTEN:  And the second one was to the extent the

15    defendants are inclined to go back to exhibits that have been

16    offered -- we assume no new exhibits are coming in since that's

17    already been ruled on by the Court, but to the extent they go

18    back to what's in evidence and have Agent Casola read some

19    other portion, we just ask it not be done in a "the government

20    didn't show you this" kind of way, because obviously nobody

21    wanted me to have him read every part of every exhibit.  They

22    highlight something they think is important to them, we just

23    don't want the question to imply some ill motive on the

24    government's for not having read it on direct.

25          THE COURT:  Would you like to respond?

1           MR. BONDY:  I'd like to ask --

2           THE COURT:  Please remain seated and speak into the

3     mic.

4           MR. BONDY:  So sorry, your Honor.

5           THE COURT:  It's hard to get used to it, but we're

6     masked.  We really just need to remain seated and speak into

7     the microphone.

8           MR. BONDY:  I'm not going to ask that.  I do think I

9     can note, based on what the agent has said with his 12,400

10    some-odd documents that were at issue, and we have about 20

11    pages.  I calculated it.  I think we have .001667 percent of

12    all of the material has been put into this summary.  I would

13    like to adduce that from him.  I think it's been put into the

14    record, the number of documents or pages, and then the quantum

15    of the number of pages that are in the summary chart.

16          MR. SCOTTEN:  So the question is are 25 pages a very

17    small percentage of 20,000 pages?  I don't think that's

18    relevant and it's potentially confusing.  The whole point of a

19    summary witness is not to have the jury read 20,000 pages, and

20    that is not a vice or rather a virtue of his testimony.

21          So to the extent the point is to imply, you're missing

22    the big picture, jury, that would be inappropriate.  I think

23    it's fine if he wants to read what I said, like this is not

24    everything, but any connotation that not giving the jury

25    everything is misleading or incomplete sort of defeats the

LAECpar5                        Casola - direct

1    whole purpose of a summary witness, which is to save everybody

2    time, and nobody would have been happy if I just read exhibits

3    for two weeks.

4              THE COURT:  I don't think there is any problem reading

5    the percentage.  It is what it is.  It's sort of a fact that's

6    already before the jury.  I don't have any problem with that.

7              Anything else?  The witness will come up.  All right,

8    we'll bring in the jury.

9              When Mr. Hampton was bringing lunch, the jury did ask

10   how many witnesses were left.  He didn't respond because he

11   doesn't respond to questions like that, but I thought I should

12   pass it along.  I'm not in the habit of --

13             MR. LEFCOURT:  I'm sorry, I didn't hear you.

14             THE COURT:  One of the jurors asked Mr. Hampton how

15   many witnesses are left.  So you can use that as you will.  I

16   just thought it's relevant information or not, but I'm not in

17   the habit of telling them there is X witnesses left because it

18   can be misleading and confusing because there are shorter

19   witnesses, longer witnesses.  So, FYI.

20             (Continued on next page)

21

22

23

24

25

LAECpar5                        Casola - direct

 1                (Witness present)

 2                (Jury present)

 3                THE COURT:  You can be seated.  Good afternoon, ladies

 4     and gentlemen.  We're continuing with the direct testimony of

 5     the witness.  Mr. Scotten.

 6                MR. SCOTTEN:  Thank you, your Honor.

 7                Ms. Drescher, can we please put back up Government

 8     Exhibit 83, which is I think where we were when we went to

 9     lunch.  I think we were perhaps on row 8.

10                I wrote this down wrong.  Give us one second and I

11     will catch us up.  Row 4.

12     BY MR. SCOTTEN:

13     Q.  Agent Casola, was this the chat from Kukushkin with the

14     reference to Igor's table that we discussed right before the

15     lunch break?

16     A.  Yes.

17     Q.  And then if we can now go -- really, you can see it here.

18     What is the next entry in the table?

19     A.  A message from Fruman attaching an image.

20     Q.  What does Fruman write a minute after that?

21     A.  Just reminding everybody what we agreed on.

22                MR. SCOTTEN:  Ms. Drescher, could we please pull up

23     that image.  Let's do the translated version of that image,

24     83-A-5-T.

25     Q.  What are we looking at?

1    A.   This is a screenshot of a WhatsApp message.

2    Q.   With who?

3    A.   Muraviev.

4    Q.   I'm not going to ask you to read it because I'm going to

5    ask you, have we actually seen this previously in your

6    testimony?

7    A.   We have.

8    Q.   Do you remember when?

9    A.   No.

10   Q.   If you would just want to flip through your charts and take

11   a look at page 6 towards the bottom, maybe that will refresh

12   your recollection?

13   A.   Okay.

14   Q.   And so when did it first come up in your testimony?

15   A.   It occurred on September 10th and it was from Fruman to

16   Kukushkin and Parnas.

17             MR. SCOTTEN:  If we can now go back to Government

18   Exhibit 83 and scroll forward to rows 27 to 39.

19   Q.   Now, I'm not going to ask you to read these, but at a very

20   high level of generality, can you just summarize the topic of

21   these chats.

22   A.   Attempting to arrange a phone call.

23   Q.   And does the chat state whether a phone call actually

24   happened?

25   A.   No.

LAECpar5                     Casola - direct

1   Q.  What is the date and time of the last entry?

2   A.  October 31st, 2018, at 11:28 p.m.

3         MR. SCOTTEN:  Ms. Drescher, can we please return to

4   page 22 of the summary charts.

5   Q.  Agent Casola, can I ask you to read the white entry at

6   11:52 p.m., also on October 31st, 2018?

7   A.  From Kukushkin to Muraviev, Fruman is in touch and Leva is

8   in hiding somewhere.  Well, they understand everything, they

9   read and understood that we no longer sow and expect concrete

10  results from them.

11  Q.  Agent Casola, what are the last two lines on this chart?

12  A.  Two messages, individually both going to Fruman.  One from

13  the committee to electric Wes Duncan and one from Laxalt for

14  Nevada, both of which are receipts for $10,000 donations to

15  each one of those campaigns.

16        MR. SCOTTEN:  Ms. Drescher, can we please turn the

17  page.

18  Q.  Looking at this page, Agent Casola, what exhibit is the

19  source of all the information on this page?

20  A.  Government Exhibit 86.

21        MR. SCOTTEN:  Ms. Drescher, can we just pull up that

22  exhibit, please.

23  Q.  Starting at the top, what is it?

24  A.  A WhatsApp communication between Muraviev, Parnas, Fruman,

25  and Kukushkin.

LAECpar5                      Casola - direct

1        MR. SCOTTEN:  If we can scroll down.

2   Q.  Can you describe the file type of the first nine chats?

3   A.  Images.

4        MR. SCOTTEN:  Ms. Drescher, can we publish the first

5   of those pictures, Government Exhibit 86-A-1.

6   Q.  Agent Casola, do you recognize anyone in this picture?

7   A.  I do.

8   Q.  Who do you recognize?

9   A.  Parnas on the left and Rudolph Giuliani on the right.

10       MR. SCOTTEN:  Ms. Drescher, can we publish the

11  remaining eight pictures one at a time.  It's going to take us

12  to A-9.  If we can go back to the chat, 86.

13  Q.  In row 10, Agent Casola, do you see the chat immediately

14  following those pictures?

15  A.  I do.

16  Q.  And what is it?

17  A.  A message that Fruman sends.  We are flying to Michigan

18  from Indiana.

19  Q.  Is there a response?

20  A.  Muraviev sends a thumbs up emoji.

21       MR. SCOTTEN:  Ms. Drescher, can we jump forward a bit

22  to row 42.

23  Q.  Agent Casola, who are the persons speaking in the chats we

24  can see?

25  A.  Parnas and Kukushkin.

                MR. SCOTTEN:  With the Court's permission — there is

going to be a fair number of chats like this — I'd like to ask

Agent Casola to read what Parnas wrote and I'll read what

Kukushkin wrote until it stops being a dialogue.

                THE COURT:  Yes.

Q.  If you want to start with Mr. Parnas.

"Q.  Kunya, make sure you get Adam Laxalt the $12,500.  I was

very embarrassed just now.  They said they never received the

check from Oasis.  I don't understand.

"A.  Excuse me, Leva, the money where wired to Global Energy in

order to cover all the donations whatsoever.  What does this

have to do with Oasis.  You are the one issuing them the

checks, not me or Andre.  You should be embarrassed bringing it

up after all.

"Q.  Are you fucking crazy.  What are you talking about.  You

went to me and the BP and pledged $12,500 from Oasis.  I don't

want to play these games.  You are going to get everybody in

trouble.

"A.  From us, not Oasis.  Oasis doesn't do any business in

Vegas.

"Q.  You're fucking sick.  You don't remember what you say to

people.  This is the governor and attorney general.  He came up

to me and asked about the group he met, Oasis, and why they

didn't send a check.  I'm not going to argue with you.  You can

talk to Igor.

1    "A.  We were supposed to tell him that the checks from global

2    are indeed the donations from us.

3    "Q.  This is crazy and stupid shit.  I'm done.

4    "A.  You supposed to tell them, not me."

5    Q.  And then what type of files do we have after that?

6    A.  From 58 to 61 are image files sent by Fruman.

7         MR. SCOTTEN:  Ms. Drescher, can we please go back to

8    the summary charts, page 23.

9    Q.  Agent Casola, is there anything here that we didn't cover

10   in looking at that chat?

11   A.  No.

12        MR. SCOTTEN:  If we can please go to the next page.

13   Q.  In this page, do you see an entry for Election Day 2018?

14   A.  I do.

15   Q.  Other than that entry, what exhibit is the information here

16   from?

17   A.  Government Exhibit 86.

18   Q.  Is that the same chat we were just looking at?

19   A.  Yes.

20        MR. SCOTTEN:  Ms. Drescher, can we please go back to

21   Government Exhibit 86, now starting on November 4th, which I

22   believe is row 58.

23   Q.  At least from what you can see here, what type of files are

24   we looking at, Agent Casola?

25   A.  Image files.

1         MR. SCOTTEN:  Ms. Drescher, can we again go through

2    these images, I think it's going to be 58 through 74.

3    Q.  This time, Agent Casola, as Ms. Drescher pauses on each

4    one, can you just identify any people or places you recognize?

5    A.  Yes.  Daytona Beach International Airport.  DeSantis and

6    Giuliani.  Parnas, Giuliani, and DeSantis.  Giuliani.  Parnas

7    and Giuliani.  A flight map from Daytona Beach to Boca Raton.

8    Giuliani.  Parnas.  Giuliani.  Parnas.

9    Q.  Where is Parnas there?

10   A.  He is on the right of the picture, taking a picture.

11        Flight map of Boca Raton to Manchester, New Hampshire.

12   A location indicating Manchester, New Hampshire.  Giuliani and

13   Parnas.  Giuliani and Parnas.

14        MR. SCOTTEN:  Could we just play maybe the first 10

15   seconds so that we can see --

16        (Video played)

17   Q.  Who do you recognize here?

18   A.  From left to right, Fruman, Giuliani, and Parnas.

19        MR. BONDY:  Your Honor, can I ask to play the whole

20   video, please.

21        MR. SCOTTEN:  I didn't hear it.

22        THE COURT:  He asked to play the whole video.

23        MR. SCOTTEN:  The whole video is sort of a partisan

24   campaign message, including about foreign affairs.  I'm not

25   really sure it would be appropriate.  And it's three minutes

1   long.  I think maybe that would better come in in the defense

2   case, if at all.

3          MR. BONDY:  I'm sorry, what was the last phrase?  I

4   didn't hear that.

5          THE COURT:  He said it would be better to come in in

6   the defense case, if the all.

7          MR. SCOTTEN:  We can talk about whether it should come

8   in later, your Honor.

9          THE COURT:  That's fine.

10          MR. BONDY:  It's in evidence.  What are we talking

11   about?  It's a video in evidence.

12          THE COURT:  It's in evidence.

13          MR. SCOTTEN:  That's fair.  To the extent it should

14   have been redacted, then they can play the rest of it or not

15   later.  There it no reason this witness has to play it.

16          MR. BONDY:  If we do decide it should be redacted,

17   we'll redact it before it goes back to them.

18          THE COURT:  Okay.

19          MR. BONDY:  Thank you.

20   A.  Fruman, Giuliani, and Parnas.  Parnas on the left and

21   Fruman on the right.

22   Q.  And can you read the writing behind them?

23   A.  DeSantis Nuñez for Governor.

24          MR. SCOTTEN:  If we could please now go back to

25   Government Exhibit 86 through the end of all those.

LAECpar5                       Casola - direct

1    Q.  Agent Casola, are there any chats on November 6th, 2018?

2    A.  No.

3    Q.  Was there anything significant about November 6th, 2018?

4    A.  It was Election Day.

5         MR. SCOTTEN:  Can we please now go down to row 77.

6    Q.  I'm going to ask you, Agent Casola, to read it.

7    A.  It's a message from Kukushkin.  Congratulations to

8    everybody on the victory in Florida.  When can we get a license

9    and find the stores.

10   Q.  And Agent Casola, do we see any pictures of a political

11   candidate in Florida in the 2018 election?

12   A.  Yes.

13   Q.  Who?

14   A.  DeSantis.

15   Q.  And can you now please read the next lines, the sender and

16   the translation?

17   A.  From Fruman, already soon.  From Kukushkin, that certainly

18   makes me happy.  Smiling emoji.

19        MR. SCOTTEN:  If we can scroll down, I think we can

20   capture the rest of the chat.

21   Q.  What are the next six rows up to 85?

22   A.  Image files.

23   Q.  And who sends them?

24   A.  80 to 84 is Fruman.  85 is Muraviev.

25        MR. SCOTTEN:  Ms. Drescher, can we please display

LAECpar5                    Casola – direct

1     those one at a time.

2     Q.  Agent Casola, I'll again ask you to note anyone you

3     recognize.

4     A.  DeSantis and Parnas sinking in a little bit on the right on

5     that image.  DeSantis.  I don't recognize anyone.  DeSantis on

6     the left, Parnas on the right.  DeSantis.  DeSantis and Parnas.

7     Q.  And can I ask you to remind the jury who sent this last

8     picture?

9     A.  Muraviev.

10          MR. SCOTTEN:  Ms. Drescher, can we please go back to

11    Government Exhibit 86.  If you can just blow up the bottom.

12    Q.  Agent Casola, can I ask you to just read the last three

13    rows, sender and translation.

