UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

UNITED STATES OF AMERICA,

      - against-

ANDREY KUKUSHKIN, *et al*.,

                        Defendants.

-------------------------------------------------------------- X

S3 19 Cr. 725 (JPO)

ORAL ARGUMENT
REQUESTED

**ANDREY KUKUSHKIN'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO SET ASIDE THE VERDICT AND FOR A
JUDGMENT OF ACQUITTAL, PURSUANT TO FED R. CRIM. P. 29(C) OR IN THE
ALTERNATIVE FOR A NEW TRIAL PURSUANT TO FED R. CRIM. P. 33(B)(2)**

December 9, 2021

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Faith A. Friedman
1776 Broadway, Suite 2000
New York, N.Y. 10019
Tel: (212) 737-0400
Fax: (212) 988-6192
Email: lefcourt@lefcourtlaw.com
*Attorneys for Andrey Kukushkin*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 2

   1.  Summary of the Offense Charged in the Indictment........................................ 2

   2.  Summary of the Evidence Presented at Trial ................................................... 3

ARGUMENT ............................................................................................................... 8

POINT ONE

   THE COURT SHOULD SET ASIDE MR. KUKUSHKIN'S CONVICTION AND ENTER
   A JUDGMENT OF ACQUITTAL ON COUNT ONE .......................................... 8

   1. The Legal Framework ..................................................................................... 8

   2. The Evidence was Legally Insufficient to Sustain a Conviction of Conspiracy .................... 9

      a.  The Evidence is Legally Insufficient to Establish The Existence of the Charged
         Conspiracy (Meeting of the Minds) .......................................................... 11

      b.  The Evidence is Legally Insufficient to Establish Kukushkin Willfully Joined the
         Charged Conspiracy .................................................................................. 17

      c.  Conclusion .................................................................................................. 24

POINT TWO

   THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A
   JUDGMENT OF ACQUITTAL ON COUNT THREE.......................................... 24

POINT THREE

   THE COURT SHOULD ORDER A NEW TRIAL ON COUNTS ONE AND THREE
   UNDER RULE 33 ................................................................................................. 27

     A. Legal Standard............................................................................................. 27

     B. The Verdicts Should Be Set Aside Because They Are Against the Weight Of The
        Evidence.................................................................................................... 28

C. The Court Should Grant a New Trial For Counts One And Three With a Proper Willfulness Instruction And A Good Faith Defense Charge ..........................................30

   1. The willfulness definition and instruction misled the jury ...........................................32

   2. Kukushkin was entitled to have a good faith defense charge included in the jury instructions ...................................................................................................................34

D. The Court Should Grant a New Trial Because Erroneous Evidentiary Rulings Substantially Prejudiced Kukushkin ...............................................................................35

   1. The Court wrongly admitted a privileged communication (GX-137, DX B-6) ..........36

   2. The Court wrongly admitted the contribution chart (GX 1403) and summary chart (GX 1402) .................................................................................................................39

E. The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Denial of His Motions to Sever ........................................................................41

F. The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Government's Improper Summation Arguments ...............................................45

   1. Bad Purpose ...............................................................................................................46

      a)  Use of Andrey Muraviev's Profile Photo .......................................................46

      b)  Attendance at the Elko and Las Vegas Rallies .................................................48

      c)  Bribery Arguments............................................................................................48

   2.  The Russian Roots Email (GX 137) .........................................................................48

G. The Court Should Grant a New Trial Based on the Prejudice to Mr. Kukushkin Resulting from the Cumulative Impact of the Trial Errors ............................................49

POINT FOUR

   KUKUSHKIN SEEKS LEAVE TO JOIN IN THE MOTIONS OF HIS CO-DEFENDANT THAT INURE TO HIS BENEFIT .......................................................................................50

CONCLUSION....................................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berger v. United States*,
    295 U.S. 78 (1935)................................................................................45

*Cheek v. United States*,
    498 U.S. 192 (1991)....................................................................18, 31, 32

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943)................................................................................24

*Jackson v. Virginia*,
    443 U.S. 307 (1979)..................................................................................8

*Phillips v. Bowen*,
    278 F.3d 103 (2d Cir. 2002)...................................................................35

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)....................................................................18, 19, 32

*Strickler v. Greene*,
    527 U.S. 263 (1999)................................................................................45

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999)...................................................................37

*United States v. Archer*,
    977 F.3d 181 (2020)....................................................................17, 28, 32

*United States v. Autori*,
    212 F.3d 105 (2d Cir. 2000)...................................................................28

*United States v. Avenatti*,
    No. 19-CR-373, 2021 U.S. Dist. LEXIS 125442 (S.D.N.Y. July 6, 2021) ...........................28

*United States v. Banki*,
    685 F.3d 99 (2d Cir. 2012)......................................................................45

*United States v. Baptiste*,
    8 F.4th 30 (1st Cir. 2021).......................................................................49

*United States v. Barrett*,
    496 F.3d 1079 (10th Cir. 2007) .............................................................49

*United States v. Bell,*
    584 F.3d 478 (2d Cir. 2009).............................................................................28, 35

*United States v. Benton,*
    890 F.3d 697 (8th Cir. 2018) .........................................................................19, 34

*United States v. Casamento,*
    887 F.2d 1141 (2d Cir. 1989)................................................................................39

*United States v. Certified Envtl. Servs., Inc.,*
    753 F.3d 72 (2d Cir. 2014)....................................................................................28

*United States v. Concepcion,*
    983 F.2d 369 (2d Cir. 1992)..................................................................................25

*United States v. Conlin,*
    551 F.2d 534 (2d Cir. 1977)..................................................................................41

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012)................................................................................9, 19

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994)..............................................................................9, 15

*United States v. Davis,*
    131 F.R.D. 391 (S.D.N.Y. 1990) .........................................................................37

*United States v. Donnell,*
    608 F.3d 546 (9th Cir. 2010) ...............................................................................13

*United States v. Doyle,*
    130 F.3d 523 (2d Cir. 1997)..................................................................................34

*United States v. Feola,*
    420 U.S. 671 (1975)..........................................................................17, 32, 33

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001)...........................................................27, 28, 34

*United States v. Gabinskaya,*
    829 F.3d 127 (2d Cir. 2016)..................................................................................49

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002)......................................................................................9

*United States v. Ho,*
    984 F.3d 191 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2862 (2021) .........................39

*United States v. Jones*,
   393 F.3d 107 (2d Cir. 2004)...........................................................................8

*United States v Jones*,
   605 F. Supp.513 (S.D.N.Y. 1984) ................................................................25

*United States v. Kapelioujnyj*,
   547 F.3d 149 (2d Cir. 2008)...........................................................................8

*United States v. Kosinski*,
   976 F.3d 135 (2d Cir. 2020).........................................................................33

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011).........................................................................35

*United States v. Landesman*,
   --- F4 ---, Nos. 19-CR-3207, 19-CR-3209, 2021 U.S. App. LEXIS 32945 (2d
   Cir. Nov. 5, 2021) .......................................................................................28

*United States v. Levin*,
   No. 15-CR-101, 2015 U.S. Dist. LEXIS 137615 (S.D.N.Y. Oct. 5, 2015) ............36

*United States v. Lorenzo*,
   534 F.3d 153 (2d Cir. 2008)......................................................................8, 9

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001).........................................................................10

*United States v. Ohle*,
   678 F. Supp. 2d. 215 (S.D.N.Y. 2010).........................................................42

*United States v. Pauling*,
   256 F. Supp. 3d 329 (S.D.N.Y. 2017), *affirmed*, 924 F.3d 649 (2d Cir. 2019) ...................8, 9

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019)...........................................................................8

*United States v. Pedroza*,
   750 F.2d 187 (2d Cir. 1984).........................................................................35

*United States v. Pinto*,
   850 F.2d 927 (2d Cir. 1988).........................................................................39

*United States v. Pipola*,
   83 F.3d 556 (2d Cir. 1996)......................................................................24, 32

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006)................................................................ *passim*

*United States v Reinhold,*
    20 F. Supp. 2d 541 (S.D.N.Y. 1998) ...................................................................41

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1992) ...................................................................10, 17

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) ...................................................................42, 44

*United States v. Sanchez,*
    969 F.2d 1409 (2d Cir. 1992) ...................................................................27, 35

*United States v. Singh,*
    924 F.3d 1030 (9th Cir. 2019) ...................................................................19

*United States v. Smuckler S v. Smuckler,*
    991 F.3d 485 (3d Cir. 2021) ...................................................................19

*United States v. Stavroulakis,*
    952 F.2d 686 (2d Cir. 1992) ...................................................................10

*United States v. Stein,*
    428 F. Supp. 2d 138 (S.D.N.Y. 2006) ...................................................................42

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003) ...................................................................11

*United States v. Taylor,*
    464 F.2d 240 (2d Cir. 1972) ...................................................................9

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) ...................................................................9

*United States v. Van Hise,*
    No. 2-CR-847, 2017 U.S. Dist. LEXIS 126004 (S.D.N.Y. Aug. 8, 2017) ......................42, 44

*United States v. Wiley,*
    846 F.2d 150 (2d Cir. 1988) ...................................................................9

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ...................................................................39

*Untied States v. Litvak,*
    889 F.3d 56 (2d Cir. 2018) ...................................................................28

**Statutes**

18 U.S.C. § 371 ...................................................................2, 10

52 U.S.C § 30121 ................................................................................................................18, 19, 32

52 U.S. C. § 30122 ..............................................................................................................10, 13, 25

**Other Authorities**

Fed. R. Crim. P. 29 ....................................................................................................... *passim*

Fed. R. Crim. P. 33 ....................................................................................................... passim

Federal Rules of Evidence Rule 403 ............................................................................................36

Federal Rules of Evidence Rule 1006 .........................................................................................39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

UNITED STATES OF AMERICA,

    - against-

ANDREY KUKUSHKIN, *et al.*,

                   Defendants.

S3 19 Cr. 725 (JPO)

ORAL ARGUMENT
REQUESTED

---------------------------------------------------------------- X

**ANDREY KUKUSHKIN'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO SET ASIDE THE VERDICTS AND FOR A
JUDGMENT OF ACQUITTAL, PURSUANT TO FED R. CRIM. P. 29(c) OR IN THE
ALTERNATIVE FOR A NEW TRIAL PURSUANT TO FED R. CRIM. P. 33(b)(2)**

**INTRODUCTION**

      Defendant Andrey Kukushkin submits this Memorandum of Law in support of his motion

to set aside the jury's verdicts and for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c)[1]

or in the alternative for a new trial pursuant to Fed. R. Crim. P. 33(b)(2). The jury convicted

---
[1] This motion is intended to supplement the arguments made in support of the Rule 29 motion
Kukushkin and Parnas made at trial. *See* Tr. 1103:7-1111:4. Those arguments are reasserted and
incorporated by reference as if fully set forth herein. In addition, Kukushkin requests that, upon
granting the instant motion, the Court also conditionally grant his motion for a new trial pursuant
to Rule 33 in the event that the judgment of acquittal is later vacated or reversed. Fed. R. Crim.
P. 29(d)(1).

Kukushkin of Count One, conspiracy to violate the federal election laws[2] and in doing so defrauding the United States, as well as Count Three, aiding and abetting the making of a contribution by a foreign national.  As detailed below, the Court should set aside Kukushkin's convictions on both counts and judgments of acquittal should be entered with respect thereto because the evidence as to each count fails to support a finding of guilt beyond a reasonable doubt.  Alternatively, the verdict should be vacated, and a new trial ordered, as it is against the weight of the evidence and constitutes a manifest injustice which cannot stand.

## **BACKGROUND**

### 1. **Summary of the Offenses Charged in the Indictment**

The third Superseding Indictment charged Andrey Kukushkin and Lev Parnas with conspiracy to make political contributions and donations allegedly by a foreign national, Andrey Muraviev (Sup. Ind. ¶ 1(a)); to make political contributions and donations in the names of others (*id.* at ¶1(b)); and in doing so, to defraud the United States, specifically the Federal Election Commission ("FEC") (*id.* at ¶1(c).  (Count One).  Sup. Ind. ¶¶ 1-2 (Dkt. 207).  Kukushkin and Parnas also were charged with a substantive count of aiding and abetting Muraviev in making political contributions and donations ((Count Three) Superseding Indictment ¶ 4 (Dkt. 207)).  Together with a solicitation count (Count Two), in which Kukushkin was not charged, these counts formed what was referred to as the Foreign Donor Scheme.

