```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                   :
UNITED STATES OF AMERICA
                                                   :
            - v. -
                                                   :   S3 19 Cr. 725 (JPO)
ANDREY KUKUSHKIN,
                                                   :
                        Defendant.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys
    - *Of Counsel* -

The Government respectfully submits this letter in advance of the sentencing of Andrey Kukushkin scheduled for March 15, at 2 p.m.  As the Court is aware, Kukushkin now stands convicted for his pivotal role in scheming to funnel one million dollars in foreign contributions to be given to American political candidates, thereby trying to corrupt U.S. elections to advance his own financial interests.

In seeking a non-custodial term, Kukushkin principally rehashes arguments that were made to, and rejected by, the jury at trial, among them that he never agreed to help channel Andrey Muraviev's money to U.S. political candidates, but was only helping to fund a legal cannabis venture, and that he was unaware of any U.S. election laws.  These self-serving arguments, which are contradicted by the trial record, as the Court recently concluded in denying Kukushkin's post-trial motions, emphasize the glaring lack of any acceptance of responsibility for the harms he caused to the American public in seeking to corruptly influence U.S. elections.  For the reasons set forth below, a sentence within the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 51 to 63 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

I. **THE OFFENSE CONDUCT**

As the Court is well aware, Kukushkin conspired to illegally donate one million dollars of Russian oligarch Andrey Muraviev's money to candidates in United States federal and state elections.  Kukushkin played a key role in working with Muraviev to fund and facilitate the making of these illegal political contributions in an effort to benefit a future cannabis business venture with Muraviev, Parnas, Fruman and Correia.  In particular, one of the purposes of the donations was to help them secure valuable cannabis licenses from state authorities.  (*See* PSR ¶¶ 19-28).  When Muraviev agreed to fund these political contributions, he transferred his money to a bank account controlled by Fruman's brother—and unconnected to the cannabis business that the contributions

1

were intended to support—in order to help conceal the illegal foreign origin of Muraviev's funds. (*See* PSR ¶¶ 20-30).

From the beginning of their venture, Kukushkin worked to provide Muraviev's money for illegal political contributions, and Parnas and Fruman worked to secure the political connections and make donations that would benefit their business venture. In mid-June 2018, when Kukushkin and Fruman exchanged updates on their mutual progress, Fruman replied that he and Parnas were "working Washington" and subsequently sent Kukushkin a series of photographs of Fruman and Parnas with political figures, including former President Donald J. Trump. (*See id.* ¶ 20). Referencing the importance of Muraviev's financial backing, Kukushkin exchanged knowing jokes about how Muraviev (and his money) was necessary given that the politicians Fruman and Parnas met were "raking it in just for an appointment." (*Id.*).

Over the course of the summer and fall of 2018, Kukushkin repeatedly told the group in no uncertain terms that Muraviev's money was intended for political donations, and that Parnas and Fruman would be writing the "checks" for these illegal donations, not him or Muraviev: "Leva, the money where wired to Global Energy in order cover all the donations whatsoever" (GX 86); "please allocate 10% of the existing donation funds" (GX 54); "We were supposed to tell him that the check(s) from Global are indeed the donations from us" (GX 86); "I believe we all have a . . . precise course of action . . . Money transferred by Andrey M to Global was to support the very specific people & states (per Igor's table) in order to obtain green light for licensing" (GX 83); "We do not pay for anyone's political ambitions or lobbyists at all. We get a license, they get a bonus." (GX 24).

In service of buying influence with U.S. politicians for their joint cannabis venture, Kukushkin also spent his time attending campaign rallies and taking pictures with the politicians

he hoped to contribute to in order to further the group's intended objectives. For example, in early September 2018, Fruman, Parnas, Correia, Kukushkin and Muraviev met in Las Vegas, and while there, Fruman, Parnas and Kukushkin attended a political fundraiser for Adam Laxalt, who was then the Attorney General of Nevada and was running for Governor. While the group had initially planned for all five individuals to attend the event, after they were asked to provide attendee information, only Kukushkin, Fruman, and Parnas (all United States citizens) attended. (*See* PSR ¶ 22).