14    A.  Muraviev says, congratulations on the victory, everyone.

15    And then types out, a very happy face.  Fruman responds,

16    Governor of Florida.

17          MR. SCOTTEN:  One second, your Honor.

18          THE COURT:  Yes.

19          MR. SCOTTEN:  No further questions, your Honor.

20          THE COURT:  Before we turn to cross, I just wanted to

21    mention to the jury, there was an exhibit, 90-A-1, that was

22    admitted, and it was a Federal Election Commission complaint.

23    I wanted to give the same limiting instruction that I gave with

24    respect to a couple of news articles earlier.

25          That was an attachment sent from Mr. Parnas to

LAECpar5                      Casola - cross

1    Mr. Correia that's not admitted for the truth of anything in

2    that Federal Election Commission complaint.  It's admitted

3    solely for the purpose of showing Mr. Parnas's state of mind to

4    the extent you find it relevant, solely for that.  All right?

5    Thank you.

6              Cross, Mr. Bondy.

7              MR. BONDY:  Yes, your Honor.

8    CROSS-EXAMINATION

9    BY MR. BONDY:

10   Q.  Good afternoon, Special Agent Casola.

11   A.  Good afternoon, counsel.

12   Q.  That's what they call you, special agent, yes?

13   A.  Yes.

14   Q.  How long have you been with the FBI?

15   A.  A little over four years.

16   Q.  And what did you do before that?

17   A.  I was a prosecutor.

18   Q.  A what?

19   A.  A state prosecutor.

20   Q.  Where?

21   A.  North Hampton County in Pennsylvania.

22   Q.  How long did you prosecute people?

23   A.  Approximately five years.

24   Q.  You ever defend anyone?

25   A.  No.

LAECpar5                        Casola – cross

```
1    Q.  Now, you told the jury that your primary function in the
2    case was reviewing charts, yes?
3    A.  Yes.
4    Q.  Creating, did you create the summary charts?
5    A.  I did not.
6    Q.  Do you know who created the summary charts?
7    A.  United States Attorney's Office.
8    Q.  The whole office or anyone in particular?
9            MR. SCOTTEN:  Objection.  Lawyer-witness.
10           THE COURT:  Sustained.
11   Q.  I think you told us before that there were over 12,000
12   pages of information that the summary chart was gleaned from;
13   is that right?
14   A.  Tens of thousands of pages, yes, counsel.
15   Q.  Let's take the number, say 12,000, and it's about 20 pages,
16   the chart?
17   A.  The chart is 24 pages.
18   Q.  I did the math, that's about .002 percent of all the
19   documents in the case, two thousandths of 1 percent of all
20   those documents you referred to have been winnowed into the
21   summary chart; fair to say?
22   A.  I'll take your number for it.
23   Q.  Now, you did participate — correct me if I'm wrong — in a
24   search in this case; am I right?
25   A.  I did.
```

LAECpar5                        Casola - cross

1    Q.  And you didn't tell us that on direct examination, did you,

2    sir?

3    A.  No.

4    Q.  You weren't asked that question on direct, were you?

5    A.  No.

6    Q.  You don't know why you weren't asked on direct, do you?

7              MR. SCOTTEN:  Objection.  Relevance.

8              THE COURT:  Overruled.

9    A.  I didn't come up with the questions.

10   Q.  But you don't know why you weren't asked by the United

11   States Attorney that question on direct, do you?

12             MR. SCOTTEN:  That's my objection, your Honor, that

13   question.

14             THE COURT:  You don't know why you were asked by the

15   assistant?

16             MR. BONDY:  I just want an answer to the question that

17   you overruled the objection to.

18             THE COURT:  Overruled.

19   A.  I don't have personal knowledge of why that question wasn't

20   asked.

21   Q.  You met up with a bunch of agents for the purposes of

22   searching Steven Fruman's home; correct?

23   A.  Yes.

24   Q.  And that's in Woodmere, New York; right?

25   A.  Yes.

LAECpar5                          Casola - cross

1   Q.  And you did that with a number of FBI agents; right?

2   A.  Correct.

3   Q.  And, in fact, a number of those FBI agents were

4   investigating agents in this case, yes?

5   A.  Yes.

6   Q.  And they had knowledge of the investigation itself;

7   correct?

8            MR. SCOTTEN:  Objection.  Relevance.

9   Q.  From the beginning all the way through to now; right?

10           THE COURT:  Sustained.

11  Q.  Do you know who the case agents in this case are?

12           MR. SCOTTEN:  Objection.  Relevance.

13           THE COURT:  Sustained.

14  Q.  You had a pizza party before you searched Mr. Fruman's

15  house; correct?

16           MR. SCOTTEN:  Objection.  Relevance.  Prejudice.

17           THE COURT:  Sustained.

18  Q.  Do you recall, on October 9th, 2019, receiving a email from

19  Nicholas Diorio.  Who is Nicholas Diorio?

20  A.  He's an agent on my squad.

21  Q.  Do you recall being CC'd in a message, quote, for anyone

22  who is in the area --

23           MR. SCOTTEN:  Objection.  Offering hearsay.

24           THE COURT:  Sustained.

25  Q.  At some point, you carpooled on over to the search of

LAECpar5                        Casola - cross

| | |
|---|---|
| 1 | Mr. Steven Fruman's house; correct? |
| 2 | A.  Correct. |
| 3 | Q.  And were you part of the team that went inside Mr. Fruman's |
| 4 | house? |
| 5 | A.  Yes, counsel. |
| 6 | Q.  And you gathered documents and evidence from Mr. Fruman's |
| 7 | house? |
| 8 | A.  We searched for evidence, yes. |
| 9 | Q.  Did you seize evidence? |
| 10 | A.  We did seize evidence that day. |
| 11 | Q.  And I think that we had some evidence that Mr. Steven |
| 12 | Fruman is the owner or an executive in a company, F&D |
| 13 | export-import company; correct? |
| 14 | MR. SCOTTEN:  Objection.  Calls for inference. |
| 15 | MR. BONDY:  I'm sorry.  I can't hear in the bubble. |
| 16 | THE COURT:  He said calls for inference. |
| 17 | Q.  You saw a loan agreement here, we put a loan agreement up |
| 18 | on the screen, yes, it's in evidence? |
| 19 | A.  Yes. |
| 20 | Q.  For F&D Export? |
| 21 | A.  Yes. |
| 22 | Q.  And Steven Fruman signed it; correct? |
| 23 | A.  He was a signatory on that loan agreement. |
| 24 | MR. BONDY:  Now, if I may, Government Exhibit 1402, if |
| 25 | I could have that up, please. |

LAECpar5                    Casola - cross

1  Q.  This is 4/21/2018, and we see that Mr. Ahearn, Joseph
2  Ahearn sends to Mr. Parnas at 1:20 p.m. a link to two news
3  articles; right?
4  A.  Yes, that is written on the chart.
5  Q.  And you know who Mr. Ahearn is, by chance?
6  A.  I don't.
7  Q.  You never talked about who he is?
8  A.  No.
9  Q.  Mr. Ahearn, you'd agree, sends an article about special
10 counsel probing donations with foreign connection to Trump
11 inauguration; right?
12 A.  Yes.
13 Q.  And an article detailing a bipartisan marijuana bill to be
14 filed soon; right?
15 A.  Yes.
16 Q.  Do you know about the bipartisan marijuana bill?  Do you
17 know the name of it?
18 A.  I don't.
19 Q.  Do you know if it was filed soon?
20 A.  I don't.
21 Q.  Do you know if Mr. Ahearn has ever been accused of any
22 wrongdoing for sending an article on the special counsel
23 probing donations with foreign connections to Trump
24 inauguration?
25        MR. SCOTTEN:  Objection.  Beyond the scope.

LAECpar5                              Casola - cross

```
 1              MR. BONDY:  If he knows.
 2              THE COURT:  Overruled.  He can answer.
 3   A.  I don't.
 4   Q.  Mr. Parnas writes back, interesting, yes?
 5   A.  Yes.
 6   Q.  Just out of curiosity, do you know if he actually read
 7   those articles?
 8   A.  I don't have any personal knowledge if he read the articles
 9   that were sent to him.
10   Q.  So no, you don't know?
11   A.  Correct.
12              MR. SCOTTEN:  Objection.  Calls for an inference.  I
13   have no personal knowledge is different than what might be
14   referred from all the evidence that's been submitted.  I have
15   no objection to the "I have personal knowledge," but trying to
16   stretch that to no is inappropriate.
17              THE COURT:  He said, no, you don't know.
18              MR. SCOTTEN:  He has no personal knowledge.
19              THE COURT:  Right.  Same thing.
20   BY MR. BONDY:
21   Q.  We looked at some pictures before.  If I can have up
22   government 14-A-23.  You identified Mr. Parnas, yes?
23   A.  I did.
24   Q.  Do you see Mr. Correia in the picture?
25   A.  Not that I recognize, no.
```

LAECpar5                          Casola - cross

1   Q.   Would you recognize him if you saw him?

2   A.   I've seen him in person.

3   Q.   Take a look in the left-hand side of the gentleman seated

4   with his head above the flowers.  Is that Mr. Correia?

5   A.   I don't recognize him in this picture.

6   Q.   Do you recognize the gentleman sitting next to Mr. Parnas

7   as Congressman Joe Wilson?

8   A.   I don't.

9   Q.   Do you know who Congressman Joe Wilson is?

10  A.   I do not.

11              MR. BONDY:  Now, if I can go to the June 2018, the

12  summary chart, I should say for the dates July 9th to 19,

13  please.

14  Q.   Do you see at 7/9, 3:51 a.m., Mr. Kukushkin asks for --

15  that's David's phone number, please.  That's Mr. Correia, yes?

16  A.   What I see on the chart, it says David's phone number,

17  please.  For that particular line.

18  Q.   As late as July 9th, Mr. Kukushkin is asking Mr. Parnas for

19  the phone number for Mr. Correia; correct?

20  A.   He's asking for David's phone number, yes.

21  Q.   Then there is a call, 7/19, 6:16, between Kukushkin and

22  Parnas; right?

23  A.   I see that.

24  Q.   You don't know what's said on that call either, do you?

25  A.   No, counsel.

1    Q.  And you never heard that recording because you don't have

2    that recording; correct?

3    A.  Correct.  What is indicated there is the phone billing

4    detail records indicating the length of the call and the date

5    and the parties.

6    Q.  If I could invite your attention down 7/19, 9:30, Kukushkin

7    tells Fruman, Igor, we are going in circles with Leva, yes?

8    A.  I see that, yes.

9    Q.  Do you understand Leva to be Lev Parnas?

10   A.  I read it as we're going in circles with Leva.  I did not

11   know that to be a name Lev would go by.

12   Q.  Do you have any idea what Kukushkin means by telling

13   Mr. Fruman that we're going in circles with Leva?

14   A.  I have no personal knowledge of what Kukushkin was writing

15   to Fruman in that instance.

16   Q.  Again, there is the rest of the messages, yet I clearly

17   laid everything out.  We do not pay for anyone's political

18   ambitions or lobbyists at all.  We get a license and get a

19   bonus, yes?

20   A.  Yes, I see that on the summary chart as it was contained in

21   Government Exhibit 25.

22          MR. BONDY:  Now, if I could look at Government Exhibit

23   25, please.

24   Q.  This is from Mr. Kukushkin to Mr. Fruman?

25   A.  Yes.

LAECpar5                    Casola - cross

1    Q.  If I could invite your attention to the translation

2    starting with financial resource, Andreka.  Could you please

3    read to the jury from lawyers/lobbyists down to the word

4    results.

5    A.  Yes.

6    Q.  Go ahead.

7    A.  I'm just looking for where it ends.  You said down to

8    result.  Got it.  Lawyer/lobbyists, Lev and you.  We need the

9    best ones and for reasonable money, we only pay for results.

10   Q.  Now, this is the same day that there are those texts back

11   and forth about an understanding of the joint activities that

12   has been reached; correct?

13   A.  Yes, it is the same date.

14   Q.  And again, that's the same day that Mr. Fruman is told by

15   Mr. Kukushkin that they're going in circles with Leva, yes?

16   A.  The date of the understanding of the joint activities is

17   7/19 and the date that Kukushkin tells Fruman that they're

18   going in circles with Leva is also 7/19.

19             MR. LEFCOURT:  Could he have the mic a little closer?

20             THE COURT:  Please.  Thank you.

21   Q.  Now, inviting your attention to our summary chart in the

22   date range 7/25 to 8/31, on the 6th August, Fruman has a

23   10-minute and 30-second phone call with Mr. Muraviev; right?

24   A.  Yes.

25   Q.  And you know of that through GX1295, which is a phone

LAECpar5                        Casola - cross

1   record, yes?

2   A.   Correct.

3   Q.   Was Mr. Fruman speaking to Mr. Muraviev about a private

4   loan to Mr. Fruman, if you know?

5   A.   I don't know any of the contents of the phone calls listed

6   in the summary chart.

7   Q.   And, indeed, there is no recorded phone call for you to

8   review, is there?

9   A.   Only the phone bill and detail records, which don't contain

10  context.

11  Q.   That's a piece of paper with some writing across that says

12  phone call, 10-minutes and 30-seconds, yes?

13  A.   As we seen from the underlying exhibit previously.

14  Q.   There is no transcript, there is no audio, you have no idea

15  what that conversation was about, do you?

16  A.   I have no personal knowledge of what happened during that

17  conversation.

18  Q.   Now, 8/31, there is a link to an article, Fruman to Parnas,

19  describing a guilty plea for causing foreign money to be paid

20  to the presidential inaugural committee using a straw buyer of

21  inaugural tickets to avoid inauguration committee's refusal to

22  accept money from foreign nationals because of Federal Election

23  Commission rules.  Do you see that?

24  A.   I do.

25  Q.   Did you write that entry there?

LAECpar5                      Casola - cross

1    A.  I did not.

2    Q.  Do you know who wrote that entry there?

3    A.  United States Attorney's Offers.

4    Q.  You don't know who characterized the article that way from

5    the U.S. Attorney's Office, do you?

6              MR. SCOTTEN:  Objection.  Lawyer-witness.

7              THE COURT:  Sustained.

8              MR. BONDY:  Now, can I get GX32, please, the article.

9    Scroll on down a little.

10   Q.  Now, there is talk here about a plea agreement made public

11   on Friday, yes?