---

[2] While the Superseding Indictment labels the charged offense a conspiracy to make contributions by a foreign national, Kukushkin and Parnas were charged more broadly with conspiracy in violation of 18 U.S.C. § 371, the three objects of which were: (1) making contributions and donations by a foreign national; (2) making contributions in the names of others; and (3) defrauding the United States.  Accordingly, we refer to the charged conspiracy interchangeably as one to make contributions by a foreign national and to violate the federal election laws.

The Superseding Indictment additionally charged Parnas with participating in a Straw Donor Scheme (Counts Four, Five, and Six) in which Kukushkin is not alleged to have participated and to which he was not alleged to have any connection. Dkt. 207.

### 2. Summary of the Evidence Presented at Trial

Andrey Kukushkin is a naturalized United States citizen born, raised and educated in Odessa, Ukraine, formerly part of the Soviet Union. GX 755; S-12.[3] He immigrated to the United States in 1993 and was naturalized as a United States citizen in 1999, at the age of 26. *Id.* He is not registered to vote (S-3), has never voted (*id.*), and has never made a political contribution (S-10).

In 2018, Kukushkin was approached about entering into a joint venture to operate a cannabis business with Igor Fruman and his business partner, Lev Parnas. It was anticipated that this joint venture would be funded by a $1 million loan from Andrey Muraviev, a long-time friend of Kukushkin. GX 25; GX 31-A-7; GX 33; GX 39. Muraviev was a wealthy Russian national who resided abroad and funded other businesses in the United States. Kukushkin resided in the United States and worked with Muraviev in some of those business endeavors. With respect to the venture with Parnas and Fruman, Kukushkin's goal was to establish a lawful cannabis business and obtain a "network of licenses" for retail cannabis operations in various states throughout the United States. GX 25.

In late May 2018, Kukushkin met with Fruman in Miami and thereafter communicated with him casually via text message. GX 14. On June 2, 2018, Kukushkin told Fruman that "Andrey", believed to be Muraviev, "will support $" (*id.*) without providing any additional

---

[3] Unless otherwise noted, all exhibit references are to the exhibits admitted at trial. It is our understanding that the Court is in possession of an electronic copy of all admitted trial exhibits. To the extent the Court would like the defendant to produce or upload to the ECF filing system a copy of the trial exhibits cited herein, he will do so upon request.

context.  Between June 5, 2018, and July 5, 2018, Parnas and Fruman made $156,000 in political

contributions and donations. S-11.  All were in Parnas's or Fruman's names and listed "Global

Energy Producers" ("GEP"), Parnas's and Fruman's energy business as their employer. *Id.*; GX

108; GX 112; GX 113; GX 114; GX 117; GX 120; GX 121; GX 124; GX 155; GX 156; GX 160.

Kukushkin had no involvement in making any of these contributions and no connection to GEP.

Nor did GEP have any involvement in the cannabis industry. No evidence was adduced at trial

showing that the contributions were made to further the proposed cannabis business or were

made with Kukushkin's knowledge, consent, or agreement.

On July 1, 2018, Kukushkin had sent Fruman a copy of the Oasis – teaser, a brochure for

investors, and similarly told him that there was a seat available for Fruman on the Board of

Directors. DX A-3.  The first direct communication between Kukushkin and Parnas was not until

July 2018. GX 89.  On July 19, 2018, Kukushkin texted Fruman that "an understanding of the

joint activities has been reached" and laid out a proposed structure and allocation of

responsibilities for the future venture. GX 25.  Parnas and Fruman were to be responsible for

"Lawyers/Lobbyists" and the "Goals" were to "quickly take control of a network of licenses for

stores in California…" (*id.*).  Kukushkin also mentioned the possibility of a separate investment

by Parnas and Fruman in the "Friends & Family round" of "Oasis Fund" – Kukushkin's separate

business venture (*id.*), for which he would "establish advsery board seats [sic] before we launch"

(*id.*; *see also* DX A-3).

In early August, David Correia, an associate of Parnas and Fruman, visited Kukushkin in

California to learn more about Kukushkin's Oasis business operations.  DX A-9.  Kukushkin

used the Oasis corporate credit card to pay for the trip (DX B-2) and others involved in the Oasis

venture understood it to be a pitch meeting (DX B-8; B-9).  In an email several weeks after the

visit to Oasis, Correia opined "great opportunity with these guys since Big Andre is funding".

DX B-4.  Correia claimed Kukushkin was "not a smart businessman", explained the issues being

dealt with were "literally retarded" and noted that it "create[d] a great opportunity for us". *Id.*

The email ended with Correia lamenting about the serious financial hardships Correia was

experiencing.  *Id.*

The following month, Parnas, Fruman, Kukushkin and Muraviev all met in Las Vegas.

Another participant at the meeting was Stephen Lenn, a cannabis attorney, introduced to

Kukushkin by Parnas and Fruman. GX 53.  By this time, Parnas and Fruman had incurred nearly

$500,000 in credit card debt over the course of several months by charging travel, entertainment,

clothing, restaurant, education, and other living expenses incurred over the preceding several

months.  GX 203.  In addition, political contributions the pair had made months earlier – in June

and early July – for the benefit of GEP were included in these balances. *Id*.  Parnas and Fruman

were desperate for money for their own personal and GEP related endeavors, (Tr. 807:13-809:4

(Van Rensburg)[4]), and began pressuring Kukushkin and Muraviev for money for the anticipated

joint cannabis business (GX 33; GX 43).

On September 12, 2018, Correia created for Parnas the "Cannabis Schedule and budget"

with "projections" which he then sent to Kukushkin and Muraviev. GX 33, 33-A-6; GX 42, 42-

A-1; GX 53, 53-A-2; GX 135.  Approximately one week later, on September 18, 2018, Muraviev

wired $500,000, to FD Import Export, a United States company associated with Fruman,

pursuant to a loan agreement. GX 42, 42-A-12; GX 31, 31-A-7.  While the text exchanges

indicated the monies were to fund the joint cannabis venture nevertheless, the next day,

---

[4] Unless otherwise specifically indicated citations to "Tr." followed by page and line numbers
refer to the trial transcript.

September 19, 2018, the money was used to pay off the $495,000 outstanding balance on the FD Import Export credit card account. GX 203; GX 408; GX 1403.

At the end of September/early October, Parnas and Fruman needed more money. Two disputes then arose between the parties. First, Kukushkin expected Parnas to pay travel expenses he planned to incur in pursuit of the joint cannabis venture; Parnas refused. GX 52; GX 57; GX 58. Correia told Kukushkin that he understood the first $500,000 (which by now had been fully dissipated) had been earmarked for "charitable/political donations", not operational expenses like travel. GX 52. Referring to the $500,000 as "donation funds", but only in response to Correia's use of the term, Kukushkin nevertheless insisted that the funds must be used to pay the expenses – evidently unaware that the funds had been used to pay Parnas's and Fruman's unrelated expenses. GX 52. So adamant that these costs were to be paid for by the joint venture, which was the point of the message, Kukushkin refused to pay his own way and did not travel to Miami for the supposed meeting. GX 58.

The second fight centered on Parnas's and Fruman's demand for the second $500,000 tranche. GX 58. Kukushkin and Muraviev argued that (as far as they knew) the first $500,000 had yet to be spent and they had seen no results – no efforts on behalf of the cannabis venture had been undertaken, no licenses applications had been submitted, no licenses purchased, nothing. GX 58; GX 60; GX 61. To act as if some effort had been made, Parnas had Correia worked to get the joint venture's business entity operational and open a bank account. GX 54. Parnas then had Correia create a list of contributions and donations that Parnas and Fruman allegedly had made or pledged on behalf of the joint venture, entitled the "SIG Contribution list". GX 58; GX 61; GX 144; GX 146. It was sent to Muraviev and Kukushkin. GX 61, 61-A-5. None of the contributions, donations or pledges on the list had been or were ever made. S-11;

GX 61-A-5.  Nevertheless, on October 16, 2018, Muraviev wired the second $500,000 tranche to FD Import Export. GX 48.  Approximately $79,000 was used to pay the FD credit card bill, $33,000 was used to pay off FD's line of credit, another $3,150 was paid to an FD vendor, and the bulk of the remainder was divvied up between Parnas and Fruman with $100,000 going to Fruman and $263,000 to GEP (Parnas).  GX 203; GX 408.  A small amount remained in the FD Import Export account to cover company expenses.  *Id.*  No contributions were made with the Muraviev funds, and none were used for the benefit of the cannabis venture.

At the end of October, Parnas and Fruman tried to extract an additional $2 million from Muraviev, but he and Kukushkin refused.  GX 82; GX 83; GX 84.  On November 1, 2018, Fruman made two $10,000 contributions, one to Adam Laxalt (running for Governor of Nevada) and another to Wes Duncan (running for Nevada Attorney General), using the FD Import Export credit card and listing GEP as his employer.  GX 155; GX 156.  Both Laxalt and Duncan were opponents of cannabis legalization (Tr. 546:2-4 (Laxalt); Tr. 155:18-19 (Duncan)) and no evidence was adduced as to how a contribution to either campaign might benefit the fledgling cannabis business – other than the concept of "supporting winners". In fact, both testified, that there was nothing they could do to assist.  Tr. 155:18-19 (Duncan); Tr. 163:2-22 (Duncan).  The credit card bill for the Laxalt and Duncan contributions was not paid until December 24 and even then, only partially paid.  GX 203.  According to the testimony of Kimberly Espinoza, it was impossible to know if the partial payment included any funds from Muraviev (Tr. 1043:1-9 (Espinoza)) and another large deposit, from Strauss Coffee, was received by FD Import Export the same day the credit card payment was made (Tr. 1032:12-1033:5).  Further, Ms. Espinoza, testified that it was impossible to know if either contribution had ever been paid.  Tr. 1066:2-25 (Espinoza).

**ARGUMENT**

**POINT ONE**

**THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A JUDGMENT OF ACQUITTAL ON COUNT ONE**

### 1. The Legal Framework

Rule 29(a) of the Federal Rules of Criminal Procedure is a safeguard of "the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion". *Jackson v. Virginia*, 443 U.S. 307, 318 n.10 (1979). It would not satisfy constitutional due process "to have a jury determine that [a] defendant is *probably* guilty". *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008); *see also United States v. Pauling,* 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017) (Oetken, D.J.) (internal citations omitted), *affirmed*, 924 F.3d 649 (2d Cir. 2019). Accordingly, Rule 29 provides that a court **must** enter a judgment of acquittal upon a defendant's motion if it concludes that "no rational trier of fact could find guilt beyond a reasonable doubt" as to each and every element of the charged offense. *See United States v. Pauling*, 924 F.3d 649, 655 (2d Cir. 2019) (quoting *Virginia*, 443 U.S. 307 at 319).

In making a sufficiency of the evidence determination, a court is "obligated to 'consider the evidence presented at trial in its totality, not in isolation'". *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369-70 (2d Cir. 2005)). While a court defers to a "jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence", courts may not credit "specious inferences", (*United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004)), or "inferences within the realm of possibility when those inferences are unreasonable", (*United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006); *see also United*

*States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone cannot stand . . . .  The government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt"); *United States v. Wiley,* 846 F.2d 150, 155 (2d Cir. 1988); *United States v. Taylor*, 464 F.2d 240, 242 (2d Cir. 1972) ("The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy").  Instead, courts must be "faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt". *United States v. Pauling,* 256 F. Supp. 3d 329 at 334. "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt'", (*id.*), mandating acquittal. *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012); *United States v. Taylor*, 464 F.2d at 242 ("[N]o other result is permissible within the fixed bounds of jury consideration"). Put another way, where, as here, the evidence is "in equipoise", a court's intervention to enter a judgment of acquittal is required. *United States v. Coplan*, 703 F.3d at 69; *see also United States v. Valle,* 807 F.3d 508, 513 (2d Cir. 2015) (quoting *United States v. Lorenzo,* 534 F.3d 153, 159 (2d Cir. 2008); *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (*quoting United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

It is in this legal context that we review the evidence (or, more aptly, lack of evidence) adduced in support of the charges.