Following the trip to Las Vegas, Parnas and Fruman repeatedly requested funds from Kukushkin and Muraviev for political donations, including to Laxalt and Wes Duncan, who was then running for Attorney General of Nevada. (*Id.* at ¶¶ 22-23 (*See, e.g.*, GX 58 (chat exchange including SIG list, GX 146, noting donations as "committed" but not yet "paid" to Laxalt and Duncan, among others))). After receiving those requests, and consistent with the group's joint understanding, Muraviev and Kukushkin did in fact have $1 million of Muraviev's money transferred to Parnas and Fruman to pay for political donations. (*Id.* at ¶¶ 22-27; *see, e.g.*, GX 73 (chat exchange wherein Kukushkin explains "the money was transferred ~$1M to Lev & Igor's company a long time ago to cover all the contributions as planned.")).

Ultimately, the group's scheme resulted in over $150,000 of Muraviev's money being donated to candidates in the 2018 election cycle. These donations included the group steering $50,000 of Muraviev's money to Friends of Ron DeSantis, who was then running for Governor of Florida. After election day came, one part of the defendants' plan became a reality as Ron DeSantis was elected the Governor of Florida. Kukushkin congratulated the group on the victory, believing it would result in the valuable cannabis licenses they desired for their joint venture. (*See* PSR ¶ 27).

## II. THE GUIDELINES CALCULATION

### A. The Probation Office Calculations

On October 10, 2019, Kukushkin was arrested for the above conduct. (PSR ¶ 32). On October 22, 2021, a jury found him guilty of conspiring to make campaign contributions by a foreign national, in violation of 18 U.S.C. § 371, and aiding and abetting the making of contributions by a foreign national, in violation of 52 U.S.C. §§ 30121 and 30109(d)(1)(A) and 18 U.S.C. § 2.

The Probation Office calculates the defendant's advisory Guidelines range as follows:

- Pursuant to U.S.S.G § 3D1.2, Counts One and Three are treated as a single group ("Group One"). (PSR ¶ 53).

- The Sentencing Guideline applicable to Group One is U.S.S.G. § 2C1.8(a). (PSR ¶ 54).

- Pursuant to U.S.S.G. § 2C1.8(a), the base offense level for Group One is 8. (*Id.*)

- Pursuant to U.S.S.G §§ 2B1.1(b)(1)(H) and 2C1.8(b)(1), because the value of the illegal transactions was more than $550,000 but not more than $1,500,000, the offense level is increased by 14 levels. (PSR ¶ 55).

- Pursuant to U.S.S.G §§ 2C1.8(b)(2)(A), because the offense involved an illegal transaction made by or received from a foreign national, the offense level is increased by 2 levels. (PSR ¶ 56).

- Accordingly, the Guidelines offense level applicable to Group One and the total offense level are 24. (PSR ¶ 56).

The Probation Office calculated that the defendant had no criminal history points, resulting in a criminal history category of I. (*See* PSR ¶ 66). Based upon these calculations, the Probation Office calculated Kukushkin's Guidelines range to be 51 to 63 months' imprisonment. (*See* PSR p. 35).

### B. The Probation Office Correctly Calculated the Loss Enhancement

Kukushkin challenges the Probation Office's calculation, asserting that his total offense level should be 10 rather than 24 because the proper value of the illegal transactions was at most $136,000. (Def. Mem. 24-26).[1]

Contrary to Kukushkin's unsupported arguments, the documentary and testimonial evidence at trial established that the Kukushkin agreed to make $1 million in illegal campaign contributions. Kukushkin and Muraviev corresponded directly, and in larger groups, about the intended donations and these chats made clear that Kukushkin agreed that $1,000,000 of Muraviev's money would be used for political donations as outlined in the group's charts. (PSR ¶¶ 19-27; *see, e.g.*, GX 45 (Kukushkin, Muraviev, and Mikhalev discussing transfer of first $500,000 to Parnas and Fruman based on list of proposed donations); GX 83 (Kukushkin, Muraviev, and others discussing agreement to use Muraviev's funds to support candidates identified in "Igor's table")). Indeed, Kukushkin ignores his own words where he stated in no uncertain terms that "the money was transferred ~$1M to Lev & Igor's company a long time ago to cover all the contributions as planned." (GX 73). Given Kukushkin's conviction for conspiracy, it is irrelevant whether the full $1 million was used to make the illegal campaign contributions because the defendants' plan as explicitly and repeatedly outlined, and which Kukushkin agreed to, was to pour a million dollars of Muraviev's money into U.S. elections. Accordingly, the correct

---

[1] In fact, Kukushkin contends that the sum should be zero, because he did not conspire to make these contributions. (Def. Mem. 24-26). The jury rejected that argument in convicting him, and the Court rejected the argument in its recent ruling on Kukushkin's post-trial motions.