12   A.  It says in the plea agreement, made public Friday, yes.

13   Q.  And there is discussion about a bunch of charges, crimes

14   that some lobbyists had admitted to but was not going to be

15   charged with; right?

16   A.  It says in the plea agreement, made public Friday.

17   Prosecutors outlined other crimes that the lobbyists, Sam

18   Patton admitted to but wouldn't be charged with.  Among them

19   was causing foreign money to be paid to the Trump inaugural

20   committee.  Patton signed off on the allegation.

21   Q.  And you don't know if Mr. Parnas had some interest in

22   something pertaining to tickets in the inauguration as opposed

23   to just generalized campaign finance reform, do you?

24   A.  I don't have any personal knowledge of Mr. Parnas's

25   interests in this article.

LAECpar5                          Casola - cross

1   Q.  You have no idea why this article got sent back and forth,

2   do you?

3   A.  I have no personal knowledge as to why.

4           MR. BONDY:  Now 9/5/2018, our summary chart, please.

5   Q.  We see at 4:02 p.m. from Ahearn to Parnas and Correia an

6   invitation to a 9/7 fundraiser in Las Vegas with Adam Laxalt

7   with special guest Mike Pence.  Do you see that?

8   A.  I do.

9   Q.  Below it at 4:11, Kukushkin and Parnas have a FaceTime

10  call, yes?

11  A.  I see that.

12  Q.  What do they talk about?

13  A.  I don't know.

14  Q.  Do you have --

15  A.  I'm sorry?

16  Q.  Do you have the call anywhere?

17  A.  I have no personal knowledge of what happened on that phone

18  call.

19  Q.  And, of course, do you have a recording, if you know, of

20  this FaceTime call?

21          MR. SCOTTEN:  Objection.  This is asked and answered.

22  The witness said they have no recordings --

23          THE COURT:  Sustained.  Sustained.

24  Q.  Mr. Ahearn, on the 5th at 5:46 p.m., the 5th of September

25  tells Parnas and Correia, quote, let me know if you guys want

LAECpar5                         Casola - cross

1    to go.  I can make sure Laxalt speaks highly.

2              Did I read that correctly?

3    A.  You did.

4    Q.  Again, you don't know what Mr. Ahearn might do to, quote,

5    make sure Laxalt speaks highly, do you?

6    A.  I have no personal knowledge of what actions he was -- said

7    he would take.

8    Q.  If I could look at Government Exhibit 38 with you.  Row 3

9    is 9/8/2018, 10:01:15 p.m.  Do you see that?

10   A.  I do.

11   Q.  That message body is in a foreign language; right?

12   A.  It is.

13   Q.  What language?

14   A.  It appears to be Russian.

15   Q.  Do you know?

16   A.  Looks like Russian to me.  It might not be.

17   Q.  Do you speak Russian?

18   A.  I do not.

19   Q.  Do you write Russian?

20   A.  I do not.

21   Q.  Have you ever used a translation app in your life, sir?

22   A.  No.

23   Q.  Do you know what that is?

24   A.  I understand what they are, yes.

25   Q.  What is it?

LAECpar5                        Casola - cross

1    A.   Generally, it's a way that you can translate from one

2    language to another.

3    Q.   There is a forensic -- I mean, this is from a phone;

4    correct?

5    A.   This is from a phone.  Yes, this is -- this particular

6    exhibit is from a phone.

7    Q.   That's from a phone, it's a device that was seized from the

8    government, it's in custody, right, you have that thing?

9    A.   We have that phone, yes.

10   Q.   And to your knowledge, is there a way to determine whether

11   an app was used to translate a conversation or not?

12   A.   That, I don't know.

13   Q.   Have you ever seen any kind of a forensic dump on whether

14   an app was used to translate a conversation in this case?

15           MR. SCOTTEN:  Objection.  Beyond the scope.

16           THE COURT:  Sustained.

17           MR. BONDY:  Moving on.  On the 10th of September, if

18   we could, in the summary -- maybe it's in this one.  Is it on

19   GX38?  Do we have a second page to this exhibit?  Yes.  There

20   we go.  Can we go up again.  I'm looking for a 9/10

21   conversation.  Let's go to the summary chart, actually.  9/10.

22   I think it might be the next one.  Igor Fruman and

23   Mr. Kukushkin.  Here we go.

24   Q.   Inviting your attention to 9/10 between 1:29 and 1:32 a.m.,

25   a text between Mr. Fruman and Mr. Kukushkin, is this in English

1    in the original, if you know?

2    A.  If we can pull it up, I could review it.

3    Q.  Take a look.  Would you agree it's not in English in the

4    original?

5    A.  I would agree.

6    Q.  Walking through it, at the bottom, Mr. Fruman writes, every

7    invested dollar yields a hundred thousand, exclamation point,

8    exclamation point, exclamation point, exclamation point.  Do

9    you see that?

10   A.  I see that in the exhibit.

11   Q.  Do you know if that's true?

12   A.  I don't know -- I have no personal knowledge if that --

13   Q.  Do you know if Mr. Fruman meant it when he said it?

14   A.  I have no personal knowledge of his intent when he said it.

15   Q.  Then I'll invite your attention to Government Exhibit 53.

16   Cannabis schedule and budget at line 2.  Can we get that

17   document up, please.  Is there another page to this document,

18   if you know?

19   A.  Yes.

20   Q.  And you weren't asked this question on direct, but I'd like

21   to ask you, do you see the asterisk in front of, say, scheduled

22   trips to meet with?  Do you see the asterisk right in the front

23   there?

24   A.  I do.

25   Q.  And do you know what that asterisk means?

LAECpar5                     Casola - cross

1    A.   I do not have personal knowledge of what that asterisk

2    means.

3    Q.   Does it say it on the face of the document in front of you?

4    A.   There is an asterisk at the bottom that says, dates subject

5    to schedule availability.

6    Q.   There are two asterisks on the document, as well; right?

7    A.   Correct.

8    Q.   Behind campaign contributions as to every state listed on

9    the document; correct?

10   A.   I see that in the --

11   Q.   And you weren't asked it on direct, but I'll ask you, could

12   you tell the jury what the two asterisks mean, according to

13   this chart?

14   A.   Donations are projections.

15   Q.   And what's a projection?

16   A.   Something that they anticipated.

17   Q.   Projections frequently don't occur; fair to say?

18   A.   They're projections because they're anticipated.  I don't

19   know if they occurred or not.

20            MR. BONDY:  Now, the summary chart at 9/13, September

21   13th, please.

22   Q.   We have a message from Mr. Fruman to Mr. Kukushkin.  It's

23   important to transfer 500.  The man whom you met with us in

24   Nevada called, said that he was personally waiting for us with

25   his deputy who would take over from him when he becomes

LAECpar5                        Casola - cross

1    governor to discuss our issue.

2             Do you understand that person waiting with his deputy

3    to be Mr. Adam Laxalt?

4    A.  I only understand what's written in the text is copied from

5    GX43.  I don't understand if that is who that was actually

6    referencing.  What I know it says is the man you know with us

7    in Nevada called, said that he was personally waiting for us

8    with his deputy, we'll take over for him when he becomes

9    governor to discuss our issue.

10   Q.  You have phone records of Mr. Fruman, do you not?

11   A.  Yes.

12   Q.  Have you been able to find in the phone records or put into

13   a summary chart an actual phone call from a man in Nevada,

14   Mr. Laxalt, say, or Mr. Duncan, or Mr. Stewart, who we heard

15   from, a call, 9/13 to Mr. Fruman?

16   A.  I looked for what was listed in the summary chart to see if

17   it was accurately reflected from Government Exhibits.  I did

18   not go through all Government Exhibits.

19   Q.  Would you agree if you have his phone record and his call

20   was made on that device, you should be able to glean or find

21   that actual phone call; correct?

22   A.  Can you rephrase the question.

23   Q.  You've got the records, and if this call had actually

24   occurred, you would have a way to confirm that that call had

25   been placed to Mr. Fruman that day; right?

LAECpar5                        Casola - cross

1   A.  No, counsel.

2   Q.  No?

3   A.  No.

4   Q.  Why not?

5   A.  There is a lot of ways you can make a phone call.  It might

6   not necessarily have been through that phone number.  It could

7   have been through an encrypted app or another phone.

8   Q.  To your knowledge, did anyone ever bother to look?

9              MR. SCOTTEN:  Objection.

10             THE COURT:  Sustained.

11  Q.  Are you aware of anybody looking to ascertain whether, in

12  fact, that entry is true?

13             MR. SCOTTEN:  Still objection.

14             THE COURT:  You can answer.

15  A.  I have no personal knowledge of that aspect of the

16  investigation.

17  Q.  And the same day, Fruman is essentially sending to

18  Mr. Parnas what he had just sent to Mr. Kukushkin, yes, it's

19  important to transfer 500?

20  A.  Yes.

21             MR. BONDY:  Government Exhibit 44, please.

22  Q.  At line 4, September 13th, 2018, around about the middle of

23  the translation, Mr. Fruman states, I can't even explain to Lev

24  that Sasha left and he didn't reach his destination and should

25  consult and discuss with someone and, dot dot dot, exclamation

LAECpar5                         Casola - cross

1    point, exclamation point, exclamation point.  Do you see that?

2    A.  I do.

3    Q.  Do you have any idea what it was that Mr. Fruman couldn't

4    explain to Lev?

5    A.  I don't have any personal knowledge of that, no.

6            MR. BONDY:  And 9/14/2018 of the summary chart,

7    please.

8    Q.  You'd agree that these are messages between Mr. Fruman,

9    Mr. Kukushkin, Kukushkin and Igor Fruman, Mr. Muraviev and

10   Mr. Mikhalev, it looks like Steven Fruman, but you'd agree Lev

11   Parnas is nowhere in any of these communications on 9/14; am I

12   right?

13   A.  There are no communications listed with Lev Parnas on the

14   sheet of the summary chart for 9/14/2018.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. BONDY:

2    Q.   But what does appear there is the bank account information

3    and routing number for the FD Import & Export Corporation,

4    right?

5    A.   Right.

6    Q.   And that's a company that you know to be owned by Steven

7    Fruman and Igor Fruman?

8    A.   I don't know them to be owned by those individuals.

9    Q.   Did you see any import or export corporation documents?

10   A.   From my recollection, I did not personally recover any of

11   those documents.

12   Q.   From your recollection, did other members of the FBI search

13   team recover those documents?

14   A.   I don't recall.

15   Q.   Do you recall anything they seized?

16   A.   No.

17   Q.   Now 9/14, 2:17 p.m., Igor Fruman sends a message to his

18   brother Steven Fruman, correct?

19   A.   Correct.

20   Q.   Saying he will send it on Monday for sure, transferred

21   everything to Switzerland today, yes?

22   A.   Yes.

23   Q.   Let's look at Government Exhibit 31.

24            And that's entry 3 we're talking about here, row 3.

25   There's the message originally in what we believe to be

1    Russian, correct?

2           And that's the translation.  He says he will send it

3    on Monday for sure, transferred everything to Switzerland

4    today.  Right?

5    A.  He says he will send it on Monday for sure, transferred

6    everything to Switzerland today.  I see that message.

7    Q.  In line 4 Steven Fruman is asking:  What about the

8    agreement?

9    A.  Yes.

10   Q.  And Igor says he will send it tomorrow, right?

11   A.  I see that.

12   Q.  Now this is the loan agreement set forth in line 7.  It

13   actually gets sent.

14          MR. BONDY:  And could we get it up on the screen,

15   please?

16   Q.  This is between Direct Capital and FD Import & Export,

17   right?

18   A.  Correct.

19   Q.  It's a loan agreement for a loan of half a million dollars?

20   A.  Yes.

21   Q.  And if I may see the signature block on that.

22          We have people identified as the director of this

23   Intellect Capital Company that's been traced to Mr. Muraviev,

24   correct?

25   A.  Correct.

LAETPAR6                          Casola – cross

1   Q.  But you wouldn't really know if it was traced to

2   Mr. Muraviev because you only did the summaries, right?

3              MR. SCOTTEN:  Objection.  There's a stipulation on

4   that point, your Honor.

5              MR. BONDY:  It's a stipulation.  I'm asking about his

6   knowledge.

7              MR. SCOTTEN:  This idea of a stipulation is to take

8   that out of the case because everyone agrees on it, so

9   objection on that basis.

10             THE COURT:  I think that's right.  It's an agreed—upon

11  fact, so his knowledge is irrelevant.

12  Q.  But we never stipulated and agreed, if you know, sir, that

13  Steven Fruman was the manager of the FD Import & Export

14  Company, did we?

15  A.  I did not see a stipulation as to that point.

16  Q.  And you don't know why we stipulated to Muraviev and his

17  company but we did not have a stipulation about Steven Fruman

18  and FD Import & Export, do you?

19             MR. SCOTTEN:  Objection.

20             THE COURT:  Sustained.

21  Q.  Do you have any idea why Steven Fruman cared at all about

22  the receipt of that half a million dollars on that day?

23  A.  I have no personal knowledge about what Steven Fruman cared

24  about.

25  Q.  Do you have any idea whether FD Import & Export had bills

LAETPAR6                        Casola - cross

1   to pay that they intended to pay with that money?

2   A.  I have no personal knowledge about the imports and exports

3   billing issues or not.

4   Q.  So now if we could go back to the summary for September 18,

5   please.  We have a video of an assault on a street artist, yes?

6           Do you remember seeing that one?

7   A.  I do.

8   Q.  And it's an assault --

9           MR. BONDY:  Could we put up GX43, please, again?

10  Q.  You didn't choose to put that video in.

11          MR. BONDY:  I would like the video of the actual

12  incident, please.

13  Q.  You didn't choose to put this into the summary, did you?

14  A.  No.

15  Q.  You don't know who did, do you?

16  A.  The United States Attorney's Office.

17  Q.  You don't know why, out of the 12,000 pages in the case,

18  this made it into the 25-page summary, do you?

19  A.  I don't know why the particular selections from the

20  exhibits were chosen.

21          MR. BONDY:  Let's play that again, please.

22          (Video recording played)

23  Q.  If I was to characterize that as a video depicting an

24  African-American man and his African-American girlfriend

25  assaulting and hitting another African-American man in the

LAETPAR6                         Casola - cross

1    streets of Times Square, would have correctly characterized it

2    to you?

3    A.  I view that as a video of an assault on street artist, and

4    there are quotes in the video:  Give me my money back.  Do you

5    think this is a joke?

6           So I watched the video, saw that was in the video, and

7    had it looked at on the summary chart as accurate.