### 2.  The Evidence was Legally Insufficient to Sustain a Conviction of Conspiracy

Count One of the Superseding Indictment charged and the government purported to prove that Kukushkin conspired (1) to make political contributions directly or indirectly by a foreign national; (2) to make political contributions in the name of a person other than the true donor;

and (3) to defraud the FEC in violation of 18 U.S. C. § 371 and 52 U.S.C §§ 30121, 30122, and 30109 (d) (1) (A) & (D).  Sup. Ind. ¶¶ 1 and 2 (Dkt. 207); *see also* Tr. 1302:2-4; 1305:18-19; 1306:18 (Gov't Summation).

A conspiracy is a kind of criminal partnership – an agreement of two or more persons to join together to accomplish some unlawful purpose.  *See* Tr. 1482:20-22 (Jury Charge).  "In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" – here at least one of three goals.  *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Although the coconspirators "need not agree on every detail of their venture, there must be proof beyond a reasonable doubt that they agreed on the essential nature of the plan" – regularly referred to as a "meeting of the minds".  *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992) (citing *Blumenthal v. United States*, 332 U.S. 539, 557 (1947)) (internal quotations omitted).  "When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone".  *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1992) (internal quotations omitted); *See* Tr. 1482:25-1483:2 (Jury Charge).

More than just proving a mutual agreement or meeting of the minds to violate the law in the manner charged, (Tr. 1484:21-24 (Jury Charge)), the government also was required to prove beyond a reasonable doubt that Kukushkin participated in the charged conspiracy knowingly and willfully.  Tr. 1483:13-24 (Jury Charge).  As the jury was instructed, an act is performed "knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident".  *See* Tr. 1487:19-21 (Jury Charge).  For an act to be committed "willfully", "the defendant must act [] with knowledge that some part of his course of conduct was unlawful and

with the intent to do something the law forbids".  "In other words, a person acts 'willfully' when he acts with a "bad purpose" to disobey or disregard the law".  Tr. 1487:23-1488 (Jury Charge).

The government's theory of conspiracy was that Kukushkin agreed with Parnas for Andrey Muraviev to make political contributions and donations through straw donations made by and in the names of Parnas and Fruman.  Tr. 1299:9-11 (Gov't Summation).  In order for the jury to have found Kukushkin guilty, the government was required to prove beyond a reasonable doubt: (1) that Kukushkin and Parnas entered into this unlawful agreement; (2) that Kukushkin knowingly and willfully became a member of the alleged conspiracy; and (3) that one of the members of the conspiracy knowingly committed at least one overt act in furtherance of the conspiracy.  *See* Tr. 1483:17-24 (Jury Charge); *see also United States v. Svoboda,* 347 F.3d 471, 476 (2d Cir. 2003).  The government failed to prove the essential elements of this crime – specifically, the existence of (meeting of the minds), and Kukushkin's membership in (willfulness), the charged conspiracy.  Accordingly, at the close of the government's evidence, Kukushkin timely moved for a judgment of acquittal pursuant to Rule 29.  Tr. 1107:12-1108:15.  The Court reserved judgment on the motion.  Tr. 1110:8-9.

### a.  The Evidence is Legally Insufficient to Establish the Existence of the Charged Conspiracy (Meeting of the Minds)

As the Court explained, for the jury to convict Kukushkin on count one, the evidence at trial had to prove beyond a reasonable doubt the existence of the charged conspiracy.  In other words, the government was required to prove that Kukushkin and Parnas entered into an agreement to violate the law and to accomplish an unlawful act or plan, here to violate the Federal Election Campaign Act's ("FECA") prohibition on donations by foreign nationals and straw donors, and to defraud the FEC.  *See* Tr. 1483:17-24 (Jury Charge).  At best (for the government), the evidence of an agreement on the "essential nature" of a plan was equally (or

11

nearly equally) consistent with innocence as any inference of guilt but under any analysis it was insufficient to prove beyond a reasonable doubt the existence of a meeting of the minds, an essential element of Count One.

To establish the existence of the charged conspiracy, the government relied extensively on text messages cherry picked from exchanges between different individuals, during different time frames, about different matters and then ascribed their own significance and meaning, pushing its own narrative to create the illusion of the required "meeting of the minds". *See* GX 1402. Critically, far from satisfying the government's burden, the evidence proved an ever shifting "inception" of the so-called agreement, the vast differences in the party's goals and objectives, and the disconnect between the proof the government tried to piece together.

As to the fact of an "agreement" itself, the government argued that the evidence established "clear as day" there was "an agreement here". Tr. 1301:5-6 (Gov't Summation). The government initially relied upon GX 25 ("an understanding of the joint activities has been reached") (Tr. 1301:6-9 (Gov't Summation)); followed by GX 58 ("I am reminding about our agreements") (Tr. 1301:10-13 (Gov't Summation)); then GX 83 ("Hi Lyova. In Las Vegas we agreed on the principles of our cooperation") (Tr. 1301: 14-17 (Gov't Summation)); and later, GX 14 ("we will resolve it with you and Andrey will support $ :)") (Tr. 1302:2-12 (Gov't Summation); Gov't Rebuttal Tr. 1449:10-15, 23-25). These exchanges, one from June, another from July, and still others from October, at best demonstrate a fluid discussion in which not even the parties were clear on if or when an agreement had been reached. Thus, the mere existence of an agreement was conjecture, not "clear as day".

Further to showing some "agreement" between the defendants, the government was required to prove, beyond a reasonable doubt, the "essential nature" of that purported agreement.

The government argued that the evidence established that Parnas and Kukushkin agreed to three illegal objects of the charged conspiracy: (1) to make more than $25,000 in contributions from a foreign national; (2) to make more than $25,000 in straw donations; and (3) to defraud the United States.  *See* Tr. 1301:20-24, 25 (Gov't Summation); *see also* Tr. 1481:18-1482:12 (Jury Charge).  In addition, as the jury was charged, in order to establish criminal liability under 52 U.S.C. § 30122 (straw donations), the promise of reimbursement must be a causal factor in the intermediary's decision to make the unlawful contribution.  *See* Tr. 1488:23-1489:19 (Jury Charge).  Thus, for purposes of the second objective of the conspiracy, the government had to prove that Parnas and Kukushkin agreed to the unlawful objective of reimbursing the political contributions or donations *prior* to the time the contributions were made.  *See United States v. Donnell*, 608 F.3d 546 (9th Cir. 2010) (finding defendant guilty of violating Section 30122 by arranging for 13 individuals to donate to a presidential campaign pursuant to a prior promise to reimburse that induced the donations).

The government relied upon virtually the same text exchanges to demonstrate to prove the essential nature of the agreement as it did the existence of the agreement. Viewed in isolation and in the light most favorable to the government, the messages include references by Kukushkin to an "agreement" with the alleged co-conspirators and sporadic mentions of "contributions" and "donations".  GX 25; Tr. 1301:12-13 (Gov't Summation); GX 1402; GX 24; GX 14; GX 33. Based on this evidence, the government asked the jury to infer that in Kukushkin's June 2, 2018, WhatsApp message relayed an agreement to fund the various contributions and donations that Parnas and Fruman subsequently made in June and July.  Tr. 1302:7-12 (Gov't Summation); Tr. 1332:9-12; Tr. 1440:12-16 (Rebuttal Summation).  And that this agreement or understanding was later solidified by the July 19, 2018, exchange. GX 25.  As to the second and third objects, the

government took an *ipso facto* position – the contributions or donations at issue were not made in Muraviev's name so they were intended as straw donations and to prevent the FEC from discovering the true donor.  The government's position is a non-sequitur.

First, neither the June 2 nor the July 19 texts made mention of an agreement to make political contributions and donations. GX 14; GX 25. Second, the June 2, 2018, message provided no obvious context at all. GX 14. What's more, arrayed against the government's cherry-picked selections were many messages in which Kukushkin corresponded with Parnas and Fruman about obtaining legal services for their cannabis venture, deciding on the leadership structure of the enterprise, preparing marijuana licensing applications under legal guidance, and ultimately obtaining a "network of licenses" for cannabis retail stores.  *See* GX 25; DX A-3, A-9, A-14; DX B-1.  Indeed, the July 19, 2018, text exchange, provided that the "understanding" of "joint activities" contemplated that Muraviev's investment would be used for, among other things, "lawyers/lobbyists" (GX 25), not political contributions or donations.

Critically, "lawyers/lobbyists" are terms wholly consistent with the concept of "access" and placed that term into proper context.  In contrast, however, the government asked the jury to infer (speculate) that "access", which appears in multiple exchanges (GX 33; GX 39), meant to make political contributions or donations, into proper context.  The presence of this language also rendered later use of terms "donation funds" or "contributions" just as consistent with innocence as it did with guilt and thus insufficient to prove Kukushkin's guilt beyond a reasonable doubt.

Moreover, all the contributions at issue had been made prior to the July 19, 2018, "understanding" of "joint activities" message (GX 25), and all of those contributions were expressly made for the benefit of GEP (GX 17; GX 18; GX 21), Parnas and Fruman's unrelated

energy business.  Likewise, none of those contributions can be found on the SIG Contribution list, cited by the government as key evidence of the essential nature of the agreement (GX 61, 61-A-5; S-11).  If the June 2, 2018, WhatsApp message really was confirmation that Muraviev would fund Parnas's and Fruman's political contributions and donations, one would expect the SIG contribution to include the contributions actually paid with the first $500,000, it did not.  Similarly, every entry on the SIG contribution list was dated between September and October 2018, none were June or July.  *Id.*  The most reasonable inference is that Parnas and Fruman had resolved to make political contributions and donations (lawful or otherwise) long before they connected with Kukushkin or hatched their scheme to fraudulently use Muraviev's money to get themselves out of debt (*see* Tr. 1409:21-1410:7), showcasing that Kukushkin never participated in any foreign donor or straw donor scheme.[5]

The only reasonable inference to be drawn from the messages collectively is that Kukushkin agreed to a lawful cannabis business among the parties whereby he would facilitate *financial contributions* from Muraviev for lawful activities in setting up the business entity, including licensing, lobbying, and legal services, not that he entered into a scheme to make illegal political contributions.  *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (on sufficiency review, only "reasonabl[e]" inferences should be drawn in favor of government); *accord United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006).

---

[5] In its rebuttal summation, the government argued that Kukushkin met Parnas in Miami, Florida in late May/early June (the evidence does not show Kukushkin to be in Miami in early June).  The government cited GX 14 as proof of the meeting.  GX 14 provides no such evidence as it is a text exchange between Kukushkin and Fruman in which Kukushkin thanks Fruman and makes no mention whatsoever of Parnas.  Moreover, in the 1000s of texts and phone records introduced at trial, the first communication between Parnas and Kukushkin was July 7, 2018 (GX 89).  The government simply made up the entire story and waited until its rebuttal summation to do so.