value of the illegal transactions to which Kukushkin's agreed is $1 million, which results in a 14-level enhancement pursuant to U.S.S.G. §§ 2B1.1(b)(1)(H) and 2C1.8(b)(1).

### C. The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Office recommends a sentence of 18 months' imprisonment. (PSR pp. 35-37).

### III. DISCUSSION

Consideration of the factors set forth in 18 U.S.C. § 3553(a) militates strongly in favor of a Guidelines sentence in this case.

### A. The Defendant's Criminal Scheme

The nature and circumstances of Kukushkin's crimes warrant a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(1). Kukushkin played a key role in working with Muraviev to transfer one million dollars to Parnas and Fruman, for the express purpose of using that money to influence U.S. elections. As with the other U.S. businesses that Kukushkin ran with Muraviev's money, Kukushkin was the main correspondent brokering the exchanges between Fruman and Parnas and Muraviev to further their scheme. Throughout their conspiracy, Kukushkin expressly proclaimed "we all have a clarity from day 1" on the "precise course of action" for the "[m]oney transferred by Andrey M" to be used "to support" the proposed campaign contributions outlined in the group's charts. (GX 83). He repeatedly emphasized to Parnas and Fruman how important Muraviev's money was to the success of their venture, and correspondingly, how important he was as Muraviev's main business associate in the U.S. market. And when Parnas and Fruman were anxiously waiting for Muraviev to transfer the remaining $500,000, it was Kukushkin who forwarded a detailed chart of proposed campaign contributions to Muraviev and urged him to send

the remaining money to them. (GX 45). A few days later, Muraviev approved the transfer of the remaining $500,000 the group had previously agreed upon. In short, Kukushkin was instrumental in bringing both sides of the equation together to run the group's scheme to influence U.S. elections with foreign money, and should receive the recommended sentence for that serious crime.

Kukushkin paints himself as an innocent businessman who only wanted to build "a lawful cannabis business," but, incredibly, "was in the wrong place at the wrong time" when he was victimized by Parnas and Fruman. (Def. Mem. 2-3, 16-19). Kukushkin was far from an innocent businessman who fell victim to circumstance: the evidence at trial shows that Kukushkin was an eager and pivotal participant in the scheme to funnel $1 million dollars of Russian oligarch money into U.S. elections. Kukushkin's efforts to hide behind his claimed desire to build a "lawful cannabis business" fare no better. Setting aside the fact that Kukushkin invested none of his own money toward this "lawful cannabis venture," as the Court saw at trial, the entire $1,000,000 of Muraviev's money was expressly earmarked for political contributions—which Kukushkin unequivocally endorsed and agreed to—to benefit the group's business venture. (*See, e.g.*, PSR ¶¶ 24-27; GX 33, 61). And Kukushkin was no victim of Parnas and Fruman: even though Parnas and Fruman repurposed Muraviev's money to pay off credit card bills for luxury travel, golf outings, and the like, that does not negate, or even mitigate, Kukushkin's earnest effort to illegally influence U.S. elections in service of the group's cannabis venture. (*See* GX 1403 (tracing expenditure of Muraviev's funds)).