8    Q.  So is the answer to my question yes, that the video depicts

9    an African-American man and his girlfriend assaulting a street

10   artist in Times Square, or is the answer to my question no?

11          MR. SCOTTEN:  I'm not sure of the relevance of this

12   line of questioning, your Honor.

13          THE COURT:  Sustained.

14   Q.  Again, you have no idea why that video was selected by the

15   United States Attorney's Office to be played in this courtroom,

16   do you?

17          MR. SCOTTEN:  Objection.  I think your Honor sustained

18   on this point before.

19          THE COURT:  Sustained.

20   Q.  9/18 of the summary chart once again, please.

21          There is a receipt of an incoming wire for a half a

22   million dollars, yes?

23   A.  There's a Chase account alert regarding an incoming wire of

24   500,000.

25   Q.  And the date of that is September 18, you would agree, yes?

LAETPAR6                          Casola - cross

1    A.   Yes.

2    Q.   And that's the first of the loans for Mr. Muraviev, yes?

3    A.   That is the first time that I had seen the summary chart,

4    in other words, the alert for an incoming wire.

5    Q.   Would you agree with me that the first monies paid by

6    Mr. Muraviev to Igor Fruman were paid on or about September 18

7    of 2018?

8    A.   I have no personal knowledge if that's accurate.

9              MR. BONDY:   9/17 Fruman to Kukushkin, GX43, if we

10   could see it.   The actual signed agreement again, the date on

11   the agreement.

12   Q.   Read the date to the jury, sir.

13   A.   17th day of September, 2018.

14   Q.   And this is the first of the two loan agreements, am I

15   correct?

16   A.   The first of two loan agreements.

17   Q.   To your knowledge, there was no money paid by Mr. Muraviev

18   before this transaction, right?

19   A.   This is the only transaction that I have seen in the

20   summary charts.

21   Q.   So to the extent any kind of a donation was made in August

22   of 2018 or July of 2018 or June of 2018 or May or April or

23   March or February of 2018, those donations, those contributions

24   were not made with Mr. Muraviev's money, correct?

25             MR. SCOTTEN:   Objection, calls for a financial

LAETPAR6                          Casola - cross

1    conclusion doubly beyond the witness's scope.

2              MR. BONDY:  I'm sorry?

3              MR. LEFCOURT:  Your Honor, I object to the speaking

4    objection.

5              MR. SCOTTEN:  Counsel is arguing in his question.

6              MR. BONDY:  These are speaking objections.

7              THE COURT:  The objection is sustained.

8    BY MR. BONDY:

9    Q.  You do agree that January 2018 up until September 17 of

10   2018 is a period of time immediately before this agreement was

11   signed, right?

12             You agree with that, don't you?

13   A.  January to September was before September 18?

14   Q.  Yeah.

15   A.  I agree that happened before.

16   Q.  Because you only know what's in the summary, you have very

17   little knowledge of anything else, I need to ask it that way,

18   sir.

19   A.  Yes, I reviewed what was in the summary chart and

20   determined it to be accurately reflected in the underlying

21   government exhibits.

22   Q.  GX52, if I might invite your attention to row 13.  David

23   Correia is writing here to Mr. Kukushkin, is that right?

24   A.  Can I see the top of the exhibit?

25             Yes.

LAETPAR6                         Casola - cross

1    Q.  Okay.  And back to that line.

2           And Mr. Correia is saying that their bank account

3    needs to be opened the next day, correct?

4           Therefore our bank account needs to be opened

5    tomorrow.  Do you see that?

6    A.  Yes, I do see that.

7    Q.  And that's on September 30 of 2018, Mr. Correia telling

8    Mr. Kukushkin he still needs to open a bank account, right?

9    A.  Yes.

10   Q.  Is that for the SIG company, if you know?

11   A.  That I'm not aware.

12          MR. BONDY:  If I could get Government Exhibit 58,

13   please, at the top of page 3, entry number 30.

14   Q.  This is in Cyrillic by Mr. Fruman, and this is to

15   Mr. Kukushkin as well, sir?

16   A.  Yes.

17   Q.  And Mr. Fruman writes:  Yes, we need to open an account

18   urgently and to deposit 500 there.  We have to fork over a

19   check for 250 to him at the event.  It would be a pity if you

20   were not there.

21          Do you see that?

22   A.  I do.

23   Q.  In the course of your preparing the summary charts, did you

24   ever see a check for $250,000 -- 250 to be given to someone at

25   an event in October of 2018?

LAETPAR6                         Casola - cross

A.  I did not prepare the summary charts, I looked to see if
the language that was quoted from the government exhibits was
accurately reflected in the summary chart.  So for this I would
have reviewed to determine that the language here is accurately
reflected in the summary chart itself.

Q.  But you would never have seen something like a $250,000
check, right?

A.  What was included in the summary chart was the text from
this text message.

Q.  So you have never seen anything like a check for 250,
correct?

A.  The only thing I saw was this message.

Q.  Do you know if a check for 250 exists or that was a figment
of Mr. Fruman's imagination?

          MR. SCOTTEN:  Objection.

          THE COURT:  Sustained.

          MR. BONDY:  The summary chart 9/26 to 27, please.
9/26 to 27.

          Let's try Government Exhibit 50 then.

Q.  Here we have Mr. Correia WhatsApping with Mr. Kukushkin,
yes?

A.  Yes.

Q.  Just for a moment, WhatsApp is a service that people use to
message with each other, correct?

A.  Correct.

LAETPAR6                        Casola - cross

1  Q.  People can use their phone as well, yes?

2  A.  Yes.

3  Q.  People that use their phone internationally, they don't

4  have incur international fees to call, correct?

5  A.  That I don't know.

6  Q.  Have you ever used WhatsApp?

7  A.  Yes.

8  Q.  Have you ever made a phone call with WhatsApp?

9  A.  Yes.

10  Q.  Do you know you're not charged for those phone calls?

11  A.  I know I'm not charged but I use it domestically.

12  Q.  It's an encrypted app, right?

13  A.  Yes.

14  Q.  There's nothing wrong or criminal about using an encrypted

15  app, is there?

16  A.  There's nothing wrong with using an encrypted app, no.

17  Q.  Have you ever started a group discussion yourself on

18  WhatsApp where you're the one to add people?

19  A.  No.

20  Q.  Have you been added to other people's group chats?

21  A.  Not on WhatsApp.

22  Q.  Have you been added to other people's group chats?

23  A.  On WhatsApp?

24  Q.  You just said not on WhatsApp.

25  A.  I have been added to group texts via text message before.

1   Q.  And on other encrypted apps, like say Signal or Telegram?

2   A.  Sure.

3   Q.  You used Signal?

4   A.  I have.

5   Q.  You used Telegram?

6   A.  No.

7   Q.  That's another encrypted app service, correct?

8   A.  There are many.

9   Q.  Nothing wrong with you using it, is there?

10  A.  No.

11  Q.  Now at row 3, Mr. Correia is saying hey, bro, just want to

12  touch base on a couple of things.  And one, he speaks about

13  going with the name Strategic Investment Group, right?

14  A.  Yes.

15  Q.  And that he's got all the paperwork finalized and ready to

16  open a bank account, right?

17  A.  Yes.

18  Q.  And that Amanda --

19          You don't know who Amanda is, do you?

20  A.  I do not.

21  Q.  -- is going to email the corporate resolutions that they

22  both need to sign, correct?

23  A.  Correct.

24  Q.  Indeed, Mr. Muraviev and Mr. Kukushkin would be the

25  majority owners of this company, right?

LAETPAR6                          Casola - cross

A.   It says:  Please let me know if you already have the name

of the entity or entities that you and Andrey M. will be using

to reflect 51 percent ownership in the company.

Q.   And by "you," you mean Andrey Kukushkin, right?

        This is Correia talking to Kukushkin?

A.   Correct.

Q.   At GX141, there's the unanimous written consent in lieu of

an organizational meeting by the board of directors of

Strategic Investment Group, Inc., yes?

A.   I see that exhibit.

Q.   And this is a document that purports to be essentially the

acceptance of a variety of things, right, written consent about

accepting the articles of incorporation of a business, right?

A.   Unanimous written consent in lieu of organizational meeting

by the board of directors of the Strategic Investment Group,

Inc.

Q.   Do you have any idea what this means?

A.   No.

Q.   Do you have any reason to believe that this document would

not be a normal corporate document?

A.   I have no personal knowledge if this is a normal corporate

document or not for this organization.

Q.   Have you any experience with reviewing corporate

resolutions and bylaws?

        MR. SCOTTEN:  Objection, beyond scope.

1            THE COURT:  Sustained.

2            MR. BONDY:  Palliatech, June 5 of 2018, on the summary

3    chart, please.

4            MR. SCOTTEN:  Ms. Drescher is doing her best to help

5    defense counsel but I think he's going to have to be more

6    specific.

7            MR. BONDY:  She's doing great and I'm trying to be

8    specific.

9            MR. SCOTTEN:  On this entry I'm not sure we know what

10   you're looking for.

11           MR. BONDY:  GX137, 6/5/2018.

12   Q.  This is Kukushkin receiving an email from a woman named

13   Christine Rigby, right?

14   A.  It is.

15   Q.  At Palliatech.  Do you know what Palliatech is?

16   A.  I don't have any knowledge of that company.

17   Q.  You looked at the deck and a board presentation, did you

18   not?

19   A.  I read from it, yes.

20           MR. BONDY:  And if I could have up that deck we looked

21   at earlier.

22   Q.  There are board members listed here, correct?

23   A.  There are.

24   Q.  You see Mr. Muraviev?

25   A.  Yes.

LAETPAR6                          Casola - cross

1    Q.  You see Joseph Lusardi, yes?

2    A.  I do.

3    Q.  Do you know Joseph Lusardi to be the CEO of a publicly

4    traded cannabis company named Curaleaf?

5    A.  I do not have personal knowledge of who he is.

6    Q.  Have you ever heard of Curaleaf?

7    A.  I have not.

8    Q.  Have you ever heard of Joseph Lusardi?

9    A.  I have not.

10   Q.  Do you know if Mr. Muraviev was an early equity holder in a

11   publicly traded company, Curaleaf?

12   A.  I have no personal knowledge to that effect.

13   Q.  Other than personal knowledge, do you have any knowledge

14   from anywhere else?

15   A.  No.

16   Q.  You're not sure what type of business Palliatech is?

17   A.  Correct.

18        MR. SCOTTEN:  If counsel would like a stipulation that

19   it's some sort of legalized cannabis business, we're happy to

20   stipulate to that.

21        MR. BONDY:  I don't know if it is.

22   Q.  Now at GX144, we have Mr. Correia talking about a draft for

23   a contribution chart, is that fair to say?

24   A.  Yes.

25   Q.  And it's a draft, and he sends this draft to Mr. Parnas,

LAETPAR6                           Casola - cross

1    yes, and to Mr. Fruman?

2    A.   Yes, he does.

3         MR. BONDY:   Could we get up the draft.

4    Q.   Robert Menendez, senator, first line, right?

5    A.   Yes.  Well, Robert Menendex, I guess.

6    Q.   You're correct about that.  It's really Menendez, but

7    spelled Menendex here?

8    A.   Yes.

9    Q.   $25,000 is the amount of contribution listed there, yes?

10   A.   That is the amount listed.

11   Q.   Do you know if that was ever paid?

12   A.   No, I don't have any personal knowledge.

13   Q.   Do you know if it was committed?

14   A.   I do not know if it was committed.

15   Q.   Same as to Frank LoBiondo, a representative, he's a

16   Republican, 25 grand.  Do you know if it was paid?

17   A.   I do not.

18   Q.   Do you know if it was committed?

19   A.   I do not.

20   Q.   Bonnie Coleman?

21   A.   I do not.

22   Q.   Mr. Pascrell.

23   A.   No.

24   Q.   Bob Hugin?

25        MR. SCOTTEN:   Your Honor, the government will

LAETPAR6                        Casola - cross

1    stipulate that the witness has no personal knowledge as to

2    whether any donation on any of these charts was made.

3    Q.  Do you know if anyone at all in the government has any

4    knowledge as to whether or not these contributions --

5              MR. SCOTTEN:  Objection.

6              THE COURT:  Sustained.

7    Q.  Page 2 of this chart.  I think we have agreed to this, you

8    have no personal knowledge as to whether any of this stuff was

9    ever committed or paid, right, would you agree?

10   A.  I would agree.

11   Q.  If I could compare Government Exhibit 146 to 144,

12   Government Exhibit 146 has some inclusions that don't appear in

13   144, yes?

14   A.  Correct.

15   Q.  Same thing as to Kirsten Gillibrand or Peter King or

16   Letitia James or Andrew Cuomo, you don't have any idea whether

17   this is true or false, do you?

18   A.  No personal knowledge if what is listed is accurate.

19             MR. BONDY:  Next one, please.

20             Is there another page on this document, 146?

21   Q.  Same as to all of the people appearing here, Adam Laxalt,

22   Wes Duncan, Dean Heller in particular, you don't know whether

23   any of this is accurate?

24   A.  No personal knowledge whether any of this is accurate.

25             MR. BONDY:  Next page of the exhibit, please.

LAETPAR6                        Casola - cross

1    Q.  America First Action, Political Action Committee.  Do you

2    see that?

3    A.  I do.

4    Q.  250,000?

5    A.  I see that.

6    Q.  Do you have any idea whether America First Action was ever

7    paid a contribution of any sort in connection with this case?

8    A.  I have no personal knowledge of that.

9    Q.  Pete Sessions.  He was a congressman, yes?

10   A.  From Texas, yes.

11   Q.  Do you have personal knowledge of that?

12   A.  That he was a congressman from Texas?

13   Q.  Yes.

14   A.  Yes.

15   Q.  You don't know if 150 grand was paid to him, right?

16   A.  No personal knowledge.

17           MR. BONDY:  If I could have government's Exhibit 61

18   up, please, lines 8 and 9 -- we'll go to 7.

19   Q.  Cyrillic from Mr. Kukushkin talking about:  I'm already in

20   California, guys.  Let's move step by step.

21           That's the entry that starts there?

22   A.  Yes.

23   Q.  And at the end of it:  We need to reserve a budget for

24   company development to open the shops and to find the real

25   estate.  This is a very expensive part and can't be ignored.  I

1    suggest a conference call for us to communicate the priorities.

2              Did I read that right?

3    A.  I see that.

4    Q.  Do you have any evidence of a conference call occurring on

5    this subject?