Finally, the government's reliance on these selective text exchanges ignores completely the realities of what took place – a fraud, not an agreement or conspiracy.  There is a critical distinction between words, actions, and intent.  The evidence presented at trial demonstrated that the parties entered into their association with vastly differing purposes in mind.  Kukushkin was embarking on a legitimate business endeavor to build a successful lawful cannabis business, legally obtaining cannabis licenses along the way, with the hope of one day selling the business to a larger operator.  *See* GX 25.  On the other hand, Parnas and Fruman had no such intentions – no matter what they said.  Consistent with their pattern of behavior in other charged (and uncharged) conduct, Parnas and Fruman needed money to pay off substantial credit card debt incurred from lavish spending on travel, luxury goods, restaurants, entertainment, educational, family and living expenses, incurred over months for their own personal and/or for GEP business and to continue to live the high-life on a going forward basis and build their nascent energy business.  GX 203; DX A-12; Tr. 807:3-809:4 (Van Rensburg).  They saw Kukushkin, whom they viewed as an unsophisticated businessman, ripe for manipulation with the financial backing of Muraviev.  *See* DX B-4; DX A-4; DX A-9.  They had no interest in pursuing the success of a joint cannabis venture.  And the evidence presented at trial – even viewed in light most favorable to the government demonstrates as much.  None of the money was used to benefit a joint cannabis business, Muraviev, or Kukushkin.  No contributions were made for the benefit of the cannabis business.  No license applications were filed.  No attempts to purchase licenses were pursued.  The one business trip Kukushkin asked to have covered with funds earmarked for the business venture was denied.  GX 58.  Further, as detailed, *infra,* the only political contributions and donations made after the $1 million had been transferred (like those made prior), were made for the benefit of GEP to two Republican candidates opposed to the legalization of cannabis (Tr.

155:18-19 (Duncan); Tr. 546:2-4 (Laxalt)).  In other words, Parnas and Fruman were merely "pretend[ing]" to agree to the legitimate aims of the cannabis venture, and in fact "misled and defrauded" Kukushkin "with secret [illegal] purposes of their own", and there "[was] no conspiracy at all".  *See United States v. Rosenblatt*, 554 F.2d 36, at 38.

Looking at actions rather than words, the government never explains how the donations could possibly have been made to benefit the cannabis business.  The contributions had no connection to the business.  No communications were ever adduced in which the donations were linked to the business.  The only reasonable explanation is that the June and July donations were what they look like – made by Parnas and Fruman to benefit their energy business, GEP, and when Muraviev started to fund the unrelated cannabis business, Parnas and Fruman simply snapped up the cash to pay their own debts and continue to live the high-life.

### b.  The Evidence is Legally Insufficient to Establish Kukushkin Willfully Joined the Charged Conspiracy

Even assuming *arguendo,* the evidence was sufficient to demonstrate a meeting of the minds, it was insufficient to prove Kukushkin became a member of the conspiracy.  The Second Circuit requires that the government prove a defendant "willfully and knowingly became a member of the conspiracy, with intent to further its illegal purposes – that is, with the intent to commit the object of the charged conspiracy".  *United States v. Archer*, 977 F.3d 181, 190 (2020).  This means that the government must show that the defendant had "at least the degree of criminal intent necessary for the substantive offense itself".  *United States v. Feola*, 420 U.S. 671, 686 (1975).

The FECA requires that an individual act "knowingly and willfully" in making a prohibited donation or contribution.  As noted *supra* and as the jury was instructed, an act is done "willfully" if the person "acts with knowledge that some part of his course of conduct was

17

unlawful and with the intent to do something the law forbids". Tr. 1510:23-1511:2 (Jury

Charge). In other words, in order for the jury to have found that Kukushkin acted "willfully", the

evidence had to demonstrate that he acted with a "bad purpose" that is "to disobey or disregard

the law". *Id. at* 1511:1-2. In order to prove Kukushkin acted "willfully", the government was

required to establish that he "knew his conduct was unlawful", *i.e.*, that he knew he was breaking

the law.

Regardless of whether Sections 30121 and 30122 require application of a heightened

standard of scienter,[6] the evidence was insufficient here to prove that Kukushkin knowingly and

---

[6] While the meaning of "willfulness" in the context of federal election laws remains unsettled in the Second Circuit, courts have applied a heightened standard for "willfulness" in cases involving "highly technical statutes that presen[t] the danger of ensnaring individuals engaged in apparently innocent conduct". *Cheek v. United States*, 498 U.S. 192, 201 (1991) (finding that willfulness standard required defendant to have specific knowledge of tax statute he was charged with violating); *Ratzlaf v. United States*, 510 U.S. 135 (1994) (finding that willful violation of currency reporting requirements required defendant to have knowledge that his structured transactions were unlawful under the statute).

Sections 30121 and 30122 are "highly technical" statutes that pose a risk of "ensnaring" individuals who are unaware that their involvement with certain political contributions could be unlawful. As elicited during trial, even individuals who deal professionally with election law acknowledged that campaign contribution regulations are complex, and that their own knowledge of the subject remains imperfect even after extensive training and experience. *See* Tr. 1412:25-1414:4. Contrary to the government's arguments throughout the course of these proceedings and the trial, it is not simply a function of whether a foreign national may make political contributions or donations. That is not what occurred here and under no reading or analysis of the facts is that what can be understood as intended by any purported agreement between Messrs. Parnas and Kukushkin. Rather, at best, it can be inferred as an understanding that some of the seed money that was going to be invested in NewCo, a domestic corporation, by Muraviev and be repaid to him once the venture started generating income, might be used to make political contributions or donations. That is not the same things as a foreign national directing and making political contributions or donations. Indeed, Adam Laxalt, former Attorney General of Nevada, testified to uncertainty as to whether a domestic corporation with foreign shareholders could lawfully contribute $10,000 to his campaign. Tr. 1413:13-19.

willfully entered into an agreement to achieve the foreign donor scheme.  Here too, at best, the

evidence at trial led to "equal or nearly equal circumstantial support to a theory of guilt and a

theory of innocence", (*United States v. Coplan*, 703 F.3d at 69), as to whether Kukushkin

"willfully" joined the purported conspiracy with the intent to violate federal election law.  In

reality, the evidence of Kukushkin's membership, *i.e.,* willful joining, in the alleged conspiracy

was non-existent.

The government presented no direct evidence that Kukushkin engaged in any of the

relevant conduct with the requisite knowledge that he was violating any law, or that he acted

with the purpose of disregarding or disobeying any law because there was none.  Kukushkin had

no understanding of U.S. election law or campaign finance regulations – a highly complex area

that confuses even experts (Tr. 494:23-495:1 (Hartsock))– and did not know that making

political contributions or donations with funds originating from a foreign national could, in some

instances, be considered unlawful.[7]  Kukushkin was born, raised, and educated in the former

Soviet Union.  *See* S-12.  He immigrated to the United States in 1993 and became a naturalized

United States citizen in 1999, at the age of 26.  *Id*.  Kukushkin was not and had never been

political – he did not vote, register to vote or contribute to political campaigns.  Tr. 1414:9-19;

---

 If subject matter experts are unable to confidently articulate the nuances of these laws, they
plainly present a risk of ensnaring individuals who have no knowledge or understanding that
their conduct is in violation.  Accordingly, the heightened standard for willfulness should apply
despite the Court refusing to instruct the jury with the proper willfulness standard.  Although, we
note, that several other circuits have decided this issue to the contrary.  *See United States v.
Benton*, 890 F.3d 697, 715 (8th Cir. 2018) (applying the *Bryan* standard to a statute on FECA's
reporting requirements); *United States v. Singh*, 924 F.3d 1030, 1045 (9th Cir. 2019) (finding the
*Bryan* standard applicable to 52 U.S.C § 30121); *United States v. Smuckler S v. Smuckler*, 991
F.3d 485 (3d Cir. 2021) (noting that the standard applied by the Court in *Ratzlaf* applied only to
unusual cases involving highly technical statutes.  It did not apply to the substantive Federal
Election Campaign Act charges in this case).

[7] As Laxalt and others testified that is not always the case.  It is more nuanced and complicated
than the government suggested.  *See* Tr. 555:18-556:6.

*See also* S-3, S-10, S-11.  And there was no evidence that he received, read, saw, or was provided with copies of the political contribution and donation forms which listed a few applicable rules that the government presented at trial.  Nor did the government provide any direct evidence of Kukushkin's familiarity with the forms or knowledge of any campaign finance laws.

The trial only confirmed the scarcity of evidence of Kukushkin's willfulness.  First, the government pointed to the fact that Muraviev's name was not on any of the donor forms.  *See* Tr. 1309:6-12 (Gov't Summation).  From this fact, the government asked the jury to infer that the reason was that the defendants knew Muraviev could not make political contributions or donations.  *See* Tr. 1309:10-12 (Gov't Summation); *see also id.* 1310:14-20 (Gov't Summation). The equally, and in fact more likely, explanation was Muraviev was not considered by anyone to be the contributor or donor of the funds.  They were not made for his benefit nor the benefit of his cannabis business.  They were made for the benefit of Parnas and Fruman and their energy company, GEP.  GX 17; GX 18; GX 21.  The contributions were not made with Muraviev's knowledge, nor were they made with his money.  Indeed, the evidence was quite clear that when they were made in June, Parnas and Fruman did not know how they were going to pay the credit card bills for the contributions and donations they were making.  *See* DX B-4; DX A-12; *see also* Tr. 807:3-809:4 (Van Rensburg).  As to the Laxalt and Duncan contributions at the time those contributions were made, all of the monies provided by Muraviev had been spent.  GX 408; GX 155; GX 156.  Even still, the donations, made to political candidates who openly opposed cannabis, were made for the benefit of GEP, not a joint cannabis business.  Accordingly, at best, this evidence is consistent with both innocence and guilt and is insufficient to support a finding of guilt beyond a reasonable doubt.

Next, the government pointed to Parnas's knowledge of campaign finance laws (Tr. 1310: 21-1312:22 (Gov't Summation); Tr. 1444:10-24 (Rebuttal Summation)), and asked the jury to impute by inference to Kukushkin (Tr. 1314:1-14; 1444:10-24; Tr. 1444:25-1445:4 (Rebuttal Summation)). Specifically, the government cited to various contribution and donation forms found in Parnas's home and prepared by his assistant at his direction, as well as Parnas's membership on the President's Finance Committee as proof of his knowledge of the prohibition on donations by certain foreign nationals and by straw donors. *Id.* The jury was asked to speculate and infer that since Parnas warned Joseph Ahearn, a fundraiser for America First, about taking political contributions and donations from some other potential donor, he must have spoken to Kukushkin about the prohibitions on foreign donations. Tr. 1313:25-1314:13 (Gov't Summation). In the thousands of pages of evidence presented at trial there was absolutely nothing to support this inference. Still, the government said it must have happened. However, to return a guilty verdict the jury was required to find beyond a reasonable doubt, that Kukushkin **on his own** had a sufficient understanding of U.S. election laws and knew his purported agreement with Parnas was unlawful. The most reasonable inference drawn from the evidence adduced at trial is that Kukushkin lacked such an understanding which is fatal to his conviction on Count One.

The sole piece of "direct" evidence upon which the government relied as proof of Kukushkin's knowledge was a link sent by Kukushkin to Muraviev to an article alleging that Parnas and Fruman were under investigation by the FEC for making straw donations. Tr. 1315:5-17 (Gov't Summation); GX 30-A-1. While the government characterized the forwarding of the article as an indication that Kukushkin not only knew that Parnas and Fruman were making straw donations but planned to himself use them as a conduit, the most reasonable

inference given all the other evidence is that Kukushkin flagged an unfavorable news story about potential business partners out of concern for the potential impact of such publicity on his lawful venture.  It was also just as likely that Kukushkin was interested in the article due to Parnas's and Fruman's strong denials of wrongdoing and the author's independent assessment and suggestion that the investigation may have been without merit.  *See* GX 30-A-1 at p.4-6.

　　　　With no proof that Kukushkin willfully entered into any alleged conspiracy, *i.e.*, with knowledge of its illegal nature, the government attempted to fall back on the claim that he did so with a "bad purpose".  However, as detailed *infra,* rather than to arguing that Mr. Kukushkin "disobey[ed] or disregard[ed] the law", as this Court instructed the jury, the government instead argued that Kukushkin's and Parnas's conduct was un-American and that the jury should infer that Kukushkin therefore acted willfully.  *See* Tr. 1317-1318:19 (Gov't Summation). Specifically, the government suggested to the jury that Kukushkin engaged in bribery ("He's a businessman. He just wants to pay off politicians for licenses. Tr. 1317:20-21 (Gov't Summation)); attended political rallies under false pretenses ("There are lots of good people who … never make time to vote, but most … don't spend their time going to campaign rallies …acting like diehard partisans when… they couldn't care less about politics" *id.* 1317:12-14); and was a Russian aligned anti-American; from which they should infer he was acting with the requisite bad purpose.  Tr. 1337:24-1338:15 (Gov't Summation); *see also* Point III.F.1, *infra*. Not only are these speculative inferences improper, baseless, and made in bad faith, but they support no such finding.  Indeed, they do not even suggest that Kukushkin had any criminal intent.