Kukushkin also uses his alleged political naivete, including the fact that he has never voted or donated in his own name, to avoid accepting responsibility for his blatant criminal conduct. (Def. Mem. 2-3, 16). But the evidence adduced at trial, proved that Kukushkin knew very well that it was illegal to donate money to political campaigns in someone else's name. The most devastating evidence at trial that flatly contradicts Kukushkin's narrative came in the form of a news article that Kukushkin forwarded to Muraviev, which described using a "conduit" to "mask

the actual sources of . . . political contributions" as illegal. (GX 30-A-1). What is more, the article described the alleged users of the illegal conduit as Parnas and Fruman, and the conduit as GEP. That is, Kukushkin was so undeterred to learn that Parnas and Fruman were being investigated for illegal donations, that he went ahead and intentionally worked with them on a similar scheme. Kukushkin arranged to have Muraviev's money transferred to the exact same conduit entity, GEP, "in order to cover all the donations whatsoever." (GX 86). This was not naivete, but cynicism: Kukushkin attended political rallies, posed in photos with politicians, and wore a "Make Our Farmers Great Again" hat, while privately joking to Muraviev about how he was buying influence. (GX 74.) Kukushkin's lack of interest in politics is not a mitigating factor. Instead, it shows that rather than having any interest in matters of public concern, Kukushkin wanted only to illegally purchase influence to advance his financial interests. (*See, e.g.*, GX 24 ("We do not pay for anyone's political ambitions or lobbyists at all. We get a license, they get a bonus.")). In short, despite knowing full well the criminal nature of the conduct, Kukushkin dove headfirst into his criminal partnership with Muraviev, Parnas and Fruman, which demonstrates that he believed he was above the law and serves only to underscore the necessity of a substantial term of imprisonment.

### B. The Need to Reflect the Seriousness of the Offense

Kukushkin should also receive a Guidelines sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Kukushkin's offense was particularly serious in at least two respects. First, illegal campaign contributions corrupt our elections. Straw donations undermine the transparency of elections, and allow individuals to have oversized influence. Foreign contributions interfere with our democratic institutions by permitting outside actors to influence or attempt to influence election outcomes. Even when contributions are relatively small or cannot be directly tied to an

election outcome, the crime is serious. As Judge Sullivan, then sitting in this District, explained when imposing a Guidelines sentence for a vastly smaller crime, "the damage done" by illegal campaign contributions "in adding to what could fairly be characterized as public cynicism over this process is incalculable . . . it's a very serious crime for that reason because it makes people shrug and say the system is corrupt." *United States v. Pan*, 12 Cr. 153 (RJS), Dkt. 204 at 31. Here, the amount of money involved was substantially greater than many other campaign finance prosecutions, and therefore a lengthier sentence is appropriate.

Second, it is clear from Kukushkin's own words to his co-conspirators that he believed he was committing a more serious crime than simply making unlawful donations. He believed he was *buying* political influence and governmental action. (*See, e.g.*, GX 77 (Kukushkin to Muraviev: "Currently Las Vegas doesn't accept any more applications . . . with the help of our 'new friends,' we shall get a guaranteed response before mid-December!"), GX 78 (Kukushkin bragging to Muraviev that "[t]hey control the whole State police, just in case :)")). That belief makes this crime significantly more serious than a situation where an individual simply exceeded contribution limits. And therefore, his conduct demands a sentence that reflects the extent, scope, and motivation for the offense. *See United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 46 ("Only if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath.").

Kukushkin claims the damage to his business investments and reputation from the negative publicity generated by this case suffice to provide just punishment. Far from it. Although Kukushkin's earnings and business reputation no doubt suffered harm from this case, few people would recognize that as just punishment for the serious crimes here, especially when Kukushkin's

chief concern is maintaining a role in the regulated cannabis industry in spite of his convictions. *See Binday*, Dkt. 349 at 45 (explaining need for sentence to show that "this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years"). Moreover, it appears Kukushkin's business reputation would have nevertheless suffered as a result of a civil suit in the cannabis industry, which predated his arrest in this case. While Kukushkin is the plaintiff in that lawsuit, he is accused in a cross-claim complaint of breaching his fiduciary duties and alleged to have mismanaged the company's assets and failed to file any tax returns. (*See* PSR ¶¶ 112, 115).[2] Accordingly, the collateral consequences to Kukushkin's business investments do not warrant any mitigation of the substantial sentence Kukushkin's serious criminal conduct merits.