6    A.  I have no personal knowledge of a conference call

7    occurring.

8    Q.  Do you have any personal knowledge as to whether or not

9    reserving a budget for company development to open these shops

10   and find real estate is expensive?

11   A.  I have no personal knowledge to that effect.

12   Q.  Line 8, Mr. Fruman 10/9/2018, Andryuka:  Read the

13   correspondence, bro.  Did I read that right?

14   A.  You did.

15   Q.  Then a minute later, "We have time until November 6, after

16   that it's over" is what Mr. Fruman says to Mr. Kukushkin, yes?

17   A.  Correct.

18   Q.  Do you perceive this as Mr. Fruman pressuring Mr. Kukushkin

19   to get him money quickly?

20   A.  I read the chart, saw what was listed in the government

21   exhibit, and indicated if it was accurately listed in the

22   summary chart.

23   Q.  So it wasn't your job to determine whether in fact

24   Mr. Fruman was pushing Mr. Kukushkin for money, right?

25   A.  My job was to determine that what was accurate in the

LAETPAR6                          Casola - cross

1    government's exhibit was accurately reflected in the summary

2    chart.

3    Q.  But the government's exhibit is like an email or a text or

4    something that they seized from Mr. Kukushkin or Mr. Fruman or

5    Mr. Parnas, right?

6    A.  Correct.

7    Q.  So it's not the government creating the record, is it?

8    A.  No.

9    Q.  So you didn't have -- it wasn't your job to determine

10   whether this might be Mr. Fruman pushing Mr. Kukushkin for

11   money?

12   A.  It was not.

13           MR. BONDY:  If I could get up GX1212.

14   Q.  We talked about the contact card, is that right?

15   A.  Correct.

16           MR. BONDY:  Could we pop up the contact card?

17   Q.  You were asked questions about this on direct examination,

18   were you not?

19   A.  I was.

20   Q.  Is it correct to say it depicts the Statute of Liberty

21   looking at a person bending over with what appears to be their

22   rear end stuck out?

23   A.  In part.

24   Q.  You don't know why the government selected this piece of

25   evidence out of 12,000 some-odd pages to put in the summary and

1    play to the jury, do you?

2            MR. SCOTTEN:  Objection, your Honor, if we could get

3    an instruction.

4            THE COURT:  Instruction about what?

5            MR. SCOTTEN:  About not -- asking the witness why the

6    government put anything before them is improper, as Mr. Bondy

7    well knows.

8            THE COURT:  Well, I think it's fair to say you are

9    making your points on cross-examination, and that's fine, but

10   when we get into why the government choose particular exhibits,

11   that's beyond what's proper.

12   Q.  What does that mean to you?  What relevance does that have

13   to this case?

14           MR. SCOTTEN:  I would like to hear the witness answer

15   that, your Honor.

16           THE COURT:  Okay.

17           THE WITNESS:  Sorry, I can't hear.

18           MR. SCOTTEN:  I think it's fine if he's asking for

19   speculation as to why a picture of Andrey Muraviev mooning the

20   Statute of Liberty would be relevant to this case.  If he wants

21   an FBI agent to speculate on that, I think it's fine.

22           MR. BONDY:  I'll withdraw it.

23           THE COURT:  Okay.

24   Q.  It would be just speculation for you to be explaining to us

25   why this has been selected and put in front of the jury, right?

1   A.  I looked at the government exhibits that were given to me

2   to determine if they were accurately represented for the

3   summary chart.

4   Q.  Government Exhibit 64-A1, if I might.

5           To the left of Mr. Parnas, that tall man is Jared

6   Kushner, right?

7   A.  Yes.

8   Q.  And the tall woman is Ivanka Trump to the right of

9   Mr. Parnas?

10  A.  Yes.  I'm not frankly sure about the height of either of

11  them, but yes.

12  Q.  They're both taller than Mr. Parnas in the picture?

13  A.  Fair.

14  Q.  Do you know whether this was at a cannabis event in

15  Washington DC that had been set up by Mr. Joseph Ahearn?

16  A.  I don't have any personal knowledge of what the event was

17  that he was attending.

18  Q.  Do you know if Mr. Joseph Lusardi, who I characterized as

19  the CEO of Curaleaf, a publicly traded cannabis company, was

20  present that same day at that same event?

21  A.  I have no personal knowledge of that.

22  Q.  And do you know if Mr. Ahearn was present at this event?

23  A.  I also have no personal knowledge of that.

24          MR. BONDY:  Government Exhibit 58, following page, if

25  I could, please, the 11th of October.

LAETPAR6                      Casola - cross

1   Q.  Here we have Mr. Fruman at line 107 stating to

2   Mr. Kukushkin, is that right?

3   A.  Yes.

4   Q.  I spoke with Andrey.  It is better using the old scheme to

5   avoid problems later, yes?

6   A.  Yes.

7   Q.  "Scheme," do you know if that has a negative connotation in

8   Russian?

9   A.  I don't speak Russian.

10  Q.  So you don't know, do you?

11  A.  I have no personal knowledge of what the connotation is.

12  Q.  You don't speak the language, so it's not like you could

13  get knowledge from elsewhere, right?

14          It's not about personal knowledge, you don't speak

15  Russian, right?

16  A.  Right.

17          MR. BONDY:  GX48, if I could.

18  Q.  We have Mr. Mikhalev speaking with Steven Fruman, right?

19  A.  Yes.

20  Q.  And at first, Mr. Mikhalev, on the 17th of September, asks:

21  Please sign and send me back.  Yes?

22  A.  Yes, I see that text.

23  Q.  And 30 seconds later there's a loan agreement that is sent

24  by Mr. Mikhalev to Mr. Fruman, right?

25  A.  I see that, yes.

LAETPAR6                              Casola - cross

1    Q.  And just as an expedient to move through this, that was the

2    loan agreement that we looked at earlier, correct?

3    A.  Could we take a look at it?

4    Q.  Sure.

5         MR. BONDY:  Loan agreement 9/17/2018, depicted in line

6    4, please.

7    Q.  Same agreement?

8    A.  Yeah -- no, this is not.  It's the same agreement but not

9    executed at the bottom like the one we previously reviewed.

10   Q.  So on the 17th it gets sent by Mr. Mikhalev to Steven

11   Fruman.  He then signs it and sends it back, yes?

12   A.  Correct.

13   Q.  Then the money flows to Mr. Fruman's company, right?

14   A.  There is a later record of an incoming wire.

15   Q.  To FD Import.

16   A.  Correct.

17        MR. BONDY:  Could we go back to the exhibit.

18   Q.  Now do you have any idea why Steven Fruman is the recipient

19   of this money as opposed to Igor Fruman?

20   A.  No, I have no personal knowledge.

21        MR. BONDY:  48A-26, if I could, please.

22   Q.  This is the second loan agreement, right?

23   A.  That is correct.

24   Q.  And this one is dated the 12th day of October, 2018,

25   correct?

1    A.  Correct.

2    Q.  And it's between Nilder Investments Limited --

3         Is this a company that you know to be associated with

4    Mr. Muraviev?

5    A.  Yes, based on the stipulation.

6    Q.  -- and FD Import & Export, the same company that we spoke

7    about just now, correct?

8    A.  Correct.

9    Q.  And who signed this one?

10   A.  Ms. Anna Andreou and Ms. Sophia Ioannou for Nilder

11   Investments Limited, and on behalf of FD Import & Export,

12   Mr. Steven Fruman.

13   Q.  Now the money is then paid in the second tranche, I believe

14   it's called, by Mr. Mikhalev, right?

15   A.  He asked about how to send the second tranche, correct.

16   Q.  And the second tranche was sent, correct?

17   A.  Could we see the exhibit for that?

18   Q.  Sure.  Let's look at GX48 number 30 and 31, please.

19        Hi Steven, did you get money?  I'm sorry I didn't

20   respond yesterday.

21        Yes, received yesterday.

22   A.  I see those texts.

23   Q.  So you would agree that on the 16th of October it looks

24   like the money was paid, right?

25   A.  I agree they texted that the money was sent and received,

1    yes.

2    Q.  Between the 16th of October and October 31st, do you know

3    what happened to the $500,000?

4    A.  I have no personal knowledge as to that.

5    Q.  Do you know where any of it flowed after going to FD

6    Import?

7    A.  I have no knowledge of how the finances were spent or not.

8    Q.  You're not a financial analyst?

9    A.  No, counsel.

10   Q.  Now at page 16 of the summary chart, on the 17th of

11   October, which would be the following -- maybe page 17,

12   Mr. Parnas at 9:29 p.m., the next page, 10/17 at 9:29 p.m.

13   A.  There's a 9:29 p.m.

14   Q.  Fruman says to Kukushkin:  Meeting with the governor and

15   prosecutor.  We are now trying to coordinate for Saturday.  The

16   President will be in Elko.  Do you see that?

17   A.  I do.

18   Q.  And just above it we have Mr. Parnas saying to the group,

19   Kukushkin, Fruman, Muraviev and Vulis, he sends a link to a Fox

20   Business story:  White House to unveil federal cannabis reform

21   very soon, says top GOP lawmaker.  Yes?

22   A.  He asks that four lines above and a few days before, but I

23   see the message where he links the Fox Business story.

24   Q.  Do you happen to know what the First Step Act is, sir?

25   A.  I don't know.

1          MR. SCOTTEN:  Objection.

2          MR. BONDY:  Just asking.

3          MR. SCOTTEN:  Still objection.

4          THE COURT:  What's the relevance?

5          MR. BONDY:  That's the bipartisan bill that Mr. Parnas

6   is excited to be sending the link to.

7          THE COURT:  You can answer.

8   A.  Sorry, could you pose the question again, counsel?

9   Q.  Sorry.

10  A.  Could you pose the question again?

11  Q.  Do you know what the First Step Act is?

12  A.  No, I don't.

13  Q.  Do you know that --

14         MR. SCOTTEN:  Objection to counsel testifying it into

15  evidence.

16         MR. BONDY:  It's tough, I can't hear in the bubble.

17         THE COURT:  What's the question?

18         MR. BONDY:  I'll move on.  We'll talk about the First

19  Step Act later.

20  BY MR. BONDY:

21  Q.  You don't know what the CARES Act is either, I imagine, do

22  you?

23  A.  No, I have no personal knowledge what the CARES Act is.

24  Q.  And do you know if around about this time in the United

25  States there was any kind of an initiative to try to end mass

LAETPAR6                          Casola - cross

1   incarceration?

2                    MR. SCOTTEN:  Objection, relevance to the charges in

3   this case.

4                    THE COURT:  You can answer.

5   A.  I don't know.

6   Q.  Now the summary at page 18, 10/20, 3:55 p.m. to 59 p.m.

7   Kukushkin sends Mr. Muraviev and Mikhalev pictures of them at

8   the outdoor event.  Do you remember those pictures we were

9   looking at?

10  A.  I do.

11  Q.  And he says the new attorney general is in the video -- in

12  the middle rather, yes?

13  A.  He says that in reference to one of the pictures, not the

14  video.

15  Q.  And do you know if what's being implied there by

16  Mr. Kukushkin is that that, quote, new attorney general --

17                    That's Mr. Duncan, am I right?

18  A.  The individual that is in the middle of that particular

19  picture --

20                    Actually can we make sure we're talking about the same

21  one?

22  Q.  Sure, let's go to GX75.

23                    MR. SCOTTEN:  It would be A4.

24  Q.  There in the middle, who is that guy?

25  A.  Wes Duncan in the middle.

LAETPAR6                         Casola - cross

```
1    Q.  How do you know?
2    A.  He was running for attorney general of Nevada at the time.
3    Q.  How do you know what he looks like?
4    A.  Because he ran a campaign.
5    Q.  Does that mean you saw him on TV?
6    A.  No, I saw his picture.
7    Q.  You saw other pictures of him and you know that this is
8    him, correct?
9    A.  Correct.
10   Q.  You didn't see him yesterday in court, did you?
11   A.  No.
12   Q.  Were you here in court yesterday?
13   A.  No.
14   Q.  Now back to page 18, October 20, that entry, 3:55 p.m., the
15   new attorney general is in the middle.  Do you know if this is
16   an implication or some insinuation that Mr. Duncan would be
17   willing to take a bribe?
18   A.  I have no personal knowledge of what Mr. Kukushkin meant
19   when he sent the message that said the new attorney general's
20   in the middle.
21   Q.  Moving down to 10/22 in the summary chart, please,
22   4:09 p.m., Kukushkin again:  I have met with an attorney
23   referred by the attorney general.  Currently Las Vegas doesn't
24   accept any more applications.  With the help of our new friends
25   we shall get a guaranteed response before mid-December.
```

1            Do you see that?

2   A.  I do see that text.

3   Q.  In reviewing these materials for the summary chart, did you

4   ever see a guaranteed response from the new friends in

5   mid-December?

6   A.  There was no text message in the summary chart that is a

7   guaranteed response text from an underlying document that I

8   reviewed.

9   Q.  And you don't know if such a document even existed, right,

10  a guaranteed response?

11  A.  Can you rephrase?

12  Q.  You don't know if this is true, that there is going to be a

13  guaranteed response from the new friends, right?

14  A.  No, counsel, I don't know if what is stated here in these

15  text messages is accurate.

16  Q.  Government Exhibit 78, I think it's A11.

17            Mr. Kukushkin is wearing a hat that says Make Our

18  Farmers Great Again, right?

19  A.  Yes.

20  Q.  Do you think that's a bad thing?

21            MR. SCOTTEN:  Objection.

22  A.  My personal --

23  Q.  Isn't that a good thing?

24            THE COURT:  Sustained.

25  Q.  1024, page 20 of the summary.

1              Mr. Kukushkin is complaining here after a call with

2    Daniel Stewart, yes?

3    A.  I'm sorry, what line, counsel?

4    Q.  Well, let's start at the top.  He's on the line with Daniel

5    Stewart?

6    A.  I see that message, yes.

7    Q.  It doesn't look good from what I hear, yes?

8    A.  I see that.

9    Q.  If we don't get prime locations within two to six months,

10   we're out of the game for a long time, right?

11   A.  That's accurate.

12   Q.  We need the governor's approval and green light to

13   implement this with December license awards and to include us

14   in per plan, yes?

15   A.  I see that message.

16   Q.  And you don't have any idea whether this was even possible,

17   do you?

18   A.  I have no personal knowledge whether that's possible or

19   not.