　　　　First, this was not a bribery scheme and the government's suggestion to the contrary was improper.  Tr. 1337:24-1338:3 (Gov't Summation).  Second, getting caught up in the fanfare of a

rally (1317:12-15 (Gov't Summation)) – whether you believe in the politics or not – does not create a basis to infer criminality.  Finally, as detailed *infra* the government's reliance on Muraviev's profile picture (GX 1212) as evidence of Kukushkin's willfulness is highly offensive.  Tr. 1318:4-8 (Gov't Summation).  The picture, painted in a folk-style, depicts an individual that the government suggests is mooing the Statue of Liberty.  GX 1212.  It was painted by a famous Leningrad underground artist, Vladlen Gavrilchik, known for his satire and critique of Soviet life and perspective.[8]  In this country, thinking critically or even disdainfully of one's government does not make you guilty of a crime, our constitution affords us all that right. Indeed, it would be unconstitutional for the jury to infer that an exercise of a constitutional right renders Kukushkin guilty, and yet, that is exactly what the government asked the jury to do.

Finally, the government relied upon the Russian Roots email and the fact that Muraviev was not a shareholder of Strategic Investment Group.  *See* Tr. 1319:18-23 (Gov't Summation). Notably, as to the former, the government took a new position: the email was a cover-up.[9]  *See* Tr. 1320:13-19 (Gov't Summation).  Specifically, the government argued that because Kukushkin knew counsel was on the email chain, he provided an innocent and false explanation for not including Muraviev as an owner of NewCo/Strategic Investment Group.  *See id.*  Of course, the government's argument was pure speculation without any basis from which to infer

---

[8] As detailed *infra* at Point III.F.1, had the government spent just a little bit of time during the years of their grand jury investigation researching this artist it would have been discovered that its use of the picture was a complete misinterpretation of the picture and its meaning.

[9] Throughout these proceedings, including in the initial indictment (Dkt. 1), the government the Russian Roots email was proof positive that Kukushkin knew that it was illegal to make political donations using monies from a foreign national.  It was an admission as to why Muraviev could not be a disclosed shareholder in NewCo.  After months of hearing counsel shouting from the rooftops that in fact the statement had nothing to do with making political contributions or donations, and the presence of counsel established Kukushkin's lack of criminal intent the government changed its position, the Russian roots statement was an innocent cover meant for counsel to justify not including Muraviev as a shareholder of NewCo.  Tr. 1320:13-19

that fact designed to minimize defense counsel's reasonable explanation that Kukushkin would

not have included counsel on the email if he was acknowledging a criminal plan. The

government then asked the jury to draw the same inference from the inclusion of Muraviev as a

shareholder on two other entities, which had been formed years earlier.  Whether or not

Muraviev was a disclosed owner of NewCo/Strategic Investment Group is irrelevant with respect

to the alleged Foreign Donor Scheme – as NewCo/Strategic Investment Group did not make a

single political contribution or donation.  In other words, this evidence was irrelevant and not

proof of willfulness.

### c.   Conclusion

In short, the government's case required the impermissible "piling of inference upon

inference" by the jury, *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943), and failed to

establish beyond a reasonable doubt the requisite (1) meeting of the minds; (2) knowledge of the

unlawful nature of the objective of the purported conspiracy ("willfulness").  Accordingly,

Kukushkin's conviction on Count One should be set aside and a judgment of acquittal entered.


## POINT TWO

### THE COURT SHOULD SET ASIDE KUKUSHKIN'S CONVICTION AND ENTER A JUDGMENT OF ACQUITTAL ON COUNT THREE

Under Second Circuit law, to show that a defendant is guilty of aiding and abetting,

"[t]he government must . . . prove the underlying crime was committed by someone other than

the defendant and that the defendant himself either acted or failed to act with the specific intent

of advancing the commission of the underlying crime".  *United States v. Pipola*, 83 F.3d 556,

562 (2d Cir. 1996).  In order to prove specific intent, "the prosecution must prove the defendant

knew of the proposed crime – suspicion that it might occur is not enough – and had an interest in

furthering it".  *Id.*  "[T]he mere presence at the scene of a crime, association with criminals, or

even knowledge that a crime is being committed is insufficient to support a conviction for aiding and abetting, absent some purposeful behavior from which requisite intent can be inferred". *United States v Jones*, 605 F. Supp.513, 515 (S.D.N.Y. 1984).  For criminal liability to attach, "an aider and abettor must share in the principal's essential criminal intent".  *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) (internal quotation omitted).

As the government correctly focused the jury, key among the issues in the substantive foreign donation count is "where did the money go" (Tr. 1331:9) and in what amounts (*id.* lines 9-10).  As the jury was instructed, to find Kukushkin guilty of aiding and abetting the making of contributions by a foreign national, as charged in Count Three, the government had to prove beyond a reasonable doubt that (1) a foreign national, here, Muraviev, directly or indirectly, made one or more contributions and donations; (2) the aggregate amount of such contributions or donations was at least $25,000 in a calendar year; (3) that Kukushkin aided, abetted, counseled, commanded, or induced Muraviev, in making or to make the contributions or donations at issue; (4) Kukushkin did so knowingly and willfully and with the intent to facilitate the crime of making contributions or donations by a foreign national or to help it succeed.  *See* Tr. 1501:13-1502:2 (Jury Charge).

As discussed above, viewed in the light most favorable to the government, the evidence at trial was no more than equally consistent with Kukushkin's lack of knowing and willful agreement to any unlawful contribution scheme as it was with guilt, requiring his conviction to be vacated.  Still, even if there were sufficient evidence of Kukushkin's intent for the aiding and abetting charge, the evidence at trial was insufficient to establish the $25,000 threshold necessary to establish a violation of 52 U.S.C. § 30122.

First, as discussed above, the gap in time between Parnas's first contributions and donations and any agreement to transfer funds facilitated by Kukushkin categorically excludes any amounts of the first $500,000 transfer that were used to "reimburse".  Second, the evidence clearly shows these monies were simply used to pay off outstanding credit card debt without regard to the expenses charged and done so without Kukushkin's or Muraviev's knowledge or consent.  GX 203; GX 408.  Third, there was no evidence to prove, or even from which to infer, that at the time the first contributions and donations were made Parnas and Fruman had any knowledge or expectation that they would be able to fund these contributions or donations with money from Muraviev (or from any particular source).  Similarly, there was no evidence to prove that Kukushkin knew the contributions were being made or that he agreed to fund them. Fourth, the proof made clear that all of the contributions and donations made by Parnas and Fruman were made for their own benefit and the benefit of GEP, not the joint cannabis venture. GX 108; GX 112; GX 113; GX 114; GX 117; GX 120; GX 121; GX 124; GX 155; GX 156; GX 160.  Fifth, the evidence showed that the second $500,000 was used to pay personal credit card expenses, not political contributions or donations, and was otherwise divvied up between Parnas and Fruman.  Sixth, even if some portion of the second $500,000 tranche somehow paid for a percentage of the Duncan and Laxalt donations (something the government's own witness could not testify to), there was no evidence that Kukushkin, Parnas or Fruman knew that to be the case, or that the aggregate amount of those donation totaled more than $25,000 for the calendar year 2018.  GX 203; GX 408.  Finally, as with all prior contributions made by Parnas and Fruman, it would not have been in Kukushkin's or Muraviev's interest to donate to Laxalt or Duncan as both were Republican candidates opposed to cannabis.  *See* Tr. 546:2-4 (Laxalt); *see also* Tr.

155:18-19 (Duncan); GX 155; GX 156.  The donations were plainly in Parnas's, Fruman's, and their energy company, GEP's, interest.

For these reasons, the government failed to establish beyond a reasonable doubt that Kukushkin aided and abetted the making of foreign donations.

## POINT THREE

## THE COURT SHOULD ORDER A NEW TRIAL ON COUNTS ONE AND THREE UNDER RULE 33

In the alternative, the Court should vacate the judgment and grant a new trial in the interest of justice.  *See* Fed. R. Crim. P. 33(a); *see also* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.").

### A.  Legal Standard

The Second Circuit has said that "[n]o harm and only good can come to our system of justice where we require the government to supply competent, satisfactory and sufficient evidence to prove an element of criminal liability.  To let a verdict stand on anything less is indeed a manifest injustice . . .". *United States v. Ferguson*, 246 F.3d 129, 132 (2d Cir. 2001). Rule 33 of the Federal Rules of Criminal Procedure grants the Court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice".  *Id.* at 133 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).  The Court's discretion to order a new trial "if the interest of justice so requires" under Rule 33(a), is broader than the grounds for acquittal under Rule 29.  *See id.* at 134.

Courts within the Second Circuit have ordered new trials for a multitude of errors that result in a manifest injustice, including, among other bases, when:  (1) the verdict is against the

weight of the evidence, (*United States v. Ferguson*, 246 F.3d 129, 132 (2d Cir. 2001)); (2) a

court's jury instructions mislead the jury, (*United States v. Quattrone*, 441 F.3d 153 (2d Cir.

2006)); (3) a court errs in admitting prejudicial evidence, (*United States v. Bell*, 584 F.3d 478 (2d

Cir. 2009)); (4) prosecutorial misconduct including inappropriate or improper arguments and

remarks, (*United States v. Certified Envtl. Servs., Inc.,* 753 F.3d 72, 96 (2d Cir. 2014)); and (5)

prejudice resulting from cumulative errors *Untied States v. Litvak,* 889 F.3d 56 (2d Cir. 2018).

### B.  The Verdicts Should Be Set Aside Because They Are Against the Weight of the Evidence

A Rule 33 motion based on the sufficiency of the evidence "may properly be granted

even where a Rule 29 motion is denied".  *United States v. Landesman*, --- F4 ---, Nos. 19-CR-

3207, 19-CR-3209, 2021 U.S. App. LEXIS 32945, at *80 (2d Cir. Nov. 5, 2021).  To allow a

guilty verdict challenged as against the weight of the evidence under Rule 33 stand, "[t]he trial

court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record

supports the jury verdict".  *Ferguson*, 246 F.3d at 133.

"[I]n contrast to the analysis under Rule 29, a district court considering a Rule 33 motion

need not view the evidence in the light most favorable to the Government".  *See United States v.

Avenatti*, No. 19-CR-373, 2021 U.S. Dist. LEXIS 125442, at *40 (S.D.N.Y. July 6, 2021).  A

court must objectively weigh the evidence and the credibility of the witnesses so long as the

court does not "wholly usurp" the role of the jury.  *See United States v. Autori*, 212 F.3d 105,

120 (2d Cir. 2000).  A trial judge may only "intrude upon the jury function of credibility

assessment" if "exceptional circumstances" require it.  *See id*.  If, as is the case here, "the

evidence preponderates heavily against the verdict to such an extent that it would be a 'manifest

injustice' to let the verdict stand[,]" the Court should grant a new trial.  *See United States v.

Archer*, 977 F.3d 181, 188 (2d Cir. 2020).

For the reasons set forth in Kukushkin's motion for a judgment of acquittal, no reasonable jury could find the charged offenses proven beyond a reasonable doubt.  But even if the evidence were sufficient, the jury's verdicts were against the weight of the evidence.  The evidence clearly established that Mr. Kukushkin was an apolitical naturalized United States citizen.  *See* Point I.2.a. *supra; see; also* S-3, S-10, S-12.  He knew nothing about federal election laws or making political contributions and donations or about the rules for doing so.  Kukushkin was interested in building a legitimate cannabis business by lawfully pursuing cannabis licenses, using lawyers along the way, and not making political contributions.  *See* Point I.2.a. *supra*; *see also* DX B-1.