### C. The Need to Afford Adequate Deterrence and Protect the Public

A substantial sentence within the Guidelines range is also necessary to promote deterrence. *See* 18 U.S.C. §§ 3553(a)(2)(B) and 3553(a)(2)(C). General deterrence is arguably the most important factor this Court should consider in imposing sentence in cases such as this where the conduct was deliberate, sophisticated, and meticulously concealed. That is particularly true where,

---

[2] During his deposition in that lawsuit, Kukushkin admitted that Muraviev was financing the entire lawsuit.

Curiously, Kukushkin reported to the Probation Office that he is employed by Next Phase Holdings LLC, and vaguely explained that while he did not receive a salary he was compensated through "certain reimbursements and allowances that he is given as a result of his managerial role and the oversight he provides to the construction sites." (*See* PSR ¶¶ 85, 105). These reimbursements include paying the lease for an apartment Kukushkin rents in San Francisco equivalent to approximately $5800 a month. (*See id.*). While he does not identify who his employer is that is paying for his "personal household expenses" and lodging, as established during trial, the financial backer for Next Phase Holdings was also Muraviev. (*See* Tr. 176-77; GX 801). Given this financial arrangement, which has existed since at least 2016 when Next Phase Holdings was created, it strains credulity to believe that Kukushkin had no taxable income from 2016 to 2020. (*See* PSR ¶ 117).

as here, Kukushkin and his co-conspirators took numerous steps to conceal their conduct and made their crimes particularly difficult to detect. Among other things, Kukushkin and his co-conspirators had Muraviev's money wired from overseas corporate bank accounts, none of which were in Muraviev's name, which made it more difficult to trace the money and tie the scheme back to Muraviev. They also papered the transfers as a "loan" to Fruman's brother's business, while failing to mention any of the parties involved or that the money was even for their joint cannabis business. (PSR ¶ 28). To achieve general deterrence and respect for the law in a case of this nature, there is simply no substitute for prison time. As Judge Jed S. Rakoff explained in sentencing an insider trading defendant who the court believed would personally never re-offend, "[o]thers similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012); *see also, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (same); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)). Given the deliberate and sophisticated lengths Kukushkin and his co-conspirators took to commit their crimes, a substantial term of imprisonment is necessary to send a strong message to those who might be tempted to engage in similar conduct that the risks, if they are caught, will include serious prison time.

This Court should also reject Kukushkin's claim that his age suffices to prevent recidivism. (Def. Mem. 20-21). To start, even if that were so, it would not eliminate the need for general deterrence. *See Gupta*, 904 F. Supp. 2d at 355. And given that the defendant began committing the instant crime at age 46, having now turned 50 cannot provide much assurance that age has changed his ways. General statistics about age correlating with a lower risk of recidivism upon release does not prove that in Kukushkin's case he will not re-offend, particularly as he committed the instant offense well outside the age range where immaturity and foolishness could afford some explanation. Indeed, despite not having any criminal convictions that count toward his criminal history score, from age 25 to 33, Kukushkin had no less than five arrests for crimes running the gamut from trespassing to loitering with the intent of engaging in prostitution. (PSR ¶¶ 69-73). While the details of these arrests are unavailable, what is clear is that Kukushkin was no stranger to criminal law enforcement well into a mature age and maintained that disregard for the law through the criminal conduct that brought him before this Court. Even when faced with an article that his partners in crime were being investigated for a similar illegal contribution scheme, Kukushkin barreled forward undeterred. His criminal actions, despite understanding he was exposed to an enormous risk of prosecution, demonstrate his blatant contempt for the law. And his continued insistence that he was the unluckiest rube who was in the "wrong place at the wrong time" makes plain that he views this case as an inconvenience to evade, and not an opportunity for reformation. (Def. Mem. 2). Thus, although general deterrence remains the primary concern, this Court should not take for granted that Kukushkin will not re-offend if given the slap on the wrist he requests.

Kukushkin also briefly asserts that he should receive a lenient sentence because the certainty of apprehension provides greater deterrence than the length of sentences. (Def. Mem.