20   Q.  Mr. Kukushkin at 11:17 p.m. then volunteers:  Now it's --

21   lion emoji -- Lev's turn.  This is what we want:  All the

22   counties supporting Republicans have at least to ask the

23   governor by the way of requesting licenses quota and he will

24   approve it for our particular group.

25              I read that right?

LAETPAR6                        Casola - cross

1    A.  Yes, counsel.

2    Q.  You have no idea whether Mr. Parnas took any action

3    whatsoever consistent with Mr. Kukushkin suggestion, do you?

4    A.  I see that Kukushkin wrote the message that you just read.

5    Q.  You don't have any idea whether Mr. Parnas took any action

6    based upon Mr. Kukushkin's suggestion, yes or no?

7             MR. SCOTTEN:  Objection.  If we could confine the

8    questions to:  Do you have any personal knowledge?

9             I don't think anybody wants the witness inferring what

10   he might have some idea of.

11            THE COURT:  He could answer to the extent of his

12   personal knowledge, correct.

13   A.  I have no personal knowledge.

14            MR. BONDY:  Row 15, please, GX81.  Actually let's do

15   line 8.  Start with line 8, please.

16   Q.  Counties can't say shit against veterans, not now, not

17   ever.

18            Do you know what that means?

19   A.  I don't know what Mr. Kukushkin meant by sending that.

20            MR. BONDY:  Row 15 of the same document, please.

21   Q.  Mr. Kukushkin is saying:  Together with lawyers, yes?

22   A.  That is in the text.

23   Q.  We have to write something beautiful, right?

24   A.  That is in the text.

25   Q.  And with the attorney general help, the current governor

1    establish and leave a legacy at the end while leaving his post

2    to his successor, correct?

3    A.  I see that in the message.

4    Q.  Do you know if anyone ever wrote anything beautiful or not?

5    A.  Could you rephrase that?

6    Q.  Do you know whether anyone, Mr. Kukushkin or anyone

7    associated with him, actually wrote something, beautiful or

8    not, on this subject?

9    A.  I have no personal knowledge if, in relation to what he's

10   talking about here, anybody wrote anything.

11   Q.  And do you know what he means by help the current governor

12   establish and leave a legacy at the end?

13   A.  I do not know what his intent was in writing that.

14   Q.  Page 21 of the summary chart, 3:09 p.m., we have

15   Van Rensburg to Kukushkin, yes?

16   A.  I see that line.

17   Q.  Do you know who Van Rensburg is?

18   A.  I know her name is Deanna Van Rensburg.

19   Q.  Do you know what her role is vis-a-vis this case?

20   A.  I do not.  I see on the bottom line Fruman tells Kukushkin:

21   She's my secretary and travel and event coordinations manager.

22   Have nothing to do with many situations.

23          That's the extent of my knowledge.

24          MS. FRIEDMAN:  Your Honor, before we keep going, I

25   apologize, but it's 3:45 and we haven't taken the afternoon

1    break.

2              THE COURT:  Do the jurors need a break?

3              Would this be a good time?

4              MR. BONDY:  It's fine, your Honor.

5              THE COURT:  Please leave your pads on your chairs and

6    we'll continue until 4:30.

7              (Jury not present)

8              THE COURT:  We'll take ten minutes.

9              (Recess taken)

10             MR. BONDY:  Your Honor, we had an unfortunate issue

11   that arose during the break.

12             As I was walking back into the courtroom, I heard

13   Mr. Scotten say:  We just have one bullet.  Does anyone have a

14   sidearm?  If I could have one bullet.  Behind my back,

15   referring to me, citing a firearm and a bullet.  When I called

16   him on it, he tried to say:  I suggested a duel.  But here's

17   the thing, he did it to about five FBI agents.  I heard them

18   all laughing in response to his remarks.  It's inappropriate.

19   It's reprehensible.

20             Moving back from that, at the break Mr. Scotten

21   approached me and accused me of lying to the jury and saying

22   that the United States Attorney's Office was somehow racist

23   because I replayed the video of the street vendor getting

24   bashed in the head that they selected and cherry picked and

25   made that 1,000th of a percent of the evidence that did not

1    have to be here and had marginal relevance.

2              He invited it, I cross-examined on it.  I walked out

3    of the room.  I walked back in the room and I was literally --

4    I had a United States Attorney from the Southern District of

5    New York ask for a bullet and a sidearm and have the law

6    enforcement officers in this case laughing about it.  So I

7    would ask for some kind of an admonition.

8              I'm ready to start.

9              MR. SCOTTEN:  Mr. Bondy's characterization is fairly

10   inaccurate, in my view.  I understand the Court wanting to

11   inquire further.  I'm happy to do that but suggest not doing it

12   on the jury's time and do it at 4:30.

13             MR. BONDY:  Let's ask him what he said.

14             MR. SCOTTEN:  Or do it now.  Either way is fine with

15   me, your Honor.

16             MR. BONDY:  Whatever he is said was completely

17   inappropriate and had no place in this courtroom.

18             THE COURT:  You heard it?

19             MR. BONDY:  I heard it, Mr. Parnas heard it.  It was

20   in the courtroom.  The FBI agents heard it.  Mr. Roos had those

21   agents leave the courtroom before the Court got on the bench.

22   Yes, multiple people heard it, your Honor, including perhaps

23   the public mic.

24             THE COURT:  We'll address it after the jury leaves.  I

25   would like to use their time, so we'll bring the jury in.

1           (Jury present)

2           THE COURT:  Please be seated.  We're going to continue

3    with the cross examination.  Mr. Bondy.

4           MR. BONDY:  Thank you, your Honor.

5           If we could go to page 21 of the summary chart.  Thank

6    you.

7    BY MR. BONDY:

8    Q.  3:09 p.m., we see Ms. Van Rensburg ask Mr. Kukushkin, can

9    you tell me when Adam Laxalt's team can expect the two checks

10   totaling $12,500; right?

11   A.  I see that.

12   Q.  And then Mr. Kukushkin responds to Ms. Rensburg indicating

13   that a million dollars had been transferred over to Lev and

14   Igor's company a long time ago to cover all the contributions

15   as planned; right?

16   A.  I see that text.

17   Q.  Mr. Fruman zooms in at 3:17 to 23, says to Mr. Kukushkin,

18   Andrey, what kind of mushroom did you eat today; right?

19   A.  Fruman sends that message to Kukushkin, yes.

20   Q.  And do you understand this to mean Mr. Fruman thinks

21   Mr. Kukushkin has lost his mind?

22   A.  I don't know what Fruman meant when he sent that message to

23   Kukushkin.

24   Q.  Well, the following line, Kukushkin confirming, quote, did

25   you all lose your mind there, yes?

LAECpar7                       Casola - cross

1    A.  Kukushkin sends that to Fruman, yes.

2    Q.  And he sends the screenshot of texts between Kukushkin and

3    van Rensburg; yes?

4    A.  He sends that, yes.

5              MR. BONDY:  Next page, please, page 22.

6    Q.  Here we have Mr. Parnas to Kukushkin, Muraviev, and Fruman

7    at 11:13 saying, he had just gotten off the phone with Igor

8    Fruman who had explained to Mr. Parnas the situation, and then

9    he wants to schedule a meeting to discuss, yes?

10   A.  He says Igor in the text, but otherwise, yes.

11   Q.  And you know Igor to be Igor Fruman; right?

12   A.  He says Igor there.  I don't know if he knows another Igor

13   or not.

14   Q.  So you think this could be another Igor, sir?

15   A.  The text says, I just got off the phone with Igor and he's

16   explained to meet situation.  Please let me know when we can

17   schedule a meeting to discuss.

18   Q.  Are you telling us you don't even know if that's Igor

19   Fruman?

20   A.  I'm telling you that the text says Igor.  I was correcting

21   your misreading of the text.

22   Q.  Can we agree it's Mr. Fruman?

23             MR. SCOTTEN:  Objection.  Calls for an inference.

24             THE COURT:  Sustained.

25   Q.  Then, a half hour later, Mr. Parnas says to Mr. Kukushkin,

LAECpar7                         Casola - cross

1    Muraviev, and Fruman, I don't want to discuss everything over

2    text; correct?

3    A.  Yes.

4    Q.  And a half hour earlier, he had asked to schedule a

5    meeting; right?

6    A.  Yes.

7    Q.  Have you ever text messaged with someone and asked if you

8    can just talk about something instead of texting?

9    A.  Yes.

10   Q.  Anything wrong with that?

11   A.  Is there anything wrong with asking to discuss something

12   over the phone or in person as opposed to text?  Is that what

13   you're asking?

14   Q.  That's my question.

15   A.  No, not in and of itself.

16   Q.  Then we have, at Government Exhibit -- 10/30/2018,

17   Government Exhibit, I think it's 83, there is Lev Parnas at

18   line 1, yes?

19   A.  Correct.

20   Q.  11:13 in the morning speaking to everybody.  He says, hi,

21   guys, I hope everyone is good.  I just got off the phone with

22   Igor and he's explained to me the situation.  It's very

23   disturbing after all our talks and meetings that we are still

24   nowhere in our understandings.  After spending time in Las

25   Vegas with Andrey and Igor, I realize this is not what I signed

1    up for.  Parentheses, the business plan Andrey explained to us,

2    end parentheses.  Igor convinced me to continue because he said

3    he spoke with Andrey M.

4          By the way, Andrey M, do you understand that to be

5    Mr. Muraviev?

6    A.  I understand that to be that he spoke with Andrey M.

7    Q.  You have no idea if that's Mr. Muraviev?

8    A.  I have no personal knowledge of what he meant when he said

9    Andrey M.

10         MR. BONDY:  I think I put a yellow dot on my screen, I

11   didn't mean to.  Another one.

12   Q.  And he's on the same page.  At this time, I would like to

13   stop this partnership and meet to discuss how we can move

14   forward.  This is not personal.  I like everybody very much and

15   love to hang out, but this is very serious business as I

16   explained when we met in Vegas.  Please let me know when we can

17   schedule a meeting to discuss.  Thank you and have a great day.

18         I read that correctly, yes?

19   A.  Yes.

20   Q.  And do you understand this communication from Mr. Parnas to

21   be that he would like to stop his partnership and talk to

22   everyone about how to move forward?

23   A.  I have no personal knowledge of his intent in sending this

24   message.  What I know is what it contains in the summary charts

25   matches what is on the Government Exhibit.

LAECpar7                        Casola - cross

1   Q.  You have no reason to think he did not say in this message,

2   I would like to stop this partnership and meet to discuss how

3   we can move forward, do you?

4   A.  I have no personal knowledge of what his intent was in

5   sending this message.

6   Q.  I didn't ask the about intent.  Is that the accurate

7   message?

8   A.  What you read, was it accurate?

9   Q.  Is it accurate?

10  A.  You read it accurately, yes.

11  Q.  That's right.  That's what he sent to everybody, right,

12  that's an accurate reflection of a message Mr. Parnas sent to

13  Mr. Kukushkin, Mr. Muraviev, and Mr. Fruman; am I right?

14  A.  You read it properly.

15  Q.  Now, at line 2, if I might.  Mr. Muraviev writing, hi,

16  Leva, in Las Vegas, we agreed on the principles of our

17  cooperation and share in the future enterprise.

18          It's written in Cyrillic and there is an American

19  translation; am I right?

20  A.  Correct.

21  Q.  Do you happen to know if this was read with a translational

22  app?

23  A.  Can you rephrase.

24  Q.  Do you happen to know if this was read by the reader in the

25  original language or translated?

1  A.  You mean by the recipients on this thread by original

2  reader?

3  Q.  Yes.

4  A.  Oh, I have no knowledge of how this was read by the

5  recipients.

6  Q.  Do you know if Mr. Parnas writes in Cyrillic?

7  A.  I have no personal knowledge of if he writes in Cyrillic or

8  not.

9  Q.  Do you know if he can read in Cyrillic?

10  A.  I have no personal knowledge of that.

11  Q.  At line 3, Mr. Parnas is again stating, thank you for the

12  quick response, my brother.  I don't want to discuss everything

13  over text, yes?

14  A.  That is -- he wrote that, yes.

15  Q.  And again, there have been times in your life when you

16  don't want to talk over text, you would rather talk to people;

17  correct?

18  A.  Correct.

19  Q.  Nothing wrong with that in and of itself, is there?

20  A.  In and of itself, no, there is not.

21  Q.  Now, when you went to raid Mr. Fruman's house, Steven

22  Fruman's house, there were 20 agents there?

23  A.  When we searched Steven Fruman's house, there were numerous

24  agents there.  I don't know the exact count.

25  Q.  And you know that there are agents in this case who have

1   been assigned to be the case agent, yes?

2   A.   There are case agents assigned in every case, yes.

3   Q.   Do you happen to know any of them without telling us who

4   they are, do you know them?

5           MR. SCOTTEN:   Objection.   This was sustained earlier,

6   your Honor.

7           MR. BONDY:   Let me withdraw that.   Let's move.

8   Q.   Do you happen to see any FBI agents seated in the courtroom

9   here today in the audience?

10  A.   Yes.

11  Q.   How many?

12  A.   Sorry.   Looking around the box.   Three.

13  Q.   This is Mr. Goodman over here; right?

14  A.   No, counsel.

15  Q.   Who's this guy?

16          MR. SCOTTEN:   Objection to this line of questioning,

17  your Honor.

18          MR. BONDY:   I'm so sorry.

19          THE COURT:   Sustained.

20          MR. BONDY:   Could the people who are FBI agents please

21  stand up?

22          THE COURT:   Sustained.   Move on.

23  Q.   You're the only one that wants to stand up.

24          MR. SCOTTEN:   Objection, your Honor.

25  Q.   And you don't know why an agent that might have had

LAECpar7                        Casola - cross

1    knowledge about this investigation is not sitting in your chair

2    now, do you?

3                MR. SCOTTEN:  Objection, your Honor.

4                THE COURT:  Sustained.

5                MR. BONDY:  Thank you.  Thank you, agent.  No further

6    questions.

7                THE WITNESS:  Thank you, counsel.

8                THE COURT:  Cross examination?

9                MR. LEFCOURT:  No questions, your Honor.

10               THE COURT:  Redirect?

11               MR. SCOTTEN:  Very briefly, your Honor.  Actually, you

12   know what, I'll pass, your Honor.  No redirect.