Parnas and Fruman on the other hand had a nascent energy business, GEP, that they were trying to promote while also having families to support.  *See* Point I.2.a. *supra.*  They had incurred hundreds of thousands of dollars in debt over the course of several months in those pursuits.  *Id.*; *see also* GX 203.  They needed money to pay off their debts.  DX B-4; DX A-12; Tr. 807:3-809:4 (Van Rensburg); *see also* Point I.2.  They saw Kukushkin as an unsophisticated mark who could provide access to the funds they needed, through his wealthy friend Muraviev.  DX B-4.  Parnas and Fruman hatched the joint cannabis venture scheme ultimately extracting $1 million dollars.  *See* Point I.2.a.

The evidence clearly established that the agreement was a joint cannabis venture, not an illegal contribution scheme.  *See* Point I.2.a.  The theory advanced by the government was illogical.  If the idea was to make contributions in order to pave the way to obtain cannabis licenses it makes no sense to make contributions secretly and in other's names, the point is recognition.  Nor does it make sense to make contributions to those who oppose legalizing cannabis.

Parnas's and Fruman's use of the funds further supports the fact that there was no scheme here. Unbeknownst to Kukushkin all of the money was used to pay the debts of Parnas, Fruman, and their energy business GEP. GX 203; GX 408; *see also* Point I.2.a; Point II. None of it benefitted the joint cannabis venture. While it turned out, these debts included approximately in $156,000 in credit card charges for political contributions and donations Parnas and Fruman had made months earlier in June and July 2018 (GX 203), again all of those contributions were made for the benefit of GEP (GX 108; GX 112; GX 113; GX 114; GX 117; GX 120; GX 121; GX 124; GX 155; GX 156; GX 160), and without the knowledge or consent of Kukushkin. *See* Point I.2.a.; *See* Point II. And they were paid without the knowledge or consent of Kukushkin.

As to the contributions made to Laxalt and Duncan on November 1, 2018, again, the evidence clearly demonstrated that they were made solely for the benefit of Parnas and Fruman and GEP. *See* Point I.2.a; Point II. First, they were made to candidates that openly opposed cannabis legalization. *Id.; see also,* Tr. 155:18-19 (Duncan); Tr. 546:2-4 (Laxalt). Second, Fruman was the donor and GEP was his identified employer. *Id.; see also,* GX 155; GX 156. Third, at the time the contributions were made the monies from Muraviev had already been dissipated. *Id.; see also,* GX 408. And finally, there was no expectation more would be forthcoming. *Id.; see also,* GX 83.

Under these circumstances, "the soundness of the verdict is highly doubtful" and this Court should exercise its discretion to order a new trial. *See United States v. Autuori*, 212 F.3d 105, 121 (2d Cir. 2000) (affirming grant of new trial based on weight of the evidence).

## C. The Court Should Grant a New Trial for Counts One and Three with a Proper Willfulness Instruction and a Good Faith Defense Charge

Kukushkin's primary theory of defense was that he lacked the "willful" intent to conspire to violate or to aid and abet a violation of the FECA. During the charge conference, Kukushkin

30

requested that, due to the complexities of election and campaign finance laws and the nuances, (i) the definition of willful reflect a "heightened standard of willfulness consistent with [*Cheek v. United States*, 498 U.S. 192]", (Tr. 1237:7-25 (Charging Conf.)), and (ii) the scienter element of the conspiracy charge instruct that a co-conspirator must knowingly and willfully became a member of the alleged conspiracy with the "intent of achieving [the alleged conspiracy's] unlawful objective, namely violation of the federal election laws", (*Id. at* 1257:10-14; 1284:3-7 (Charging Conf.)) (Kukushkin joining co-defendant objection).  Kukushkin also requested a good faith defense charge "consistent with Sand Instruction 8-1".  *Id.* at 1287:14-19 (Charging Conf.).

The Court rejected the heightened willfulness argument and did not define "willfulness" consistent with *Cheek*.  Tr. 1487:23-1488:8 (Jury Charge).  As to the scienter element of conspiracy, the Court rejected the request to define the unlawful object as a "violation of the federal election laws", instead, instructing the jury:

> The second element the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendants knowingly, willfully and voluntarily became members of the alleged conspiracy with the intent of achieving its unlawful objective.  In deciding whether the defendant was in fact a member of the conspiracy, you must consider whether the defendant knowingly and willfully joined the conspiracy intending to advance or achieve its goals.  Did he participate in the conspiracy with knowledge of its unlawful purpose and with the specific intention of furthering its objective?

Tr. 1491:22-1492:9 (Jury Charge).  The Court's instruction did not include a good faith defense charge.

1.   <u>The willfulness definition and instruction misled the jury.</u>

A jury instruction is erroneous if it "fails to adequately inform the jury of the law or misleads the jury as to a correct legal standard".  *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (internal quotations and citations omitted).

The willfulness instruction misled the jurors as to the element central to Kukushkin's primary theory of defense – his lack of intent to violate the FECA.  To convict on the conspiracy charged in Count One, the government was required to show that the defendant had "at least the degree of criminal intent *necessary for the substantive offense itself*".  *United States v. Archer,* 977 F.3d 181, 190 (2020) (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975) (emphasis added)).  A similar intent requirement was necessary for the aiding and abetting charge in Count Three: "[t]he government must . . . prove . . . that the defendant himself either acted or failed to act *with the specific intent of advancing the commission of the underlying crime*", i.e., "the prosecution must prove the defendant knew of the proposed crime . . . and had an interest in furthering it".  *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) (emphasis added).

Here, the underlying crime – violation of the FECA – required a "knowing and willful" intent.  52 U.S.C § 30121.  Though, as noted *supra,* the Second Circuit has not yet decided the meaning of "willful" in the context of this statute,[10] it is well-established that cases involving technical statutes that present a danger of ensnaring individuals engaged in apparently innocent conduct – for example, federal criminal tax offenses and anti-structuring offenses – require that a defendant knew of the existence and meaning of the statute that made their conduct unlawful. *See, e.g.*, *Cheek v. United States*, 498 U.S. 192; *Ratzlaf v. United States*, 510 U.S. 135.  Indeed, in *Ratzlaf*, the Court carefully explained that the heightened standard was required because the

---

[10]   *See* Note 4 *supra.*

conduct involved "is not inevitably nefarious", leaving open the possibility that its holding would be applied to other offenses. *Ratzlaf*, 510 U.S. at 144. The complexities and nuances of the FECA were addressed at great length during the trial and supported the use of a heightened standard charge in this case under the persuasive logic applied in *Cheek* and *Ratzlaf*.

Setting aside whether a heightened standard of willfulness applies, at a minimum the Court should have instructed the jury that the government had to prove that Kukushkin knowingly and willfully became a member of the alleged conspiracy charged in Count One with the intent of achieving a "*violation of the federal election laws*". Tying the intent on the conspiracy charged in Count One to the "criminal intent *necessary for the substantive offense itself*", is black-letter law in the Second Circuit. *United States v. Archer*, 977 F.3d 181 at 190 (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975) (emphasis added)). Accordingly, the government had to prove that Kukushkin had the intent to violate the federal election laws (or FECA), even if not a specific provision of those laws. The single reference to intent to achieve the conspiracy's "unlawful objective" that appeared in the jury charge (Tr. 1492:1), was insufficient.

Notably, even where the Second Circuit has rejected a heightened standard of willfulness and held that the government did not need to prove that a defendant charged with conspiracy to violate the securities law "knew he was violating the securities laws", the district court included an instruction that tied conspiracy intent to the underlying objective, in that case, "the insider trading scheme". *See, e.g.*, *United States v. Kosinski*, 976 F.3d 135, 153 (2d Cir. 2020) ("It is not required that the Government show that Dr. Kosinski, in addition to knowing what he was doing and deliberately doing it, also knew that he was violating some particular statute. But the defendant must have acted with *knowledge and intent to carry out the insider trading scheme*".

(emphasis added)).  At a minimum, a similar charge requiring that the government prove that Kukushkin knowingly and willfully became a member of the alleged conspiracy with the intent of achieving the "federal election law scheme", should have been given to the jury.

Given the significant deficiencies in the government's evidence of Kukushkin's willfulness identified above in Point I.2.b., if a rational jury had been instructed that a heightened willfulness standard applied, it is unclear that they would have convicted Kukushkin on Counts One and Three, and, if they had not been misled as to the second element of the conspiracy charge, it is unclear that they would have convicted Kukushkin on Count One.

> 2.   Kukushkin was entitled to have a good faith defense charge included in the jury instructions

"A defendant is entitled to a jury charge which reflects his defense".  *United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997) (citations omitted).  If a district court fails to give a defendant's requested instruction that is "legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge", the conviction should be overturned.  *United States v. Quattrone*, 441 F.3d 153 at 177.

Good faith is a complete defense to Counts One and Three.  *See, e.g.*, *United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018) (despite rejecting heightened willfulness standard, the district court issued a good faith defense instruction with respect to the FECA count).  The Second Circuit has held that the failure to give a specific good faith charge does not require reversal where the court, "ha[s] already charged that the Government had to prove willfulness and that good faith was a defense to the willfulness element".  *United States v. Doyle*, 130 F.3d 523, 540-41 (2d Cir. 1997).  In that case, the district court had instructed the jury that "[a] defendant's conduct is not willful [if] it was the result of a good faith understanding that he was

acting within the requirements of the law". More recently, the Second Circuit reached a similar result where the district court charge explained "knowingly" meant "deliberately and voluntarily", and could not be a "mistake or accident or mere negligence or some other innocent reason". *See, e.g.*, *United States v. Kozeny*, 667 F.3d 122, 136-37 (2d Cir. 2011) (instructions also included that the government did not meet its burden if the defendant "actually believed that the transaction was legal").

Here, despite Kukushkin's request, the charge made no mention of innocence, good faith, or a belief that actions were legal and, accordingly, the Court erred in denying the request for a good faith defense charge. It is no excuse that the charge included a separate defense charge because that charge did not indicate that, if the defense charge was believed, it would mandate acquittal. *See United States v. Pedroza*, 750 F.2d 187, 205 (2d Cir. 1984) ("it is of some value to a defendant to have the trial judge clearly indicate to the jury what his theory of the case is, and that that theory, if believed, justifies acquittal" (citations omitted).

Given the insufficiency of the willfulness charge, a good faith defense was all the more important to ensure that the jury charge reflected Kukushkin's defense.

### D. The Court Should Grant a New Trial Because Erroneous Evidentiary Rulings Substantially Prejudiced Kukushkin

The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury's verdicts. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir 1992). A new trial should be granted where the admission or exclusion of evidence was so prejudicial that a serious miscarriage of justice has resulted. *United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009). Prejudice is measured by "assessing error in light of the record as a whole". *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (internal quotation and citations omitted).

1.  <u>The Court wrongly admitted a privileged communication (GX-137, DX B-6[11])</u>

Kukushkin objected to the introduction of GX 137, arguing that the email chain was a privileged attorney-client communication and inadmissible under Rule 403 of the Federal Rules of Evidence.  Dkt. 161 at 44; Dkt. 233 at 5-6.  In rejecting defense counsel's argument,[12] we respectfully submit, the Court wrongly determined the communication was about a business decision and therefore not privileged.  *See* Pre-Jury Selection Conference Tr. 6:10-20; *see also Id.* at 151:9-10 ("talking about a business decision, I don't think that's legal advice").  As to admissibility, we submit, the Court further erred in finding that the emails "have probative value insofar as they show the participants formed the business venture at issue in a way that deliberately avoided naming Mr. Muraviev".  *Id.* at 6:11-13.  The Court noted that "the fact that the defendants have an innocent explanation or interpretation of the emails does not deprive them of their probative value.  They're free to argue that interpretation".  *Id.* at 6:13-16.