21-22). Although this Court referred to that general approach when imposing a below-Guidelines sentence on Fruman, it has little application to Kukushkin. Unlike Fruman, Kukushkin deliberately kept his name off of any filings related to the political donations at the center of this case, which made the detection and punishment of his criminal conduct far from certain and weighs in favor of a lengthier sentence. Moreover, and more importantly, Kukushkin refused to admit responsibility even after he was caught, denying guilt even in the face of his own documented words. That is to say, Kukushkin tried to make the justice system seem as *uncertain* as possible for those who might be similarly situated and tempted to follow in his footsteps. Having failed in in effectively concealing his crimes or evading responsibility, he cannot reasonably turn around and plead for lenience on the grounds that getting caught matters is what matters most. In fact, the source Kukushkin cites acknowledges that longer sentences can have some deterrent effect. (Def. Mem. 22 n.3 (citing https://www.ncjrs.gov/pdffiles1/nij/247350.pdf). Thus, even if the most important factor in general deterrence is the efforts of law enforcement in catching criminals, Kukushkin cannot claim that the judiciary should leave undone whatever additional contribution it can make by fully punishing those who seek to evade responsibility, but fail.

   D. **History and Characteristics of the Defendant**

Kukushkin's history and characteristics provide no mitigation or excuse for his conduct and are not a reason to depart or vary from the Guidelines. What emerges from Kukushkin's submission is a picture of a defendant who, despite a challenging childhood in Ukraine, managed to become a U.S. citizen and to attain significant success and wealth. He also was blessed with a loving and supportive family. (Def. Mem. 6-14; PSR ¶¶ 77-80). Nonetheless, despite significant financial success and a loving family, Kukushkin held himself above the law in scheming to funnel one million dollars in foreign money to American political candidates. Kukushkin was fortunate enough to have had multiple avenues to earn an honest living, but he chose to participate in a

criminal conspiracy geared toward corrupting U.S. elections in order to advance his own financial interests, and for that conduct a substantial term of imprisonment is warranted.

Kukushkin claims that his incarceration will impose burdens on his family and his fiancée's family. (Def. Mem. 9-15). This is unfortunately likely to be true, as it is in the case of every defendant who chooses to commit a felony. For that reason, courts will not typically consider a defendant's claim of family hardship at sentencing absent truly "extraordinary" circumstances. *See United States v. Nivar*, 2003 WL 21488061, at *4 (S.D.N.Y. June 26, 2003) (collecting cases); *cf.* U.S.S.G. § 5H1.6 ("family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted"). Kukushkin has not identified any facts so extraordinary as to defeat that rule: Although his father is very ill, his mother, his brother, and his fiancée are all capable of assisting his father in Kukushkin's absence. (PSR ¶ 75). In addition, while Kukushkin shares joint custody of his son, his son is in boarding school in Virginia and his mother is still a part of his life. (PSR ¶¶ 82-84). Similarly, Kukushkin's fiancée and her daughter came to the United States approximately two years ago. Since at least that time, she has been aware of Kukushkin's criminal case and its potential collateral consequences. (PSR ¶¶ 88-89). While she undoubtedly relies on Kukushkin for emotional support, she appears to have been able to secure employment and contributes significantly to the family's monthly income. (PSR ¶ 110). That Kukushkin's crimes will also cause his family and his fiancée's family to suffer is unfortunate, but it cannot allow Kukushkin to escape just punishment.

Nor do Kukushkin's claims about his good deeds, including most recently with respect to the events unfolding in Ukraine, rise to a level meriting any leniency. (*See* Def. Mem. 13). Although Kukushkin's willingness to take in and help care for his fiancée's mother who recently fled the fighting in Ukraine is laudable, it does not rise to the extraordinary character that the law

requires. *See* U.S.S.G. § 5H1.11 ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (requiring "exceptional degree of public service and good works" under § 3553(a)); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence."). Similarly, the good deeds he has performed for his friends and family and his recent engagement in civic discourse are not the sort of exceptional service and generosity that distinguish Kukushkin from other defendants that appear before this Court and thus should not warrant any leniency for the crimes Kukushkin has committed.