13               THE COURT:  Thank you, sir.  You may step down.

14               THE WITNESS:  Thank you, your Honor.

15               (Witness excused)

16               THE COURT:  Government, do you want to call your next

17   witness?  We have 15 minutes.

18               MR. ROOS:  Government calls Michael Hartsock.

19               THE COURT:  Sir, if you would please come up to the

20   witness stand.  When you come into the witness box, please come

21   up to the top stair, can you remove your mask if you choose to

22   once you're in the witness box.  Please remain standing and

23   raise your right hand and you'll be sworn in.

24    MICHAEL HARTSOCK,

25        called as a witness by the Government,

LAECpar7                          Hartsock – direct

1          having been duly sworn, testified as follows:

2                  THE DEPUTY CLERK:  Please state your full name and

3    spell your last name for the record.

4                  THE WITNESS:  Michael Hartsock, H-A-R-T-S-O-C-K.

5                  THE COURT:  Mr. Roos.

6                  MR. ROOS:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MR. ROOS:

9    Q.  Good afternoon, Mr. Hartsock.  Can you hear me okay?

10   A.  Yes, I can.

11   Q.  We're both talking through plastic boxes, so just let me

12   know.

13                  Are you currently employed?

14   A.  Yes.

15   Q.  Where are you employed?

16   A.  I work at the Federal Election Commission.

17   Q.  Is the Federal Election Commission also known as the FEC?

18   A.  Yes.

19   Q.  What does the FEC do?

20   A.  The FEC is an independent regulatory agency of the federal

21   government.  The purpose of the FEC is to administer and

22   enforce the federal campaign finance laws.

23   Q.  How long have you been with the FEC?

24   A.  I've worked for the agency for 17 years.

25   Q.  What's your position there?

1  A.   Currently, I serve as a branch chief in the reports

2  analysis division.

3  Q.   What does that division do?

4  A.   The reports analysis division is responsible for reviewing

5  and analyzing all the financial disclosure reports that are

6  filed by federal political committees.

7  Q.   What types of people or entities are political committees?

8  A.   There are various committee types.  Mainly, there are two

9  types.  What's known as, first, an authorized committee.  An

10 authorized committee means that it is a committee that is

11 authorized by a federal candidate to act in that candidate's

12 behalf to run that campaign.  We also have what's referred to

13 as unauthorized committees.  As the name implies, these

14 committees are not authorized by a federal candidate.  An

15 example of this would be a political action committee or a

16 political party committee.

17 Q.   Do these committees file reports?

18 A.   Yes.

19 Q.   What type of reports?

20 A.   These reports are reports of receipts and disbursements.

21 There is various numbers based on the committee type that is

22 filing the report.  The report contains all of the receipts

23 coming into the committee's account and all of the

24 disbursements going out of the committee's account.

25 Q.   Are you familiar with an FEC Form 3?

1    A.  Yes, I am.

2    Q.  What's that?

3    A.  The FEC Form 3 is the form that is used by an authorized

4    committee to file its financial disclosure information.

5    Q.  Now, in 2003, how were reports filed by a political

6    campaign?

7    A.  In 2003?  I'm sorry?

8    Q.  2018.

9    A.  In 2018 -- well, there is two methods of filing a report.

10   A report can be filed either electronically.  This would entail

11   the committee downloading reporting software creating the

12   report within that software and uploading that report to the

13   FEC.  Then committees can also -- some committees can still

14   file on paper.  They would simply handwrite the report or type

15   it out and send it to the FEC via mail.

16   Q.  So once the FEC receives a report, what does it do with it?

17   A.  Once the FEC receives the report, there is a little bit of

18   internal processing that occurs just to make sure that all the

19   specifications and data requirements are met.  Then,

20   ultimately, each report that is filed is posted on the FEC

21   website for public consumption.

22   Q.  Does the FEC conduct any type of review of the reports?

23   A.  Yes.  That's my job or the division that I work in, the

24   reports analysis division.  Once the report is filed with the

25   FEC, every report will be reviewed and analyzed by a campaign

1    finance analyst.

2    Q.  What sort of things does the analyst look for in the

3    report?

4    A.  First and foremost, we look to make certain that all the

5    information that is required to be included on the report is,

6    indeed, included on the report.  We also analyze the financial

7    data contained within the report to attempt to identify any

8    potential violations of the Federal Campaign Act.

9    Q.  What types of violations would those be?

10   A.  For example, one of the things that we look for is, there

11   are such things called contribution limits, meaning an

12   individual can only give a certain amount to a given committee.

13   So those are the types of things that our analysis includes.

14   We're checking contribution limits to make sure no excessive

15   contributions were made or received by the committee.

16   Q.  Are there any other types of contributions you would look

17   for?

18   A.  Yes.  One of the things that comes to mind is contributions

19   from foreign nationals.  Foreign nationals are prohibited from

20   making contributions to committees to influence federal

21   elections.  So we are -- that is one of the things that we're

22   checking for in the report.

23   Q.  What about a contribution in the name of someone other than

24   the true donor?

25   A.  If we were aware of that, that would certainly be something

LAECpar7                         Hartsock - direct

1   that we would attempt to address.

2   Q.  Is there like a name that's used at the FEC for those types

3   of contributions?

4   A.  Yes.  We refer to those as straw donors.

5   Q.  What about the phrase conduit contribution, are you

6   familiar with that?

7   A.  Yes, conduit contribution is when a contribution originates

8   from one person, passes to another person ultimately to the

9   recipient.

10  Q.  The reports that are filed with the FEC, are those made

11  available to the public?

12  A.  Yes.  Every report that is filed by a committee is

13  ultimately posted up on the FEC website where you can view an

14  image of each page of the report.

15  Q.  Is there any way, like an ordinary person can search

16  through the materials on the FEC website?

17  A.  Yes.  We have a very extensive database as part of our

18  website.  So, not only do you have the opportunity to look at

19  the actual image view of the report, but you can simply, based

20  on a certain data point, for example an individual

21  contributor's name, you can put that into the search database

22  and it would generate results showing every contribution that

23  that individual had made that was disclosed on an FEC report.

24  Q.  Can a regular person also look up one of these FEC Form 3s?

25  A.  Yes, they certainly can.

LAECpar7                    Hartsock - direct

1    Q.  I want to direct your attention to Government Exhibit 652,

2    which is for the witness only.  Mr. Hartsock, have you seen

3    this document before?

4    A.  Yes, I have.

5    Q.  What is it?

6    A.  This is an FEC form 3, otherwise known as a report of

7    receipts and disbursements for an authorized committee.

8    Q.  Does it relate to a particular committee?

9    A.  Yes.  It looks like this report is filed by Pete Sessions

10   for Congress.

11           MR. LEFCOURT:  Can he speak into the mic, your Honor.

12           THE COURT:  It's hard for people to hear in the

13   courtroom because there is a lot of background noise.  If you

14   can speak close to the mic, we would appreciate it.

15           THE WITNESS:  I apologize for that.

16   Q.  For everyone's benefit, would you mind repeating, I think I

17   asked you what this particular document shows.

18   A.  Yes.  This is an FEC Form 3.  It's a report of receipts and

19   disbursements by an authorized committee.

20   Q.  And which committee?

21   A.  It appears that it's a report by Pete Sessions for

22   Congress.

23   Q.  To your knowledge, are people who are contributors who send

24   data to the FEC, is that information collected as part of the

25   campaign's regular activity?

LAECpar7                    Hartsock - direct

1    A.  Yes.

2    Q.  Is it the general practice of campaigns to file these

3    reports with the FEC?

4    A.  Yes.

5    Q.  What, if anything, on this document would indicate that

6    this was filed with the FEC?

7    A.  I can see in the upper left-hand corner of the document,

8    there is an image number that is stamped on this.  Each time a

9    report is filed with the FEC, each page of that report receives

10   its own unique image number.  It's a very long string of

11   numbers.  That image number corresponds to the image number

12   that is posted on the website.

13          I also see that in the upper right-hand corner there

14   is a date timestamped there, as well.

15          MR. ROOS:  Your Honor, the government offers

16   Exhibit 652.

17          THE COURT:  Any objection?

18          MR. LEFCOURT:  No.

19          THE COURT:  652 is admitted.

20          (Government's Exhibit 652 received in evidence)

21          MR. ROOS:  Can we publish it.

22   Q.  Mr. Hartsock, the jury wasn't seeing the document that you

23   were just going through, so we're going to walk through it

24   again.  Let's start on the first page.  Can you describe for

25   the jury what this is?

1    A.  Yes, this is an FEC Form 3, otherwise known as a report of

2    receipts and disbursements for an authorized committee.

3    Q.  What sort of information is contained in this?

4    A.  This report would contain all of the receipts coming into

5    the committee's account and disbursements going out of the

6    committee's account based upon the coverage dates of the

7    report.

8    Q.  What time period does this particular report relate to?

9    A.  The covered period for this report is April 1st, 2018

10   through June 30th, 2018.

11   Q.  Was there a particular campaign or committee that filed

12   this report?

13   A.  Yes.  This appears to be filed by Pete Sessions for

14   Congress.

15   Q.  Does it appear on the website?

16   A.  Yes, it does.

17   Q.  How do you know that?

18   A.  I know that because of the image number that's stamped in

19   the upper left-hand corner there.  Every report, every page of

20   every report receives its own unique image number when it is

21   processed and posted on the FEC website.

22          MR. ROOS:  Ms. Drescher, could we please go to page 82

23   of the document.

24   Q.  Mr. Hartsock, what type of information does this part of

25   the form indicate?

1   A.   This is what's referred to as a Schedule A of the Form 3.

2   It's where the committee would itemize individual contributions

3   received from an individual.   So anytime an individual crosses

4   the itemization threshold of $200 in an election cycle, they

5   are required to itemize that individual's contribution with all

6   their information.

7   Q.   Can you read the name on the individual receipt in the

8   C-section of this form.

9   A.   Yes.   It's Parnas, Lev, Mr.

10  Q.   What's the date of the receipt?

11  A.   June 25th, 2018.

12  Q.   And the amount?

13  A.   $2,700.

14  Q.   Is that the max amount in that year?

15  A.   During the 2018 election cycle, the contribution limit was

16  $2,700 for individuals, yes.

17          MR. ROOS:   Ms. Drescher, can we please go to page 78.

18  Q.   Mr. Hartsock, can you read the name of the individual

19  recipient under C at the bottom of this page.

20  A.   Fruman, Igor, Mr.

21  Q.   And the date of the contribution?

22  A.   June 25th, 2018.

23  Q.   The amount?

24  A.   $2,700.

25  Q.   Does it matter to the FEC whether campaigns provide

1    accurate information on these reports?

2    A.  Yes.

3    Q.  Why is that?

4    A.  It matters for several reasons.  I would say first and

5    foremost for public transparency.  That is one of the goals and

6    missions of the FEC is to provide transparency to the federal

7    campaign finance process by allowing anyone to go to our

8    website and see who exactly has contributed to what committees

9    and what amounts.

10          I would secondly say that it's important from the FEC

11   standpoint that we have accurate information because, as I

12   mentioned previously, we are performing review and analysis on

13   each of these reports.  We're looking at every page, we're

14   looking at every transaction.  Without accurate information on

15   the report, of course, our analysis would be or could be

16   inaccurate.

17   Q.  How would inaccurate reports interfere with the FEC's

18   mission then?

19   A.  Perhaps if we didn't have accurate information, we would

20   potentially miss a violation of one of the federal campaign

21   finance laws.  For example, if we were checking contribution

22   limits and we didn't have the contributor's accurate

23   information, we wouldn't be able to successfully track the

24   contributions --

25          MR. LEFCOURT:  I'm sorry.  Could he speak into the

1    mic?

2              THE COURT:  Could you speak a little loudly.

3              MR. ROOS:  I'll ask a followup question to sort of

4    address the missed point.

5    Q.  What are the types of laws that you might miss or the

6    restrictions you might miss with inaccurate reports?

7    A.  I gave the example of tracking a contribution limit for an

8    individual.  If we did not have the contributor's accurate and

9    true information, we may not be able to accurately track the

10   contribution limits, which could, in essence, be a violation

11   that the FEC missed.

12   Q.  What about tracking foreign donors?

13   A.  I would say much the same thing.  If we didn't have that

14   information, we wouldn't be able to identify potential

15   prohibited contributions.

16             MR. ROOS:  One moment, your Honor.

17             Your Honor, I would say I'm about halfway through my

18   questions with Mr. Hartsock.  I do see it's 4:30, I don't want

19   to take advantage of the jury's time.  I'll defer to you.  I'm

20   happy to keep going as I'm sure Mr. Hartsock is, but I'm also

21   happy to have the jury go on their way.

22             THE COURT:  Since I said 4:30, I want to keep with the

23   4:30 as much as possible.  So I'm going to let you go for the

24   evening.  Please leave your pads on your chairs.  Don't talk

25   about the case or do any research on this case, which is

LAECpar7                        Hartsock – direct

1    essential to having this case decided on the evidence in the

2    trial.  That's only fair to the parties.

3              We'll start back tomorrow morning at 9:30 again.  I

4    want to thank you for your patience.  We'll try to start as

5    close as possible to 9:30.  We will have breakfast again for

6    you in the morning and coffee in the jury room.  So please try

7    to arrive between 9:00 and 9:15.  Have a good night, everybody.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  And you may step down, sir.  You all can

3    be seated.

4              MR. SCOTTEN:  So, if I might, your Honor.  In case

5    there is a contention about what was said, we're asking the

6    agents who were standing with me to leave the courtroom so

7    they're not witnesses to my statements.

8              MR. ROOS:  I was not doing that.  I was conferring

9    with them about Mr. Hartsock's travel, who was supposed to fly

10   out tonight, but I'm happy to talking to agents about leaving

11   the courtroom.

12             MR. SCOTTEN:  I thought they should leave the

13   courtroom.  I thought that was what was going on.

14             THE COURT:  All right.  So, I want to give you a

15   chance to address what Mr. Bondy raised at the end of the last

16   break.

17             MR. SCOTTEN:  Thank you, your Honor.  And I apologize.

18   I'm going to give you all the context, which may be more than

19   your Honor wants.

20             So, at the end -- at the break, I approached Mr. Bondy

21   — the court was out of session — right here and I told him in

22   sum and substance that I did not think his suggestion of race

23   in this case was appropriate.  I didn't think it was in the

24   bounds of zealous advocacy and he did not agree.  He said some

25   strong words.  I don't remember what they were and I'm not -- I

1   don't mean to imply that they were beyond appropriate, but

2   clearly he disagreed with me strongly.