It is well-established in this district that communications with respect to the formation of corporate entities are protected by attorney-client privilege.  *United States v. Levin*, No. 15-CR-101, 2015 U.S. Dist. LEXIS 137615, at *1 (S.D.N.Y. Oct. 5, 2015) (assessing the application of the crime-fraud exception to privileged documents pertaining to "legal services, including . . . the formation of new entities").  The email chain contains exchanges between attorneys at Greenspoon Marder LLP and David Correia regarding the formation of a corporate entity in Nevada.  It is clear from the discussion on the email chain that the participants were discussing

---

[11]  The Defense Exhibit was admitted to show the jury an email earlier in the chain that the Court found was not privileged but the government had redacted.

[12] The defendants moved pretrial to suppress the Russian Roots email which included GX 137 and preclude the government from using it at trial.  That motion was denied in a written opinion.  That opinion was provided to the parties but does not appear to have been filed on the docket.

the formation of a corporate entity, with lawyers hired to provide legal advice in connection with the formation of that entity. As such, the email chain is protected by attorney-client privilege.

Indeed, when Correia wrote to Kukushkin that one of the attorneys "made a good argument for a c-corp", the participants are discussing legal advice with respect to the formation of the entity. Kukushkin's response, which includes advisors of the corporate entity, John Sinadinos and Alexander Mikhalev, described his views about the lawyer's "argument about personal liability protection under C Corp formation". Kukushkin's note that he is "trying to establish the core structure and how transparent should Andrey be" is not a business decision separate from the legal advice regarding the formation of the entity, and, even if it was the "mere fact that business advice is given or solicited does not . . . automatically render the privilege lost". *United States v. Davis*, 131 F.R.D. 391, 401 (S.D.N.Y. 1990) ("[W]here the advice given is predominantly legal, as opposed to business, in nature the privilege will still attach"). Indeed, one of the Greenspoon Marder attorneys helping establish the corporate entity adds Kukushkin to the email exchange because his answers pertaining to the entity's structure and ownership were necessary for the entity to receive legal advice regarding its formation.[13]

The Court's view of the email chain's probative value as to Muraviev's involvement was also misplaced. The email chain is not probative of the assertion that the participants on the chain formed the corporate entity in a way that deliberately, or nefariously, avoided naming

---

[13] To the extent the Court determined there was a waiver of any privilege, we submit, that it too is an erroneous legal conclusion. The presence of a third-party does not destroy privilege "if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client". *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Sinadinos and Mikhalev were advisors of the corporate entity, Dkt. No. 160, and their inclusion in the email chain by Kukushkin was in aid to his communications with the Greenspoon Marder lawyers about the formation of the entity. Accordingly, their participation in the email chain does not destroy the attorney-client privilege.

Muraviev – a position the government seeming abandoned for the first time in its summation.  At most, the email chain shows Kukushkin's consideration of the entity's "core structure" and Muraviev's "transparency" in response to the corporate entity's lawyers' questions about the entity's officers, directors, and shareholders.  The corporate entity that is the subject of these communications was never part of Parnas's "essential plan" to make the illegal contributions, and Muraviev's response had everything to do with legitimate business concerns and nothing to do with Parnas.  Because the email had no probative value, it should have been excluded.  Even if it did have probative value, it was outweighed by the prejudice to Kukushkin because the reference to "Russian roots" in the innocent context of the email was too easily confused with the government's far-fetched theory supporting the Foreign Donor Scheme.[14]

The admission of the email chain into evidence was not harmless.[15]  The government's summation wrongly focused on the document as evidence of Kukushkin "cover[ing]" up the alleged Foreign Donor Scheme when it was clearly unrelated to the point that it should not have even been before the jury.  Tr. 1320:13-19 (Gov't Summation).  The email chain was one of the most prominent pieces of evidence introduced by the government with respect to intent, highlighted during the government's summation, and undoubtedly impacted the jury's verdicts.

---

[14] As previously noted, and detailed further, *infra,* the innocent explanation as a "cover-up" was a newly contrived theory the government advanced for the first time in its summation and contrary to every position taken previously in every submission and argument made to and before this Court.

[15] Indeed, the taint of the Court's misunderstanding regarding the nature of the clearly privileged communication prejudiced Kukushkin long before trial even began.  The government relied upon the privileged email in its initial grand jury presentment and continuously throughout the grand jury investigation, including as the primary basis for probable cause to obtain search warrants to search property in which Kukushkin had legitimate privacy interests and which led to admissible evidence.

2. <u>The Court wrongly admitted the contribution chart (GX 1403) and summary chart
(GX 1402)</u>

Rule 1006 of the Federal Rules of Evidence provides that "[t]he proponent may use a

summary, chart, or calculation to prove the content of voluminous writings, recordings, or

photographs that cannot be conveniently examined in court".  Fed. R. Evid. 1006.  The Second

Circuit "has long approved the use of charts in complex trials and has allowed the jury to have

the charts in the jury room during its deliberations so long as the judge properly instructs the jury

that it is not to consider the charts as evidence".  *United States v. Casamento,* 887 F.2d 1141,

1151 (2d Cir. 1989) (noting that "[s]everal times during the trial, the district judge instructed the

jury that the charts were not evidence.  He also told the jurors that they were free to disregard the

contents of the charts if they chose to do so.  The judge repeated these instructions during his

charge".); *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) ("With due regard for the

possibility that the jury would accept such summaries as documentary fact, the trial court

repeatedly reminded the jurors of their responsibility to determine whether the charts accurately

reflected the evidence presented".).

Cases in the Second Circuit that have affirmed the use of summary charts "'to draw the

jurors' attention to particular evidence culled from a voluminous set of records'" involve such a

limiting instruction.[16]  At trial, however, over defense counsel's objection, (Tr. 262:17-24, Dkt.

No. 233 at 7-8), the government admitted into evidence GX 1402, which is a summary chart that

includes "[p]hone records, WhatsApp messages, iMessages, emails, and screen shots", (Tr.

---

[16] *United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) (noting the District Court's limiting
instruction stating that the charts were not evidence; they were only "graphic demonstrations of
the underlying evidence", and the jury had to determine for itself whether they fairly and
accurately summarized the underlying evidence.).  *United States v. Ho*, 984 F.3d 191, 210 (2d
Cir. 2020), *cert. denied*, 141 S. Ct. 2862 (2021) (noting that "the jury was properly advised that
the charts themselves did not constitute independent evidence and that it was the jury's duty to
first determine that they accurately reflected the evidence on which they were based").

261:22-24).  The government also admitted into evidence, again over defense counsel's objection

(Tr. 948:11-14, Dkt. No. 233 at 7-8), GX 1403, which is a "diagram [that] shows the tracing of

funds from Intellect Capital to contributions paid on Lev Parnas and Igor Fruman's credit cards".

Tr. 1011:1-3.  The Court did not incorporate defense counsel's proposed limiting jury instruction

regarding charts and summaries:

> Some of the exhibits that were admitted into evidence were in the
> form of charts or summaries.  I decided to allow these charts and
> summaries in addition to the underlying documents that they
> represent to save time and avoid unnecessary inconvenience.  Such
> summaries are not, however, independent evidence of their subject
> matter and they are only as valid and reliable as the underlying
> evidence – also admitted into evidence – which they summarize.
> You are free to disregard these charts and summaries in their
> entirety.  It is for you to decide whether they accurately, completely,
> and objectively reflect the content of the underlying documents.
> Your evaluation of the charts and summaries should be based on
> your consideration of all testimony you heard about who prepared
> the summaries, the way they were prepared, and the reliability and
> completeness of the underlying documents.

Dkt. No. 221.

Instead, the jury was instructed to consider the summary exhibits as any other evidence:

"Now, some of the exhibits that were admitted into evidence were in the form of charts and

summaries.  You should consider them as you would any other evidence".  *See* Tr. 1470:4-6

(Jury Charge).  The only limiting instruction given to the jurors was that GX 1402 was "quoting

from" or "refer[s] to" exhibits and is "something that the prosecution team . . . put together

taking parts of different exhibits to create essentially a timeline bringing them together".  Tr.

287:23-288:4 (Casola).  No such instruction was given with respect to GX 1403.  Further, no

limiting instruction was given regarding the fact that the two exhibits are not themselves

independent evidence, and that it was the jury's responsibility to determine whether the exhibits

accurately reflected the evidence they summarize.

The admission of the two government exhibits, without a limiting instruction, was unfairly prejudicial to Kukushkin, as the exhibits did not fairly represent competent evidence already before the jury.  *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (citation omitted).  GX 1402 is a purported summary of the defendants' communications yet presents only pieces of communications that most clearly support the government's position, without full context.  Sufficient cross-examination to avoid prejudice to Kukushkin was not possible – it would have required an impractical examination of every single communication listed in the chart, requiring questioning about nearly 60 government exhibits that the chart purports to summarize and about which the witness had no substantive knowledge whatsoever.  Similarly, GX 1403 summarized the tracing of funds that the government intended to use as proof that the money Kukushkin facilitated went towards contributions paid with Parnas and Fruman's credit cards.  But the exhibit was not merely a summary of the underlying exhibits – it actually represented the government's *interpretation* of the data in the underlying exhibits and was used by the government to elicit a new theory of its case mid-trial.  Cross-examination, in lieu of an appropriate limiting instruction, was insufficient, particularly given the limited time defense counsel was left to prepare (Tr. 755), to make clear that the jurors should determine whether the "analysis", (Tr. 1050:3-4 (Espinoza)), in the exhibit accurately reflected the underlying sources for the government's determinations.

### E.  The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Denial of His Motions to Sever

When a district court improperly denies a motion to sever resulting in a prejudicial spillover effect, the Court should grant a new trial.  *United States v Reinhold*, 20 F. Supp. 2d 541, 555 (S.D.N.Y. 1998).  "Substantial prejudice may be found where evidence admissible against jointly-tried co-defendants 'in some way affected the jury's ability fairly and rationally to

evaluate the evidence of . . . guilt'".  *United States v. Van Hise*, No. 2-CR-847, 2017 U.S. Dist. LEXIS 126004 at *128-129 (S.D.N.Y. Aug. 8, 2017) (citing *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996)).

Prior to trial, Kukushkin, joined by his co-defendants, requested that the Court sever Counts Four through Six, relating to the Straw Donor Scheme and Count Seven, relating to the Fraud Guarantee Scheme, from Counts One through Three, relating to the Foreign Donor Scheme – the only scheme with which Kukushkin was charged.  Dkt No. 161 at 5-6.  Kukushkin also argued that he should be tried alone because of the significant disparity in the amount and magnitude of proof offered between his co-defendants and himself and the antagonistic theory of defense that he and Muraviev were defrauded by their co-defendants.  Dkt. No. 161 at 3-7.  The Court denied the request to sever, except as to the Fraud Guarantee Scheme.  Dkt. No. 200 at 4-6.  At a pre-trial conference on October 5, 2021, Kukushkin renewed the request to sever – restating concerns about proceeding to trial with Parnas.  *See* Final Pretrial Conference October 5, 2021, Tr. 73:7-9.  The Court again denied the request.

The Court erred in denying the motion to sever.  Severance is proper if co-defendants are not alleged to participate in the same series or acts constituting a charged offense.  *United States v. Ohle*, 678 F. Supp. 2d. 215, 224 (S.D.N.Y. 2010); *United States v. Stein*, 428 F. Supp. 2d 138, 141 (S.D.N.Y. 2006).  "'[M]utually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance".  *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (citing *Zafiro v. United States*, 506 U.S. 534, 538 (1993)).  The only commonality between all the fraud schemes is Parnas and his associates.  Setting that aside, the methods to carry out the schemes were different, the targets – like Kukushkin – of each scheme were unrelated, and the schemes occurred at different times.

The Court's error was not harmless and caused substantial prejudice to Kukushkin at trial in at least two ways.  First, the significant disparity in the amount and magnitude of intent evidence offered as to Parnas spilled over to Kukushkin.  The government relied on the spillover evidence to argue that Kukushkin knowingly and willfully became a member of the alleged conspiracy with the "intent of achieving its unlawful objective".  As the evidence presented at trial supports, Kukushkin thought Muraviev's money was being used to procure cannabis licenses; he had no idea Parnas, and his associates were using them to pay off delinquent personal credit card debts that included political contributions and donations.  Tr. 1035:23-1036:5 (Espinoza); GX 203.  This was confirmed by the consistent business-related nature of Kukushkin's communications with Parnas and Fruman, as well as the months-long gap between when the contributions were made and when Kukushkin first met with Parnas.  Tr. 1052:14-20 (Espinoza).  Kukushkin had no experience with campaign finance laws, he was born, raised, and educated overseas, and he did not vote, register to vote or ever contribute to a political party. *See* S-3; S-10; S-12. Further, campaign finance laws are complicated, leading to the reasonable inference that an apolitical person such as Kukushkin would not be privy to them.  Tr. 491: 9-24 (Hartsock).