Finally, as previously discussed, while Kukushkin has no prior criminal convictions that count toward his criminal history, his criminal record is far from unblemished. Despite those brushes with the law, Kukushkin continued on his criminal path and engaged in the far more sophisticated and deleterious conduct that led to his current convictions. Again, he did this in spite of his great fortune in life—motivated by nothing except for his own self-interest and greed. In sum, while the Government submits that the focus of sentencing should rest on his crimes, the defendant's history and characteristics only further indicate that a substantial term of imprisonment is necessary and appropriate.

### E. Relative Culpability

Kukushkin further claims that because "Fruman and Correia are substantially more culpable and engaged in substantially more criminal conduct" than Kukushkin, he should receive a "substantially more lenient sentence than either of them." (Def. Mem. 22-24). To be sure, Correia and Fruman were charged with more counts and with separate criminal conduct than Kukushkin, and the evidence at trial showed that Fruman repurposed Muraviev's money for his own personal benefit. But Fruman and Correia did not plead guilty to most of the bad acts Kukushkin lists, nor did this Court consider those acts in sentencing them, meaning that the important facts for purposes of relative culpability are not Kukushkin's allegations, but the sentencing conduct. Focusing on the only conduct that matters for relative culpability, the conspiracy to make illegal contributions using a foreign national's money, the evidence at trial proved that Kukushkin's conduct was more serious than Correia's and at least on par with Fruman's.

While Correia was an active participant in the development of the joint cannabis venture and contributing to the group's contribution list, Correia followed Parnas and Fruman's instructions and was not on the front line communicating the demands for Muraviev's money or facilitating the donations. In comparison, Kukushkin was an active, pivotal participant in all of the group's discussions about their plans and intentions for their joint venture and how the illegal contributions would serve their interests in obtaining those valuable cannabis licenses. (*See, e.g.*, PSR ¶¶ 22-24). And when push came to shove in securing the second $500,000 tranche that Muraviev owed toward the group's endeavor, it was Kukushkin who forwarded the group's contribution list and urged Muraviev to complete his commitment, which he did. (*Id.* at ¶ 26; GX 45). As Kukushkin himself acknowledged to the group, Muraviev's financial backing was

essential to the success of the group's criminal venture, and Kukushkin played an instrumental role in bringing Muraviev's money to the table. (*See, e.g.*, PSR ¶ 20).

For similar reasons, Kukushkin's conduct is at least on par with that of Fruman, who played a lead role in soliciting and pressuring the Russian side of the conspiracy to send the $1 million to illegally distribute to American political candidates. While Fruman (and Parnas) were primarily responsible for soliciting and orchestrating the political donations, Kukushkin played no less of a pivotal role in cementing the group's objectives for the ultimate goal of these illegal contributions. (*See, e.g.*, GX 24 (chat exchange "We do not pay for anyone's political ambitions or lobbyists at all. We get a license, they get a bonus.")). As such, the record flatly contradicts that Kukushkin merits a sentence "substantially more lenient" than Correia or Fruman.

Finally, Kukushkin obviously differs significantly from Fruman and Correia in that he has never taken responsibility for his conduct. While they admitted their wrongs and expressed remorse, Kukushkin continues to deny responsibility despite painfully clear documentary evidence—much of it in his own words—proving his guilt. That distinction is captured in the greater Guidelines range to which Kukushkin is exposed, as well as in the § 3553(a) factors: A defendant, like Kukushkin, who brazenly denies his obvious guilt is more likely to re-offend and does far less to ensure respect for the law than defendants who admit what they have done and that it was wrong.[3]

---

[3] Kukushkin also cannot reasonably complain of a "trial penalty." (Def. Mem. 27-28). He never faced the type of mandatory minimum sentence sometimes faulted in this context, nor did he "put the Government to its proof" in order to test a novel legal theory or dubious evidence. He simply chose—unlike Fruman and Correia—to show no remorse, hoping for a miscarriage of justice that the jury refused to grant him.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range of 51 to 63 months' imprisonment and a $20,000 to $200,000 fine would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
March 8, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:  /s/_____
Aline R. Flodr
Nicolas Roos
Hagan Scotten
Assistant United States Attorneys