3           Then I went downstairs to go to the bathroom.  When I

4   came back up, I passed by Mr. Bondy in the hallway.  He

5   appeared angry.  I don't remember if he said anything.  And

6   then I came inside the courtroom and was standing at the back

7   there, approximately where the CSOs are talking to several of

8   the agents and perhaps or perhaps not some of the AUSAs, but

9   certainly some of the agents.

10          At which point, Mr. Bondy entered the courtroom in

11  order to continue with court, we were about ready to

12  reassemble.  He looked very angry.  And again, I don't recall,

13  he may or may not have said anything, but the overall

14  impression -- and I'm not using it perjoratively, it's just the

15  best way I can think to express it was, he sort of confronted

16  me and suggested there would be further confrontation in the

17  future.  It sort of felt like a kid calling another kid out to

18  fight on the playground.  All the agents looked at me like,

19  what is that about, to which I made a joke, which was, I think

20  we're going to have a duel.  Does anybody have a sidearm.  I

21  guess I need one bullet.

22          It was not the intent of a threat.  The joke was the

23  idea of an 18th Century duel.  You need a gun with one bullet.

24  My intent was to make fun of Mr. Bondy's apparent sort of

25  intention to have some very grand confrontation with me.  I was

1   not threatening him.  And frankly, your Honor, I don't think

2   any reasonable person would portray it that way.  And I think

3   there may be some element of seeking strategic advantage here.

4               MR. BONDY:  If I may.

5               THE COURT:  Why don't you speak into the mic, please.

6               MR. BONDY:  I hope there is video in this courtroom.

7   The video will reflect that after, at the break, the start of

8   the break, Hagan Scotten ran over to me, literally ran over to

9   me like he's accosting me and accused me of calling the United

10  States Attorney's Office racist, and did say it was

11  inappropriate and everything else.

12              I said to him no, I told him I was questioning based

13  on the exhibit they put in.  I suggested, as I believe that

14  that exhibit being placed in, itself, in this trial, is some

15  racist video.  It was offensive to us, almost everyone here.

16  There was no need for that piece of evidence.  And I said to

17  him, no, I cross examined on it legitimately and I'm going to

18  cross examine legitimately.  He told me he'll go tell the jury

19  in the closing argument all about it, he can do whatever he

20  wants.

21              I walked out, I went to the restroom.  I made a point

22  of going elsewhere where I didn't think Mr. Scotten would be.

23  I know Mr. Scotten is an officer, a former army officer, combat

24  veteran who has an aggressive manner about him, and everyone on

25  the defense team can attest to that.

1        When I came back from the bathroom, I was speaking to

2  two journalists.  I walked into the courtroom.  I wasn't angry.

3  I was walking by here and Mr. Scotten had his gaggle of FBI

4  agents with him.  As I'm coming up, I hear him say, does anyone

5  have a sidearm.  I don't hear anything about a duel and give me

6  a bullet.  Then, when I confronted on it, he tries to deny it

7  and comes up with this notion of a duel.

8        But, whatever it was, it was inappropriate.  It is

9  inappropriate for you to have a federal law enforcement officer

10 from the United States Attorney's Office attempting to chill my

11 advocacy in this courtroom on behalf of my client, whom I'm

12 defending with great zeal, I believe, by threatening to have a

13 shot by his bullet.  There is no place for that in this

14 courtroom.  That's what I'm upset about.

15       THE COURT:  I understand.  He explained.  His version

16 of the story was he was making a joke.  Maybe you interpreted

17 it differently.

18       MR. BONDY:  He wasn't talking to me.  It wasn't a joke

19 to me.  It was some meanspirited thing he said behind my back

20 involving a bullet and a weapon and shooting me with other

21 members of law enforcement from the Federal Bureau of

22 Investigation, who I heard all laugh.  It's just inexcusable.

23       THE COURT:  Well, if it was a joke, it should have

24 been the kind of thing that you need to be careful about.

25       But, more importantly, I think you're all exhausted,

1    you've all been working extremely hard, and in the heat of

2    battle, things can get personal sometimes when they shouldn't

3    be, but things are very intense and I understand how that

4    happens, and it is the heat of battle.

5            So I'm going to say I'm glad the jury wasn't here.  I

6    don't think this affects the trial.  You may be frustrated with

7    each other, you may be frustrated with me because I tend to let

8    lawyers try their case to the extent I can.  And maybe I don't

9    put limits on people, on both sides, that they wish I did.

10           But you need to be cordial and you need to be

11   professional.  And I say that to everybody.  And in the heat of

12   battle, I just want you all to think about that.  I think this

13   is likely something that was misinterpreted.  But I just want

14   you all to be as professional and cordial as your positions

15   require.

16           MR. BONDY:  Your Honor, I understand what you're

17   saying and I understand the position you are in and I will

18   circle back to it.

19           A video would reflect that my version of events is

20   accurate.  If the FBI agents were questioned, they'd probably

21   concur that this was said.  It doesn't change the fact, it

22   wasn't funny to me, no one has apologized to me.

23           I practiced law for 26 years in this court, and I've

24   never had anybody say that to me or about me, ever.  It's

25   outrageous.  I'd ask for an apology from Mr. Scotten.  Frankly,

1    I think I should have an apology from his supervisor.  I think

2    it's inappropriate.

3            I'm not tired and I'm not upset, except for the

4    context of what was said.  I'm not exhausted and I don't feel

5    emotional except for the fact that I've been insulted in the

6    courtroom by the prosecutor, threatened.

7            THE COURT:  I don't think you were threatened.

8    Genuinely, I don't think you were threatened.  I think he was

9    making some comment, it might not have been an appropriate

10   comment to make in the context of the heat of battle and how it

11   might be misinterpreted where you've just been arguing about

12   what was appropriate and not appropriate as a lawyer.  You have

13   different views about that.  I just need you all to be cordial

14   and professional.

15           MR. BONDY:  You have that from me, your Honor, yes.

16           MR. SCOTTEN:  Same, your Honor.

17           I did want to briefly address the underlying exhibit,

18   because I don't want any ambiguity about that, leaving behind

19   that.  I do think that it's quite clear, just in case there is

20   any dispute about the purpose of the exhibit -- in fact, if I

21   could, can I ask Ms. Drescher just to put up page 10 so we can

22   see what I'm about to refer to --

23           MS. FRIEDMAN:  Your Honor, we can't understand

24   anything he's saying.

25           MR. SCOTTEN:  I'm sorry.  I can get closer.

1          The exhibit that Mr. Bondy is discussing is described

2     in the summary chart as assault on a street artist, something

3     to the effect of, give me my money, do you think I'm a joke, I

4     think -- I hope that the jury understood the obvious

5     implication here in the context of Mr. Kukushkin extending

6     $500,000 in that conversation, there is no excerpting there,

7     that's the video, the loan agreement, I think the implication

8     is clear that it's a threat.  The reason we are offering it is

9     to show that this is sort of not a legitimate business loan

10    context.  Rather, you would not expect this sort of thing in a

11    legitimate loan the defense has characterized it as, though I

12    suppose the jury will decide if they agree with that inference.

13         My point is, it is very clear why we're offering it.

14    It does not have anything to do with race, which I think should

15    be very obvious.  Whether it was appropriate of Mr. Bondy to go

16    down that road or not is a matter of advocacy.  I'll leave it

17    to the Court.  I'm not asking your Honor to weigh in on it.  I

18    thought, on a personal level, it was deeply inappropriate --

19    and that's why I informed him not on the record and I'm not

20    asking for relief, just as a matter of what I felt was within

21    the bounds of professionalism.

22         THE COURT:  To be clear, you weren't -- I'm not sure

23    how race is relevant, exactly.  I don't know the point of your

24    conversation.  You thought it was a racist video, I think you

25    just said.

1          MR. BONDY:  I thought that video was really

2    inappropriate to play to the jury and it had a racial impact on

3    it.  Yes, I think that half the jury thought so, no matter what

4    I asked Agent Casola.

5          THE COURT:  Did you think the prosecutors were using

6    it in a way to do something inappropriate on the lines of race?

7          MR. BONDY:  I don't know if they're using it in a way,

8    but it was selected in a way.  And I say this having defended

9    people much of my adult life having been born and raised and

10   publicly educated in New York, having three children of color,

11   it impacted upon me based upon my life experiences and a wife

12   of color.  Yes, it affected me in a way that I thought was

13   offensive.  Out of the one thousand -- the summary chart is one

14   one-thousandth of 1 percent, was that really necessary in the

15   case?

16         And then I cross examined the witness within the rules

17   established by the Court.  I questioned the witness and the

18   Court allowed me to question the witness and I didn't go beyond

19   the Court's rules.  So I don't think that anything I did on the

20   cross examination was inappropriate.

21         And we're in a case, we're talking about Putin and the

22   henchmen and the oligarchs and the Russian Roots and this

23   xenophobic stuff about our clients from the beginning to the

24   end.

25         THE COURT:  But this isn't a video that the government

1     just gratuitously put before the jury.  It was a communication

2     by key people in the case in the context of --

3               MR. BONDY:  I agree.

4               THE COURT:  -- in the context of financial deals.

5               MR. BONDY:  Here's the thing, there are tens of

6     thousands of communications in the case, and that was not

7     necessary to further any point.  What was that probative of

8     exactly?  How did it further any aspect of this case?  Wasn't

9     there some other document that they could -- did they need that

10    document?  How does one select that document to play before the

11    jury?

12              THE COURT:  Well, in any event, you both have

13    different views about the appropriateness of its use.  It's now

14    in.  I don't think I need to resolve your different views about

15    its relevance.  But, in any event, you obviously have a

16    disagreement.

17              Again, I just say, I'm not going to make anyone

18    apologize because this is one of those situations where there

19    are different interpretations of what happened and I want to

20    assume the best of all of you as professionals and not assume

21    bad faith.  I think you all have a real disagreement here.  But

22    what I care about is what happens before the jury and that

23    you're appropriate and professional, but also that you be

24    cordial and professional during the trial.

25              MR. BONDY:  Yes.  I love coming here and I always love

1    coming here.  This is a sanctum to me, and to be treated that

2    way by a laughing Mr. Scotten, who sits there laughing right

3    now as I speak right now in front of you is totally

4    inappropriate.  So I understand your point.  You'll always have

5    my cordiality and you'll always have my respect.  I don't

6    necessarily think that Mr. Scotten was acting in good faith

7    with me still and I don't know if I ever will.

8              THE COURT:  Anything else?

9              MR. SCOTTEN:  I don't want to engage in further record

10   making.  I don't think I've treated Mr. Bondy in any particular

11   way and I don't think, outside the advocacy he's now

12   attempting, anyone would have perceived it that way.

13             THE COURT:  I think that's all I need to hear on this.

14   You have my admonition.  Have a goodnight, everybody.

15             MR. ROOS:  Your Honor, just for defense attorneys, the

16   press, the order tomorrow is going to be Mr. Hartsock

17   continuing, Mr. Laxalt, Ms. Van Rensburg, Ms. Boothe.  I think

18   that may take -- fairly hopeful we'll get through these folks

19   since they're all out-of-town witnesses.  If it looks like

20   we're going particularly speedy, we'll provide a fifth name

21   around lunchtime.

22             THE COURT:  How many more witnesses are there?

23             MR. ROOS:  So I think we're making pretty good

24   progress.

25             THE COURT:  I guess the question is, are we on track

1   from the government's perspective?

2              MR. ROOS:  Yes, that's correct.  Candidly, I thought

3   maybe we would be through one more or maybe half a more witness

4   today, but we're generally in the ballpark.  We may make it up

5   tomorrow depending on how things go.  So I think we're in

6   pretty good shape and potentially would be resting on Monday at

7   least in terms of our witnesses, although we'll be able to give

8   the Court a better sense of that tomorrow, perhaps around

9   lunchtime when we see.  Theoretically, if there is an extensive

10  cross of Mr. Hartsock, then I'll be telling you it's going to

11  be Wednesday of next week.

12             THE COURT:  So after Boothe, there still are --

13             MR. ROOS:  There still are witnesses after Boothe.  I

14  would say there is a certainty there will be fact witnesses, at

15  least one fact witness on Monday, probably multiple.  But

16  tomorrow at lunch, we'll be able to give the Court a better

17  update on sort of where we are.

18             THE COURT:  Okay.  Thanks, everyone.  Have a good

19  night.

20             (Adjourned to October 15, 2021 at 9:15 a.m.)

21                              * * *

22

23

24

25

1                       INDEX OF EXAMINATION

2       Examination of:                           Page

3        DANIEL STEWART

4       Direct By Ms. Flodr  . . . . . . . . . . . . 238

5       Cross By Mr. Bondy . . . . . . . . . . . . . 241

6       Redirect By Ms. Flodr  . . . . . . . . . . . 259

7       Recross By Mr. Bondy . . . . . . . . . . . . 259

8        ANTHONY CASOLA

9       Direct By Mr. Scotten  . . . . . . . . . . . 260

10      Cross By Mr. Bondy . . . . . . . . . . . . . 385

11       MICHAEL HARTSOCK

12      Direct By Mr. Roos . . . . . . . . . . . . . 447

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                       GOVERNMENT EXHIBITS
 2    Exhibit No.                                    Received
 3     4, 8, 14, 15, 24, 25, 26, 27, 28, 30, . . . . 234
 4              31, 32, 33, 34, 35, 38, 39,
 5              40, 42, 43, 44, 45, 48, 50,
 6              52, 53, 54, 58, 59, 60, 61,
 7              62, 64, 66, 68, 72, 73, 74,
 8              75, 77, 78, 79, 81, 82, 83,
 9              84, 86, 89, 90, 91, 133, 135,
10              137, 141, 144, 146, 155, 156,
11              167, 601, 702, 1212, 1295,
12              1296
13    1402  . . . . . . . . . . . . . . . . . 262
14    S7  . . . . . . . . . . . . . . . . . . 273
15    S5 . . . . . . . . . . . . . . . . . . . 309
16    S4 . . . . . . . . . . . . . . . . . . . 321
17    S15 . . . . . . . . . . . . . . . . . . 356
18    S3 . . . . . . . . . . . . . . . . . . . 360
19    652 . . . . . . . . . . . . . . . . . . 453
20                       DEFENDANT EXHIBITS
21    Exhibit No.                                    Received
22     B6  . . . . . . . . . . . . . . . . . . 325
23
24
25
</pre>