The evidence about Parnas's intentions was comparatively overwhelming.  Parnas was seemingly well-versed in federal election law.  He was privy to campaign contribution forms that explicitly forbade donations by foreign nationals or in the name of another, warned political fundraiser Joe Ahearn about potentially illegal foreign donations, and was even part of President Trump's campaign finance committee.  *See* Tr. 1310:21-24, 1311:4-19, 1312:2-8, 1313:2-4 (Gov't Summation); *see also* Tr. 1165:14-1167:1 (Ahearn).  Tellingly, in its summation, the government's best argument to convict Kukushkin was that "Parnas knew this rule so well he

could teach others about it, doesn't matter just for Parnas. Think about what it's going to tell you for Kukushkin". Tr. 1313:5-7 (Gov't Summation). Evidence of a co-conspirator's intent cannot be transferred from one co-conspirator to another. This type of prejudicial spillover impact is precisely what severance is intended to prevent. *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) ("'Prejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper".).

Second, Kukushkin was limited in his antagonistic theory of defense that he was defrauded by Parnas, particularly because the Court only severed the Fraud Guarantee Scheme. Evidence relating to the Fraud Guarantee Scheme would have helped explain how Parnas and Correia were involved in a pattern of defrauding rich investors in order to promote their own interests and lifestyle. Such evidence would have supported Kukushkin's primary defense – that he was similarly defrauded and there was no "meeting of the minds". Kukushkin sought to introduce evidence about the Fraud Guarantee scheme in his defense through the admission of the sentencing letter used by the government against Correia, detailing the methods and facts of the scheme. *See* Final Pretrial Conference October 5, 2021, Tr. 62:6-15; Dkt No. 224 at 12-14. The Court determined that the evidence would be overly prejudicial to Parnas and excluded it. *See* Final Pretrial Conference October 5, 2021, Tr. 72:13-18.

While "appropriate" limiting instructions can address the risk of spillover, (*United States v. Van Hise*, 2017 U.S. Dist. LEXIS 126004 at *129), the record here shows that limiting instructions were insufficient. In *Van Hise*, the court used limiting instructions on at least twelve different occasions during the presentation of evidence to instruct the jury that certain pieces of evidence could not be used against Van Hise. *Id*. at *131. In comparison, despite the fact that

44

Kukushkin was not charged with the three Counts relating to the Straw Donor Scheme, during presentation of the evidence in this case, the Court only gave essentially one limiting instruction expressly indicating that evidence relevant to Parnas was not relevant to Kukushkin.  Tr. 270:3-6.

### F.  The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Government's Improper Summation Arguments

Prosecutors play a special role in our system of justice, and by necessity, courts and defendants rely on the government to fulfill its responsibilities with integrity. The government's "'obligation to govern impartially is as compelling as its obligation to govern at all; and [its] interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (*quoting Berger v. United States*, 295 U.S. 78, 88 (1935)).  "[The prosecutor] may prosecute with earnestness and vigor - indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one".  *Berger v. U.S.,* 295 U.S. 78, 86 (1935), overruled on other grounds by *Stirone v. U.S.*, 361 U.S. 212 (1960).

A defendant asserting that a prosecutor's remarks warrant a new trial "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial".  *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (citing *U.S. v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993).  Even if a remark is deemed improper, it must cause "substantial prejudice" to result in a new trial.  *Id*.  The government's conduct here crossed that line.

### 1. Bad Purpose

As detailed *supra,* the government lacked sufficient evidence of Kukushkin's willful participation in the conduct forming the basis of the charged conduct.  Kukushkin was apolitical, unaware of the FECA rules, not registered to vote, not born, raised, or educated in the United States, and had never made a political contribution or donation.  There was essentially no direct evidence that he was aware of any prohibition on donations by foreign nationals or straw donors, or what either prohibition entailed.  Nor was there any evidence, direct or otherwise that he knew of the existence of the FEC, much less its purpose or function.  This was fatal to the government's prosecution of Kukushkin, so the government relied instead on speculation, conjecture and a misstatement of the law seemingly intended to inflame the jury.

Specifically, the government argued to the jury that willfulness was established by proof of a "bad purpose", established here by the fact that Kukushkin was a Russian ally and bad American, who attended Trump rallies and bribed public officials.  *See* Tr. 1317-1318:19 (Gov't Summation).

#### a)   *Use of Andrey Muraviev's Profile Photo*

The centerpiece of the government's argument was Muraviev's profile picture, which was enlarged on the video monitors for the jury.  GX 1212; Tr. 1318:4-8 (Gov't Summation).  As noted, *supra,* the picture is a primitive folk-style painting by Vladen Gavrilchick, a well-known and important artist from the Leningrad underground.  He is a former naval officer who graduated from the High Naval School in Leningrad.  At first glance the painting seemingly depicts an individual "mooning" the Statue of Liberty.  GX 1212.  The government took great offense at this depiction and suggested the jury should as well.  Indeed, it argued:

> This is Muraviev's image for himself, a picture of someone mooning the Statue of Liberty, and Kukushkin is helping this guy put a million dollars into U.S. elections? There is no way Kukushkin doesn't know he's doing something with a bad purpose.

Tr. 1318:4-8 (Gov't Summation).  In other words, Kukushkin and Muraviev do not like the United States so they must be guilty.  But this is America and except in exceptionally rare circumstances that are not present here, it is not a crime to think critically or even disdainfully of our government.  Moreover, it may well be that it was intended as a patriotic commentary on the Trump administration's immigration policies.  In any event, using a photograph that one may consider representative of such a view is not tantamount to criminal intent.  That is the beauty of our country and our constitution.  Nor was the government's argument a proper recitation of the legal standard.

But more to the point, a bit of research using one of the government's countless Russian translators would have discovered that the government's argument – as improper as it was on its face – had no basis in fact.  Gavrilchick, the famous artist who painted the picture and whose works have been found at Sotheby's, the State of Tretyakov Gallery, the Russian Museum, and the Hermitage, has devoted his artistic works to the norms and anomalies of Soviet life.  His works have been described as satirical in nature and predominated by "irony, parody, and the grotesque" and "politicized".  They are known to portray the gloomy realities of **Soviet life** and present stereotypical images of **that** nation's people and rituals.  In other words, they are not meant to be a commentary on the United States.[17]

Thus, the government's rush to cast Kukushkin as a "bad guy" acting with a "bad purpose", without any due diligence, just as it did with respect to the stricken Times Square video, not only resulted in a legally incorrect argument to the jury, but a highly improper and inflammatory one that substantially prejudiced Kukushkin, as was the government's sole intent.

---

[17]https://artinvestment.ru/en/invest/artistofweek/20171211_vladlen_gavrilchik_auction_prices.html; https://beautybellezzabeaute.wordpress.com/2016/11/09/vladlen-gavrilchik/; https://www.sothebys.com/en/auctions/ecatalogue/2008/russian-art-n08428/lot.308.html.

    *b)*    ***Attendance at the Elko and Las Vegas Rallies***

As discussed above, the government then compounded matters with an equally offensive and absurd argument that Kukushkin's appearance as a full fledge supporter at the Trump and Pence Elko and Las Vegas Rallies, even though he was "apolitical", further meant he was acting with "bad purpose" from which the jury should infer he was acting willfully and thus guilty.  Tr. 1317:12-15 (Gov't Summation).  This argument too was improper, legally without merit, and factually baseless.

    *c)*    ***Bribery Arguments***

Finally, the government subtly wove into its bad purpose argument that, although charged with federal election law violations, Kukushkin was really engaged in a bribery scheme aimed at paying off politicians for cannabis licenses.  From this claim (there was no evidence) the government improperly urged the jury to infer that Kukushkin acted willfully with respect to the Foreign Donor Scheme.  Tr. 1337:24-1338:3 (Gov't Summation).  In other words, the government improperly argued that Kukushkin is an unseemly cannabis operator guilty of many offenses – even if not charged – and so you should find him guilty.  It goes without saying that this amounts to improper and highly prejudicial government misconduct.

### 2. The Russian Roots Email (GX 137)

GX 137 has been at the center of this prosecution since its inception.  The defense's position from day one was that there was nothing sinister or nefarious about the statements in the email, Kukushkin was simply expressing his concerns about the political paranoia rocking the country at the time due to the Mueller investigation.  At each turn, the government resisted the argument.  In its decision denying Kukushkin's motion to suppress, and adopting the government's view, the Court credited his innocent explanation as possible and suggested it was

one that could be made at trial. Kukushkin advanced the argument at trial, along with the fact that Kukushkin's inclusion of counsel on the email itself demonstrated a clear lack of criminal intent.

In its summation, the government seemingly shifted its entire theory and suggested that Kukushkin's statement was now an explanation designed as cover for the benefit of the attorneys on the email – to explain why Muraviev would not be included. The government's conduct was problematic for two reasons: (1) had it taken this position initially it is unclear if the Court would have admitted GX 137 at trial or even signed any of the search warrants in which it was cited; and (2) although we agree it was entirely innocent, there is no basis whatsoever to take the leap that the email was a cover-up. The prejudice, particularly given the depths to which this email has permeated these proceedings is substantial.

### G.  The Court Should Grant a New Trial Based on the Prejudice to Kukushkin Resulting from the Cumulative Impact of the Trial Errors

To the extent the Court does not find any one of the above-discussed errors alone sufficient to grant a new trial, the Court should grant a new trial because the cumulative impact of the errors prejudiced Kukushkin. Under Rule 33's broad discretionary "interest of justice" standard, courts may consider the impact of all harmless errors "and analyze[] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless". *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007) (internal quotations omitted); *see also United States v. Gabinskaya*, 829 F.3d 127, 134-35 (2d Cir. 2016). Cumulative error analysis requires a court to consider the impact of issues that, when considered in the totality, "cast a shadow on the verdict's integrity". *United States v. Baptiste*, 8 F.4th 30, 39-40 (1st Cir. 2021) ("'Individual errors, insufficient in themselves to necessitate a

new trial, may in the aggregate have a more debilitating effect' and thus add up to prejudice".).

The cumulative effect of all the errors, when grouped together, prejudiced Kukushkin's trial.


### POINT FOUR

**KUKUSHKIN SEEKS LEAVE TO JOIN IN THE MOTIONS OF HIS CO-DEFENDANT THAT INURE TO HIS BENEFIT**

We respectfully seek leave for Kukushkin to adopt, incorporate by reference, and join in all motions of his co-defendant, Lev Parnas, that inure to his benefit and are not inconsistent herewith.

50

## CONCLUSION

For all of the reasons set herein, as well as those set forth at trial and contained in the

motions of Parnas, Andrey Kukushkin respectfully requests that the Court set aside the verdicts

and enter a judgment of acquittal, pursuant to Fed R. Crim. P. 29(c) on Counts One and Three or

in the alternative order a new trial pursuant to Fed R. Crim. P. 33(b)(2) on each count, along with

any other or further relief which to the Court seems just and proper.

Dated:  December 9, 2021
        New York, New York

                            Respectfully submitted,

                            GERALD B. LEFCOURT, P.C.


                            By /s/  Gerald B. Lefcourt
                                Gerald B. Lefcourt (GBL 5030)
                                Faith A. Friedman (FAF 6066)


                            1776 Broadway, Suite 2000
                            New York, N.Y. 10019
                            Tel: (212) 737-0400
                            Fax: (212) 988-6192 fax
                            Email:  Lefcourt@lefcourtlaw.com
                            *Attorneys for Andrey Kukushkin*